1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
2                              HOUSTON DIVISION

3
ANTHONY G. PETRELLO,                )
4            Plaintiff,             )
                                    )
5   V.                              )
                                    )
6   MATTHEW W. PRUCKA,              )         NO. H-08-CV-1933
    SHERYL S. PRUCKA,               )         FEBRUARY 23, 2010
7   PEGGY McGEE and TEXAS           )
    HERITAGE PROPERTIES, LP,        )
8            Defendants,            )
                                    )
9   and                             )
                                    )
10  RAHUL NATH and USHA NATH,       )
             Defendants and         )
11           Intervenors.           )

12

13              TRIAL BEFORE THE HONORABLE DAVID HITTNER
                            AND A JURY
14
                            VOLUME 1
15                        PAGES 1 - 247

16

17

18   For the Plaintiff         Ms. Lynn Liberato
                               Haynes and Boone, LLP
19                             1221 McKinney, Suite 2100
                               Houston, TX  77010
20
                               Mr. David H. Berg
21                             Berg & Androphy
                               3704 Travis
22                             Houston, TX  77002

23                             Mr. George R. Gibson
                               Nathan Sommers Jacobs, PC
24                             2800 Post Oak Blvd., 61st Floor
                               Houston, TX  77056
25

```
 1   For Defendants             Mr. Murray J. Fogler
     Matthew W. Prucka and      Mr. Alex B. Roberts
 2   Sheryl S. Prucka           Beck Redden & Sechrest, LLP
                                1221 McKinney, Suite 4500
 3                              Houston, TX  77010

 4   For Defendants             Mr. Emilio F. DeAyala
     Peggy McGee and Texas      Buck, Keenan, Gage, Little,
 5   Heritage Properties          Lindley & DeAyala, LLP
                                700 Louisiana, Suite 5100
 6                              Houston, TX  77002

 7   For Defendants and         Mr. Guy E. Matthews
     Intervenors Rahul Nath     The Matthews Firm
 8   and Usha Nath              2000 Bering Drive, Suite 700
                                Houston, TX  77057
 9
                                Mr. John Wesley Raley, III
10                              Raley & Bowick, LLP
                                1800 Augusta, Suite 300
11                              Houston, TX  77057

12   Court Reporter             Bruce Slavin, RPR, CM

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings reported by mechanical stenography and produced
25   by computer-aided transcription.
```

<pre>
 1                          I N D E X

 2

 3                                                    Page

 4

 5   Opening Statement by Mr. Berg                     6

 6   Opening Statement by Mr. Fogler                  17

 7   Opening Statement by Mr. DeAyala                 23

 8   Opening Statement by Mr. Raley                   26

 9

10   ANTHONY G. PETRELLO

11   Direct Examination by Mr. Berg                   29
     Cross-Examination by Mr. Fogler                 113
12   Cross-Examination by Mr. DeAyala                138
     Cross-Examination by Mr. Raley                  151
13   Redirect Examination by Mr. Berg                183
     Recross-Examination by Fogler                   195
14   Recross-Examination by DeAyala                  196
     Recross-Examination by Raley                    198
15   Redirect Examination by Mr. Berg                198

16

     MATTHEW PRUCKA
17
     Direct Examination by Mr. Berg                  202
18

19

20

21

22

23

24

25
</pre>

```
 1            MR. FOGLER:  We do have an issue that we need to
 2   take up at some point.  It doesn't have to be --
 3            THE COURT:  What's that?
 4            MR. FOGLER:  It's the issue of whether we're going
 5   to try attorneys' fees to the jury or not.
 6            THE COURT:  Whatever you want to do.
 7            MR. FOGLER:  Well, we would like to have it go to
 8   the jury.  They have --
 9            THE COURT:  What's the law on that?
10            MR. GIBSON:  Your Honor, we're finishing our brief
11   right now, but my understanding of the law is that, under
12   the Fair Housing Act, because they're attorneys' fees as
13   costs, they're submitted to Your Honor.  We're not seeking
14   attorneys' fees as damages under the Fair Housing Act.
15            THE COURT:  Okay.
16            MR. RALEY:  Your Honor, this is one of those rare
17   instances in which --
18            THE COURT:  Hands out of your pocket, please.
19            MR. RALEY:  -- I agree with Mr. Berg.
20            THE COURT:  We'll do it later.
21            MR. BERG:  Should I argue it now?
22            THE COURT:  Right now?  No.  Don't talk to me about
23   it.
24                         (Jury present)
25            THE COURT:  Thank you.  Have a seat, please.
```

00:00 (line 5)
00:00 (line 10)
00:00 (line 15)
00:00 (line 20)
00:01 (line 25)

         1              Good morning, ladies and gentlemen.

         2              I want to mention to you that tomorrow

         3    morning, if anybody wants to get here earlier, at 9:00

         4    o'clock, that's where I will be.  At 9:00 o'clock, a good

00:01    5    part of all the judges of the district will be sitting up in

         6    Courtroom 11-A upstairs, and it's open to the public.

         7              What it is is the annual presentation of

         8    service awards, people that have been in government service

         9    anywhere from 15 to -- I mean, five years all the way up to

00:01   10    30, 35.  The whole court -- or a bunch of the judges sit for

        11    that ceremony and people are called up.

        12              If you want to come and see it, you're

        13    welcome.  It's open to the public.  So, that's at 9:00

        14    o'clock in Courtroom 11-A, which is the huge courtroom

00:02   15    upstairs.  It's two stories tall and about three times as

        16    wide and four times as deep.  You're welcome, if you want,

        17    to come.

        18              As soon as I'm done there, I'm coming right

        19    downstairs.  I have that other sentencing, which will be a

00:02   20    lot more involved than this, as soon as I'm done, about

        21    9:40, 9:45.  And then, as soon as that's done, we'll get

        22    back into trial.

        23              We're about to proceed with opening

        24    statements.  Opening statements, as I said, is just -- and I

00:02   25    always phrase it this way -- is just a road map of what the

*Opening Statement by Mr. Berg*

1  evidence will show.

2          So, if we have an objection from the other

3  side that one of the lawyers is going into summation,

4  arguing, it may or may not be sustained.  "Sustained" means

00:02  5  that I uphold the objection.

6          And, just generally, you're not to hold it

7  against either side -- or any of the sides for objecting.

8  It's the way that attorneys work to bring to my attention

9  something that may or may not be according to the Rules of

00:03  10  Evidence.  I keep my book up here, and we hit the books from

11  time to time.

12          So, the time is -- Plaintiff has 20 minutes.

13  All the Defendants have 20 minutes.  And then we'll be ready

14  to go.

00:03  15          Go right ahead.

16          MR. BERG:  If it please the Court.

17          May I have a two-minute warning, Your Honor?

18          THE COURT:  Go on.

19          MR. BERG:  Good morning, ladies and gentlemen of

00:03  20  the jury.

21          This is a case about a family with a special

22  needs child and, as a result, special needs of their own.

23  It is not just a case about bricks and mortar, although

24  there will be the purchase of a house involved in the case.

00:03  25  But it'll be about a father and a mother's desire to provide

*Opening Statement by Mr. Berg*

1  the right sort of handicapped-accessible house for their

2  daughter, Carena Petrello.

3              Ladies and gentlemen, my name is David Berg.

4  I represent Tony Petrello, and I'm here to advocate for the

00:03  5  rights of Cindy Petrello and Tony and their daughter,

6  Carena.

7              Yesterday His Honor told you correctly that

8  Carena Petrello has cerebral palsy.  It is an umbrella

9  description of what she suffers from.  I'm not going to go

00:04  10  into great detail, but it is important to the case for you

11  to understand she has severe mental disabilities.  No one in

12  this courtroom disagrees with that.  It is stipulated by the

13  parties.

14              She functions at the level of a two- or

00:04  15  three-year-old child.  She is unable to perform physically

16  except in the most modest kinds of ways.  She can walk with

17  braces a few steps, and the Petrellos are very, very proud

18  of that.  But she falls.  She stumbles.  She cannot feed

19  herself.  She has to be cared for 24 hours a day.

00:04  20              Because of their circumstances and because of

21  who they are, Carena Petrello has lived at home since the

22  day that she came home from the hospital in 1998.  Carena is

23  12.  She was born in 1997, but she was an extremely

24  premature child just on the cusp of what the doctors call

00:05  25  viability, but what you and I know as her life.

*Opening Statement by Mr. Berg*

1          It is a significant fact that, after she came

2     home, she required 24-hour-a-day care.  She always has and

3     she always will.  The Petrellos have not put her in an

4     institution and you'll hear why, although I think the

00:05    5     evidence will be pretty clear it's because of their great

6     love for their daughter and, also, because they can.

7          Let me tell you what this case is about.  And

8     by "they can," I mean they can afford to.  This is a case

9     that revolves around the needs that they have for their

00:05   10     daughter, the concern they have for their daughter when they

11     are no longer with us.  It is the stone in their shoe that

12     they think about all the time.

13          So, Tony and Cindy early in 2006 -- This is

14     not the first time they thought about providing for their

00:06   15     daughter when they're gone.  Early in 2006 they obtained a

16     piece of property right behind their own -- you'll see

17     pictures of it -- that they wanted to have to build a house

18     at some point for Carena when they are gone, a smaller home

19     that would -- than the one they live in that would allow the

00:06   20     people who work with Carena to concentrate on her and not on

21     running the house.

22          Let me show you -- And there's no question

23     that there is -- that these are affluent families, all of

24     them.  I don't want to hide that from you.  I don't want to

00:06   25     run away from it.  Let me show you a picture of -- Will you

*Opening Statement by Mr. Berg*

1    blow that up, please, sir.  Thanks, Al.

2                   Let me show you this picture.  The Petrellos

3    live here at No. 10 -- No. 10 Remington.  The Pruckas, who

4    are one of the Defendants in this case, live here, next

00:06    5    door.  Now, this is in what's called the Shadyside

6    subdivision.  It's one of the most affluent subdivisions in

7    this city.

8                   Let me tell you what happened.  Mr. Petrello

9    and Mrs. Petrello discovered there were some real problems

00:07    10   on that property they had bought before.  They'll tell you

11   about it in more detail, but it had to do with security and

12   it had to do with some other issues, location.

13                  And, sure enough, a once-in-a-lifetime

14   opportunity came up.  The Petrellos live at No. 10 Remington

00:07    15   and the house at No. 8 Remington they heard was going to be

16   for sale, right next door.

17                  Now, but for Carena Petrello, Cindy and Tony

18   have no need for another house.  They certainly have no need

19   to go and spend the kind of money it was going to cost for

00:07    20   another house.  But, in their mind -- and I think the

21   evidence will be clear to you -- what was most important and

22   most critical was that, when they are gone, she would have a

23   place to live.

24                  Also, in the interim, they would be able --

00:08    25   and Tony Petrello will tell you about this, as will Cindy,

*Opening Statement by Mr. Berg*

1    if she should take the stand -- they will tell you how their

2    house is not right for Carena.  Could she live there?  Yes.

3    But they want a house that would be handicapped-accessible.

4                   So, what did he do?  Tony heard that his

00:08  5    neighbor, his neighbor of seven years, Mr. Prucka and

6    Ms. Prucka, Sherry and Matt Prucka, were going to sell their

7    home.  So, he e-mailed him.

8                   He said, "Matt, what do you think?  Are you

9    going to sell your house?  It's going to be terrible for our

00:08  10   neighborhood if you leave," a neighbor talking to a

11   neighbor.  You will see that.

12                  Matt Prucka confirmed, yes, indeed, he was

13   going to sell his house.

14                  But Tony asked Matt Prucka, "Can we -- Since

00:08  15   your house is not listed" -- or for whatever reason -- "can

16   we be excluded from the brokerage commission, the brokerage

17   fee?"

18                  Now, that happens.  You deal directly with a

19   seller of a house.  You may have seen a sign, "House for

00:09  20   Sale.  Call owner."  That way, the owner doesn't have to pay

21   the brokerage fee.  If you've bought or sold a home, you

22   know that, when you get a sales price, if you sell your

23   house for $100,000, you have to deduct whatever the

24   brokerage fee was from that.

00:09  25                  It's critical that you understand that

*Opening Statement by Mr. Berg*

1    Mr. Petrello -- there will be no dispute about this -- did

2    not have to pay -- I mean -- excuse me -- Mr. Prucka, in

3    dealing with Tony Petrello, did not have to pay a brokerage

4    fee.

00:09    5                So, Tony said to Matt, "I'll tell you what.  I

6    want to know what you guys are asking for your house."

7                Matt Prucka told him $8.3 million.

8                So, Tony made his first offer and he said,

9    "I'll tell you what.  I'll make an offer of six and a half

00:09   10   million dollars."

11               Over a period of time, he told him, "You just

12   leave that offer out there."

13               Matt didn't want to take it.  He wanted more

14   money.  Matt Prucka did.

00:10   15               He said, "I'll tell you what.  You leave that

16   offer out there and see if you can do better.  Use my

17   offer."  "Tell other people about it," says Tony Petrello to

18   his neighbor, Matthew Prucka.

19               And, sure enough -- and you're going to see

00:10   20   how this happens -- late on a Sunday night, December 3rd,

21   2007, Matt Prucka calls and he wakes Tony up, who's sick.

22               And I won't go into the details of that call,

23   but the evidence will show that, as a result of the call,

24   the next day Tony upped his offer almost to the asking

00:10   25   price, $8.2 million.  But it's not really at the asking

*Opening Statement by Mr. Berg*

1    price because Mr. Prucka does not have to pay a commission.

2    It's above the asking price, and I'll show you that in a

3    moment.

4              And then the McGee -- Mr. Prucka had hired

00:11  5    Heritage Texas Properties, and the house was listed by a

6    Miss McGee, the broker.  She's another Defendant in this

7    suit, along with her employer, Heritage Texas, and Dr. Nath,

8    who bought the house.

9              Now, let me tell you what happened.  Dr. Nath

00:11 10   bought the house for $8.3 million, eight point two

11   ninety-nine five hundred thousand dollars.

12             Now, I want to show you what the net effect

13   was and why we're in this courtroom.  Mr. Petrello thought,

14   "You know what?  If he doesn't pay -- if Mr. Prucka doesn't

00:11 15   have to pay any kind of brokerage fee, Mr. Prucka -- if

16   you're in Mr. Prucka's shoes, the bottom line is you net

17   what you get."

18             Mr. Petrello offered $8.2 million.  The net to

19   the Pruckas -- to Sherry and Matthew Prucka is $8.2 million.

00:12 20   Dr. Nath offered eight point two ninety-nine five thousand

21   dollars, but ended up paying -- and this is in the

22   evidences, ladies and gentlemen -- it won't be disputed -- a

23   3 1/2 percent brokerage fee versus no brokerage fee for Tony

24   Petrello and Cindy Petrello.

00:12 25             The brokerage fee has to be deducted from the

Case 4:08-cv-01933   Document 154   Filed in TXSD on 02/24/10   Page 13 of 274

*Opening Statement by Mr. Berg*

1    price that Dr. Nath paid.  And there's a difference.

2    Remember, Mr. Prucka, when he deals with Tony Petrello, gets

3    what he nets and he nets what he gets.  The bottom line is

4    what matters.

00:12    5         The difference -- The amount of money -- The

6    Pruckas would have made more, had they sold to the

7    Petrellos, almost $200,000, $190,982.50.

8         Tony smells something rotten.  He's very

9    upset.  Cindy knows.  They had to have another reason, the

00:13    10    Pruckas, for not selling to them.  Why wouldn't Mr. Prucka

11    sell to Mr. Petrello when the net effect of the sale was

12    that he comes out $190,000 to the good?

13         And, so, we initiated what's called discovery,

14    and here's what we found out.

00:13    15         Mr. Prucka -- and his wife agrees, according

16    to Mr. Prucka -- didn't want Tony Petrello messing with the

17    interior of his house, harming the architectural integrity.

18         Now, how did he know what Tony was going to do

19    with that house?  Because Tony Petrello told him from the

00:13    20    start, "I want to widen the hallways.  I want to put in an

21    elevator for Carena, because she's always going to be in a

22    wheelchair, to get up and down stairs."

23         He told him he wanted to make a master

24    bathroom where she could be accommodated.  And I'll let Tony

00:14    25    tell you the details of that, but just as the evidence will

1   show, she needed -- There's no question she had a special

2   need.  This was a special needs child.  And Tony and Cindy

3   are believers in home health care.

4            We think the evidence will show you that

00:14   5   Mr. Prucka's excuse that he wanted to preserve the

6   architectural integrity of his home and Mrs. Prucka's were

7   code words, and I'll tell you why.

8            It is our belief that the evidence will show

9   that Matthew Prucka has admitted that he didn't sell to the

00:14   10   Petrellos, that Mrs. Prucka didn't sell to the Petrellos,

11   because they were going to make these changes that would

12   make this house handicapped-accessible.

13            Miss McGee.  Miss McGee.  She's a close friend

14   of the Pruckas.  Who is she?  She is their broker.  She is

00:14   15   going to earn -- or her company is going to earn -- Heritage

16   Texas Properties -- and she'll earn a part of it -- that

17   290,000-dollar commission.  So, she is involved.  She's in

18   on it.  She knows why the Pruckas don't want to sell to the

19   Petrellos.

00:15   20            What are the two reasons we think the evidence

21   will show and that she's admitted?  They don't want the

22   house to be made handicapped-accessible -- the Pruckas

23   don't -- and they want a real family living there.

24            You'll hear this in the evidence, I believe,

00:15   25   ladies and gentlemen.  They want a family living there.

1    Well, as you know, Carena is part of a family, but she may

2    never have one of her own.  She cannot.

3              Dr. Nath.  Dr. Nath comes to this without --

4    to this transaction also part of what we feel we can show

00:15    5    you is a conspiracy to violate the Civil Rights Act, the

6    federal Fair Housing Act.

7              Tony and Dr. Nath speak.  Now, Dr. Nath is a

8    smart guy.  He's a doctor.  He operates, as we understand

9    it, on children.  And Tony tells him why he wants the house.

00:16    10             Dr. Nath got his contract.  That was on

11    December the 4th and 5th, over that two-day period.  And a

12    few days later, December 7th, Tony notices a bunch of people

13    in the yard of the house next door to him.

14             So, he sends a fellow named J.J. Cortez, who

00:16    15   works for Tony and Cindy, over to find out who's over there

16   and to ask Dr. Nath over.

17             And when he came over -- there's more to this

18   conversation -- he told Dr. Nath, "I need this house for my

19   daughter.  Would you step aside?  Would you let us buy the

00:16    20  house instead of you?"

21             Tony already -- You know, his mind is reeling.

22   He knows -- In his heart, he knows he had to have made the

23   highest financial offer.

24             He offers -- You know, I'll let him go into

00:16    25  the details, but Dr. Nath knows that Tony's family wants

1   that house for Carena's future home and for her special

2   needs and he won't back away.

3           The evidence will show that he paid almost

4   $8.3 million.  He could have bought a house anywhere, but he

5   did not.  He wouldn't back away.  He wanted that house.  And

6   he may love that house and his wife may love that house and

7   their children.

8           But, ladies and gentlemen, he cannot deny --

9   In fact, we feel the evidence will show he's admitted he

10  went into this transaction knowing he may have to move out

11  of that house.  Eyes wide open.  And he went ahead.

12          Now, ladies and gentlemen, we will tell this

13  story in greater detail and we will show you that this is

14  what the evidence will show.

15          We will prove it to you, we believe, by the

16  preponderance of the evidence and more so that the Judge

17  asked us -- or told you about yesterday.  That is our

18  burden.  We accept it gladly.

19          Why are we here?  This is not just a house

20  about -- a case about bricks and mortar.  It's about far

21  more than that.  It's a story about the special needs of a

22  special child.  It's a story about discrimination.

23          It's a case where we ask no sympathy from you.

24  We're not here to find sympathy.  We are here because the

25  law was violated, in our view, and we feel we can prove it.

*Opening Statement by Mr. Fogler*

1          You will hear, ladies and gentlemen, a lot of

2    excuses for discrimination, but you will never hear one to

3    justify it.

4          Thank you.

00:18  5          THE COURT:  All right.  Total defense, break it up

6    however you want.

7          You want a two-minute notice on your side,

8    also?

9          MR. FOGLER:  I don't think that will be necessary,

00:18  10   Your Honor.

11         THE COURT:  Okay.  Go right ahead, then.

12         MR. FOGLER:  May it please the Court, counsel.

13         Mr. Petrello coveted his neighbor's house.

14   It's not that he needed the Prucka home.  There was -- He

00:19  15   had a very nice mansion of his own.

16         THE COURT:  Would you speak up a bit, sir.

17         MR. FOGLER:  He had plenty of room in his

18   15,000-square-foot home for his wife and his daughter and

19   himself.  As you heard, just a year prior to all of the

00:19  20   events that we're here to discuss, he bought the lot and

21   house behind him and tore that house down.

22         We don't blame Mr. Petrello for wanting the

23   Prucka home.  His house -- By the way, the Petrello house

24   and the Prucka house are very historic structures.  They

00:19  25   were built in the 1920s by a very famous American architect.

*Opening Statement by Mr. Fogler*

1          You will hear that Matt and Sherry Prucka

2   spent several years and lots of their money restoring the

3   house back to the architectural style that it had originally

4   been built back in the 1920s.  They love their house.  They

00:20   5   love the history of the house.

6          But you will hear that the Pruckas had decided

7   to move to Utah and they put their house on the market

8   reluctantly.  Mr. Petrello -- As a neighbor, they were

9   acquaintances of the Pruckas.

00:20   10          Mr. Petrello wanted an advantage in dealing

11   with the Pruckas and, as you heard, Mr. Petrello asked

12   Mr. Prucka if he could be exempted from any broker agreement

13   so that Mr. Prucka would not have to pay a commission if the

14   house was sold to Mr. Petrello.

00:21   15          Mr. Prucka agreed.  And you will see in the

16   listing agreement, that is, the contract between Mr. Prucka

17   and his wife and Heritage Texas Properties, that there is an

18   exemption under certain circumstances.

19          It wasn't entirely clear to the Pruckas that

00:21   20   Mr. Petrello was very serious at first.  Mr. Petrello never

21   came over to look at the house.  Mrs. Petrello never came

22   over to look at the house.  They never sent any architects

23   or designers or engineers to look at the house.

24          Mr. Petrello was told that the asking price

00:21   25   was $8.3 million, but he bid 6.5.  But he didn't bother to

*Opening Statement by Mr. Fogler*

1    put that in writing.  He didn't bother to extend a written

2    contract or provide an earnest money check.  Mr. Prucka

3    turned that offer down.

4              Now, among the several people who came to look

00:22   5    at the house were the Naths, Dr. and Mrs. Nath.  They loved

6    the house.  They loved the history of the house.  They liked

7    what the Pruckas had done to restore the house.

8              Dr. and Mrs. Nath offered $7.6 million.  They

9    put it in writing.  They signed a contract -- a proposed

00:23  10    contract and they delivered an earnest money check to show

11    they were serious and they wanted the house.  But Mr. Prucka

12    thought that price was too low as well and he rejected it.

13             Now, I want you to pay special attention to

14    the events of December 3, 4 and 5 of 2007.  As you heard

00:23  15    from Mr. Berg, on the evening of December 3rd, Mr. Prucka,

16    who had just received the offer -- the 7.6-million-dollar

17    offer from the Naths -- Mr. Prucka called Mr. Petrello.

18             He told him he had an offer.  He invited

19    Mr. Petrello, if he chose, to make an offer.  He recommended

00:23  20    to Mr. Petrello that he bid at or above the list price if he

21    really wanted to get the house.

22             Now, Mr. Petrello bid $8.2 million, again, not

23    in writing, no earnest money check, no contract.  But

24    Mr. Prucka did not turn that offer down immediately.  What

00:24  25    did he do?

*Opening Statement by Mr. Fogler*

1          The very next morning, on December 4,

2    Mr. Prucka went to his lawyer and he asked his lawyer to

3    draft a contract to sell the house Tony Petrello.  That is

4    not the conduct of a person who intended to discriminate

00:24    5    against Mr. Petrello's daughter.

6               You will hear that the Pruckas wanted to sell

7    the house to somebody who would preserve the architecture of

8    their house, what they had so lovingly restored.  That's

9    true.

00:25    10              That is not a negative comment and it wasn't

11   intended to be anything negative towards Carena Petrello or

12   towards anybody else.  They would have felt the same about

13   anyone who wanted to buy the house.

14              It was a positive comment on their part about

00:25    15   how they felt about their house.  Ultimately, though, of

16   course, they knew that whoever bought the house would be

17   free to do whatever they wished with it.

18              So, ultimately, though, after Mr. Petrello had

19   offered the $8.2 million, the Naths came back with an offer

00:25    20   at the asking price, at the price at which it had been

21   listed in the listing agreement.

22              Now, you've seen the chart that Mr. Berg put

23   up on the screen where he says that it would be more money

24   in Mr. Prucka's pocket if he sold the house to Mr. Petrello

00:26    25   than if he had sold the house to the Naths.

1          The arithmetic is correct, but we're going to

2     show you that the chart is wrong.  But it really doesn't

3     make any difference because, to the Pruckas, the Naths

4     offered the list price, the price that they had asked for

00:26      5     from the very beginning, and it was reasonable for them to

6     accept that price.

7          Tony Petrello is a very successful man.  He's

8     got two degrees from Yale.  He's got a law degree from

9     Harvard Law School.  He is president of the largest on-shore

00:26     10     drilling company in the world.

11          He knows how to buy property.  He knows

12     that -- If he had really wanted the house, he knows what he

13     could have done.  He could have offered the list price,

14     given a contract.  He had his opportunity to do that several

00:27     15     times.

16          Mr. Petrello is a man who's used to getting

17     what he wants, and he wanted this house very badly, it

18     appears, and he was very upset that he had been outbid.

19          So, when he learned that the Naths had signed

00:27     20     a contract -- a written contract on December 4 or 5, as

21     Mr. Berg told you, between the Pruckas and the Naths, a

22     contract that had no termination option, a contract that

23     bound Mr. Prucka and his wife to sell the house to the Naths

24     and bound the Naths to purchase that house, Mr. Petrello was

00:28     25     very upset.  He hired lawyers.  He claimed that Mr. Prucka

1    had a contractual obligation.

2            MR. BERG:  Objection, Your Honor.  This violates

3    the motion in limine that you granted only two days ago.

4            THE COURT:  I recall what it was.

00:28    5            MR. BERG:  The --

6            THE COURT:  Wait.  Wait.  I recall what it was.

7                  What's your response?

8            MR. FOGLER:  My response, Your Honor, is that this

9    is part of exactly what happened.  He filed a lis pendens.

00:28   10   That's in evidence.

11           MR. BERG:  This is nothing but an attempt to get

12   behind your ruling to go into the contents of the lawsuit,

13   Your Honor, and that is what you forbid.

14           THE COURT:  Is the lis pendens in evidence?

00:28   15           MR. BERG:  It is.

16           THE COURT:  All right.  To that extent, overruled.

17   But stay within it.  We had hours of hearings on this point.

18           MR. FOGLER:  Yes, Your Honor.

19           THE COURT:  Stay down that channel.

00:28   20           MR. FOGLER:  Mr. Petrello instructed his lawyers to

21   file a notice with the property records of Harris County,

22   claiming that he had an interest in the Prucka property.

23                  He tried to stop the sale, but the sale went

24   through.  The Naths bought the property, and they have been

00:29   25   living there for more than two years.

1      Now, at the end of this case, you're going to

2    be asked to determine whether the Pruckas intended to

3    discriminate against Mr. Petrello, and the evidence is going

4    to show you that they did not.

00:29   5      But the real question that you should be

6    asking yourself, as you listen to the evidence, is:  If he

7    wanted the house, why didn't he make an offer in writing

8    sufficient to buy the house?  Only he can answer that.

9      Thank you.

00:29  10      THE COURT:  11 minutes have gone by.

11      MR. DeAYALA:  Ladies and gentlemen of the jury, my

12    name is Mano DeAyala.  I represent Peggy McGee and Heritage

13    Texas Properties.  And Robin Mueck is here in the back on

14    behalf of Heritage Texas Properties.

00:30  15      The evidence will show, I believe, that none

16    of the Defendants discriminated against Mr. Petrello or his

17    daughter.  Since I have very limited time, I'm going to get

18    to the heart of this matter.  I'm just going to speak on

19    behalf of my client very quickly.

00:30  20      Mr. Petrello has accused Peggy McGee of

21    discrimination.  That's a big deal.  He's hired three

22    Houston law firms to help him prove it.

23      The evidence in this case will show that Peggy

24    McGee neither discriminated by action or by thought.  The

00:30  25    evidence will show that Mr. Petrello, through his idea,

1    excluded himself from the listing; that is, he excluded

2    himself from dealing with Heritage Texas Properties or Peggy

3    McGee with respect to this property.  That's what happened.

4                Before the listing -- And that listing was in

00:31  5    November.  I believe it was signed November the 12th of

6    2008.  Since -- Prior to that, October the 30th, he was

7    dealing with Mr. Prucka directly with respect to this

8    property.

9                Nowhere does Mr. Petrello ever e-mail, call,

00:31 10    talk to Peggy McGee.  In fact, it wasn't until after this

11    lawsuit was filed that I think the two of them ever saw each

12    other.  To this day, I don't think the two of them have ever

13    really spoken to each other.  Yet, he sues her for

14    discrimination.

00:31 15                And in the conduct of the selling of this

16    house, she did not provide marketing materials to them.  She

17    did not show the property to them.  He never submitted an

18    offer to her, oral or in writing, with respect to this

19    property.  Yet, he sues her for discrimination.

00:32 20                He never tells her, "I want to use the home

21    for a certain purpose."  He never tells her, "I have a

22    handicapped daughter."  He never tells her, "I want this

23    property to be a medical facility."  Yet, he sues her for

24    discrimination.

00:32 25                You will see and hear from testimony from both

1   Mr. Petrello and Mr. Prucka to corroborate that they did not

2   include Peggy McGee in their dealings with each other,

3   whatever those dealings might be.

4            The evidence will also show that Peggy McGee

00:32   5   never encouraged the Pruckas to sell the property to the

6   Naths, nor did she ever discourage the Pruckas from selling

7   the property to the Petrellos.

8            More importantly, the evidence will show what

9   was in Peggy McGee mind at this time, and what was in her

00:32   10   mind was, "I was unaware that the Petrellos had a daughter

11   who was disabled like this.  I was unaware of what they were

12   going to use the property for.  I was out of the loop."

13            What she did do was work hard to obtain this

14   listing.  What she did do was spend a lot of time, a lot of

00:33   15   effort, to showcase this highest-valued property she had

16   ever sold before, ever dealt with before.

17            So, what she does is she researches the

18   property.  She does her due diligence.  This property is one

19   of these properties that only a limited group of people are

00:33   20   really going to be interested in:  A, one who has the

21   wherewithal to buy it; and, B, one who appreciates the

22   historical architectural significance in -- sitting in this

23   home.  It is unique in that respect.

24            The evidence will show that she did

00:34   25   photographs, marketing, special gatherings with the top

1    agents in town, to market and promote this home.  And the

2    result was, within 30 days of listing it -- I think it was

3    20-some-odd days -- she obtains a full-price offer of eight

4    point two nine nine five.  That's an accomplishment.  That's

00:34    5    an achievement.

6              What the evidence will show is that

7    Mr. Petrello did everything he could to remove Heritage and

8    Peggy McGee from his dealings and his desire for this

9    property.  And he's going to ask you to punish them.

00:34    10             Thank you.

11             THE COURT:  Five minutes left, sir.

12             MR. RALEY:  May it please the Court.

13             I'm John Raley and, with Guy Matthews, I'm

14    pleased to represent Dr. Rahul and Usha Nath.

00:34    15             You will see from the evidence in this case

16    two things, first, that the Naths are just the buyers of the

17    property.  That's it.  They saw an ad on the Internet.  They

18    called.  They toured the house.  They loved it.  They paid

19    the full asking price for the property.  They're just the

00:35    20    buyers.

21             And buyers, you'll see from the evidence,

22    don't discriminate.  They can't.  The Naths had no power to

23    control who the Pruckas sold the house to, to make them sell

24    to one or not to the other.  They had no power, no control,

00:35    25    over that at all.  They're just the buyer.

1        But at the time, the Naths entered into a

2   written, binding, enforceable contract to buy the house on

3   December 4th and 5th, 2007, a contract that indeed the

4   Pruckas could have used to sue the Naths to compel them to

00:35   5   buy the house, if the Naths had decided, "We don't want to

6   buy the house."  But at the time they signed that contract,

7   the Naths had not ever met or talked to the Pruckas.

8        The Naths had not ever met or talked to the

9   Petrellos.  The Naths didn't even know the name of their new

00:36   10   next-door neighbors, the Petrellos.  They knew nothing about

11   their young daughter, Carena, nothing whatsoever.

12        On that date, they signed the contract binding

13   them to sell the house -- or to buy the house, and they did

14   buy the house because they loved it.  They wanted it.  So

00:36   15   that's the first point.  They're just the buyer and buyers

16   can't discriminate.

17        The second point, you'll learn from the

18   evidence, is that the Naths did not know anything about this

19   alleged motive that Mr. Berg raised.  They didn't know

00:36   20   anything about why the Pruckas would want to sell to them

21   and not to sell to anyone else, except for the obvious

22   motive, that the Naths offered the full purchase price.

23        And the Naths didn't know anything about even

24   an alleged motive until over six months after they bought

00:37   25   the house and moved into it with their children -- their two

1  adult children.  Their daughter, Priya, and their son,

2  Devin, are both students at St. Thomas University and live

3  in the house with them.

4          So, the first point is they're just the buyer.

00:37  5  The second point is they didn't know anything about

6  Mr. Prucka's alleged motive.

7          And I think it's important to point out, Your

8  Honor -- ladies and gentlemen, that you'll see from the

9  evidence that the Naths had no agreement with the Pruckas

00:37  10  not to modify the house.

11          As the buyers, they could modify the house.

12  The Pruckas could do nothing to stop them because they had

13  sold the house.  That's the way it works.

14          So, here we are.  The Naths and their children

00:38  15  have lived for over two years in their home that they bought

16  and paid for on 8 Remington, and Mr. Petrello wants to take

17  it away from them.

18          We're asking you to respect the rights of

19  homeownership and return a verdict for the Naths.

00:38  20          Thank you.

21      THE COURT:  Let me see the attorneys over here.  I

22  don't need the court reporter.  Just right over here.

23          (Off-the-record discussion)

24      THE COURT:  All right.  With that, the clocks are

00:41  25  ready to go.

1          Plaintiff, call your first witness.

2          MR. BERG:  Tony Petrello, please.

3          THE COURT:  Yes, sir.  Raise your right hand and be

4   sworn.

00:41   5          **ANTONY G. PETRELLO, THE PLAINTIFF, SWORN**

6          THE COURT:  Have a seat, please.

7                    DIRECT EXAMINATION

8   By Mr. Berg:

9   Q.  Will you please give us your full name, Tony.

00:41   10  A.  Anthony G. Petrello.

11  Q.  Mr. Petrello, where do you currently reside?

12  A.  10 Remington Lane.

13  Q.  And before we even begin, you've heard opening

14  arguments; have you not, sir?

00:41   15  A.  Yes.

16  Q.  Is it a fair statement that you coveted, lusted after,

17  that house at 8 Remington?

18  A.  Not at all.

19  Q.  Let's take a moment to develop your background, if we

00:41   20  can.

21          Where were you born?

22  A.  I was born in Newark, New Jersey.

23  Q.  And let's move ahead to the education that Mr. Fogler

24  mentioned.

00:42   25          Did you attend Yale University?

*A. Petrello - Direct by Mr. Berg*

1   A.   I received my BS from Yale in mathematics and my MS in

2   mathematics from Yale --

3   Q.   How did you get --

4   A.   -- University.

00:42   5   Q.   I'm sorry.  Excuse me.  Can you pull that a little

6   closer.

7   A.   (Complies)

8   Q.   Okay.  Thanks.

9                How did you get to go to Yale?

00:42   10   A.   I was fortunate enough to be accepted and went on a

11   scholarship and took out some loans and my mother took a

12   second job.

13   Q.   And you said you got two degrees there?

14   A.   Yes.  I got a BS and MS in mathematics.

00:42   15   Q.   And that would be a master's in mathematics?

16   A.   Master's in mathematics.

17   Q.   Tell the jury how old you were when you got your

18   master's in mathematics?

19   A.   I finished all the requirements for a master's at the

00:42   20   age of 19.

21   Q.   And that's when you received it?

22   A.   I received it jointly when I graduated, but I finished

23   all the course requirements and took the oral exams at the

24   age of 19.

00:42   25   Q.   I know you don't want me to ask you this.

1          But did you receive honors at Yale?

2    A.   Yes.

3    Q.   Well, tell us --

4    A.   I graduated summa cum laude, Phi Beta Kappa, John Alan

00:43    5    Lewis Prize twice and the Stanley Lewis Prize, I believe.

6    Q.   Were those academic prizes?

7    A.   Yes.  They were also as a Yale Scholar of the House.

8    Q.   And what is a Yale Scholar of the House?

9    A.   I was relieved of all course requirements to work on my

00:43    10   Ph.D. while I was an undergraduate.

11   Q.   Is it a safe statement, Mr. Petrello, that you are -- or

12   were, at least, what is commonly called either a nerd or a

13   dork or something along those lines?

14   A.   Something along those lines.  Fair.

00:43    15   Q.   You worked very hard in school; did you not?

16   A.   Yes.

17   Q.   And then you went to law school?

18   A.   Yes.

19   Q.   And you went to Harvard Law School?

00:43    20   A.   Yes.

21   Q.   After Harvard -- or while you were at Harvard, you went

22   to work for a law firm; did you not?

23   A.   Yes.  I clerked during my first summer of law school at

24   a law firm by the name of Baker & McKenzie, which had

00:43    25   offices in many places around the world.  But I worked in

*A. Petrello - Direct by Mr. Berg*

1    their New York office the first summer.

2    Q.   After that, did you continue working there?

3    A.   Upon graduation, I joined the firm as an associate.

4    Q.   And how long did you stay with them?  To what year?  I

00:44    5    want to bring you forward in time until you moved to

6    Houston.

7    A.   I graduated in 1979 from law school, and I worked with

8    Baker & McKenzie until the fail of 1991.

9    Q.   At that time when you left, did you have any special

00:44    10    position with Baker & McKenzie?

11    A.   At the time I left, I had been managing partner of the

12    New York office for about five years.

13    Q.   Now, I believe that, in 1984 -- and I may have the date

14    wrong -- was when you and Cindy got married.

00:44    15    A.   We were married May 27th, 1984.  We celebrated our 25th

16    anniversary last year.

17    Q.   And you met Cindy while you were at Yale?

18    A.   Yeah.  Cindy and I met together while we were at Yale.

19    She was at a woman's catholic college, Albertus Magnus, up

00:44    20    the street in New Haven.

21    Q.   And that was in New Haven, you said?

22    A.   Yes.

23    Q.   Now, did you -- You moved here to join Nabors

24    Industries?

00:44    25    A.   Yes.  Nabors Industries, which is a drilling company,

33

1    has offices in Houston.  I joined them in October, 1991.  I

2    was -- They were a client of mine and I joined them.  I gave

3    up the practice of law to become the president and chief

4    operating officer in Houston.

00:45    5    Q.  They were a client of yours while you were at Baker &

6    McKenzie?

7    A.  Correct.

8    Q.  And, so, you did work with them?

9    A.  Yes.

00:45    10    Q.  And they decided to hire you to come here?

11    A.  Yes.

12    Q.  And you've lived here since?

13    A.  Yes.

14    Q.  Now, Mr. Petrello, please tell the jury -- Let's get

00:45    15    away from the business for a moment.

16              Did you and Cindy try to have children along

17    the way?

18    A.  Yes.  Along the way, we tried for a number of years.

19    Q.  Tell the jury when Cindy finally became pregnant.

00:45    20    A.  She became pregnant in the summer of 1997, using

21    in vitro fertilization.

22    Q.  And in vitro, of course, is a scientific way of

23    impregnating someone, without going into the details?

24    A.  Correct.

00:45    25    Q.  And would you describe the pregnancy itself to the jury.

34

1    A.   She was initially pregnant with -- She had twins and a

2    couple of months into the pregnancy she got sick and lost

3    one of the twins.

4              As her pregnancy continued, it was very

00:46   5    strained.  By the 23rd week of her pregnancy, she was

6    extremely sick and, at one point, the baby became so extreme

7    that we had to go to the hospital.  She went to the

8    hospital --

9    Q.   Let me stop you there.

00:46   10             Something happened that caused you to take

11   Cindy to the hospital.   True?

12   A.   Yeah.  We were at dinner.  She had incredible pain.

13   Q.   Tell us about the dinner.  I want you to tell the jury

14   where you were and who you were with.

00:46   15   A.   We were at a restaurant in Houston with my family

16   visiting from the East Coast.  We were celebrating

17   Thanksgiving.  And she, as I said, got into this pain and I

18   had to take her -- Together we drove to the hospital

19   emergency room.

00:47   20             She was admitted immediately.  They tried to

21   keep the baby there with various -- inside her with various

22   treatments.  It went on for several days.  But at a certain

23   point, both Cindy and the baby got in trouble.

24   Q.   And what did you understand was Cindy's trouble?

00:47   25   A.   She was internally bleeding.

*A. Petrello - Direct by Mr. Berg*

1   Q.   And how dangerous was that?

2   A.   It was dangerous to her life.  The baby at that point

3   went breech and the doctor came to me -- because my wife was

4   sedated -- and said they had to operate and gave me some

00:47   5   choices.

6   Q.   Now, first, tell us what you mean, the baby went breech.

7   A.   The cord wrapped around the baby's neck and the baby had

8   to be taken out immediately.

9   Q.   Were your mom and your sister at the hospital with you

00:48   10   or --

11   A.   Yes.

12   Q.   What choices did the doctors give you at this point?

13   A.   The doctors said that, when the baby comes out --

14   because, at this point, the baby was 24 weeks, three days --

00:48   15   the baby would likely be on a respirator and the baby

16   would -- there was a high probability would have a lot of

17   problems.  They gave me the choice of pulling the plug.

18   Q.   And what was your response?

19   A.   Absolutely not.

00:48   20   Q.   Tony, after the baby was born, how long did she remain

21   in the hospital?

22   A.   Five months.  To May, 1998.

23   Q.   And during this period of time were you and Cindy at the

24   hospital?  What were your roles?  What did you do?

00:48   25   A.   Every day.  My wife was there all the time, and I was

*A. Petrello - Direct by Mr. Berg*

1   there as much time as I could possibly be.

2   Q.   How big was the bay when she was born?

3   A.   Carena -- The name "Carena" in Italian means "little

4   dear one" because she was 1 pound, 4 ounces.  The doctors

00:49   5   suggested I take a picture and -- because no one would

6   believe it.  Her head was here and her foot was here

7   (indicating).  So, that's how big she was.

8           A few days into the -- while she was in the

9   hospital, they had to perform a heart operation on her.

00:49   10   It's called -- Maybe "heart" is a layperson's word, but it's

11   called a PDA, because the valve between the upper chambers

12   did not close and there was regurgitating of the blood.

13   And, so, they had to cut her open to do that.

14   Q.   Is that that operation that Dr. Cooley perfected or is

00:49   15   it something different?

16   A.   No.  It's something different.  Basically, when a baby

17   is in the womb, the baby obviously is being fed out of the

18   mother's -- the oxygen from the mother's blood.  So, the

19   blood doesn't go through the lungs.

00:50   20           But, you know, when the baby pops out and the

21   doctor spanks the baby, what happens is this little duct

22   between the heart closes and then the blood gets rerouted so

23   that the lungs start performing.

24           In Carena's case, when she came out, because

00:50   25   she was so small and so weak, that closure didn't happen.

*A. Petrello - Direct by Mr. Berg*

1    So, even though the lungs started to work a little bit, they

2    couldn't work fully.

3            So, she was built sort of like half and half.

4    They had to perform that operation to keep her alive.  So,

00:50    5    she was on the respirator during this entire time.

6    Q.   Tony, do you recall when Carena came home from the

7    hospital?  And then fill us in on what her daily care was

8    like then and now, if you would.  And I'll interrupt you

9    with a couple of questions along the way.

00:50   10    A.   Okay.  When she came home from the hospital in May of

11    1998, she was on heart monitors and a whole set of medicine.

12    She had to be fed through a tube with a pump through her

13    nose into her stomach.

14            Because of her size, you couldn't pump that

00:51   15    much into her stomach and you had to do it over an extended

16    period of time.  Therefore, you couldn't do it just during

17    the daytime.  You had to do it at nighttime.

18            So, we had to have a staff of nurses all the

19    time.  We were fortunate enough that nurses in the hospital

00:51   20    became very attached to her and five of the nurses gave up

21    their -- took leaves of absence from Women's Hospital and

22    joined us to work with us full-time.  They were with us for

23    several years.

24    Q.   What kind of care does Carena require?  Who's in charge?

00:51   25    How does it work?

1    A.   Well, Carena's needs over the years have changed, in

2    part, because her issues have changed.

3             In the fall of 1998, about a year -- almost a

4    year after she was born, she didn't meet the development

00:52    5    milestones and we discovered after taking an MRI at Texas

6    Children's Hospital that she had what's called PVL.

7             In short, what that meant is she had suffered

8    a stroke at the top of her brain and that stroke accounted

9    for her motor deficits.  The hypothesis was that the stroke

00:52    10   either occurred during those events I told you about or

11   while she was on the respirator.

12            The result of that was that her issues about

13   her ability to walk and navigate and arm movements were all

14   a problem.  And, so, we began sets of therapy to deal with

00:52    15   that and we would augment our nurse team with special

16   therapists along the way.

17   Q.   What is the goal of -- Now, your daughter functions at

18   what level cognitively?  What is her mental capacity?

19   A.   She is incredibly difficult to test because she can

00:53    20   neither talk or reciprocate in any exchange.  So, the best

21   indication we have is that it's at a three-year level.

22   Q.   And at three-year level, you say?

23   A.   Yeah.

24   Q.   Her --

00:53    25   A.   Certain types of things are lower and certain other

*A. Petrello - Direct by Mr. Berg*

1    things are higher.

2    Q.   But that averages out?

3    A.   Yeah.   At a three-year-old.

4    Q.   Tell us about her physical disabilities, if you would.

00:53   5    A.   Okay.

6    Q.   And then I'll have a question.

7    A.   Well, physically, she -- as I said, she can't talk.   As

8    David mentioned, she wears braces and, with a walker, she

9    can walk up to 30 to 50 steps before she gets tired.   She

00:53   10   can't balance herself.   She can't dress herself.

11             She can't -- If you put the food on a fork,

12   she can feed herself, putting the fork in her mouth now.

13   She can't -- We're working on stabbing the food with a fork.

14             To give you an idea, she can't blow her nose.

00:54   15   She still wears a diaper because she doesn't control her

16   bodily functions.

17   Q.   Well, what's the point of all this therapy?   Why do you

18   care?   What can you do?

19   A.   Carena is a testament to the endurance of a pure soul.

00:54   20   I mean, she's been a fighter from day one.   And the fact is,

21   you know, I guess, you know, my aspirations were for my

22   daughter to go to one of the universities I went to.   My

23   wife was a professional tap dancer and aspired for her to be

24   a dancer.

00:54   25             Today we take great pride in the fact that

*A. Petrello - Direct by Mr. Berg*

1    Carena can do something like actually eating.  For the first

2    three years of her life, I mentioned she had to be fed with

3    a tube with a pump.  Five years after that she was fed with

4    pureed food.

00:55    5             For those eight years, we had an occupational

6    therapist working with her constantly and it was only after

7    eight years that one day, while sitting at the table, Carena

8    just reached over and grabbed a French fry and started

9    eating.

00:55   10             And, so, many people are aware today that, in

11   1998, it was discovered that the brain has plasticity,

12   meaning that the brain can repair itself if it's properly

13   motivated.

14             So our goal in life is to try to give Carena

00:55   15   that chance and use whatever resources we have to give her

16   an environment that will enable her to thrive the best she

17   can.  And we make and have made those kind of progress.  We

18   have a lot of really good people working with us to do that.

19             So, we take exceptional pride about that.

00:56   20   And, frankly, when Carena gets up and we ask her to take ten

21   steps, we can see that it brings joy to her, too.

22   Q.  She's aware?

23   A.  We think she's aware.

24   Q.  She has a soul?  There is something going on in there?

00:56   25   A.  Correct.

*A. Petrello - Direct by Mr. Berg*

1    Q.   Where did she get that French fry?

2    A.   Took it off her mother's plate.

3    Q.   She reached across -- And this has been -- that was a

4    mark of progress; was it not?

00:56    5    A.   Correct.

6    Q.   Do you restrict your interest in seeing this kind of

7    progress strictly to your own daughter?

8    A.   No.  I mean, one of the things -- Obviously, before

9    Carena, I had no idea this whole world existed and, in the

00:56   10   quest to address Carena's needs, we've encountered lots of

11   experiences.

12              By the age of 3 -- She actually started out

13   with being able to say a few words.  At the age of 16, she

14   could -- actually knew all her colors.

00:57   15   Q.   16 months?

16   A.   16 months.

17              She was actually ahead of the curve and she

18   knew her colors.  She could spell her name.  She could never

19   have a conversation, but she could do that.  We actually

00:57   20   thought she might have been a savant.

21   Q.   Meaning what?

22   A.   A child prodigy that could do all these calculations in

23   her head and things like that.  But, then, by the age of

24   three, she started to decline.

00:57   25              By the age of five, she lost all her language

*A. Petrello - Direct by Mr. Berg*

1    and she would basically retract into a fetal position and

2    wouldn't do anything.

3              At that point, we did a quest.  We went around

4    the country looking for help to, basically, every

00:57   5    university.  That's how we discovered this whole world and

6    what's happening with children like Carena.

7    Q.   Have you gotten involved in the Medical Center?

8    A.   Yes.

9    Q.   Tell us about your involvement.  And I'd like you to

00:57  10    talk about the research institute.  And then we're going to

11    talk about her special needs and this house issue.

12    A.   Well, one of the things we learned is, for children with

13    neurological disorders, there's just a lot of questions and

14    not a lot of answers.

00:58  15              There's 14 million kids in the country with

16    neurological disorders and there's just not a lot of

17    research because no one knows what to do.

18              We found a lot of people interested in doing

19    something, but it wasn't funded and no one had brought

00:58  20    together all the necessary people.

21              So, my wife and I decided to speak to Texas

22    Children's Hospital.  And, you know, there's institutes for

23    cancer and there's institutes for the brain, there's

24    institutes to help adults with Alzheimer's.

00:58  25              But, believe it or not, throughout the entire

1   country, there's no dedicated institute to focus on mental

2   disabilities for children.  And, so, we said we thought we

3   should try to create one.

4          And Texas Children's Hospital and Baylor

00:58   5   College of Medicine agreed and we came up with the idea of

6   creating the first research institute for children focused

7   solely on the brain and to build it.

8   Q.   You're on the board at Texas Children's; are you not?

9   A.   Right.

00:59   10   Q.   And do you have any special responsibility on the board?

11   A.   I'm a member of the board of trustees and chairman of

12   the finance committee.

13   Q.   And do you spend a significant amount of time working

14   with Texas Children's and in the Medical Center?

00:59   15   A.   Yes.

16   Q.   Who put their money where their mouth was for the

17   institute?

18   A.   My wife and I made the initial funding, again, the

19   200-million-dollar building.

00:59   20   Q.   And did it happen?  Is it happening?

21   A.   It's happening.  We've raised $140 million, and the

22   building is going up.  It's over 300,000 square feet.  It's

23   smack in the heart of the Medical Center.

24          It has -- The executive director will be Huda

00:59   25   Zoghbi, who discovered the gene that causes Rett Syndrome

*A. Petrello - Direct by Mr. Berg*

1    and Erb's, which is a very debilitating disorder that,

2    actually, some people thought my daughter had at one point.

3              That building is going up right now.  It will

4    open for business the fall of this year.

01:00   5    Q.  Mr. Petrello, let me take you back to the Petrello

6    household, then.

7              Tell us about a night in the Petrello house.

8    I want you to talk about Cindy and yourself and what you do.

9    A.  Well, every -- virtually every night during the week and

01:00   10   on a Saturday, not necessarily a Sunday, Carena has to have

11   a massage therapist come.

12             CP -- As some people may know, with CP,

13   basically, the brain sends a signal to the legs and it says

14   to tense your leg.

01:00   15             So, if you're sitting there now and you say

16   tense my leg, in Carena's case, basically, that signal is on

17   all the time.  So, she's always in contraction.  So, we do

18   these massage therapies every day to stretch her and to

19   loosen up all those muscles.

01:00   20             Some CP kids you see twisted in chairs and

21   everything.  Carena is not like that because she's been

22   getting this therapy every day from the day she was

23   basically born.

24             So, she undergoes that.  Then she has dinner

01:01   25   and then has trouble always going to sleep.  But,

*A. Petrello - Direct by Mr. Berg*

1   eventually, she goes to sleep.  She typically only sleeps

2   several hours.

3           I think mothers of newborn babies basically

4   joke how they don't get sleep.  My wife hasn't had sleep in

01:01   5   about 12 years because virtually every night, you know,

6   Carena is waking up.  She either has to have a diaper change

7   or is thirsty or whatever.  And, of course, she can't do

8   anything for herself.

9           During the early years we had nurses actually

01:01   10   staying in the room with her all the time because we had

11   machines.  After we moved along, we converted the -- The

12   house has a system where there's infrared cameras in her

13   room and speaker systems throughout the house.

14           So, in any room of the house we can see even

01:02   15   with the lights off what's going on in the room.  There's an

16   audio on that plays into any room in the house.

17           And, so, as soon as we know during the course

18   of the night there's something, one of us goes in --

19   typically, it's not me; it's my wife -- and -- Yeah.  So,

01:02   20   that's what a typical night is.

21   Q.  I spoke in opening statement about your concern about

22   Carena's future.  I'd like for you to talk us to a bit about

23   that and lead us to why you bought the house -- the

24   property, rather, at 18 Sunset.  Please go ahead, sir.

01:02   25   Describe, in general, why you did that.

*A. Petrello - Direct by Mr. Berg*

1    A.   Well, I think we're obviously very committed to making

2    sure that Carena is given an environment in which she has

3    the best chance of doing whatever she's capable of doing.

4    In our present home here, with my wife and I around, we can

01:03    5    make that happen.

6              The home was originally designed before we

7    knew all these issues with Carena --

8    Q.   Mr. Petrello, I'm circling your house so the jury will

9    know what you're talking about.

01:03    10    A.   The brick there --

11    Q.   Do you want it?

12    A.   Sure.

13              Here's the front courtyard.  This is the front

14    part of the house.  This is one wing.  This is another wing.

01:03    15    This whole section here is what we call the old part of the

16    house (indicating).  It was built in 1920.

17              And then from here in the back it's the new

18    section.  It had been renovated by someone else before we

19    bought the house and then we improved it.  This is the

01:03    20    backyard, a pool.  There's a tennis court here (indicating).

21              And the house was originally set up -- Our

22    families all live on the East Coast.  My family is in New

23    Jersey.  My wife's family is in Connecticut.  We had hoped

24    that people would visit us in Houston, friends.

01:04    25              So, the house was originally set up to have

1   people spend long periods of time.  My parents are both

2   elderly.  So, that's why it was done.

3   Q.  Let's make it clear.

4           This is not a typical situation?

01:04   5   A.  This is not a typical house.

6   Q.  And when you were growing up in Newark, did you expect

7   to live in this house?

8   A.  I lived in a two-family house with my grandmother.

9   So....

01:04   10          So, the house was set up this way.  And,

11  obviously, right now we're doing everything we can to create

12  the kind of environment that Carena will thrive in.

13          What is on our mind and what we constantly

14  have to worry about is what happens when my wife and I die,

01:04   15  because we have no other family down here in Houston and,

16  for the reasons I described to you, Carena needs 24-hour

17  care.  And, so, the question is what happens to her.

18          We believe, because of her special needs --

19  Unfortunately, lightening struck twice in Carena's case.

01:04   20  You know, she's both physically and mentally handicapped.

21  So, there's just not many -- We don't think

22  institutionalization would be a solution afterward.

23          And, so, what we believe is that we would like

24  to create a custom environment consistent with how she's

01:05   25  going to spend the remaining years with us in our life and

*A. Petrello - Direct by Mr. Berg*

1    plan for that transition.

2              And, so, to that end, we thought she should --

3    we would find a house that would be suitable for her --

4    Q.  Let me ask you one question that the jury would want to

01:05   5   know.

6              Her life span, have you discussed that with

7    the doctors?

8    A.  Yes.

9    Q.  And tell us what you expect out of her life span.

01:05  10   A.  I think Carena clearly will live, you know, if --

11   assuming she gets the kind of treatment and things, you

12   know, well into her 50s and past.

13   Q.  And how old are you, Tony?

14   A.  I'm 55.

01:05  15   Q.  I won't ask you how old Cindy is.

16   A.  No.  Don't.

17   Q.  All right.  I'm sorry to have interrupted you.  Please

18   go back to --

19   A.  Okay.  So, there's two issues with the current house.

01:06  20             The current house -- This part of the house,

21   which is -- About 60 percent of the house is built with

22   step-downs.  In other words, the house is built out of

23   concrete and -- in the old days, that's the way houses were

24   built -- and there's these step-downs, three or four steps.

01:06  25   There's a step-down on that wing, and there's a step-down on

*A. Petrello - Direct by Mr. Berg*

1    this wing (indicating).

2              The result is that, in our house today, the

3    only part that's accessible for someone in a wheelchair is

4    from here to the back (indicating).  60 percent of the house

01:06  5  can't be used by someone in a wheelchair.

6              The same thing is true on the second floor.

7    The second floor has these same step-downs.

8              So, that's the first issue.  If one were going

9    to make the whole property handicapped-accessible, you'd

01:06  10  actually have to, basically, rebuild the house.

11   Q.  And let me stop you.

12             Talk about the step-downs.  And we'll show it

13   on the screen.

14   A.  Yeah.  The step-downs --

01:07  15  Q.  Can we go to that?

16   A.  So, this, for example, is the garden room.  You see

17   these steps here?  This is -- On the previous screen, this

18   is a room off to the left here.  There's a living room here

19   and there's three steps coming down on -- that are marble

01:07  20  stairs right here (indicating).

21             I think the next slide might show the steps

22   better.

23             You can see here the room.  You see the steps.

24   So, this wing of the house steps down.  Then it steps up.

01:07  25  Then there's a middle section of the house that you saw, the

A. Petrello - Direct by Mr. Berg

1   front part.

2          THE COURT:  Where exactly are the steps, sir?

3   Point that out.

4          THE WITNESS:  Sure, Your Honor.

01:07   5          MR. BERG:  Do you want him to step down?

6          THE COURT:  No.  No.  That's fine.

7          THE WITNESS:  It's right there (indicating).

8          THE COURT:  Oh.  I see.  They're looking straight

9   into a hallway there --

01:07   10          THE WITNESS:  Correct.

11          THE COURT:  -- which is to the left of the window.

12          THE WITNESS:  Correct.

13          THE COURT:  Okay.  Got it.

14   A.  And that actually is a doorway that leads into a fairly

01:07   15   large living room.  And then the next room -- Yeah.  That's

16   the living room.

17          Then the next room there is actually the front

18   foyer.  Okay?  So, that's on that side.

19          And then, on the other side of the house --

01:08   20   Here's another view of those steps you can see in that same

21   room.  Flip.

22   By Mr. Berg:

23   Q.  Can you go to the next one.

24   A.  Okay.  This is the dining room.  You can see from the

01:08   25   dining room you can't get into the library.  You can't get

*A. Petrello - Direct by Mr. Berg*

1    into the hallway.  And this is all original to the house.

2    Okay?  This was all redone.

3    Q.  Was it important to you -- Well, first of all, let's

4    talk about the timing.

01:08    5                    When did you buy this house?

6    A.  We bought it in 1996.

7    Q.  And how long did it take before you moved in?

8    A.  Four and a half years.

9    Q.  And during that period of time what was your goal?

01:08    10   A.  Our goal --

11   Q.  And talk about Carena, too, and her condition at the

12   time.

13   A.  Well, our goal at the time was to -- We were attracted

14   to the house because of its beauty, its historical

01:08    15   significance.  We wanted to make sure that we renovated it

16   and updated it in keeping with it and, at the same time,

17   wanted to provide for our family --

18              THE COURT:  You can move that mic back a little bit

19   because getting some feed.

01:09    20              THE WITNESS:  Yes, Your Honor.

21              THE COURT:  Thank you.

22   A.  We wanted to make sure that it would accommodate our

23   family for extended periods of time, which is why it has the

24   size and resources, so our respective moms could come down

01:09    25   and spend long times with us.

*A. Petrello - Direct by Mr. Berg*

1    By Mr. Berg:

2    Q.   And what are we looking at here?

3    A.   So, this is the second floor.  Carena's bedroom -- We're

4    looking out the door of Carena's bedroom, and you can see

01:09    5    the steps (indicating).

6              So, to go to the remainder of the house

7    there -- which, again, this is the front of the house.  To

8    go to the remainder of the house, you have to go up.  And

9    you go this way (indicating).

01:09    10             You go toward that new wing I was explaining.

11    It goes that way.  And Carena's bedroom would be right here

12    (indicating).

13    Q.   Is there an elevator in the house?

14    A.   Right.  You see where that icon is.  There's an elevator

01:09    15    right there that was put in.

16    Q.   And let me ask you a question.

17             Talk to us about that elevator and its

18    sufficiency at this time.

19    A.   Well, the elevator is, basically, an elevator designed

01:10    20    for a few people to get into.  But the elevator doesn't

21    really contemplate an adult in a wheelchair.

22             Now, an elevator on a house -- Many of you may

23    know most elevators on a house have these gates that you

24    close and then the elevator goes down.

01:10    25             Well, when you have a daughter that is -- has

53

*A. Petrello - Direct by Mr. Berg*

1    developmental challenges, you can't put her in the chair in

2    an elevator with a gate because -- if she puts her hand or

3    anything through the gate.  So, someone has to be with her

4    in the elevator.

01:10    5              So, at a certain point, that elevator doesn't

6    work for a wheelchair.  And, in fact, today the only time we

7    use the elevator is -- We take her out of the wheelchair,

8    hold her and then we walk in the elevator.

9    Q.   There is the elevator?

01:11    10   A.   Yes.  This is the elevator.

11   Q.   Mr. Petrello, let me take you forward.  Then I'm going

12   to ask you what it would take to make this house

13   handicapped-accessible.  You already said one choice is to

14   tear it down.

01:11    15             Were there any other choices?

16   A.   Well, 40 percent of the house is handicapped-accessible.

17   I don't want to be misleading.  But 40 percent of the house

18   is because that new wing is handicapped-accessible.  But

19   that's not really the issue.

01:11    20             The issue is, when we die -- This house is,

21   with all the ancillary spaces, about 17,000 square feet and

22   it's on five acres.  It has a staff of six people away from

23   my daughter's staff just to maintain the grounds.  It has

24   elaborate gardens.

01:11    25             It was set up, as I said, to create an

*A. Petrello - Direct by Mr. Berg*

1    environment for my family.  Everything in this house centers

2    around our daughter today, but it's also for our family.

3    It's for my parents and my wife's family and friends and --

4    for all the things we love to do.  We love this house.

01:12    5              But when my wife and I die, to run a house of

6    this complexity -- okay? -- While I'm here, it takes six

7    people.  And the point that my wife and I are concerned

8    about is, when we die, we want an environment for my

9    daughter that's focused on her.

01:12    10             So, we need a home that will support her

11    needs.  And having, you know, five acres and elaborate

12    gardens and pools and all those kinds of things, that's

13    wonderful and we're very fortunate to have that, but that's

14    not what we're looking to do.

01:12    15             We're looking to create what's the best thing

16    for Carena.  What we want to do -- It's hard enough telling

17    you people we want to have a team of people that can look

18    after her as an alternative to institutionalization in a

19    home that makes sense -- that meets her needs and makes

01:12    20   sense.

21             We also want an environment where we have a

22    chance to prepare for that transition, because Carena -- As

23    many people know around special needs children -- For

24    example, Carena has autistic-type characteristics.  They

01:13    25   don't adapt to change very well.

*A. Petrello - Direct by Mr. Berg*

1    When Carena gets upset, she can't tell us.

2  Last night I came home late and my wife was in bed and there

3  was blood on the bed because Carena was upset and she was

4  biting herself.  That's the way she expresses herself

01:13   5  because she can't talk.

6    And, so, we need to have a plan where we can

7  make this transition.  One of the things that was attractive

8  first about 18 Sunset was that property -- There's only

9  three properties adjacent to our property that are right

01:13   10  next door.

11    And, so, what we thought was, when 18 Sunset,

12  which was owned by Rice University, became available --

13  Q.  Let me ask you, Mr. Petrello -- Let's show the jury

14  where 18 Sunset is and what you're talking about.

01:13   15    Now, tell us what this map is.

16  A.  Okay.  The area we live in -- I'm sorry we didn't orient

17  you earlier.

18    This here is Rice University that people know.

19  Over here is Main Street.  Museum of Fine Art is up here.

01:14   20  Texas Medical Center is a stone's throw, right over here

21  (indicating).

22    And there's a brick wall that surrounds this

23  neighborhood.  It's one of the oldest neighborhoods in

24  Houston.  It's called Shadyside.

01:14   25  Q.  It is an affluent, exclusive section; is it not, sir?

1    A.   Yes.  And this is the main entrance here (indicating).

2    You drive down.  Our house sits at the end of the

3    cul-de-sac.  You can see it's the largest lot in Shadyside.

4                    The Prucka house is right next door.  And you

01:14   5    can see this brick wall (indicating).  And everything is

6    gated.

7                    And the unique thing about this neighborhood

8    is -- I think there's only two other places in Houston

9    city -- the residents here own the streets.  The streets are

01:14   10   private.

11                   So when my daughter comes out on a tricycle

12   for therapy and can go up and down the streets, there's no

13   traffic here because everything is closed.

14                   It's the only subdivision in Houston -- I

01:15   15   don't know if Stablewood is shut -- if they own the streets.

16   But we actually own the streets, the residents.  The City

17   doesn't own them.

18                   So this is the house (indicating).

19   Q.   And where do the Pruckas live?

01:15   20   A.   The Pruckas live right here (indicating).

21   Q.   How long were they next door to you?  Do you know?

22   A.   I think they moved in in 2001.

23   Q.   And they were your neighbors?

24   A.   Yes.

01:15   25   Q.   Were you in each other's homes?

1    A.   Yes.

2    Q.   What was your relationship with Matt or Matt and Sherry?

3    What was it like?

4    A.   Well, it was very cordial.  The neighborhood does

01:15   5    activities together, Halloween trick-or-treating.  There's

6    usually a posse that goes house to house.  Typically,

7    everyone ends up at our house on Halloween and we have a

8    party for all the kids in the neighborhood.

9              Matt has a Christmas party, I think, virtually

01:15   10   every year, and we've attended that several times.  In 2006,

11   I think they attended our Christmas party and Carena's

12   birthday party at the house.

13             Sherry has been to something for the

14   Neurological Research Institute at our house, a charity

01:16   15   event.  So, very cordial.

16   Q.   And you've been in their house?

17   A.   Been in their house.

18   Q.   You heard Mr. Fogler talk about the fact that you never

19   inspected the house, you never went in and looked at it.

01:16   20   A.   Yeah.  It's silly.  I mean, I've been in the house

21   during parties.  I know the house for the purposes that we

22   need it totally sufficiently and knew what Matt had done to

23   the house and it was unnecessary.

24   Q.   Let's go now to -- You said there were three properties

01:16   25   adjoining yours, three houses.

*A. Petrello - Direct by Mr. Berg*

1    A.   Correct.  So, there's only two houses inside the gates,

2    the Prucka house and the Meyers' house, which is here

3    (indicating).

4    Q.   Two that are adjoining?

01:16    5    A.   That adjoin us inside the gates.

6    Q.   Right.

7    A.   The only other house that borders us is this home here

8    (indicating).  Now, this is not in Shadyside.  You see this

9    is actually Sunset.

01:17    10                And people may know that this is Sunset.  This

11    is Rice University here.  There's a track that goes along

12    and you see this tract of land.  This was owned by Rice

13    University.  This is a two-way street open to the public

14    (indicating).

01:17    15                But this lot become available.  We have a

16    tennis court here.  So, a tennis court blocks -- Our house

17    is here (indicating).  There's a tennis court.  And that's

18    what blocks it.

19                But there's this house here, which you enter

01:17    20    from Sunset.  It also has a back entrance over here

21    (indicating).

22    Q.   Now, Mr. Petrello, was there a house on that property?

23    A.   Yes.  There was like a 40-year-old sort of modernistic

24    house.

01:17    25    Q.   And did you buy that property?

1   A.   Yes.   We bought it from Rice University.

2   Q.   Because the document will become important, did you have

3   some sense of what the value of that property was from an

4   appraisal or some other document?

01:18   5   A.   Well, Rice University themselves obtained an appraisal.

6   I just spoke with them on the telephone, to Scott Wise, the

7   chief investment officer.   I didn't exchange any contracts

8   with him.   I didn't have to send him a written offer.   And

9   I --

01:18   10   Q.   He trusted you?

11   A.   We agreed on the phone to what the price was and then

12   the contract got written up.   He furnished me with an

13   appraisal on the property.   We agreed on the price and

14   offered that.

01:18   15   Q.   Did you go inside that house?

16   A.   I did, actually.

17   Q.   And did you tear it down?

18   A.   Yes.

19   Q.   As a result of seeing the condition it was in?

01:18   20   A.   Yeah.   It had concrete floors, for example.

21   Q.   And why did you need this property?   You've told us

22   about the problems with your house -- the issues with your

23   house, rather.   Why did you need that property?   What was

24   your idea?

01:18   25   A.   So, in November, 2006, the odds of a property coming --

*A. Petrello - Direct by Mr. Berg*

1   There's only three lots.  The odds of something becoming

2   available only happens -- It could happen every 20 years.

3   You just don't know.

4            So, because that property came up, we bought

01:19   5   it.  We knocked it down.  And Rice University -- They were

6   well familiar with why we wanted it.

7            The theory was that we would build a house

8   eventually when Carena became an adult and we would build a

9   new house there and, when we died, this house is going to

01:19   10  get sold and that's where she's going to live.

11  Q.  I know you're not bragging, but you did write a check

12  for that house.  That will become important.

13  A.  Right.

14  Q.  And how much was it?

01:19   15  A.  3.15 million, I think.

16            THE COURT:  I'll tell you what.  It's now almost

17  11:45.  Let me stop the clock.

18            Ladies and gentlemen, we'll take a break at

19  this time.  By the way, when we end at 6:00 and we end at

01:19   20  1:00, I give myself a five-minute increment either way.

21            So, when we're supposed to adjourn at 1:00, it

22  could be 1:05.  Same thing at 6:00, plus or minus five

23  minutes.

24            It's now about 11:45.  Let's take our break at

01:20   25  this time.  Be back ready to resume at 12:00 noon.  So we'll

61

1    see you then.

2

3

4                           (Recess)

01:40    5                    (Jury present)

6              THE COURT:  Thank you.  Please be seated.

7                    Go right ahead, sir.

8              MR. BERG:  Thank you, Your Honor.

9    By Mr. Berg:

01:41   10    Q.  Mr. Petrello, I'd like to just briefly revisit the issue

11    of your home and renovating.

12                    When did you begin renovation on your home?

13    A.  We bought it in '96 and we didn't move into it until

14    September of 2004.  Four and a half years of renovation.

01:41   15    Q.  I think you need to pull that just a little closer.  I

16    don't know if everyone heard that.

17                    You said four and a half years of renovation?

18    A.  Yes.

19    Q.  And why did it take so long?

01:41   20    A.  There was an extraordinary attention to detail and the

21    type of construction that was done was done to replicate

22    everything consistent with the way it had been done

23    originally.

24    Q.  Now, Carena was born about a year and a half after you

01:41   25    bought the house?

A. Petrello - Direct by Mr. Berg

1    A.   Correct.

2    Q.   December 2nd, 1997, was it?

3    A.   Yeah.  Actually, we bought it in January of '96; so, it

4    would have been a little bit longer.  Almost two years.

01:42    5    Q.   When did you finally understand -- Well, first of all,

6    what were your expectations for Carena when she came home?

7    A.   Well, obviously, everyone always hopes for the best.  We

8    thought, with the care and the therapies and things, that

9    she would, frankly, grow out of her problems.  And in the

01:42    10   early years, news tended to only go the bad way rather than

11   the good way.

12   Q.   When did you finally understand the depth of her needs?

13   A.   After we moved into the house in September, 2004, as I

14   mentioned, that's the point where she started really

01:42    15   declining and lost all her function, wasn't speaking, would

16   just, frankly, get in a fetal position on the floor and not

17   do anything.

18        We then did the search around the country to

19   find other opinions, and I went with my wife -- We took her

01:43    20   to John Hopkins, the Kennedy Krieger Center there.  They had

21   a team of about ten different people over a period of days

22   evaluate her and, at the end of that, they came back with an

23   evaluation.

24   Q.   And what was that?

01:43    25   A.   Basically, the head doctor said to me that there's

*A. Petrello - Direct by Mr. Berg*

1   nothing that could be done for her, that the best thing we

2   could do is to love her and find a good estate and trust

3   lawyer and get a good trust fund for her.

4   Q.  So, you'd already moved into the house when you found

01:43   5   this out?

6   A.  Yes.

7   Q.  Now, let me take you back to 18 Sunset.

8           You bought that, I think you said, in November

9   of 2006?

01:43   10   A.  Correct.

11   Q.  You told us what your idea was.

12          Were there problems with that house beyond

13   maybe Carena injuring herself on the floor -- the concrete

14   floors?

01:43   15   A.  Well, it was a late '50s, early '60s house.  We had some

16   suspicion of asbestos problems as well.  And, so -- And the

17   way the whole house was set up was just not conducive to

18   what we needed.

19          So -- And, in fact, Rice University gave us a

01:44   20   report that basically said the house -- any person buying

21   the house would knock it down -- or that was Rice

22   University's appraisal, not ours.

23   Q.  You bought it for land value or for the house value?

24   A.  Well, we paid -- I think we paid reflecting the house,

01:44   25   but it was at the lower end of the range.  So....

*A. Petrello - Direct by Mr. Berg*

1    Q.  You said the odds were very much against that piece of

2    property coming up for sale?

3    A.  Correct.

4    Q.  What happened next?

01:44    5         THE COURT:  By "that property," you mean the Sunset

6    property --

7         THE WITNESS:  Yes, Your Honor.

8         THE COURT:  -- the Rice University property?

9         THE WITNESS:  Yes, sir.

01:44    10         THE COURT:  Okay.

11    A.  And, so, what we did was we started the plan, which was

12    to first link it to our property.  And to do that, we --

13    after knocking the house down, we put up a wall that we

14    erected.

01:45    15         It had had some old chain-link fence.  That

16    wall was erected around the entire perimeter of the

17    property.  I had some issues with neighbors about that that

18    delayed me a little bit.

19         And then we started the landscaping.  And the

01:45    20    idea then was, in the meantime, to make it an extension of

21    our backyard, because you saw on the map how that thing was

22    contiguous and there's a pool there.

23         We were going to build a pool house that would

24    have some facilities -- extra facilities for Carena because

01:45    25    she loves to be in the pool.  But, again, we end up with her

1   voiding issues and she needs to be taken out of the pool and

2   cleaned up.  And, so, we need some extra facilities there.

3                    So, that was the theory, to use that space as

4   an extension of our backyard until such time as we were

01:45   5   ready to build the house for her permanent and then we would

6   sell off our property.

7   Q.  Now, let me ask you:  During the period of time that you

8   had workmen on this property, what happened that affected

9   your --

01:46   10                    THE COURT:  Which property are you talking to?

11                    MR. BERG:  I'm sorry.

12   By Mr. Berg:

13   Q.  18 Sunset.

14   A.  During the period of construction on 18 Sunset, our

01:46   15   groundskeeper -- While over there one afternoon -- I think

16   it was during the afternoon -- a gang of guys came and beat

17   him up.  A police report was filed.

18                    During the construction of all the

19   landscaping, on another time, the contractor who had some

01:46   20   heavy equipment there, another group of people came and

21   stole the equipment.

22                    So, we became aware -- much more aware that,

23   on that Sunset side -- because that property borders

24   Sunset -- which I think everyone knows is a two-way street,

01:47   25   there was a lot of issues there about security.

*A. Petrello - Direct by Mr. Berg*

1    Q.   Early -- Oh, good.   You've got it.

2    A.   This is the area here (indicating).

3             And I think it's also no secret that around

4    the Rice University campus there had been a greater degree

01:47   5    of incidents.   While we were in here and behind this brick

6    wall, since we have gates, we never really had to confront

7    any of that issue.

8             So, I became much more aware because now the

9    property was going to border this, that I had bigger

01:47   10   security issues.   So, I started thinking about that as a

11   long-term issue.

12   Q.   Now, along the way -- If you'll point out the Prucka

13   house again, Mr. Petrello --

14   A.   (Complies)

01:47   15   Q.   -- what did you hear about the Prucka house and when?

16   A.   In October a year later, a year after we purchased the

17   18 Sunset property -- A year later we had heard that the

18   Prucka house might be coming on the market for sale.

19   Q.   And did you look into that?

01:48   20   A.   Yes.

21   Q.   What were the odds of the second home coming for sale,

22   in your mind?

23   A.   Well, from all my contact with Matt and Sherry, they

24   were very happy in the neighborhood.   They had young kids

01:48   25   and I thought they were going to be there for decades.   So,

*A. Petrello - Direct by Mr. Berg*

1    I was really surprised.

2              And the same thing's true for my neighbor on

3    the other side.  They both have young children as well.

4              So, it was a big surprise to me and, like you

01:48   5    said, an opportunity that comes along, you know, that you

6    really can't count on.

7    Q.  Let's go to the initial exchange.

8              I would like to show you what has been marked

9    Petrello Exhibit -- I'm too old to read that.

01:48   10             MR. BERG:  Is that Exhibit 1?

11             MR. GIBSON:  No. 1.

12             MR. BERG:  Exhibit 1.  All right.

13   By Mr. Berg:

14   Q.  All right.  Petrello Exhibit 1.

01:49   15             Tell us what this is, Mr. Petrello, and then

16   we're going to read it into the record, if you will.

17   A.  This looks like an e-mail exchange between me and Matt

18   Prucka.  I think there's a second page, if you'd put it up

19   on the screen.

01:49   20   Q.  We'll get there.

21             Where it's initiated?

22   A.  Yes.  It's in reverse order.

23   Q.  There we go.

24   A.  So, on October 30, I sent an e-mail to Matt Prucka.  I

01:49   25   basically said that I had heard through the grapevine that

*A. Petrello - Direct by Mr. Berg*

1    he might be selling his house.  You can see I made a comment

2    that the graciousness and IQ of the neighborhood will

3    definitely be deteriorated without him around there.

4            I said, "We would be interested in seeing if

01:49   5    we could agree on something before you listed it without a

6    broker's fee."  I said, "We, of course, have the ability to

7    be as flexible as you might desire.  Let me know if that is

8    of interest to you at your convenience.  In any event, hope

9    to see you all trick-or-treating."

01:50   10           This was October 30, the day before Halloween.

11   And I think I mentioned to you every Halloween in the

12   neighborhood we do -- all the kids go house to house and

13   they end up, typically, at -- The last place is our house,

14   where we have a party.

01:50   15   Q.  Go to the first line.

16           You said, "I understand through the grapevine

17   that you may have decided to remain in Utah full-time."

18           What were you referring to there, sir?

19   A.  Well, I had understood that they actually vacation there

01:50   20   or spend some time there.  But what I had heard was that

21   they were going to relocate there permanently and sell their

22   house.

23   Q.  And did you get a -- And when you got a response from

24   this, before we put it up on the screen, do you recall what

01:50   25   the response was and when you got it?

*A. Petrello - Direct by Mr. Berg*

1    A.   The very next day.

2    Q.   And what was the essence of the response?

3    A.   The essence of the response was he was in the process of

4    listing it with a broker.  I think he told me the price,

01:51  5    8.3 million.  And he said he would be interested in talking

6    to me.

7    Q.   All right.  "Tony, yes, we are addicted to the Park City

8    lifestyle and are making it permanent.  Certainly, besides

9    our friends and Sherry's mom, Shadyside is the most

01:51  10   difficult part about leaving Houston, but with school, et

11   cetera, we knew that splitting the year would not last much

12   longer.  We are in the process of putting the house on the

13   market.  We are listing it at $8.3 million.  Give me a call

14   if you're interested.  We are in the process of finalizing

01:51  15   our contract with our broker.  You can call me on my cell

16   number, which is listed below.  We are back in Utah and are

17   doing trick-or-treating here for the first time.  Say hello

18   to Cynthia.  And I hope that Carena is doing well."

19            He knew Carena's condition; did he not?

01:51  20   A.   Yes.  Matt and Sherry were very aware.

21   Q.   Now, before we move on to the next e-mail, you heard the

22   opening comments of Mr. Fogler.

23            Was there something sinister about asking if

24   you could proceed without a broker?

01:52  25   A.   No.  I think, for people that are friends, it's the

1    reasonable thing to do and it's of mutual benefit.  So....

2    Q.  How is it a mutual benefit?

3    A.  Well, when you have a broker, the broker obviously

4    expects a broker's fee and, to the extent that money is not

01:52    5    going to a broker, it's there so that the two people can

6    arrive at a price without a broker's fee, which typically

7    means that the seller ends up receiving more money net.

8    Q.  Ultimately, that's what would have happened if he had

9    taken your offer?

01:52    10    A.  Correct.

11    Q.  But let's go on.  Let's look at this one last e-mail.

12    And you say, "That's too bad, but I understand

13    the lifestyle at Park City is pretty incredible."

14    Now, what else did you say in this e-mail,

01:52    15    Mr. Petrello, of concern to this jury and this Court?

16    A.  Well, in his prior e-mail, you know, he mentioned that

17    he was in the process of listing it with a broker.  And, so,

18    I didn't want to appear like I was trying to slow him down

19    in any way.

01:53    20    So, what I said was, "Why don't you go ahead

21    with your plans and just make arrangements with the broker

22    to get an exclusion that, if you sell to me, the broker

23    wouldn't be expecting a commission."

24    Because, obviously, the broker has nothing to

01:53    25    do with putting the two of us in contact.  I just called

*A. Petrello - Direct by Mr. Berg*

1    you.  We're going to do the deal.  A broker shouldn't demand

2    a fee on something that the broker didn't do any work to

3    originate.

4                  And, so, I said, "And, by the way" -- I said,

01:53   5    "Don't just do this for me.  While you're doing it, you

6    might as well do it for everybody else in Shadyside.  There

7    may be somebody else in the neighborhood that also wants --

8    might be interested in the house.  And, so, I wouldn't

9    object if you not only excluded me.  Exclude any of our

01:54   10   other neighbors."

11                  I wasn't looking to do anything -- We have a

12   very nice neighborhood.  I wasn't looking for a leg up on

13   any other neighbors.

14                  I was just saying, "Why don't we arrange it so

01:54   15   that there wouldn't be a broker's commission.  Because I've

16   already initiated contact with you and that would mean that,

17   all things being equal, we could agree on a price without a

18   broker's commission."

19   Q.  What was your next step or his next step after this

01:54   20   e-mail exchange?

21   A.  Well, I also asked in this e-mail had he done an

22   appraisal on the property because I thought maybe that would

23   be a way to see if we could come to a negotiation.

24                  And, frankly, I was referencing back to

01:54   25   exactly how the negotiated transaction occurred with Rice

*A. Petrello - Direct by Mr. Berg*

1   University.  That's what Rice University did.  Matt went to

2   Rice.  He is an engineer.

3              And, so, I thought maybe that would be a --

4   you know, a way of negotiating.  Sometimes it's a little

01:55   5   uncomfortable negotiating with a person that's a neighbor.

6   So, maybe we could have an appraisal.  And I asked him if he

7   had an appraisal on the property.

8              So, those were the two questions I had,

9   appraisal on the property and would he exclude us from a

01:55   10   broker's commission on the deal.

11   Q.  I believe there was a telephone call that followed.  Is

12   that correct?

13   A.  Yes.

14   Q.  And what was the date of that telephone call?

01:55   15   A.  I hadn't heard back from Matt in response to my e-mail.

16   I think about a week went by and then, on November 6th, I

17   telephoned him.

18   Q.  Tell us what you said and he said in this call.

19   A.  I think I opened up saying I hadn't heard from him.

01:55   20              And he apologized, saying that he was having

21   e-mail trouble.

22              I said, "Well, I had asked you about moving

23   forward.  What about arranging for us to be excluded from

24   paying a broker's commission?"

01:56   25              He said he had already taken steps to do that.

1        I said, "Great."

2        And he then said, "Why do you want the house?"

3        And I said, "Well, as you know, I bought

4    18 Sunset for Carena.  But if I had known your house was on

01:56   5    the market at the time, because your house is right next

6    door and it's inside the gates, it would have been much

7    preferable, particularly because I know about these security

8    problems."

9        And he said, "Well, what do you want to do

01:56  10    with the house?"

11        And I said, "Well, I mean, you know, I know

12    the house is beautiful.  I mean, you know, to make it work

13    for us, we're going to have to make it

14    handicapped-accessible.

01:56  15        "I have to put an elevator in for Carena.  I

16    have to widen the hallways and we're -- appropriate for a

17    wheelchair.

18        "And in the master bedroom, which would be her

19    bedroom, I'd like to build a shower that, when she's an

01:57  20    adult, you can take a wheelchair in and have a person there

21    that actually could fit in the shower.  So, you know, have a

22    real big shower, you know, not with doors."

23        And I said, "Those are the types of things we

24    want to do."  And I said, "But the great thing is, in the

01:57  25    meantime, as you know, we have all these therapists.  We

*A. Petrello - Direct by Mr. Berg*

1    could use the house as an extension of our house to do all

2    the therapies because we're -- you know, with the number of

3    therapists and everything that we have, and Carena could use

4    more play space.  So, we could use the house as an extension

01:57    5    of our house in the meantime.  And then, when Carena gets to

6    adulthood, then she could actually reside there."

7    Q.  And did he at that time say, "Why do you covet my

8    house?"

9    A.  No.

01:57    10    Q.  Did he indicate he thought you were insincere?

11    A.  No.

12    Q.  Did he know Carena's condition?

13    A.  Yes.

14    Q.  Did he tell you, "I'm not going to cut you out -- I'm

01:58    15    not going to exclude you from the brokerage agreement"?

16    A.  No.

17    Q.  Did he tell you you had a strike against you as buyer

18    because of Carena?

19    A.  No.

01:58    20    Q.  He didn't say those things, did he?

21    A.  No.

22    Q.  Let's go on now to the exhibit.

23              He said he was in the process of creating the

24    exclusion from the contract?

01:58    25    A.  Yes.

*A. Petrello - Direct by Mr. Berg*

1    Q.  Now, this is THE --

2              MR. BERG:  What exhibit is this?

3              MR. GIBSON:  Exhibit 2.

4    By Mr. Berg:

01:58   5    Q.  This is Plaintiff's Exhibit 2.  Could you highlight that

6    so we can read it and everyone will see it clearly.

7              MR. BERG:  Your Honor, may I ask if the jury can

8    see that okay?

9              THE COURT:  Yeah.  Go on.

01:58   10             Everybody see that all right?  You may not be

11   able to read it, but it's going to be read for us.  The

12   typing itself doesn't seem too clear.

13             MR. BERG:  Let me also represent to the Court that

14   this is the agreement between Heritage Texas Properties and

01:58   15   Mr. Prucka and Mrs. Prucka.

16   Q.  Will you please read the special provisions,

17   Mr. Petrello.

18   A.  It says:  "Named exclusions to this agreement are

19   Anthony Petrello and Devinder Bhatia and family members or

01:59   20   related parties.  These parties may purchase the property

21   until January 9, 2008, and no broker's fee will be earned or

22   paid by sellers.

23             "If purchase by excluded parties occurs during

24   this time, broker will be reimbursed for hard costs by

01:59   25   sellers.  If purchase by excluded parties occurs after

*A. Petrello - Direct by Mr. Berg*

1    January 9, 2008, broker will be paid 2 1/2 percent fee by

2    sellers."

3    Q.  He did what he said he was going to do?

4    A.  He excluded -- He didn't tell me that there would be a

01:59    5    time frame on it, but he excluded me from the commission.

6    Q.  When you made your offer on the house, the latest offer

7    on December the 3rd, 2007, to skip forward for a moment,

8    were you prepared to close immediately?

9    A.  Yes.

02:00    10    Q.  And how would you do that?

11    A.  Write a check.

12    Q.  All right.  Let's go back, if we might.  Let's take that

13    down.

14           Now, the conversation you had was on

02:00    15    November -- If we could go to our timeline just to recap

16    here very quickly.  Just one at a time, please.

17           To recap where we are and to orient everyone,

18    the exchange of e-mails occurs in October of 2007.  Correct?

19    A.  Correct.

02:00    20    Q.  And then, in November of 2007, you have a November 6th

21    conversation and that's where you tell Matt Prucka very

22    clearly what you want to do with the house?

23    A.  Correct.

24    Q.  And then, on November 12th, an agreement between HTP and

02:00    25    the Pruckas -- that should be plural -- listing agreement:

*A. Petrello - Direct by Mr. Berg*

1   Named exclusions to the agreement are Anthony Petrello, and

2   then Devinder Bhatia was also named.

3           Who is Devinder Bhatia?

4   A.  He's a doctor that doesn't live in Shadyside, but he

02:01   5   lives in a subdivision behind Shadyside.  But he's very good

6   friends with some other Shadyside people, and we've gotten

7   to be somewhat friends with him as well.

8           He actually with his family during Halloween

9   comes and trick-or-treats with all the Shadyside people.

02:01   10  So, we consider him an honorary Shadyside person.

11  Q.  All right, sir.  What happened next?

12  A.  So, during that November 6th call, I asked about the MIA

13  appraisal and whether he, you know, had an appraisal or

14  wanted to go about doing something.  That was something he

02:01   15  didn't seem interested in doing.

16          So, I said, "Well, the only issue, then, is to

17  figure out a price."  And I said I would inform myself as to

18  the market and, as soon as I did, I'd get back to him with a

19  number.

02:02   20  Q.  And did you do that?

21  A.  Yes, I did.

22  Q.  When was that?

23  A.  About 10 days later.  I telephoned him on November 16.

24  Q.  And tell us about that conversation.

02:02   25  A.  I told Matt that I had a chance to look at some

78

1  material.  I -- In the meantime, I had checked, I believe,

2  the website for Martha Turner and John Daugherty, which are

3  both well-known brokers, what listings were out there.

4          I looked at the material that I had assembled

02:02  5  because just a year earlier I had negotiated with Rice

6  University.  So, I had some material about prices and what

7  things were going for.

8          I knew about the sales in Shadyside itself,

9  the houses in Shadyside.  And the largest sale of a house --

02:02  10  the largest amount paid for a house in Shadyside up until

11  that time was $5.8 million.

12  Q.  And compare the house that was sold to Mr. Prucka's

13  house.

14  A.  That house was a house owned by Bill Stewart and it's

02:03  15  an -- I think the land was 100,000 square feet whereas the

16  Prucka property is 70,000.  So, it was almost 40 percent

17  more in land.

18          And the home was about 25 percent larger, I

19  think, in square footage.  The home was in exceptionally

02:03  20  beautiful, great condition.  So, normalized, obviously, it

21  would be a lot more.

22          And, so, considering --

23  Q.  What do you mean, normalized, it would be lot more?

24  A.  Well, because Matt and Sherry's house was 30,000 square

02:03  25  feet less in land size and the size of the house was, you

A. Petrello - Direct by Mr. Berg

1   know, at least 20 percent less and I think the Stewart house

2   had, you know, a beautiful pool house, had a tennis court

3   and Matt doesn't have a tennis court, you know, it had extra

4   things, that it was clearly, on a relative basis, worth more

02:04   5   than the Prucka house.

6           Now, of course, that sale also took place in

7   an earlier time frame.  So, you had to take that into

8   account as well.

9           And I had this appraisal also from Rice

02:04   10   University that I didn't do that had a range -- It gave a

11   range for values, you know, in the neighborhood, taking into

12   account not only Shadyside, but, also, River Oaks.

13       MR. RALEY:  I'm sorry, Your Honor.  We're now going

14   into hearsay.

02:04   15       THE COURT:  All right.  I'll consider it.

16           All right.  Take it now -- If it gets there,

17   let me know.

18           Go on.

19   A.  So, based on that, I came up with a number and that

02:04   20   number was six and a half million dollars.

21   By Mr. Berg:

22   Q.  Did you convey that to Mr. Prucka?

23   A.  Yes.

24   Q.  And is it at that point that he said, "Oh, put that in

02:05   25   writing, Tony"?

*A. Petrello - Direct by Mr. Berg*

1   A.   No.

2   Q.   Did he ever say that?

3   A.   No.

4   Q.   Now, after that period of time -- let's put that

02:05   5   conversation up there -- what did he say about the

6   6.5-million-dollar offer?

7   A.   He said it was further from his 8.3 asking price than he

8   wanted.  I asked him to counter, and he wouldn't counter.

9   Q.   By "counter," you mean to negotiate with you on your

02:05   10   price?

11   A.   Correct.

12   Q.   And how was that left?  What did you tell him then?

13   A.   He said he wanted to test the market.

14           I said, "That's fine.  I'll leave my offer

02:05   15   outstanding."  I told him, "You know I want to buy the

16   house.  I'm willing to pay whatever the market price is.  I

17   just don't want to look stupid and do something -- You know

18   why I want it.  So, it's not a question of me wanting to

19   squeeze the extra nickel out of this thing.  I just don't

02:06   20   want to do anything stupid."  And I said, "I'll leave my

21   offer outstanding.  Go test the market and, if you get a

22   number you're happy with, come back to me with it so we can

23   do a deal."

24           And Matt said, "I have no intention of doing

02:06   25   anything away from you."

*A. Petrello - Direct by Mr. Berg*

1    Q.  Did he tell you at this time that he didn't want to

2    disturb the architectural integrity of his house?

3    A.  No.

4    Q.  Did he tell you at this time that he didn't want you to

02:06    5    make that house handicapped-accessible?

6    A.  No.

7    Q.  And that Sherry agreed with him?

8    A.  No.

9    Q.  Did he tell you that he wanted a family living there and

02:06    10    not Carena?

11    A.  Absolutely not.

12    Q.  Let's go to the next event.

13              What's the next time you hear from Prucka?

14    A.  On December 3, I received a telephone call from him

02:06    15    around -- I think it was around 10:00 p.m. at night.

16    Q.  And what --

17    A.  I think it was a Monday night, not a Sunday night, but

18    someone could check that.

19    Q.  Whatever night it was, you got a call at what time?

02:06    20    A.  Around 10:00 o'clock or so.

21    Q.  And what happened in that call?

22    A.  Well, the only reason why I remember the call is I was

23    sick with a really bad cold or flu and he had -- the phone

24    call had awakened me.

02:07    25              And Matt said when I answered that he had

A. Petrello - Direct by Mr. Berg

1   received an offer on the house near the asking price that he

2   may accept and wanted to know what I wanted to do.

3   Q.  And what did you do?

4   A.  I said, "I'm feeling sick as a dog right now.  Is it

02:07   5   okay if I telephone you back tomorrow?"

6   Q.  And what did he say?

7   A.  He said, "Sure."

8   Q.  Was there much more to that call?

9   A.  No.

02:07   10   Q.  What happened next, the next morning?

11   A.  The next morning I tried contacting him.

12   Q.  And what happened?

13   A.  I think I may have called his cell phone and didn't get

14   him.  And I think I actually sent an e-mail then to him,

02:07   15   saying, "I'm trying to get you."

16   Q.  And let me put that up on the screen so the jury will

17   see it.  It's at the very top.  And get the date on that, if

18   you would, please, sir, Al.

19           Albert, my heart is stopping.  Thank you.  I

02:08   20   tell you --

21           THE COURT:  Well, let's do it the old-fashioned

22   way.  Read it.

23           THE WITNESS:  I'll read it, Your Honor, if that's

24   all right.

02:08   25   By Mr. Berg:

*A. Petrello - Direct by Mr. Berg*

1   Q.   And the date, Mr. Petrello.

2   A.   Okay.  It says Tuesday.  So I guess December 3 is a

3   Monday.  It says Tuesday, December 4, 2007, 11:53 a.m.  And

4   the text says:  "Just called your cell.  Please call.

02:08   5   Tony."

6   Q.   And -- Give up.  Just quit.

7                Did you get a call from Matt?

8   A.   Yeah.  I think there was like an exchange.  And I don't

9   know whose phone call, whether it was his call or me or my

02:09   10   call to him, but we spoke shortly after that.

11   Q.   And what happened in that call?

12   A.   I said I was calling to follow up on what he had told

13   me.  And I said, "You really got an offer near the asking

14   price?"

02:09   15                And he said, "Yes.  You have to bid something

16   near that."

17                And I asked him to -- would he tell me the

18   number he got.

19                And he said, "No."

02:09   20                And I said, "Well, I thought you were actually

21   going to get back to me with the number so I could basically

22   eat it."

23                And he said, "I don't want to do it that way.

24   I want you to just give me a new number."

02:09   25                And I said, "Well, can you tell me anything

*A. Petrello - Direct by Mr. Berg*

1   about the offer?"

2               He says, "Well, there are contingencies."

3               I said, "What kind of contingencies?"

4               He said, "I'm not going to tell you the kind

02:09  5   of contingencies."

6   Q.  Let me stop you there.

7               He told you this much about the other offer,

8   that there were contingencies in it.

9   A.  Correct.

02:10 10   Q.  Give us a typical example of a contingency.

11   A.  A contingency could be that the person that's buying it

12   says, "I'm going to put an offer in, but the offer is

13   subject that, by the time we go to close, I need to borrow

14   money from a bank and I've got to get approved for a

02:10 15   mortgage."

16               Or a contingency could be that, "I'm making

17   this offer, but there are no -- the offer is predicated that

18   I have to do an inspection and, based on that inspection,

19   then I'll either change the number of my offer or I'll walk

02:10 20   on the offer."

21               So, he didn't tell me what type of

22   contingencies.  He just told me that there were

23   contingencies.

24               Now, going back to the November 6th

02:10 25   conversation, when I put my offer in at 6.5, I said 6.5 net

A. Petrello - Direct by Mr. Berg

1    to him, meaning no commission, because it was agreed there

2    was no commission, close immediately, no contingencies, that

3    is to say, no financing, no inspection, no anything.

4            I made it very clear on November 6th there

02:11    5    were no contingencies on my offer.  So, when he said there

6    were contingencies, I said, "Well, you're not going to tell

7    me the offer and you're even considering something with no

8    contingencies.  It doesn't make sense."

9            And he said, "I want you to make a new offer."

02:11    10            I said, "Okay."  And I actually paused a

11    little bit and -- you know, thinking about the situation,

12    knowing how much I wanted the property for Carena.  So, I

13    put an offer in.

14    Q.  And what offer was that?

02:11    15    A.  I said, "$8.2 million net, no contingencies, immediate

16    closing or whenever you like."

17    Q.  Did Mr. Prucka tell you that he was going to convey that

18    offer to his broker, Miss McGee?

19    A.  No.

02:11    20    Q.  Did he take the offer on that call?

21    A.  No.

22    Q.  Did he tell you he was going to use that offer to get

23    Dr. Nath to increase his offer?

24    A.  No.

02:11    25    Q.  And, again, he never told you you had a strike against

A. Petrello - Direct by Mr. Berg

1    you because of Carena?

2    A.   No.

3    Q.   Mr. Petrello, let me ask you to step -- Well, before you

4    step down, had you figured out in your mind what someone

02:12    5    else would have to bid to outbid you?

6    A.   Yes.

7    Q.   And let's go back to the first chart that I showed in

8    the opening statement.

9              Now, we're going to come back to this

02:12    10    transaction, but I want to pause here.  Let's go back

11    through this, now that the jury has heard a little more.

12              At the bottom -- Can you use your -- the laser

13    there?

14    A.   Sure.

02:12    15    Q.   At the bottom, tell us how you get to that number,

16    Pruckas make more money had they sold to Petrello.

17    A.   Well, my offer was $8.2 million.  There was no

18    commission, as you saw from the agreement.  And the net

19    amount that Prucka was going to get was $8.2 million.

02:12    20              The contract with the Naths was the list

21    price, 8,299,500.  If you take 3 1/2 percent of that, which

22    is the commission -- The listing agreement actually had a

23    5 percent commission.

24              My understanding is away from me somewhere,

02:13    25    that that day that commission got reduced to 3 1/2 percent.

1   So, the commission turned out to be $290,000.  That net was

2   still only $8,009,017.50.

3            So, my offer, net to the Pruckas, was $190,000

4   more.  Of course, I wasn't aware of the 3 1/2 percent at the

02:13  5   time.  I found this out in discovery.

6   Q.  I want to go into your thinking at this point.  I'm

7   going to pull this art paper around for a moment and ask you

8   to stand down.

9            The object of this exercise is to explain to

02:13  10  the jury what you -- what bid you thought had to be in to

11  beat some other -- to beat you, if you would.  Let's see you

12  put that master's in math to work here.

13  A.  So, my offer was 8.2 and my understanding was that the

14  commission was 5 percent.  So, I was thinking, "What number

02:14  15  would another bidder have to do to do better?"  I was trying

16  to come up with a number that I thought was going to be so

17  high that no one else would outbid me.

18           So, if you take 8.2 and you assume there's a

19  5 percent commission, that means the net is 95 percent.  So,

02:14  20  you have to take 8.2 million and divide it by .95.  And if

21  you do that -- I'm really bad on arithmetic.  So, if you

22  don't mind -- Let's see.  You take 8.2.  That meant the

23  offer had to be 8,631,578.95.

24           And, so --

02:15  25  Q.  And that would match you?

1    A.   To match my number, that's what it would have to be,

2    which you can see is about -- more than $300,000.  So, I bid

3    a number that I knew was $300,000 above the asking price.

4              Now, if it was even at .35, that means they

02:15    5    would have ended up with 96.5 percent.  So, to beat me at

6    that number, the offer would have to be 8,497,409.83.  So,

7    even that number, you can see, is almost $200,000 more than

8    the asking price.

9              So, that was -- That's how I came up with the

02:16    10   number.  I wanted to create a number that no one possibly --

11   Because I didn't think the market at the time --

12             MR. RALEY:  I'm sorry, Your Honor.  I'm going to

13   object.  The witness has already testified that he's not an

14   expert on the real estate market.  So, I'm going to object

02:16    15   to him giving an opinion as to the real estate market.

16             THE COURT:  Overruled.

17   By Mr. Berg:

18   Q.   Mr. Petrello, would you do me a favor.  Initial that.

19   I'm going to offer that as a demonstrative in just a moment,

02:16    20   if you'll initial that.

21   A.   (Complies)

22   Q.   Now, this was your thinking.  Correct, sir?

23   A.   Yes.

24   Q.   Now, you made your 8.2-million-dollar offer.

02:16    25             Did Matt Prucka say, "Put it in writing so I

1    can pass it on to my broker"?

2    A.   No.

3    Q.   Was that even an issue?

4    A.   No.

02:17  5    Q.   He was already preparing a written contract, apparently.

6    Is that correct?

7    A.   That's what I heard for the first time today.

8    Q.   In -- Well, it's a fact.  We now know it.

9              So, let me ask you this:  Did you expect to

02:17 10    get the house at this price?

11    A.   Yes.

12    Q.   What happened next?  When did you next hear from Matt?

13    A.   Later that day.

14    Q.   What happened?

02:17 15    A.   Around 4:00 or 5:00 o'clock, I received a telephone

16    call.

17    Q.   And that was from?

18    A.   From Matt.

19    Q.   And did you get the news you wanted?

02:17 20    A.   No.

21    Q.   What happened?

22    A.   He said, "Tony, I'm calling to tell you you lost."

23              And I said, "I lost?"

24              He says, "Yes.  You lost."

02:17 25    Q.   And what was your response?

*A. Petrello - Direct by Mr. Berg*

1    A.  I said, "I can't understand that.  You mean someone bid

2    more than $8.6 million for the house?"

3              And he responded, "You lost."

4              And then I kept pressing him to tell me what

02:18    5    the other offer was, and he wouldn't tell me.

6    Q.  What did you do next?  How did this end?

7    A.  Then I said to him, "What about the contingencies?"

8              He said, "Oh, I got the other buyer to drop

9    the contingencies."

02:18   10              I said, "Oh."  I said, "So, you used my offer

11   to drop it, but you won't tell me what the other offer is.

12   Will you give me a chance to beat it?  Tell me the number

13   and let me beat it."

14              He says, "No.  That's not what I want to do."

02:18   15              And then I said to him, "Well, Matt, you know

16   why I want the house for Carena.  How does it hurt you?  If

17   it's a higher number, I'm prepared to even pay more.  Just

18   tell me what the number is."

19              And he said -- continued to say, "No."

02:19   20              And I said, "Even away from Carena, just being

21   good neighbors, why wouldn't you give me that chance?"

22              And then he concluded by saying, "I'll

23   reconsider."

24   Q.  Had he ever told you that he would not do anything away

02:19   25   from you?  Did you tell us that?

*A. Petrello - Direct by Mr. Berg*

1    A.   Yes.

2    Q.   When did he tell you that?

3    A.   He told me that on November 16.

4    Q.   When you made your 6.5-million-dollar offer?

02:19    5    A.   Correct.

6    Q.   Now you're at 8.2 and he has told you you lost?

7    A.   Right.

8    Q.   He has told you he would reconsider?

9    A.   Right.

02:19    10    Q.   Did you hear from him the next day?

11    A.   No.

12    Q.   What happened?

13    A.   The next day, I believe in the morning -- late morning,

14    I tried telephoning him.  And I can't recall whether I

02:19    15    actually left a message on the cell phone.  But I tried

16    reaching him in the morning, and it wasn't until late in the

17    day I finally got ahold of him.

18    Q.   And tell us about that conversation.

19    A.   I said, "Matt, I'm calling to follow up.  I didn't hear

02:19    20    from you.  I wanted to see where you were on the deal."

21         And he said, "I concluded the deal with the

22    other buyer."

23         I said, "Well, I thought you were going to

24    reconsider it."

02:20    25         He said, "I decided to go with the other

1    buyer."

2               And I then said I'm, you know, extremely

3    disappointed or words to that effect.

4    Q.  What was your -- How were you emotionally at this point?

02:20    5    Were you screaming?

6    A.  No.  I wasn't screaming, but I was upset.

7               I said, "You're telling me someone bid more

8    than 8.6.  Let me know what the number is and give me a

9    chance to increase the offer.  I can't understand how

02:20    10   someone did this."

11              And Matt's response was, "Tony, don't you

12   think I could do the calculation?"

13   Q.  What was his tenor?

14   A.  He was dismissive.

02:20    15   Q.  You have to assume he did the calculation?

16   A.  I assume he did the calculation.

17   Q.  You have to assume he knew that he was going to pocket

18   almost $200,000 less from selling the house to Dr. Nath?

19   A.  Well, I didn't know what deal he had done, but it just

02:21    20   didn't make sense to me that someone had bid more than

21   $8.6 million.

22   Q.  Did he tell you to go to the list price, that that

23   somehow magically would put you ahead of Nath?

24   A.  No.

02:21    25   Q.  Did he indicate, "You've got to go to our list price.

*A. Petrello - Direct by Mr. Berg*

1   Someone's already given us the list price"?

2   A.   No.

3   Q.   Did he tell you to make another offer?

4   A.   No.

02:21   5   Q.   Let's go on to the -- If we can -- Now, this is

6   December 5th.

7            Now, was there a point in time -- At this

8   point, you've never conversed with Peggy McGee?

9   A.   No.

02:21   10   Q.   You don't know what her role is?

11   A.   No.

12   Q.   And you don't know what she knows about your daughter?

13   A.   No.

14   Q.   And you don't know at this point what she knows from her

02:21   15   good friends, the Pruckas, about why they won't sell to you?

16   A.   Correct.

17   Q.   Did you meet Dr. Nath?

18   A.   Yes.

19   Q.   Tell us how that came about.

02:22   20   A.   A few days later -- I believe it was December 7th, which

21   was the Friday of that week -- late in the evening, I came

22   home from work and people around the house said there was a

23   lot of activity next door and the talk was that perhaps it's

24   the new buyer.

02:22   25            So, I spoke with J.J., who is one of our

A. Petrello - Direct by Mr. Berg

```
 1   employees, who's a cook and -- a great cook -- and I asked

 2   him to see whether -- if that's the case and if the person

 3   would be willing to speak with me.

 4              So, he went over.  He actually knows one of

 5   the persons that lives on the Prucka property and, I think,

 6   through him he was -- got to ask the buyer, who turns out to

 7   be Dr. Nath, whether he would meet with me.

 8   Q.  And did he do that?

 9   A.  He came over a couple of minutes thereafter and we met.

10   Q.  Did he come over and tell you that J.J. had intimidated

11   him?

12   A.  No.

13   Q.  What was his attitude when he got there?

14   A.  He was very friendly.  He obviously had just also

15   come -- returned from work, because he was in doctor --

16   doctor -- you know, the -- the --

17              THE COURT:  Scrubs?

18   A.  -- scrubs.

19              THE WITNESS:  Thank you, Your Honor.

20   A.  And I invited him in the house and he declined, saying

21   that they were rushed and only had a few minutes.

22              And I said, "Fine.  I'll only take a few

23   minutes."

24   Q.  And I want you to tell us that conversation in detail,

25   as much as you recall, both sides of it.
```

1    A.   Well, I said to him he may not be aware, but I was the

2    other -- apparently, the other person seeking to purchase

3    the property, and I felt that I had a problem with what the

4    Pruckas had done and I wanted to explore with him whether he

02:24    5    was committed to his deal.

6    Q.   Did you tell him why you needed the house?

7    A.   Well, he looked up at my house, actually, and then asked

8    me why would I be interested in the house.

9             And I said, "Well, I have a 24-week premie,"

02:24   10    and I could have said -- I think I said cerebral palsy.  I

11    might have said PVL because he would understand PVL.  I

12    don't remember.  It was either cerebral palsy or PVL -- and

13    we wanted the house for her.  It would be her house.  We'd

14    make it handicapped-accessible and that's where she and her

02:24   15    caregivers were going to live."

16    Q.   Now, let me stop you right there.

17             This is on December 7th?

18    A.   Correct.

19    Q.   They didn't close on this house until January 16th?

02:24   20    A.   Correct.

21             MR. RALEY:   Objection, your Honor.  Leading.

22             THE COURT:   Sustained.

23    By Mr. Berg:

24    Q.   So, at this point, you had told him, had you not, why

02:25   25    you wanted the house?

1    A.   Correct.

2    Q.   All right.  What was his response?  And let's talk about

3    your conversation about the deal.  What happened next?

4    A.   He said that, actually, he's a surgeon and he does

02:25    5    something called -- operates on a lot of kids with special

6    needs, including -- I think he mentioned the term

7    brachioplexus, children have brachioplexus.

8                And then he asked me a bunch of questions

9    about Carena and, in particular, I think he asked some

02:25    10    questions about her -- the mobility of her arms and her

11    legs.

12                I explained she had spastic diplegia in her

13    legs.  Her arms she had pretty good use of, but, you know,

14    there was some limitations in the range of her motion.

02:25    15                And he said that's something, actually, that

16    he specializes in and helps kids like that and he'd be happy

17    to meet her.

18                And I said, "Oh, that's very nice."

19                And when we turned to the house, I said,

02:26    20    "Well, would you have an interest in stepping aside on some

21    basis?  Because, obviously, we're very interested in the

22    house."

23                And he said they were pretty excited about the

24    house and he didn't really think that was something that

02:26    25    interested them at the time, but if they changed their mind,

1    he would let me know.

2    Q.   What else was said?

3    A.   And we said, "Thank you."  And that was it.

4    Q.   Did you indicate there were any other houses for sale or

02:26  5    anything like that?

6    A.   I think I might have mentioned that there was at least

7    one other house we thought was coming on the market in the

8    neighborhood.

9    Q.   And was that the end of the conversation?

02:26  10   A.   Yes.

11   Q.   How did he leave?  Can you describe the end of that

12   conversation.

13   A.   It was a pleasant conversation.

14   Q.   Now, if you could put that up on the -- Not the last

02:26  15   one, please, but this December 7th.

16              This is December 7th when Mr. Nath -- or

17   Dr. Nath was at the house at 8 Remington.

18              Do you know if his wife was with him?

19   A.   I don't know.  I just know that there was a lot of

02:27  20   people over there.

21   Q.   Did you have any idea of why -- if Dr. Nath was there

22   with his wife, why there'd be other people there?  What did

23   you assume?  Or did you assume anything?

24   A.   I just assumed that they were either checking out the

02:27  25   property or making plans -- I didn't know whether the deal

1  had actually been signed or not signed at the time.

2        THE COURT:  Did you find out later that it was or

3  was not?

4        THE WITNESS:  Actually, looking at the documents

02:27  5  now, Your Honor, it appears it was signed either the night

6  of December 4 or partially December 4 and December 5.  I

7  can't tell.  The only --

8        THE COURT:  In other words, it was signed, to the

9  best of your knowledge and belief, before you had the

02:27  10  meeting with Dr. Nath at the property?

11        THE WITNESS:  Correct.

12        THE COURT:  Okay.

13  By Mr. Berg:

14  Q.  Now, you offered to -- When you said if he would be --

02:28  15  What were your words?  I don't want to misstate it.

16  A.  If there was any basis upon which he was willing to step

17  aside.

18  Q.  And what did you mean by that?

19  A.  Well, that could be whichever way, either he just, you

02:28  20  know, walks away from the contract in return for a payment

21  or flips the house to us at a certain point down the road

22  or....

23        THE COURT:  By "flip," do you mean -- I understand.

24  The jury may not.  What does that mean, flip the house?

02:28  25        THE WITNESS:  That means he buys the house and then

1    agrees to sell it to me either now or down the road.

2    Because, obviously, I'm in -- this is part of my long-term

3    plan for my daughter.

4              Another alternative would be for me to buy the

02:28   5    house and let him live in it, if he wanted to live in the

6    neighborhood for a number of years.

7              You know, I was open to anything.  I was just

8    exploring something to work out something toward my

9    objective.

02:28   10   By Mr. Berg:

11   Q.   Did you convey to him what you just said about his

12   living in the neighborhood or living next door to you?

13   A.   I think I said that we -- it would be acceptable to us

14   for him to stay in the house for a period of time because --

02:29   15   for the reasons I've already said.

16   Q.   Now, Mr. Petrello, at this point -- this is

17   December 7th, four days before you filed suit -- what was

18   your thinking?

19   A.   Well, after that phone call, I realized that the

02:29   20   question before me was, if there was something to be

21   resolved, it would have to be with the Pruckas.  Therefore,

22   based on what I knew at the time, I just felt there was

23   something that smelled.

24             And after a lot of searching back and forth,

02:29   25   on December 11, I filed a lawsuit against the Pruckas and

*A. Petrello - Direct by Mr. Berg*

1   filed a lis pendens, which basically puts everybody on

2   notice that I think I have a claim to the property.  It just

3   makes the world aware of that.

4   Q.  Did you sue the Naths?

02:30   5   A.  No.

6   Q.  How did they get into this lawsuit at first?  Do you

7   recall?

8   A.  They sued me.

9   Q.  Now, let's go to the next entry, if we might, please.

02:30   10           Now, since this lawsuit has begun, have you

11   determined when they finally closed on the house?

12   A.  My understanding is January 16.

13   Q.  And you first brought charges of -- alleging

14   discrimination when, sir?  Do you recall the date?

02:30   15   A.  I don't remember the date.  It was the summertime.

16           THE COURT:  Of what year?

17           THE WITNESS:  2008, sir.

18   By Mr. Berg:

19   Q.  Between the period of time that the closing occurred and

02:31   20   you then brought suit regarding discrimination for a civil

21   rights violation, did you discover sufficient information --

22   or did you discover information that led you to that

23   lawsuit?

24   A.  Yes.

02:31   25   Q.  And from what source?

*A. Petrello - Direct by Mr. Berg*

1   A.   From the documentary -- From the documents provided by

2   the Defendants and from their deposition testimony.

3   Q.   Now, who are you speaking of?  Tell us what a deposition

4   is, if you will.

02:31   5   A.   During the course of the lawsuit, each side gets to

6   interview and question the other side under oath in front of

7   a court reporter, just like this.

8           After my deposition, Matt Prucka -- his

9   deposition was taken and Miss McGee's and then a period of

02:32   10   time elapsed and then Dr. Nath's.

11   Q.   It was from that testimony and the documents that you

12   brought -- that was the basis of this lawsuit for

13   discrimination?

14   A.   Correct.

02:32   15       MR. BERG:  Your Honor, this might be a good, if we

16   might, it might be a good time to take a break.

17       THE COURT:  It's now five minutes to 1:00.  We

18   usually break right at 1:00.  I have to meet with the

19   probation officer concerning the sentencing tomorrow.  I'm

02:32   20   doing that during the lunch hour.

21           I've often -- I've found, also, that based

22   upon the tunnel system, it's better that we take an hour and

23   15 minutes.  You have to get back in through security.

24           If you're not familiar with downtown, right

02:32   25   across -- there's a cafeteria on the first floor, but right

A. Petrello - Direct by Mr. Berg

1    across the street is Bank of America.  It's the one with

2    sort of the gothic steeples on it, the red brick building.

3    If you go in there and take the escalator down, it links up

4    the whole tunnel system downtown.  There's shops and a lot

02:33    5    of eating facilities.

6              So, it's now almost 1:00 o'clock.  We'll see

7    you back ready to resume at 2:15.  We'll see you at that

8    time.

9                      (Lunch recess)

02:33   10                      (Jury present)

11

12         THE COURT:  Thank you.  Be seated.

13              Just a note.  The sentencing I had set for

14    tomorrow morning has been passed.  We'll have to -- I'll try

03:55   15    it here about a week from now.

16              So, tomorrow morning if you're here that -- as

17    early as 9:00 or thereabouts, if you want to see the big

18    courtroom or what it looks like with folks in it, you're

19    welcome.

03:55   20              But we'll be back underway at 10:00 a.m.  But

21    I think the next day we have a sentencing.

22              Is that the drug case?

23         CASE MANAGER:  Yes, sir.

24         THE COURT:  It's a heavy drug case.  They'll be

03:55   25    sentenced on Thursday morning.

*A. Petrello - Direct by Mr. Berg*

1       And then, after that, we'll have a

2   rearraignment where someone has pled not guilty and is

3   changing his or her plea to guilty.  So, we have to read

4   them all their rights as to what they waive by pleading

03:56   5   guilty.

6       So, I'll have two things.  A little bit of

7   interest on the criminal side.  But we'll begin -- The

8   sentencing is at 9:30, but that's not tomorrow.  It's the

9   next day.

03:56  10       Go right ahead.

11       MR. BERG:  Thank you, Your Honor.

12       May I see Nath Exhibit 34, is it?

13   By Mr. Berg:

14   Q.  Mr. Petrello, tell the jury what they're looking at,

03:56  15   please, sir.

16   A.  On the left-hand side is the front of my house and

17   that -- Is there a pointer?

18   Q.  This is a different one.

19   A.  That's the pedestrian gate around the front of my house.

03:56  20   That's my driveway.  This is the driveway to the Prucka

21   house.  That's the Prucka house.  So, you can see how close

22   the two houses are, right from here to here (indicating).

23   Q.  Was that one of the factors?

24   A.  Yes.  As I mentioned, there's only two houses in the

03:57  25   neighborhood, one on each side, and the houses are

1   exceptionally -- conveniently located right next to one

2   another.

3   Q.  Let me ask you to -- Would you use the pointer on that

4   circular drive in front there.

03:57  5   A.  Someone may recall from the overview this is the circle

6   in front of the house.  And this house, my house and the

7   other house all have their driveways off this circle.

8                 And this area, as I mentioned, is a private

9   street.  So, it has no traffic at all.

03:57  10                 So, one of the things we do with Carena is we

11   put her on a tricycle and one of her exercises is to see how

12   far down the neighborhood she can go in her tricycle.

13   Q.  How does that compare to the Sunset property that you

14   own, this same issue?

03:58  15   A.  Well, on the Sunset property -- Again, Sunset is a

16   two-way, busy public street.  So, that's not possible.

17   There is a sidewalk, but that's it.

18   Q.  Mr. Petrello, let me just ask you a couple more

19   questions.  You can take that down.

03:58  20                 First of all, why are you in this courtroom?

21   Why are you here?

22   A.  I'm here, first and foremost, to make sure -- That's my

23   daughter, Carena.  From the story I've told, I think you

24   understand she's come a long way in her life.  She has a

03:58  25   routine and a schedule with -- handled by lots of people,

A. Petrello - Direct by Mr. Berg

1   nine therapists --

2           THE COURT:  Excuse me.

3               I want to see the lawyers up here right away

4   on the record.  It's no problem with the attorneys.  Okay?

03:59   5   No problem with the pictures.  No problem with anything

6   relative to what's in here.  But I want to see the lawyers

7   up here.

8                       (At the bench)

9           THE COURT:  Sorry to interrupt at this point.

03:59   10              But whoever has that guy with them, the one in

11  the blue shirt and the red tie with the mustache, he was

12  spotted all morning making faces and shaking his head and so

13  forth, and I spotted him doing it again.  Whoever he's with,

14  shut him down.  Okay?  I apologize for that.

03:59   15          MR. BERG:  Not at all, Your Honor.  Not at all.

16                      (Before the jury)

17          THE COURT:  Okay.  Sorry for the interruption,

18  everybody.

19              Let's go.

04:00   20          MR. BERG:  Yes, Your Honor.

21  By Mr. Berg:

22  Q.  Tell us about her training, her routine, Mr. Petrello,

23  just very briefly, what it's like.

24  A.  Very briefly, she has an incredibly scheduled-out

04:00   25  existence from the moment she wakes up at 8:00 o'clock in

*A. Petrello - Direct by Mr. Berg*

1   the morning with her routine, helping her dress for school,

2   her various therapies at the house throughout the day, with

3   nine therapists visiting her until the time she ends the

4   night relaxing with a massage to loosen those legs I spoke

04:00   5   about.

6           That training is every day, and it's been that

7   way for 12 years.  In some ways, she's actually like a

8   Michael Phelps.  I mean, she puts that kind of effort in.

9   She does it and she cooperates, and she has the mind of a

04:01   10   three-year-old.

11           The least my wife and I can do is respect that

12   and want to create the best environment for her possible

13   and, in our judgment, that best environment is to have her

14   be able to live next door to us and that become her

04:01   15   permanent home.  When we die, we're going to sell our house

16   and that smaller house, that quite adequate house, is going

17   to be there for her.

18           That's what we want and that's why we're here.

19   And I hope someone makes it possible that that house gets

04:01   20   conveyed to us on the basis that we believe we're entitled

21   to.

22   Q.  Mr. Petrello, when you say you want her to live there, I

23   think you've made it clear, but when would you like for her

24   to live there?

04:01   25   A.  Well, I think I mentioned in my testimony our biggest

107

*A. Petrello - Direct by Mr. Berg*

1    concern is to make sure that that environment is established

2    and operating functionally the way we want after we die.

3    The only way we can do that is to establish it before we

4    die.

04:02    5             So, this way, we know it's up and running,

6    it's performing the right way, it's staffed the right --

7    And, so, over a period of time, we will transition to that

8    being her house where she sleeps every night.

9             But during the time period between now and

04:02    10   that point, she needs all this extra space for all these

11   therapists that I've mentioned.

12             Yes.  It's true that I have a very large

13   property.  Yes.  It's true, if I don't have this, I'm going

14   to do whatever it takes.  I will find either a place on

04:02    15   Sunset or another place on my property to build what I need

16   to do to -- do what has to be done.

17             But at the end of the day, I think anyone

18   could understand 10 Remington and the order of magnitude of

19   what it is.  As I said, it's a fantastic home.  It's a home

04:03    20   where I only wish that that would be right for her.

21             As far as I'm concerned, it's the most

22   beautiful home in Houston.  My wife has spent years trying

23   to make it the perfect home for our family.  Nothing would

24   please me more than for my daughter to be there.

04:03    25             But the fact is it's not her long-term

*A. Petrello - Direct by Mr. Berg*

1   solution.  We have to respect that.  We have to understand

2   what her capabilities are.  We have to understand the

3   economics of what makes sense.

4             What makes sense is to migrate over time and

04:03   5   take advantage of the house next door.  There are other

6   houses even down the street in the neighborhood, but the

7   point is this we could use.  It's literally 150 feet away

8   from her playroom to have the expanded playroom and improve

9   the house.

04:03   10   Q.  Mr. Petrello, tell us what you are asking the jury to

11   do, please.

12   A.  Asking to recognize the notice of claim I have on the

13   property and to cause the property to be transferred to us.

14   Q.  You're also asking for a kind of damage; are you not,

04:04   15   sir?

16   A.  Yes.

17   Q.  And tell the jury what they are and why.

18   A.  We're seeking -- I guess the term is exemplary damages.

19   And Your Honor referred to them as punitive damages.

04:04   20   Q.  And let me say, too, that His Honor indicated he's not

21   made up his mind yet on that issue.  Do you recall?

22   A.  Yes, I do.

23   Q.  Let's not be presumptuous.  I didn't mean to be.

24             Go ahead, sir.

04:04   25   A.  Well, in the event the Court does permit those to be

*A. Petrello - Direct by Mr. Berg*

1   considered, we would urge that they -- that that be done.

2   There are -- I think I've referred to this.

3         There's 14 million kids with neurological

4   problems.  There's 500,000 Americans with cerebral palsy.

04:04  5   That doesn't even count all of the disabled people we have

6   in the United States.

7         As a parent of a special needs child, no one

8   is looking for sympathy.  Sure.  These kids have started out

9   with something behind the eight ball.  What we really all

04:05  10   want is a fair shake.

11         Now, my wife and I -- We've been fortunate.

12   We have more resources than the vast majority of people.

13   There's no question about that.  Because of that, we've been

14   able to create the environment to bring the doctors and

04:05  15   therapists, frankly, you know, the best that's available.

16         And as I told you, even when the best is not

17   available, we're out now trying to create something to

18   create the new best, and that's our mission.

19         But the fact is, you know, these people are

04:05  20   not advocates for themselves and, when something like this,

21   we hope to show, happens, someone needs to show that you

22   just can't take advantage of this class of people.  And we

23   hope that the jury does something about it.

24   Q.  And that would be punitive damages?

04:05  25   A.  That would be punitive damages.

*A. Petrello - Direct by Mr. Berg*

1        MR. BERG:  Pass the witness, Your Honor.

2        THE COURT:  Go right ahead.

3        MR. FOGLER:  Your Honor, could we approach the

4    bench for a moment?

04:06    5        THE COURT:  Yeah.  Come on up.

6                        (At the bench)

7        THE COURT:  Hang on a second.

8        MR. BERG:  Do you have the chart?

9        THE COURT:  Yes, sir.

04:06   10        MR. FOGLER:  I want to make sure that I don't

11   trample on any motion in limine here.  But the lis pendens

12   that's in evidence refers to his claim for breach of

13   contract.  It refers to his claim of unjust enrichment.

14   It's in evidence.

04:06   15            I also think that he has opened the door by

16   saying, "I smelled something wrong.  I thought the Pruckas

17   had done something wrong" and that he's filed suit.  He put

18   on his time chart that he filed suit on December 11th, which

19   implies that there was something wrong.

04:06   20            I think we're entitled to explore with this

21   witness what his claims were because he's left that

22   impression, that there was something there.

23        THE COURT:  The answer is "no."  But you're free to

24   read whatever is in evidence.  Anybody can do that.  I'm

04:07   25   going to leave it right there.  I'm not going to open it up.

*A. Petrello - Direct by Mr. Berg*

1    I don't think he opened the door.  But since the lis pendens

2    mentions that, you're free to read it.

3              MR. RALEY:  Can I ask one question --

4              THE COURT:  Yes, sir.

04:07    5              MR. RALEY:  -- on that point, Your Honor?  Because

6    I want to make sure, also.

7                   The lis pendens obviously goes to what my

8    client did or did not have notice of.  It speaks to breach

9    of contract.

04:07   10                   Can I say that those claims are no longer

11   before the Court, that they have been withdrawn?

12             THE COURT:  No.  But if it comes up in a different

13   way, if you need an instruction, I'll give you an

14   instruction.  Okay?

04:07   15             MR. RALEY:  Thank you, Your Honor.

16             THE COURT:  So, if it's in evidence, you're

17   entitled to read what's in evidence.  As far as the

18   cross-examination goes, that cause of action is no longer

19   here.

04:07   20                   But if it does become relevant, you will get

21   an instruction on it, a good, clear, solid one, as to it's

22   no longer in the suit and just move on.

23             MR. RALEY:  I may request that instruction, Your

24   Honor, then, if we could --

04:08   25             THE COURT:  We're not there yet.

*A. Petrello - Direct by Mr. Berg*

1          MR. RALEY:  When we get there.

2          MR. DeAYALA:  Your Honor, the fact that he has made

3    a claim of ownership of that property -- He's claimed he has

4    ownership interest in that property.

04:08    5          THE COURT:  Is that what he said?

6          MR. BERG:  Has a right.

7          THE COURT:  Has a right.

8          MR. BERG:  Yes.

9          MR. DeAYALA:  That's what the lis pendens says.

04:08   10    It's a claim of title.  He has a claim of title to that

11    property.

12          MR. BERG:  No.  It's a right to title.

13          MR. DeAYALA:  But it's an ownership claim, which is

14    what a lis pendens is.

04:08   15          THE COURT:  I'm familiar with it.  All I know is,

16    if it's in writing, you can read it in.  We can go up to

17    that point.  Now, beyond that, let's see.

18          MR. DeAYALA:  Okay.

19          THE COURT:  I mean, that's -- I'm not saying "no."

04:08   20    But the initial part is that anything that's in evidence

21    you're free to read.

22          MR. RALEY:  I have instructed the man.  I was not

23    aware he was doing it.  He was sitting --

24          THE COURT:  Who is he?

04:09   25          MR. RALEY:  He's a paralegal for Guy Matthews.

*A. Petrello - Cross by Mr. Fogler*

1           THE COURT:  Say again.

2           MR. RALEY:  He's a paralegal for Mr. Matthews'

3     firm.  He was sitting behind us.  We didn't see him.  But we

4     have instructed him --

04:09   5           THE COURT:  Well, if I see it again, I'm going to

6     kick him out.

7           MR. RALEY:  Yes, Your Honor.  I understand.

8           THE COURT:  Okay.  Thanks.

9                     (Before the jury)

04:09  10           MR. FOGLER:  May I proceed?

11           THE COURT:  Go right ahead.

12               Once again, introduce yourself and who you

13     represent.

14           MR. FOGLER:  Thank you, Your Honor.

04:09  15                     CROSS-EXAMINATION

16     By Mr. Fogler:

17     Q.  Mr. Petrello, you know that I am Murray Fogler --

18           THE COURT:  Oh.  I thought you were going to do it

19     to the jury.  You can do it to the witness.  Go on.

04:09  20     Q.  You know that I'm Murray Fogler and that I represent

21     Matt and Sherry Prucka?

22     A.  Yes, sir.

23           THE COURT:  Pull that mic in, please, sir.

24           THE WITNESS:  Yes, sir.

04:10  25           THE COURT:  By the way, would you just turn the mic

*A. Petrello - Cross by Mr. Fogler*

1    around so it picks you up, please.

2    Q.  Mr. Petrello, you seemed to have trouble with my use of

3    the word "covet" when I told the jury in opening that you

4    coveted the Prucka home.  Is that true?

04:10    5    A.  Correct.

6    Q.  But there's no question, of course, that you wanted that

7    house.

8    A.  Correct.

9    Q.  Is that a better word?

04:10    10   A.  Yes.

11   Q.  You wanted it enough to make offers.  Right?

12   A.  Correct.

13   Q.  You wanted it enough to bring this lawsuit.  Right?

14   A.  Correct.

04:10    15   Q.  And you wanted it enough to tell the jury, as you just

16   did a minute ago, that what you really want from this

17   lawsuit are not actual damages.  Right?  Because you don't

18   have any actual damages that you're claiming here.  Correct?

19   A.  I disagree with the phrase "actual damages."  I have no

04:11    20   monetary damages.  I have actual damages.  I'm seeking a

21   transfer of property.

22   Q.  You have no monetary damages?

23   A.  Correct.

24   Q.  But what you just told the jury is that you still want

04:11    25   the house?

A. Petrello - Cross by Mr. Fogler

1   A.  Correct.

2   Q.  Let's see, Mr. Petrello, if we can establish a few basic

3   ground rules here.

4              You're a property owner yourself.  Right?

04:11  5   A.  Yes.

6   Q.  You've bought at least a couple of pieces of property

7   that we know of.  Right?

8   A.  Yes.

9   Q.  And when you first learned back in late October of 2007

04:11  10  that Mr. Prucka, your next-door neighbor, was going to sell

11  his property, of course, you knew at that point that

12  Mr. Prucka was free to sell his house to whoever he wanted

13  to.  Correct?

14  A.  Correct.

04:12  15  Q.  He was under no compulsion to sell it to you, was he?

16  A.  Correct.

17  Q.  And, in fact, he didn't have to take the highest bidder,

18  did he?

19  A.  Correct.

04:12  20  Q.  He could put the property out, accept bids, and there's

21  nothing wrong with him deciding that he didn't want to take

22  whoever bid the highest.  True?

23  A.  Correct.

24  Q.  Now, back in October of 2007, you had some advance

04:12  25  notice that Mr. Prucka wanted to sell his house, that is,

1    before it went public.  True?

2    A.  I had heard that he was.  I had noticed before it got

3    listed.  I don't know -- Obviously, I heard it from somebody

4    else.  So, I wasn't the first to hear it.

04:13    5    Q.  Well, but before the public -- It went by listing and

6    the whole idea of listing is to put it out on the Internet

7    or other public means so that anybody who is connected to

8    the realty business knows that it's available for sale.

9    True?

04:13    10    A.  Correct.

11    Q.  But you knew before that -- That is, before it was

12    listed to the public, you knew that Mr. Prucka was asking

13    $8.3 million for the house?

14    A.  Correct.

04:13    15    Q.  You could have offered him the $8.3 million on the spot.

16    Right?

17    A.  Correct.

18    Q.  But you didn't?

19    A.  Correct.

04:14    20    Q.  By the way, I mentioned this to the jury in the opening

21    as well and this seems to strike you as odd, that I

22    commented that you never submitted anything in writing to

23    Mr. Prucka.  That's true, isn't it?

24    A.  You mean -- Well, I had e-mails with him.

04:14    25    Q.  Well, but you never put any of your bids in writing?

*A. Petrello - Cross by Mr. Fogler*

1    A.   Correct.

2    Q.   You never gave him any earnest money deposit?

3    A.   Correct.

4    Q.   You never had a contract or a proposed contract that you

04:14   5    submitted to Mr. Prucka?

6    A.   Correct.

7    Q.   You told us that you had bought this property at

8    18 Sunset that's behind your house at 10 Remington.

9    Correct?

04:15   10   A.   Correct.

11   Q.   I don't want to leave the jury with the wrong

12   impression.

13            When you bought that house, there was a

14   written contract, wasn't there?

04:15   15   A.   Yes.

16   Q.   In fact, here it is.  This is Prucka Exhibit 32.

17            On November 15, 2006, you agreed to buy --

18   This is not the deed, is it?

19   A.   No.

04:15   20   Q.   There's a separate document that evidences your actual

21   ownership interest in that property.  Right?

22   A.   Correct.

23   Q.   But this is the contract that obligated you to buy and

24   Rice University to sell that piece of property?

04:15   25   A.   Correct.

*A. Petrello - Cross by Mr. Fogler*

1  Q.  It's 1.2954 acres of land, as it says here in

2  Paragraph 1.1.  Isn't that right?

3  A.  Correct.

4  Q.  It shows the purchase price of $3.15 million.  Correct?

04:16   5  A.  Correct.

6  Q.  And there was even an earnest money deposit, wasn't

7  there?

8  A.  Actually, I don't think so.  I think that was just a

9  pro forma.

04:16   10  Q.  So, when it says down here at the bottom of

11  Paragraph 1.2 that purchasers will deliver $1,000 in earnest

12  money to the title company as consideration, that was just

13  for show?

14  A.  I can't recall.  What I was saying -- When the deposit

04:16   15  you're referring to -- I thought you were saying in advance

16  of the signing of this.

17  Q.  You bought this property behind you for the same

18  purpose, actually, as why you want the Prucka house?

19  A.  Correct.

04:16   20  Q.  It was going to be a place that, ultimately, you would

21  have for Carena?

22  A.  Correct.

23  Q.  But you told the jury that you already have a very fine

24  house of your own.

04:17   25  A.  Correct.

A. Petrello - Cross by Mr. Fogler

1    Q.   And there's no doubt that it's a beautiful house?

2    A.   I think so.

3    Q.   And you -- Well, the jury saw pictures of it.

4              You're proud of it, aren't you?

04:17   5    A.   Yes.  Very much.

6    Q.   Well, you should be.

7              I mean, you told us that you spent, what, four

8    and a half years remodeling the house?

9    A.   Correct.

04:17   10   Q.   The idea being that you wanted to restore it to the

11   original architecture.  Right?

12   A.   Correct.

13   Q.   Because your house, like the Pruckas', in fact, was

14   built in the 1920s, wasn't it?

04:17   15   A.   Correct.

16   Q.   There's an American architect named Harry "Lindberg" or

17   "Lindeberg."  How is it pronounced?

18   A.   Harry T. Lindberg.

19   Q.   And he is the architect who designed your house, isn't

04:17   20   he?

21   A.   Correct.

22   Q.   And because you are pleased with your house and proud of

23   it and spent a lot of time and money, you want to preserve

24   the house to its original splendor, don't you?  There's

04:18   25   nothing wrong with that, is there?

A. Petrello - Cross by Mr. Fogler

1    A.   Absolutely.

2    Q.   And you showed us on the diagram that the jury will

3    remember that there's the front part of the house with the

4    two wings.

04:18   5              That was the original house that Mr. Lindberg

6    designed?

7    A.   Correct.

8    Q.   And that's got the levels?

9    A.   Correct.

04:18   10   Q.   And then there's the wing behind it that you guys added

11   on to?

12   A.   Correct.

13   Q.   And you told us that 60 percent of your square

14   footage -- I think you said you have a total of about

04:18   15   17,000 square feet in the house -- that 60 percent of that

16   is not handicapped-accessible?

17   A.   Correct.

18   Q.   So that 40 percent is?

19   A.   Correct.

04:19   20   Q.   And just so the jury can do the math, how many square

21   feet of your house is handicapped-friendly?

22   A.   Roughly 6500.

23   Q.   I want to make sure I understand what it was that you

24   planned to do with the lot at 18 Sunset.

04:19   25              You told us there was a house on it, but you

*A. Petrello - Cross by Mr. Fogler*

1   tore it down.  Right?

2   A.  Correct.

3   Q.  And the idea that you had was, eventually -- and maybe

4   I'm confused -- you were going to build a pool house or was

04:19  5   this the place where you were going to build the facility

6   for Carena?

7   A.  At what time?

8   Q.  Well, when you first bought the property.

9   A.  When I first bought the property, the original plan was

04:20  10   that we would build a home long-term for Carena on that

11   property.

12   Q.  And that's the same plan that you had in mind when you

13   started talking to Mr. Prucka, that is, that you would

14   build -- that you would use his house long-term for a

04:20  15   facility for Carena?

16   A.  Not for a facility.  For Carena's home.  And I wouldn't

17   just use it long-term.  I would use it starting today.

18   Q.  But it wasn't -- You didn't intend for Carena to move

19   out of your house and live in the Prucka home, at least not

04:20  20   initially, did you?

21   A.  No.  I planned to join the two properties the way -- I

22   have a carriage house and a greenhouse.  Because you all

23   have, of course, visited the house and you know the

24   structures.

04:20  25          I have multiple structures on the house.  I

*A. Petrello - Cross by Mr. Fogler*

1    have a greenhouse where Carena has a separate structure.

2    It's about 150 feet from the back door where she does that

3    therapy I talked about in the cage.

4         Then I have a carriage house, and Matt has a

04:21   5    separate structure on his property.

6         And we would just regard -- The lots

7    automatically join and we'd regard the Prucka house as just

8    another structure on our house.

9         Carena's playroom then becomes on the first

04:21   10   floor of the Prucka house.  Her therapists get additional

11   space to do massage -- We'd actually have a full massage

12   room.  We'd have a room for her home-schooling.  We'd have a

13   room for her music therapy.

14        We would use the rooms in the house as an

04:21   15   extension of our existing house.  And we would do that

16   immediately.  So, it's all one big house.  It's just broken

17   up.  And it's all on one floor.

18   Q.  But it wasn't your intent, was it, that Carena would

19   sleep under a different roof than the house that you have at

04:21   20   10 Remington, was it?

21   A.  Not in -- Not while she's the age she is.  But, over

22   time, the point was to set it up so that, yes, while we're

23   alive, she's going to start sleeping there with her people

24   there because we have to prepare for a transition for her.

04:22   25        These children -- You can't take -- The last

A. Petrello - Cross by Mr. Fogler

1   thing I want to do is to take the child when I die and the

2   next day she's all alone.  Nothing is set up.  It's going to

3   take years to make this transition.  It's going to take

4   years to set up the kind of staff and get everything set the

04:22   5   right way.

6   Q.  Let's talk about your dealings with Mr. Prucka.  And I'm

7   talking specifically about your efforts to purchase the

8   house that the Pruckas owned.

9           We've seen that there was an early exchange of

04:22   10   e-mails.  Right?

11   A.  Yes.

12   Q.  In fact, there may have been several exchanges of

13   e-mails that you had between Mr. Prucka and yourself.

14   A.  There were three e-mails on October 31 and 31 -- 30 and

04:23   15   31.

16   Q.  You also had at least three or four telephone

17   conversations.  Right?

18   A.  One on November 6.  One on November 16.  One the night

19   of December 3.  December 4, two.  December 5, one.

04:23   20   Q.  There weren't any face-to-face meetings, were there?

21   A.  No.

22   Q.  You didn't come over to look at the house?

23   A.  No.

24   Q.  Your wife didn't either?

04:23   25   A.  No.

*A. Petrello - Cross by Mr. Fogler*

1    Q.  You didn't send any architects or engineers or designers

2    or therapists or anybody else to look at it, did you?

3    A.  No.

4    Q.  So, we now have kind of the sum and substance, the whole

04:23    5    universe, of your contacts with Mr. Prucka, then, don't we,

6    those e-mails and phone calls?

7    A.  Yes.

8    Q.  And in all of those e-mails and phone calls, there was

9    nothing that Mr. Prucka said to you either in writing or by

04:24    10    telephone that led you to believe that he intended to

11    discriminate against you or Carena, was there?

12    A.  Correct.

13    Q.  Let's talk about mathematics, your major at Yale.

14              You seem to put a lot of store, based on the

04:24    15    calculations that you did for us on this big pad, on who is

16    going to pay the most money for the house.

17              That's important to you, isn't it?

18    A.  It's important to me?

19    Q.  Well, your case seems to depend on which of the

04:25    20    offers -- yours or the Naths' -- put the most money in

21    Mr. Prucka's pocket.

22    A.  Correct.

23    Q.  I mean, you're not suggesting, are you, that if there

24    are two potential buyers, that the seller should always sell

04:25    25    to the buyer whose money is the highest, are you?

A. Petrello - Cross by Mr. Fogler

1    A.   If all others things are equal.

2    Q.   So, then, under your theory, if Mr. Prucka had sold the

3    house to someone who put more money in his pocket than you

4    did, you wouldn't have any beef with him, would you?

04:25    5    A.   Assuming that no other law was violated in the process,

6    correct.

7    Q.   When you first talked to Mr. Prucka, you asked him to

8    exempt him from his listing agreement with his broker,

9    didn't you?

04:26    10    A.   I asked to exempt a transaction with me from a broker

11    commission.

12    Q.   And we saw the particular portion of the listing

13    agreement.  I'm going to put it up here in just a minute.

14             But let's be clear.  Until you filed this

04:26    15    lawsuit, you had not seen the listing agreement that the

16    Pruckas signed with Heritage Texas Properties, had you?

17    A.   Correct.

18    Q.   You didn't know what that listing agreement provided

19    for, did you?

04:26    20    A.   I only knew what he told me, which was there was no

21    commission on the sale to me.

22    Q.   Well, and as you said, you didn't realize until later

23    that there were some limitations on that exemption?

24    A.   He didn't tell me that.  You're correct.

04:26    25    Q.   Let's look at the listing agreement here.  This is

*A. Petrello - Cross by Mr. Fogler*

```
 1   actually not the signed copy, but it's a better -- It hasn't

 2   been photocopied so many times that it's fuzzy.  And let's

 3   go to the page that's got the exemption.  We looked at this

 4   earlier.

 5              And, of course, there was a little handwriting

 6   addition on the signed copy.  But this is essentially what

 7   you looked at before with the jury, isn't it?

 8   A.  Yes, it is, with the exception of the marked-up

 9   language.

10   Q.  Right.

11              It said:  "Named exclusions to this agreement

12   are Anthony Petrello and Devinder Bhatia and family members"

13   and then it had "and related parties."  Do you remember

14   that?

15   A.  Correct.

16              THE COURT:  You mean "and related parties" was

17   handwritten in?

18              MR. FOGLER:  It was handwritten in.

19   By Mr. Fogler:

20   Q.  Now, as you read, it's not exactly true that the broker

21   gets nothing if there's a sale made to you?

22   A.  Correct.

23   Q.  Because it specifically provides that the broker will be

24   reimbursed for hard costs?

25   A.  Correct.
```

*A. Petrello - Cross by Mr. Fogler*

1   Q.   Now, on your chart, the chart that Mr. Berg has shown

2   the jury a couple of times, there's no provision there for

3   the hard costs, is there?

4   A.   Correct.

04:28   5   Q.   And, of course, you know that the broker did incur some

6   expense marketing the property?

7   A.   I assume they did.  But the amount must be negligible,

8   in my understanding, because it's never been documented.

9   Q.   But you just don't know one way or the other?

04:28   10   A.   Don't know one way or the other.

11   Q.   I mean, obviously, there were some brochures.  Right?

12   Did you ever see any of the brochures?

13   A.   Yes.  And I received an advertisement in the mail.

14   Q.   Now, in addition, as you noted, this exemption that was

04:29   15   put in the listing agreement is not unlimited in time

16   either, is it?

17   A.   Correct.

18   Q.   It expires, if there's any sale to you, after January 9

19   of 2008?

04:29   20   A.   Correct.

21   Q.   But you didn't know that at the time, did you?

22   A.   Correct.

23   Q.   Now, of course, as Mr. Berg has pointed out, the closing

24   of the transaction with the Naths was on January 16 of 2008,

04:29   25   wasn't it?

*A. Petrello - Cross by Mr. Fogler*

1    A.   That's the rescheduled date.

2    Q.   But if you had not bought the property until January 16,

3    the broker fee would be owed at that point, wouldn't it?

4    A.   Hypothetically, yes.

04:29    5    Q.   Have you read this listing agreement?

6    A.   No.

7    Q.   Well, you know, of course, that -- because Mr. Prucka

8    told you -- that the list price was $8,299,500?

9    A.   That I know, not from the listing agreement.

04:30    10   Q.   Let's take a look at the language here in the listing

11   agreement.  This is the provision on listing price.

12             It says:  "Seller instructs broker to market

13   the property at the following price, $8,299,500 (listing

14   price)."

04:30    15             And you've read enough contracts to know that,

16   when you have a capitalized term like that, that means it's

17   going to be a defined term for the rest of the contract.

18   Right?

19   A.   Typically.

04:31    20   Q.   So, when it -- the next sentence says:  "Seller agrees

21   to sell the property for the listing price or any other

22   price acceptable to seller," the term "listing price" refers

23   to that number that's in the blank, doesn't it?

24   A.   Correct.

04:31    25   Q.   Now, did you know that this agreement has a specific

*A. Petrello - Cross by Mr. Fogler*

1  provision in it that determines when a commission is owed to

2  the broker?

3  A.  As I said, I haven't studied the agreement.

4  Q.  Well, let's look at it.

04:31  5         You mentioned before that the -- that you must

6  have assumed that the broker fee was 5 percent.

7  A.  Correct.  It was published that way.

8  Q.  Okay.  But you hadn't seen it in the listing agreement?

9  A.  Correct.  Wasn't privy to the listing agreement.

04:32  10  Q.  This provision of the listing agreement has three

11  subparagraphs, "A", "B" and "C".  Are you with me?  Do you

12  see that?

13  A.  Yes.

14  Q.  Okay.  And "A" sets out the 5 percent.  True?

04:32  15  A.  Yes.

16  Q.  "C" talks about when the broker's fee is payable.  And

17  "B", the one I want to focus on with you, talks about when

18  the fee is earned.  Do you see that?

19         THE COURT:  It's up there.

04:32  20  A.  Yep.

21         THE COURT:  Go on.

22  By Mr. Fogler:

23  Q.  Well, let's look at it.

24         And, obviously, B(3) is not at issue here.

04:32  25  So, let's look at Paragraph B(2).  If we start at the

A. Petrello - Cross by Mr. Fogler

1    underlined word, "earned," it says:  "Broker's fee is earned

2    when any one of the following occurs during this listing.

3                "Point 2:  Broker individually or in

4    cooperation with another broker procures a buyer ready,

04:33    5    willing and able to buy the property at the listing price or

6    at any other price acceptable to seller."

7                Now, as we just looked at, Mr. Petrello, when

8    it uses that capitalized term "listing price," that means

9    $8,299,500, doesn't it?

04:33   10    A.  Yes.

11    Q.  And what this provision means is -- from the plain

12    English, is that, if the broker, if Peggy McGee, brings to

13    Prucka a buyer willing -- ready, willing and able to pay

14    $8,299,500, the fee is earned.  Isn't that right?

04:34   15    A.  I can't say it's right.  I can read the language and

16    agree with respect to those specific words.  But, obviously,

17    I'd have to study the document.

18    Q.  So, once the Naths bid the listing price, whether the

19    Pruckas accepted that bid or not, the broker had earned her

04:34   20    fee, hadn't she?

21    A.  That's a contract interpretation issue.  I'm not sure it

22    applies in this case.

23    Q.  Well, you obviously are a lawyer.

24    A.  Yes, sir.

04:34   25    Q.  You have seen many contracts in your day, haven't you,

*A. Petrello - Cross by Mr. Fogler*

1   sir?

2   A.   Yes.

3   Q.   In your job, you see contracts all the time, don't you?

4   A.   Yes.

04:34   5   Q.   And you're telling us that you can't read this one

6   sentence and determine that, once the Naths had bid the

7   $8,299,500 and showed that they were ready, willing and able

8   the buy it at that price, that that is when the fee was

9   earned?

04:35   10   A.   Would you like me to explain?

11   Q.   You're telling me that you can't tell me that?

12   A.   I can.   What I'm saying is it's not true.

13   Q.   Now, is it your position --

14        MR. BERG:   Excuse me, Your Honor, if I might

04:35   15   interpose an objection.   I think he wanted to explain.

16        THE COURT:   What's your position?

17        MR. FOGLER:   He's answered my -- I'm sorry, Your

18   Honor.

19        THE COURT:   It's not a rule of optional

04:35   20   completeness.

21        MR. FOGLER:   I understand.   I'm cross-examining.

22        THE COURT:   Ladies and gentlemen, if it continues

23   to be relevant, we'll hear about it when Mr. Berg takes his

24   client on redirect examination.

04:35   25   By Mr. Fogler:

A. Petrello - Cross by Mr. Fogler

1    Q.  Mr. Petrello, is it your position that the Pruckas had

2    determined that they were never going to sell the house to

3    you?  Do you believe that?

4    A.  Yes.

04:36    5    Q.  So, apparently, it was a surprise to you when I told the

6    jury that they had instructed their lawyer to draft a

7    contract to sell the house to you.

8              You had never heard that before?

9    A.  I -- I haven't heard it.  Have you?

04:36    10   Q.  Well, you know, there's -- Well, let's just look at it.

11             Do you know the law firm Jackson Walker, sir?

12   A.  Yes.

13   Q.  Did you know that the law firm of Jackson & Walker were

14   the Pruckas' lawyers?

04:36    15   A.  I understand that.

16   Q.  You know how lawyers bill, don't you?

17   A.  Yeah.

18   Q.  They keep a record of their time, don't they?

19   A.  Yes.

04:37    20   Q.  And they send a bill that sets out what it is that they

21   have done during the time that they're charging you for,

22   don't they?

23   A.  Yes.

24   Q.  And here in Prucka Exhibit 20 -- Here's a bill from a

04:37    25   lawyer named Michael Kuhn.  Do you know Mike Kuhn?

A. Petrello - Cross by Mr. Fogler

1   A.  No.

2   Q.  And he's got a time entry here for December 4, 2007.

3           Now, this is the day that you offered the

4   $8.2 million, isn't it, sir?

04:37  5   A.  Yes.

6   Q.  On that day, Mr. Kuhn reports that he spent 1.2 hours.

7   And here's what it says:  "Telephone conference with

8   M. Prucka regarding sale of residence at 8 Remington Lane."

9           That, of course, is the Prucka address, isn't

04:38  10   it?

11   A.  Yes.

12   Q.  "Review listing agreement."

13           That's what we just looked at on the screen.

14   Right?

04:38  15   A.  Yes.

16   Q.  "Review TREC form of earnest money contract for

17   preparation of contract with A. Petrello."

18           That's you, isn't it?

19   A.  Yes.

04:38  20   Q.  Have you seen, sir, the contract that the Naths signed

21   with the Pruckas?

22   A.  Yes.

23   Q.  And you know that it was signed on December 4 or 5 of

24   2007, don't you?

04:38  25   A.  I think there's two dates.  I think there's a December 4

*A. Petrello - Cross by Mr. Fogler*

 1   date and a December 5 date, if my recollection is correct.

 2   Q.  Have you seen the earnest money contract that the Naths

 3   provided?

 4   A.  Yes.

04:39  5   Q.  They put down a deposit of $75,000, didn't they?

 6   A.  Yes.

 7   Q.  And that's the addendum.  Hold on.

 8              Prucka Exhibit 22 is the contract that the

 9   Naths entered into with the Pruckas, isn't it, for

04:39 10   $8,299,500?

11   A.  Which version is this?

12              Yeah.  It's the one that's signed December 4.

13   It's above Matt's signature.

14   Q.  Here's the signature page.

04:40 15   A.  No.  Go back to the next page, previous page, and you'll

16   see.  Previous.  There you go.

17   Q.  This particular addendum was signed on December 4?

18   A.  Correct.

19   Q.  And I think you made reference to the fact that there's

04:40 20   also a date of December 5 in here as well?

21   A.  Correct.

22   Q.  But this is the contract that you've seen previously in

23   which the Naths agreed to buy and the Pruckas agreed to sell

24   the property at 8 Remington Lane?

04:40 25   A.  Correct.

1    Q.   And I'm sure you saw that, in this contract, they

2    deleted any option to terminate the contract, didn't they?

3    A.   I thought there was an inspection right for -- until

4    Friday.   There was a three-day inspection period.

04:41    5    Q.   Above the signature, there was a termination option and

6    the parties appear to have scratched through it and initial

7    it, don't they?

8    A.   There's an addendum.

9    Q.   This agreement between the Naths and the Pruckas was a

04:41   10    binding contract, wasn't it?

11        MR. BERG:   Could I hear that question again, Your

12    Honor?   I'm sorry.

13        THE COURT:   Say it again.

14    By Mr. Fogler:

04:41   15    Q.   This agreement between the Naths and the Pruckas was a

16    binding contract?

17        MR. BERG:   Objection, Your Honor.   He has not been

18    called as an expert.

19        THE COURT:   Sustained.

04:41   20    Q.   You told the jury that you were upset when you lost the

21    opportunity to purchase the Prucka home?

22        MR. BERG:   Objection.   Now I will interpose an

23    objection under Rule 106, the doctrine of optional

24    completeness.   He stopped before going to the exception to

04:42   25    what he just showed Mr. Petrello.

1          THE COURT:  Overruled.

2              You may answer the question.

3              Or state it again.

4    Q.  You told the jury that you were upset that you had lost

04:42    5    the opportunity to purchase the Prucka home?

6    A.  Which conversation are we speaking of?

7    Q.  No conversation.

8              When you found out that you --

9          THE COURT:  Talking about prior testimony today.

04:42   10    A.  In one of the -- Yeah.  In the call -- telephone call.

11          THE COURT:  Question, please.

12   By Mr. Fogler:

13   Q.  You -- Within a matter of days, you had hired counsel.

14   Right?

04:42   15    A.  I don't know whether that's true, actually.

16   Q.  Well, we know that, on December 11, you had your lawyers

17   prepare and file a lis pendens.

18   A.  Correct.  By December 11 for sure.  When you said

19   "matter of days," I didn't know whether you were saying the

04:43   20    6th or 7th, but certainly by later that week.  Something was

21   filed on December 11, I believe.

22   Q.  Just so that the jury knows what a lis pendens is, this

23   was a notice that was filed with the Harris County property

24   records, wasn't it?

04:43   25    A.  Correct.

*A. Petrello - Cross by Mr. Fogler*

1    Q.   This was a notice to advise anybody -- anybody who

2    looked at these property records that you had filed a

3    lawsuit, this lawsuit?

4    A.   Correct.

04:43    5    Q.   And it says:  "This lawsuit is an action involving title

6    to real property and/or the establishment of an interest in

7    real property.  Plaintiff" -- That's you.  Correct?  You're

8    the Plaintiff, Anthony G. Petrello?

9            THE COURT:  Keep going.

04:44    10    A.   Yes.

11            THE COURT:  Okay.

12    Q.   "Plaintiff seeks specific performance of the sale of the

13    property on claims for breach of contract and unjust

14    enrichment and a request for attorneys' fees regarding real

04:44    15    property more specifically described as..."

16            And then it gives the legal description of the

17    property, doesn't it?

18    A.   Correct.

19    Q.   Now, there's nothing in this notice about

04:44    20    discrimination, is there?

21    A.   Correct.

22    Q.   That did not even become an issue until several months

23    later, did it?

24    A.   I did not file the complaint alleging it until several

04:45    25    months later.

1    Q.  There was no notice and no complaint about

2    discrimination filed before June of 2008, was there?

3    A.  Correct.

4           MR. FOGLER:  Pass the witness.

04:45   5           THE COURT:  Go ahead.  Again, state your name,

6    counsel, for the jury and who you represent.

7           MR. DeAYALA:  Again, Mano DeAyala here for Peggy

8    McGee and Heritage Texas Properties.

9                        CROSS-EXAMINATION

04:45  10   By Mr. DeAyala:

11   Q.  Mr. Petrello, I'm going to try to be brief, as my time

12   is limited here.

13             With respect to Peggy McGee --

14   A.  Yes.

04:45  15   Q.  -- the time frame in which your dealings with Mr. Prucka

16   concerning your interest in the home, the best I can tell

17   from your testimony, is October the 30th through -- and I

18   think the Nath contract was up there -- December the 5th.

19   Right?

04:46  20   A.  4 or 5.  Obviously, there's two dates.  But the Nath

21   contract -- You asked me two things.  You asked me about the

22   conversations with Prucka and you asked me about the

23   contract.

24   Q.  No.

04:46  25             My question to you was:  Your dealings with

1   this property --

2   A.   Yes.

3   Q.   -- began October the 30th --

4   A.   Yes.

04:46   5   Q.   -- your e-mail to Mr. Prucka --

6   A.   Correct.

7   Q.   -- and, of course, it ends on December the 5th, when the

8   Naths enter into an agreement to purchase the property?

9   A.   Well, it ends at my last conversation with Matt on

04:46   10   December 5.  And then, of course, there's the follow-up --

11   Q.   So, December --

12   A.   -- December 7 conversation with Dr. Nath.

13   Q.   I'm just trying to put a time frame here for the jury.

14   A.   Sure.

04:47   15   Q.   Prior to the Nath contract on December the 5th, had you

16   ever personally met Peggy McGee?

17   A.   No.

18   Q.   Never laid eyes on her?

19   A.   No.

04:47   20   Q.   Never told her about Carena's problems?

21   A.   No, sir.

22   Q.   But you spent this morning testifying about all those

23   things about Carena that are her development, her abilities

24   and disabilities, how you care for her, what you need to

04:47   25   care for her, what you would like to have to care for her,

A. Petrello - Cross by Mr. DeAyala

1    all of those things.

2              None of those things were communicated by you

3    to anyone at Heritage Texas Properties, were they?

4    A.   Correct.

04:47   5    Q.   And, again, it was your idea with respect to the listing

6    agreement to ask Mr. Prucka to remove you from that

7    agreement.  Right?  That idea came from you?

8    A.   The idea came from me to not have the broker's

9    commission payable.

04:48   10   Q.   To exclude you from the listing agreement.  Correct?

11   A.   Excuse me from the broker's commission being payable.

12   Q.   Okay.  And, so, as you dealt with Mr. Prucka, you on

13   purpose excluded the broker, Heritage Texas Properties, and

14   Peggy McGee from those dealings.  Right?

04:48   15   A.   I never affirmatively excluded or included.  I just

16   dealt with Matt.

17   Q.   Meaning no e-mails, no calls.  Right?

18   A.   I already said that.

19   Q.   You knew as of November the 12th that Heritage Texas

04:48   20   Properties was representing Mr. Prucka -- the Pruckas in the

21   sale of the home.  You knew that.  Right?

22   A.   I think, as of that date -- around that date I knew.

23   Q.   And, still, you didn't submit any of your negotiations

24   or your offers or your interests in the property to anyone

04:49   25   at Heritage Texas Properties?

A. Petrello - Cross by Mr. DeAyala

1    A.  Correct.

2    Q.  This may seem a little redundant, but I'm going to ask

3    it anyway.

4              Likewise, you never told anyone at Heritage

04:49    5    Texas Properties by writing or words that you wanted to

6    widen the halls at the Prucka home or put in an elevator or

7    those sorts of things.  Right?

8    A.  Correct.

9    Q.  Likewise, you never saw any information from Heritage

04:49    10   Texas Properties or Miss McGee.  Right?

11   A.  Certainly not from Mrs. McGee and vis-à-vis Heritage.

12   As I said, the only thing I did do is I looked at their

13   listing application on the Internet, I believe -- I mean,

14   their advertisement.

04:49    15   Q.  Now, you had Melinda Noel do some work for you, didn't

16   you?

17   A.  No.  That was at -- That's a -- I'm referring to

18   something different.  I'm talking about, on their website, I

19   believe the house was listed.

04:50    20             There was an advertisement of the house.  You

21   go on the broker's website and go to where it shows the

22   house and all the information.  I went to the Heritage

23   website.

24   Q.  And your understanding was that home was listed to the

04:50    25   public.  Right?

1    A.   Listed to the public.   Correct.

2    Q.   And if someone accepted that list price from the public,

3    there was an obligation by the Pruckas to sell that home?

4    A.   I don't know about that.

04:50  5    Q.   One way or the other?

6    A.   I don't know one way or the other.

7    Q.   Let me clarify one thing in your testimony.

8         THE COURT:   Speak up a little bit counsel, please.

9    By Mr. DeAyala:

04:50  10   Q.   Let me clear up one thing in your testimony.

11        If you were to have succeeded in acquiring the

12   Prucka home, you would not have Carena spend the night there

13   for some period of time.   Right?

14   A.   Correct.

04:51  15   Q.   The idea was that was something and a consideration in

16   the future, but you didn't know when?

17   A.   I have an idea.

18   Q.   But if I remember correctly, you didn't know when that

19   time would come.

04:51  20   A.   Correct.   I just said I have a range.

21   Q.   It wasn't necessarily upon her reaching adulthood?

22   A.   Correct.

23   Q.   It was sometime after that?

24   A.   Correct.

04:51  25   Q.   So, at least for several years that would not be her

A. Petrello - Cross by Mr. DeAyala

1    residence and she would not sleep there?

2    A.   Wrong.  It would be her residence.

3    Q.   Let me clarify that.

4              She would not be sleeping there?  That's not

04:51  5    where she would lie her head and sleep at night?

6    A.   Right.  Just the way she doesn't sleep in the carriage

7    house.  She doesn't sleep in that structure as well.

8    Q.   Where is her residence right now?

9    A.   Her residence is 10 Remington Lane.

04:52  10   Q.   Are you a de facto party to the listing agreement?

11             MR. BERG:  Objection, Your Honor.  Calls for a

12   legal conclusion.

13             THE COURT:  Sustained.

14   By Mr. DeAyala:

04:52  15   Q.   Have you ever claimed to be a de facto party to the

16   listing agreement?

17             MR. BERG:  Objection.  We may need to approach the

18   bench, Your Honor.

19             THE COURT:  Overruled.

04:52  20             Take question and answer.  I'll allow that one

21   to be answered.  Do you want to ask it again.

22   Q.   Have you ever claimed to be a de facto party

23   to the listing agreement?

24   A.   I said there could be an interpretation that -- under

04:52  25   which I was a de facto party or a third-party beneficiary,

A. Petrello - Cross by Mr. DeAyala

1    one or the other.

2    Q.  Do you still maintain that position?

3    A.  No.

4    Q.  On your October 30 e-mail -- I'm getting my assistant to

04:53    5    help me.

6              This Exhibit No. 1, the October 30 e-mail --

7    A.  Yes, sir.

8    Q.  -- the 31st -- you state that, "If you are moving fast

9    with a broker, could you exclude sales to us or other

04:53    10   Shadyside neighbors?"  Do you read that?

11   A.  Yes, sir.

12   Q.  So, at that time, you are asking Mr. Prucka not only to

13   exclude you from a listing agreement, but to exclude all the

14   Shadyside neighbors from the listing agreement.  Right?

04:54    15   A.  Correct.

16   Q.  Okay.  And you knew who all the Shadyside neighbors

17   were.  You knew them.  Right?

18   A.  Yes.

19   Q.  And you wouldn't mind any of those folks being your

04:54    20   neighbor.  Right?

21   A.  The exclusion wasn't predicated on caring about who was

22   a neighbor and who wasn't a neighbor.

23   Q.  Well, let me try it this way.

24             You were going to ask Mr. Prucka to exclude

04:54    25   you from the listing agreement and the other Shadyside

1    neighbors.  Did I read that right?

2    A.  Correct.

3    Q.  In doing so, possibly one of the other Shadyside

4    neighbors could come in under the same economic situation as

04:54    5    you and acquire that property.  Right?

6    A.  Correct.

7    Q.  They had the economic advantage under this scenario that

8    you had.  Right?

9    A.  If that were done.  That's a hypothetical.  But yes.

04:54    10    Q.  But that's what you're expressing to Mr. Prucka at the

11    time?

12    A.  No.

13    Q.  You are not expressing to him to not only exclude you,

14    but, also, other Shadyside neighbors from the listing?

04:55    15    A.  I'm expressing that it -- I'm suggesting he can do it

16    for me as well as my other neighbors.  I didn't want to put

17    anybody in a position where he was doing a favor just for me

18    when I know they're friends with other people in the

19    neighborhood.

04:55    20    Q.  And had --

21    A.  I wasn't looking to be treated special vis-à-vis the

22    people in Shadyside.  So, it was in that context.  That's

23    what it's suggesting.

24    Q.  And had he done so, had he followed your suggestion,

04:55    25    other people at Shadyside would have had the same economic

A. Petrello - Cross by Mr. DeAyala

1   advantage that you claim to have.  Right?

2   A.  Correct.

3   Q.  Why in the e-mail do you not tell him that you wanted to

4   use the property for Carena or that it is very important for

04:55   5   you to have that property for Carena?  Why did you not do

6   that?

7   A.  Because I was going to have a conversation with him.

8   Q.  Mr. Petrello, earlier you testified about your

9   background, about you having been a licensed attorney for

04:56   10  many years.

11              You've had your law degree since when?

12  A.  '79.

13  Q.  And when you were at Baker McKenzie, you were a trial

14  lawyer?

04:56   15  A.  No.

16  Q.  International arbitration?

17  A.  Among other things.

18  Q.  But --

19  A.  The last five years, I spent most of my time in

04:56   20  administrative functions, not in arbitration or anything

21  else.

22  Q.  But during your practice, one of the main parts of your

23  practice was international arbitration?

24  A.  Correct.

04:56   25  Q.  And that is a form of trial.  Right?

A. Petrello - Cross by Mr. DeAyala

1  A.  Trial lawyers say it isn't, and the arbitrators say it

2  is.

3  Q.  But the thing is you're putting witnesses on the stand

4  and you're asking questions and you're examining and

04:57    5  cross-examining.  True?

6  A.  I actually never did that -- Well, maybe one time.  We

7  always settled most of our disputes.

8  Q.  But you're familiar with the whole process.  You've been

9  involved in trial and litigation as an attorney and in your

04:57    10  current role at Nabors.  Correct?

11  A.  Well, I'm president.  I have nothing to do with the

12  legal department other than it reports to me.

13  Q.  Well, I don't want to get into a whole lot of details

14  about this.

04:57    15          The point I'm trying to make -- and I think

16  you'd agree with me -- is:  You have taken the stand a

17  number of times?  You have testified by deposition or

18  elsewhere a number of times?

19  A.  Not that many, actually.

04:58    20  Q.  Well, then, how many?

21  A.  Other than this case, you're talking about?  I think

22  twice.

23  Q.  So, earlier you said that you reviewed the discovery in

24  this case and the depositions and that's when you learned of

04:58    25  the discrimination claim.  Right?

A. Petrello - Cross by Mr. DeAyala

1   A.   Correct.

2   Q.   What discovery did you review?

3   A.   The depositions of --

4   Q.   Hold on.  Let me cut that out.  Bad question.

04:58   5            I'm talking about written discovery versus

6   depositions.  I'm talking about just written discovery.

7            What in the written discovery did you review

8   that led you to believe there was a discrimination claim?

9   A.   Okay.  You're talking about documents?

04:58   10   Q.   Yes, sir.

11   A.   All right.  The first document is -- There's an e-mail

12   from McGee to the Pruckas, talking about the wonderfulness

13   of the architecture and the importance of the historical

14   aspect of the house.

04:59   15   Q.   And I'm not trying to make you remember these documents

16   word for word.

17            You're saying there's some e-mail between

18   Peggy and the Pruckas?

19   A.   Well, if you want me to go through documents, I'll try

04:59   20   to do what I can.

21   Q.   I'm just trying to -- If there's something that sticks

22   out in your mind that is a document -- Because you testified

23   earlier that it was in the discovery.  You said the

24   documents and the depositions.

04:59   25   A.   That's --

A. Petrello - Cross by Mr. DeAyala

1          THE COURT:  Hold it, sir.

2          MR. BERG:  Objection, Your Honor.  If he's going to

3   cross-examine him out of documents, I would request that he

4   provide him with the documents, or we would.  And at some

04:59   5   time in the near future, could we take our break?  I

6   apologize.

7          MR. DeAYALA:  This is not a big point.  I'm just

8   trying to see if there's a certain document that strikes his

9   interest.

05:00   10          THE COURT:  All right.  We'll see if we can strike

11   his interest during a break.  If that's what we need to do,

12   we'll do it.

13              It's now about 3:25.  We'll be back in

14   15 minutes.  We'll see you in 15 minutes.

05:00   15                  (Brief recess)

16                  (Jury present)

17          THE COURT:  Be seated and go right ahead, please.

18   By Mr. DeAyala:

19   Q.  Mr. Petrello --

05:19   20          THE COURT:  You need to speak up, counsel.

21   Q.  Mr. Petrello, let me --

22          THE COURT:  If you need a lapel mic we can get you

23   a lapel mic.

24          MR. DeAYALA:  I'll....

05:19   25          THE COURT:  Okay.

1    By Mr. DeAyala:

2    Q.   Let me try the question this way.   When did you first

3    learn that you had a discrimination claim?

4    A.   At the time of the depositions.

05:19    5    Q.   Whose deposition?

6    A.   It was at the conclusion, really, of all three, but the

7    topic became even more apparent during the depositions of

8    Matt Prucka and Peggy McGee.

9    Q.   So, the first time was when?

05:20    10   A.   At the conclusion of those two depositions.

11   Q.   But you have no personal knowledge that Peggy McGee

12   encouraged the Pruckas not to sell the home to you.   True?

13   A.   If the definition of "personal" excludes those

14   depositions and those documents, the answer is "correct".

05:20    15   Q.   Mr. Petrello, I want to ask you what you know and don't

16   know.   Sitting here today --

17        THE COURT:   All right.   I am going to need a lapel

18   microphone.   I want to make sure everybody hears.   It's just

19   difficult.   It's a lot easier --

05:21    20        MR. DeAYALA:   It's my last question of the day.

21        THE COURT:   All right.   Leave that there.   That's a

22   deal I can't refuse.

23            All right.   Go on.

24   By Mr. DeAyala:

05:21    25   Q.   I'm not asking about what you read.   I am asking about

*A. Petrello - Cross by Mr. Raley*

1    your personal knowledge.  Do you have any personal knowledge

2    that Peggy McGee encouraged the Pruckas not to sell the home

3    to you?

4    A.  Excluding those two things, the answer is, no, I don't.

05:21    5         MR. DeAYALA:  No further questions.

6         THE COURT:  Thank you.

7                      CROSS-EXAMINATION

8    By Mr. Raley:

9    Q.  Mr. Petrello, do you know Devin and Priya Nath?

05:22   10    A.  No.

11    Q.  They're the children of Rahul and Usha Nath.  They live

12    in the house with their parents.  They attend St. Thomas

13    University.  I didn't know if you knew that or not.

14    A.  I don't know that.

05:22   15    Q.  Carena is how old, sir?

16    A.  Carena?  She's -- she was 12 in December.

17    Q.  And you are 55?

18    A.  Correct.

19    Q.  You're in good health?

05:22   20    A.  Not particularly.

21    Q.  You're wife is in good health?

22    A.  Yes.

23    Q.  You intend to live --

24    A.  As long as I can.

05:22   25    Q.  -- as long as you can.  You own, currently, 10 Remington

A. Petrello - Cross by Mr. Raley

1    and 18 Sunset?

2    A.   My wife and I.

3    Q.   Yes, sir.  I have a blowup here and I just wanted to

4    look at it with you and kind of identify these properties.

05:23    5    I know you have done it with your counsel a little already.

6          THE COURT:  If any of the attorneys need to get up

7    and move around you're free to do so.

8          MR. RALEY:  All right.  Come on.  Thank you.

9    Thank you, Mr. Matthews.

05:23   10    By Mr. Raley:

11    Q.   Mr. Petrello, 10 Remington is this big square area here.

12    Right?

13    A.   That's part of it.  That's not all of it.

14    Q.   All right.  Where does the rest of it go?  Because I

05:23   15    have the 18 Sunset --

16    A.   Would you like me to -- I can --

17    Q.   Come on down.  Let's look at it together.

18               Is that all right, Your Honor?

19          THE COURT:  All right.  Go on down.

05:23   20          MR. RALEY:  But everybody has got to speak up

21    enough not only for the lawyers back here to hear and

22    parties but the court reporter also.

23    By Mr. Raley:

24    Q.   And I'll stand back.  You don't have to write on it,

05:23   25    Mr. Petrello, but just kind of circle for the jury 10

*A. Petrello - Cross by Mr. Raley*

1    Remington currently.

2    A.   10 Remington is from here.  It goes beyond this line.

3    It goes up, over this way, down this way and this way.

4            THE COURT:  How many acres is it, please, sir?

05:24    5        THE WITNESS:  10 Remington is 3.7 acres and 18

6    Sunset 1.25.  So, together, they're 5 acres.

7    By Mr. Raley:

8    Q.   Right.  If you could stand back just a little, sir, so

9    everybody can see.  This is 18 Sunset?

05:24   10    A.   Correct.

11    Q.   This is 10 Remington?

12    A.   Correct.  My point is it goes beyond -- This is,

13    actually, an easement line.

14    Q.   Yes?

05:24   15    A.   This is not a property line any longer.  This was joined

16    back in 1921, as was this.

17            THE COURT:  Oh.  All right.

18    Q.   And the property at issue in this case is 8 Remington

19    right here.  Correct?

05:24   20    A.   Correct.

21    Q.   Thank you.

22            Thank you, Your Honor.

23            Just set it right here, Mr. Matthews, if you

24    would, because we may need it in a moment.

05:24   25            Now, so we just saw Sunset has a common

*A. Petrello - Cross by Mr. Raley*

1    boundary with 10 Remington.  It's adjacent.  Is that

2    correct?

3    A.   Correct.

4            THE COURT:  It has a brick wall in between.

05:25   5            THE WITNESS:  There is a chain link fence.

6            THE COURT:  That's it.  Just a chain link fence?

7            THE WITNESS:  Right now.  There is a brick wall on

8    the street side of 18 Sunset.

9    By Mr. Raley:

05:25   10   Q.   And you built that.  We'll talk about that in a second.

11   A.   Correct.

12   Q.   10 Remington, I believe I understood your testimony, is

13   three stories tall and has 17,000 square feet.  Is that

14   correct?

05:25   15   A.   Counting the third floor and the basement, yeah.

16   Finished space.

17   Q.   Yes.  Including the basement?

18   A.   There's actually another 2,000 feet in the basement.

19   Q.   So, with the basement it's 19,000 square feet?

05:25   20   A.   Probably.

21   Q.   And does that include the greenhouse?

22   A.   There's another 1,000.

23   Q.   So, all combined, 20,000 square feet?

24   A.   19 to 20 maybe.

05:25   25   Q.   All right, sir.  Did you include the greenhouse when you

*A. Petrello - Cross by Mr. Raley*

1    did your computation of the 40 percent that was useable for

2    Carena?

3    A.  No, I didn't.

4    Q.  So, it would actually be up to 7,000 or more square feet

05:26   5    fully handicapped accessible for Carena in 10 Remington.

6    Correct, sir?

7    A.  Correct.  The greenhouse, just so it's understood, has

8    space for my daughter.  It, also, is, actually, a home gym.

9    So, it's space for the household.

05:26   10   Q.  Use it for therapy and play and things like that?

11   A.  And other things.

12   Q.  Thank you, sir.

13              Now, when you bought 18 Sunset, which we just

14   saw here, in November of 2006 your long-term plan for

05:26   15   18 Sunset was to build there what would become a residence

16   for Carena some day?

17   A.  Correct.

18   Q.  And I believe you just testified you could still do that

19   if you wanted to?

05:26   20   A.  Correct.

21   Q.  Indeed, you demolished the house that was there.  So,

22   now it's an empty lot which could accommodate whatever kind

23   of structure you wanted to build to accommodate her specific

24   needs.  Correct?

05:27   25   A.  Absolutely.

*A. Petrello - Cross by Mr. Raley*

1    Q.   You built a fence on 18 Sunset?

2    A.   I replaced -- There was a fence that was there and then

3    we replaced it with a wall.

4    Q.   A brick wall?

05:27   5    A.   A brick wall.

6    Q.   And how high is that brick wall?

7    A.   Eight feet.

8    Q.   And there is also a metal gate there, isn't there?

9    A.   Yes, there is.

05:27   10   Q.   How high is that metal gate?

11   A.   Equally.  Equal height.

12   Q.   The wall also goes along the boundary line of the house

13   next to 18 Sunset.  Correct?

14   A.   Correct.

05:27   15   Q.   You mentioned in your direct examination that there was

16   a problem with the neighbors about that wall?

17   A.   Yes.

18   Q.   What was that problem?

19   A.   I really don't like that neighbor much.  He's my lawyer,

05:28   20   Mr. Berg.

21   Q.   He's in this courtroom, isn't he, sir?

22   A.   Yes.

23        MR. BERG:  Objection, Your Honor.  That was my

24   wife, not me.

05:28   25        MR. RALEY:  Well, I think we all need to listen to

*A. Petrello - Cross by Mr. Raley*

1    her.

2    By Mr. Raley:

3    Q.   All right.   So, the problem is now resolved, I take it.

4    A.   That was humor.

05:28   5    Q.   All right.   So, there was no problem?

6    A.   No.   There was no problem.

7    Q.   Now, when 8 Remington came onto the market purchasing

8    8 Remington became a new long-term plan for you --

9    A.   Correct.

05:28   10   Q.   -- to replace the 18 Sunset long-term plan?

11   A.   Correct.

12   Q.   Carena is a child so -- and I believe -- I know there is

13   some overlap here, but it's rely important to try to

14   establish that.   She would not have resided or dwelled in

05:29   15   8 Remington, to sleep there in the evenings, for some time.

16   Correct?

17            MR. BERG:   Object, Your Honor.   Asked and answered

18   already.

19            THE COURT:   Sustained.

05:29   20   By Mr. Raley:

21   Q.   Isn't it true, sir, that at the time you started

22   negotiating for the purpose of 8 Remington the purpose at

23   that time would not be for a dwelling for Carena?

24            MR. BERG:   Excuse me.   Your Honor, that's an

05:29   25   identical question that's been asked, same subject matter.

*A. Petrello - Cross by Mr. Raley*

1    Objection.

2            THE COURT:  Overruled.

3    Q.  The purpose at that time was not to be a dwelling.  That

4    was a long-term plan for the future.  Correct?

05:29    5    A.  No.

6    Q.  I realize that you're calling at it an extension of your

7    house, but it's really two separate houses.  Right?

8    A.  No, it's not.

9    Q.  Were you going to have some sort of a tunnel between

05:29    10   them?

11   A.  No.

12   Q.  All right.

13   A.  Basically, the way the Shadyside rules work is once you

14   buy a contiguous lot the boundaries between the lot

05:29    15   disappear and they're considered -- it's considered one

16   house and with multiple -- you could have multiple

17   buildings.  And I have a carriage house and I have, as you

18   know, a greenhouse and I'd have the Prucka house on there as

19   well.  And, so, it would be one dwelling.  It is one -- it

05:30    20   would be one dwelling.

21   Q.  That's the interpretation given the Shadyside rules, but

22   it really is a separate building, isn't it, sir?

23   A.  It is a separate building, but you asked -- It's one

24   home, though.

05:30    25   Q.  And, so, that building of 8 Remington -- at the time you

*A. Petrello - Cross by Mr. Raley*

1    negotiated for purchase --

2    A.   Yes.

3    Q.   -- that building of 8 Remington was only going to be a

4    dwelling at some point in the future but not at the moment

05:30    5    of the negotiation?

6    A.   Wrong.

7    Q.   I believe you have just testified that she wasn't going

8    to sleep there for some time.

9    A.   I don't need to sleep there to use it for her playroom

05:30   10    and for all the kinds of things -- just like you use a pool

11    house on a property, like you use a greenhouse.  It's just

12    another structure, and I am going to use it for my daughter

13    and her therapists and whatever else.

14    Q.   We'll talk about the purpose for it in a moment.  I

05:31   15    didn't ask you if it was going to be a playroom.  I am

16    trying to reiterate that she wasn't going to sleep there for

17    quite some time.  And you're not going to change that

18    testimony, are you, sir?

19    A.   I already said that.

05:31   20    Q.   All right.  Good, sir.

21              Now, it was going to be a place, as you have

22    described, for her therapy and to play.  8 Remington was

23    going to have that purpose.

24    A.   Right.

05:31   25    Q.   And she would use the home just as she currently uses

*A. Petrello - Cross by Mr. Raley*

1   her playroom now, only with more space.

2   A.   Correct.

3   Q.   Correct?  There were some pictures of the inside of your

4   home, but I don't think that your playroom has been shown

05:31   5   yet.  Let me press this button, and if we could pull up

6   Exhibit 34, please.  And I just would like you to identify

7   for the jury that these are -- Are you all right?

8   A.   I didn't know I weighed that much.

9   Q.   Maybe your health isn't so good.

05:32   10           This is a picture of Carena's playroom.

11   Correct, sir?

12   A.   Correct.

13   Q.   We can just scroll through some of those pictures.  How

14   many square feet is that playroom, sir?  Do you know?

05:32   15   A.   It's about 580, something like that.

16   Q.   And some of her therapies take place in that room

17   currently?

18   A.   Yeah.  You see a bar.  You see -- That's a sensory

19   ball --

05:32   20   Q.   Yes, sir.

21   A.   -- that you put it on the back and stretch her.

22   Q.   We can keep scrolling through.  We may actually have

23   some pictures of the greenhouse as well.

24           These are all different angles from the

05:32   25   playroom right here, aren't they, sir?

*A. Petrello - Cross by Mr. Raley*

1    A.   Correct.

2    Q.   This is the greenhouse.   Correct?

3    A.   Correct.

4    Q.   How many square feet is that greenhouse?   1,000, you

05:32    5    said?

6    A.   Well, this part of it I believe is about 700 and then

7    there's like a little section off of it with another couple

8    hundred feet.   So, I rounded up to 1,000.   It could be 900.

9    Q.   There you go.   That's a good view of the greenhouse.

05:33   10    Correct?

11   A.   Yes.

12   Q.   And this is a place where Carena does a lot of her

13   therapy?

14   A.   That's correct.   You see the massage table.   You see --

05:33   15   basically, she is put on the massage table.   The bungee

16   cords are used like a traction.   So, she's put on the

17   traction and then she's stretched every day.   They stand by

18   her as they try to stand her up on that treadmill there and

19   have her walk.   Then you will see some floor mats down there

05:33   20   where they do some exercises on the floor.

21   Q.   All right, sir.   And that's how far from your -- the

22   door to the structure or the dwelling where you live?

23   A.   About 110 feet maybe.

24   Q.   Do you agree that Carena receives now the best care and

05:33   25   treatment that money can buy?

A. Petrello - Cross by Mr. Raley

1    A.  I hope so.

2    Q.  You're going to make sure of it, aren't you, sir?

3    A.  I hope so.

4    Q.  Yes, sir.

05:34    5         Do you agree that the purchase of 8 Remington

6    is not absolutely necessary because you could still build

7    whatever you wanted on 18 Sunset?

8    A.  I agree.

9    Q.  You do not know, do you sir, if Dr. and Mrs. Nath knew

05:34   10   about your 8.2-million-dollar offer for 8 Sunset?

11   A.  I believe they did before they closed on the property.

12         MR. RALEY:  Deposition Page 174, counsel.

13         MR. BERG:  Which deposition?

14         MR. RALEY:  The first deposition of Mr. Petrello.

05:34   15   I will give you a page and line.

16         MR. BERG:  Let me get the deposition first.

17         MR. RALEY:  Sure.  I will wait for you.

18         MR. BERG:  And give us the date of this deposition,

19   please.

05:35   20         MR. RALEY:  The date of the deposition is May 12,

21   2008.

22         MR. BERG:  Page and line, please.

23         MR. RALEY:  Page 174.  My short copy doesn't have

24   lines.  It appears to be Line 16 through 23, counsel.

05:35   25         MR. BERG:  Okay.

1          MR. RALEY:  May I approach to give the witness --

2          THE COURT:  You needn't approach.  Go right on up.

3     I mean you needn't ask permission.  Go right on up.

4          MR. RALEY:   Thank you, Your Honor.

05:35    5     By Mr. Raley:

6     Q.  I am going to hand you a copy of your deposition,

7     Mr. Petrello.  Now, on the date of that deposition you

8     testified under oath.  Correct?

9     A.  Yes.

05:35    10    Q.  Just like today?

11    A.  Correct.

12    Q.  And after the deposition you were given an opportunity

13    to read and sign and make any corrections?

14    A.  Yeah.  Actually, I neglected to actually read and do

05:36    15    that, but I was given the opportunity.  You're correct.

16    Q.  Let's go through this together.  I don't want there to

17    be any confusion.  On Page 174, Line 15, the question was

18    asked you:  "Sitting here today, you don't know whether the

19    Naths were aware of your 8.2-million-dollar offer?"

05:36    20              I will let you get to the page.  I apologize,

21    sir.  Page 174.

22    A.  Yes, sir.

23    Q.  "Sitting here today, you don't know whether the Naths

24    were aware of your 8.2-million-dollar offer?"  And what did

05:36    25    you say, sir?

*A. Petrello - Cross by Mr. Raley*

1   A.  I said:  "I have openly and very specifically have said

2   that."

3   Q.  And then the next question:  "Okay.  Sitting here today,

4   you don't know whether your 8.2-million-dollar offer was

05:36   5   communicated to the Naths at any time?"  And what did you

6   say, sir?

7   A.  I said:  "I don't know."

8   Q.  Thank you, sir.

9   A.  That's not my complete answer.

05:36   10   Q.  It looks like "I don't know" is the answer.

11   A.  Well --

12   Q.  Can I move on, Mr. Petrello?

13   A.  You can do --

14       THE COURT:  Wait a second.  Yes, sir.

05:37   15       MR. BERG:  Your Honor, under Rule 106, if it is not

16   the complete answer, Mr. Petrello has a right to --

17       THE COURT:  You've got to raise it.  Is that what

18   you're rising at this time?

19       MR. BERG:  Objection.

05:37   20       THE COURT:  Then, either you or Mr. Raley could

21   read the remainder.  If you desire to do it, Mr. Berg, you

22   may.  Usually it's done that way or the examining attorney.

23       MR. RALEY:  Your Honor, for the record, the answer

24   to the question is "I don't know" and there's no further

05:37   25   answer.

1      THE COURT:  Mr. Berg, is it further explained after

2  that?

3      MR. BERG:  Yes, it is.

4      THE COURT:  All right.  Then, go ahead.  "I don't

05:37   5  know."  What's next?

6      MR. BERG:  "Sitting here today, you don't know if

7  Peggy McGee encouraged the Pruckas to accept your offer

8  versus anything else?  You don't know that?"

9      You may answer.

05:37  10      THE WITNESS:  Yeah.  These questions relate to a

11  time frame of December 4.

12      THE COURT:  Wait a second.  Is that what it says?

13      MR. BERG:  Yes, Your Honor.  This relates to a

14  different time frame.

05:38  15      (Simultaneous dialogue)

16      THE COURT:  No.  What does it say in there?  Was

17  that exactly what it says?  You can only read.  You can't

18  question -- In other words, the rule of optional

19  completeness means that if you read a letter or you read a

05:38  20  question in a deposition and an answer, if the next question

21  and answer can clarify what is said -- it used to be you had

22  to wait until you took them back as your own witness.  When

23  they adopted that rule they said, 'Well, you might as well

24  clean it up right at the time.'  So, there's been a request

05:38  25  like that.

*A. Petrello - Cross by Mr. Raley*

1          Now, we have -- What was his answer that he

2     gave to your question, Mr. Raley?

3          MR. RALEY:  For the record, Your Honor, the answer

4     was "I don't know," but the question --

05:38    5          THE COURT:  Hand it up since there's a contest.

6     Somebody just hand it up.

7          MR. RALEY:  You can have my copy, Your Honor.  It's

8     Page 174 right there, the circled part.

9          MR. BERG:  And before that, Your Honor, starting at

05:38   10     173 at the bottom.

11          THE COURT:  Overrule the objection.

12               You may continue, Mr. Raley.

13          MR. RALEY:  Thank you, Your Honor.

14               One further request.  Could I request that

05:39   15     objections be made by counsel and not by the witness.

16          THE COURT:  I will take care of that next time.

17     Absolutely.

18          MR. RALEY:  Thank you.

19     By Mr. Raley:

05:39   20     Q.  Now, isn't it true, Mr. Petrello, that you never told

21     anyone at Heritage Properties about your intentions for

22     8 Remington?

23     A.  Correct.

24     Q.  And isn't it true that Mr. Prucka never evidenced any

05:40   25     discriminatory intent in talking to you before the sale?

*A. Petrello - Cross by Mr. Raley*

1    That's correct, isn't it?

2    A.   Correct.

3    Q.   Thank you.

4              You agree that the Naths, as buyers, did not

05:40   5    have the power to force the Pruckas to sell to them or to

6    not sell to you?

7    A.   I'm not sure.  Could you repeat that.

8    Q.   You agree that the Naths did not have the right or the

9    power to force the Pruckas to sell to them.  They're simply

05:40   10   the buyers.

11            MR. BERG:  Objection.  Legal conclusion.

12            THE COURT:  Sustained as to the form of the

13   question.  You may rephrase it.

14   By Mr. Raley:

05:40   15   Q.   Do you agree that the Naths did not have the power to

16   compel a sale to them?

17   A.   I think that's true.

18   Q.   And the Naths did not have the power to compel a sale to

19   you?

05:41   20            MR. BERG:  The same objection, Your Honor.

21   Objection.  He is not an expert.

22            THE COURT:  Overruled.

23   A.   Correct.

24   Q.   Thank you, sir.

05:41   25            Isn't it true, Mr. Petrello, that you did not

*A. Petrello - Cross by Mr. Raley*

1   use a real estate broker in any manner in negotiating the

2   purchase of 8 Remington?

3   A.   Correct.

4   Q.   Thank you.

05:41   5              Now, Mr. Petrello, you agree that the last

6   offer that you made was 8.2 million?

7   A.   Net.  Yeah.

8   Q.   Now, we have all heard your counsel's opening statement.

9   You agree that the number $8.2 million is a different number

05:41   10   than the number 8.299,500?  Those two numbers are different

11   numbers.  That's self-evident, isn't it, sir?

12   A.   I would think so.

13   Q.   Good.  If a commission is to be paid on both numbers,

14   the 8.2-million-dollar number is a lower number.  Correct?

05:42   15   A.   Not necessarily.

16   Q.   Depending on the size of the commission or what?

17   A.   That's true.

18   Q.   All right.  If a standard commission of 3 percent or

19   more is to be paid on both numbers, then the 8.2-

05:42   20   million-dollar number is lower?

21   A.   If 3 percent is payable on both, then one number is

22   lower than the other.  Correct.  The 8.2 is lower.

23   Q.   Thank you, sir.

24              Now, you are the only -- We have heard about

05:42   25   Harvard Law School.  Isn't it true that of the three or four

*A. Petrello - Cross by Mr. Raley*

1    major parties in the case you're the only one that's a

2    lawyer?

3    A.  I assume so.

4    Q.  And, as a lawyer, you know the importance of a written

05:42  5    contract in real estate matters?

6    A.  They're used, yes.

7    Q.  They're required, aren't they?

8    A.  No.

9    Q.  What is the statute of frauds?

05:43  10   A.  The statute of frauds requires that if one party wants

11   to hold another party responsible and charge them with a

12   contract that, in certain cases, it has to be in writing.

13   Q.  And one of those cases is real estate.  Correct?

14   A.  Yes.

05:43  15   Q.  In your testimony from Mr. Berg's questions in your

16   direct examination you stated that on December 5th, 2007,

17   the Naths entered into a written contract to purchase

18   8 Remington.  Correct?

19   A.  I thought my testimony was that either December 4 or

05:43  20   December 5, because there's two different dates, I

21   understand, a document was signed that's a real estate

22   contract between the Naths and the Pruckas.

23           MR. RALEY:  Excuse me, Your Honor.

24   By Mr. Raley:

05:43  25   Q.  So, the documents are signed by one party on the 4th and

*A. Petrello - Cross by Mr. Raley*

1    another party on the 5th?

2    A.   It's hard to tell, but that's what it looks like.   It

3    looks like different parties.   The December 4 looks to me

4    like it's Matt Pruckas's handwriting.   And the December 5, I

05:44   5    don't know whose handwriting --

6    Q.   And the Pruckas and the Naths can presumably provide

7    more information about that when their turn comes to talk.

8    A.   Correct.

9    Q.   You agree -- and I'm not asking you to interpret this

05:44   10   contract, but you agree that this contract, like all

11   contracts, gives certain rights and certain responsibilities

12   to the parties?

13   A.   Subject to applicable law.

14   Q.   Yes, sir.   And those rights and responsibilities in

05:44   15   this, as in all contracts, are laid out within the words of

16   the document.   Correct?

17   A.   It could incorporate by reference other things.   Other

18   things could be implied by law.   There's --

19   Q.   Sure.   But, generally, we look to what lawyers call the

05:44   20   four corners of the document to find out what the meaning

21   is.   Correct?

22           MR. BERG:   Your Honor, objection.   He is not here

23   as an expert.

24           THE COURT:   Sustained.

05:45   25   By Mr. Raley:

*A. Petrello - Cross by Mr. Raley*

1   Q.  And you understand that this contract, like all

2   contracts, provides certain rights and responsibilities

3   within the document.  I'm not asking you to interpret them.

4           MR. BERG:  Objection, Your Honor.  The same

05:45   5   objection.

6           THE COURT:  Overruled.

7   A.  The contract has terms and conditions that apply subject

8   to applicable law.

9   Q.  And those terms and conditions will be important for

05:45   10   this jury to consider in this case.  Don't you agree?

11   A.  As will the applicable law.

12   Q.  Yes, sir.  This contract of December 4th and 5th, 2007,

13   between the Pruckas and the Naths was entered into before

14   you ever met or talked to Dr. Nath.  Correct?

05:45   15   A.  Correct.

16   Q.  On December 7th -- Friday evening, December 7th, 2007,

17   you asked Dr. Nath to come over to your home?

18   A.  Yes, indirectly.  But he was invited to come over, yes.

19   Q.  You sent one of your employees over to ask him to come

05:46   20   over?

21   A.  Yeah.  To see if he was willing to do that, yes.

22   Q.  And he came over?

23   A.  Yes, he did.

24   Q.  At that time you did not tell Dr. Nath that you had any

05:46   25   contract with Mr. Prucka, did you, sir?

*A. Petrello - Cross by Mr. Raley*

1    A.   I told him I had a dispute with him.

2    Q.   But you did not go into any details of the dispute

3    because you did not think it would be appropriate to go into

4    that because it was a dispute between you and Mr. Prucka.

05:46  5    Correct?

6    A.   Correct.

7    Q.   On that day, November 7th, 2007, you talked to Dr. Nath

8    about the possibility of buying the property from him.

9    Correct?

05:46  10   A.   I didn't phrase it that way.  I think I said was he

11   interested in any mechanism where he would be willing to

12   step aside, the actual mechanism.  I didn't put it in those

13   terms.

14   Q.   Well, you don't remember the exact words that were

05:47  15   spoken, do you, sir?

16   A.   No.  You used the phrase "step aside" --

17   Q.   And did you tell him that purchasing the property from

18   him might be one possibility?

19   A.   I think in my deposition I was asked that and I said

05:47  20   that that could well have been one of the scenarios.

21   Q.   Could you have said something like, "What I would have

22   said is 'Maybe that's one possibility of pursuing it'"?

23   A.   I think that's pretty close.

24   Q.   Yes, sir.

05:47  25   A.   Do you?

*A. Petrello - Cross by Mr. Raley*

1    MR. RALEY:  Your Honor, if I could refresh the

2  witness's recollection on Page 126.

3  By Mr. Raley:

4  Q.   This is not an impeachment, Mr. Petrello.  I just want

05:47  5  to make sure that you and I are clear with each other.

6  A.   I appreciate your being careful.

7  Q.   Thank you, sir.

8  A.   Yes.

9  Q.   Page 128.  I'm not going to ask another question before

05:47  10  counsel gets there, but bottom of the page.  Have you read

11  it?

12  A.   What should I read?

13  Q.   Just Lines 18 through 25 or so of Page 128.

14  A.   Yes.

05:48  15  Q.   Have you read those portions?

16  A.   Yes.

17  Q.   Is your memory refreshed a little bit after reading your

18  prior testimony?

19  A.   I don't have any problem with what I wrote here -- I

05:48  20  mean, what I said here.

21  Q.   Good.  So, would it be accurate to say that you

22  discussed the purchase of the house from Dr. Nath as one of

23  the possibilities?

24  A.   What I said here is "I would have said that maybe that's

05:48  25  one possibility of pursuing it."

*A. Petrello - Cross by Mr. Raley*

1    Q.  Thank you, sir.

2                   Now Dr. Nath was cordial to you on

3    December 7th, wasn't he, sir?

4    A.  He was.

05:49   5    Q.  But he was -- you have described him as being excited

6    about his new home.

7    A.  He described himself as being excited.

8    Q.  Right.  Okay.  I thought that that was the way you

9    described it earlier.

05:49   10                   Did he express being excited about his new

11   home to you on December 7?

12   A.  If you mean the term "excited" you mean jubilant, he

13   wasn't jubilant.  He just made the statement "We're excited

14   about having..."

05:49   15   Q.  Purchase --

16   A.  Purchase the house.

17   Q.  -- his new home?

18   A.  Correct.

19   Q.  Dr. Nath, I believe you have testified, expressed an

05:49   20   interest in your daughter.

21   A.  Correct.

22   Q.  He offered to meet her and assess what could be done to

23   help her?

24   A.  Correct.

05:49   25   Q.  You first concluded that there was discrimination in the

175

*A. Petrello - Cross by Mr. Raley*

1    sale of this home over six months after the sale.  Correct?

2    A.  Correct.  Well, after six months I took action in terms

3    of filing the lawsuit.

4         MR. RALEY:  On Page 246, counsel.  We don't have

05:50  5    that volume -- If not, I will just approach when the time

6    comes.  I will wait until Mr. Berg gets there.

7         Mr. Berg, Pages 246, Lines 9 through 14.

8         MR. BERG:  This deposition goes through Page --

9         MR. RALEY:  It's Volume 2, Mr. Berg.

05:51 10         MR. BERG:  Would you tell us the date of the first,

11   please.

12         MR. RALEY:  The first one, Mr. Berg, is --

13         MR. BERG:  May 12th.

14         MR. RALEY:  -- May 12th, 2008.  The second one is

05:51 15   January 27, 2009.

16         MR. BERG:  And what is the page, sir?  I'm sorry.

17         MR. RALEY:  Page 246, Lines 9 through 14.

18         MR. BERG:  I am with you.

19         MR. RALEY:   All right.

05:51 20   By Mr. Raley:

21   Q.  I will just need to approach, Mr. Petrello.

22         When Mr. Fogler to asked you this question in

23   your deposition "When did you first conclude that you had

24   been discriminated against?" what did you say under oath in

05:51 25   response?

A. Petrello - Cross by Mr. Raley

1      MR. BERG:  I am going to object, Your Honor.  This

2  is classically not impeachment.  I will be glad to pass it

3  up to you.  It's consistent with what Mr. Petrello had to

4  say.

05:51    5      THE COURT:  Let me see it.  Now, what are we

6  looking at, the question?

7      MR. BERG:  Page 246 starting at Line 9.

8      THE COURT:  All right.  Let me read it.

9      MR. RALEY:  My question was verbatim from the

05:52   10  transcript, Your Honor.

11      THE COURT:  And why do you object to this question

12  and answer?

13      MR. BERG:  Because the answer that Mr. Petrello

14  gave to the question was -- He asked him when he first

05:52   15  alleged discrimination.  He didn't ask him that question.

16      MR. RALEY:  That's not the question.  The record

17  will reflect the question I asked is when he first concluded

18  there was discrimination, and his answer was "I first took

19  action when I filed this petition."  So, he didn't even

05:52   20  answer the question.  He didn't answer the question I asked.

21  Therefore, I am impeaching him because the question goes to

22  when he first concluded, and that's the question I want

23  answered.

24      MR. BERG:  This is an argument over nothing.  He

05:53   25  could have very easily, Your Honor, I would say --

*A. Petrello - Cross by Mr. Raley*

1           THE COURT:  I don't see how this is impeachment.

2    It's just a shade of gray, but I will allow him to do it.

3    Overruled.

4    By Mr. Raley:

05:53  5    Q.  When you were asked the question, Mr. Petrello, "When

6    did you first conclude that you had been discriminated

7    against?" what did you say under oath?

8    A.  Do you want me to read it?

9    Q.  Yes.  Sure.

05:53 10    A.  I said:  "I first concluded I was discriminated against

11   on the basis of a disability or handicap" --

12           THE COURT:  Hold it, sir.  People have a tendency

13   to speed up when they read.

14           THE WITNESS:  I'm sorry.

05:53 15           THE COURT:  Would you read it again.  The court

16   reporter needs to get it down.  The question again.

17   A.  "I first concluded I was discriminated against on the

18   basis of a disability or handicap when I was informed of

19   Mr. Prucka's deposition testimony."  That's correct.

05:53 20   Q.  Thank you, sir.  And this event was five months after

21   the sale of 8 Remington.  Correct?

22   A.  Correct.

23   Q.  And that was when you first --

24           THE COURT:  Wait a second.  That's what he said.

05:54 25   Let's not keep going over and repeating what he said.  Next

1    question.   That's when he first concluded.

2              MR. RALEY:    Thank you, Your Honor.

3    By Mr. Raley:

4    Q.   You filed an amended petition shortly after that, which

05:54   5    was the first time you made a discrimination claim.

6    Correct?

7    A.   I think I waited until hearing Dr. Nath's deposition and

8    that's when it was filed.

9    Q.   In June --

05:54   10   A.   Correct.

11   Q.   -- of 2008?

12   A.   Correct.

13   Q.   The original lawsuit you filed did not have a

14   discrimination claim?

05:54   15   A.   Correct.

16   Q.   If we could pull up Exhibit 38, the lis pendens.

17              Mr. Petrello, isn't it true that regarding

18   8 Remington you did not have any plans for modifications in

19   the short-term and you did not know specifically what

05:55   20   accommodations would have been made in the long-term?

21   A.   Can you repeat that?

22   Q.   Yes, sir.  Regarding 8 Remington --

23   A.   Yes.

24   Q.   -- at least as of September 30th, 2008, isn't it true

05:55   25   that you did not have any plans for modification in the

*A. Petrello - Cross by Mr. Raley*

1    short-term and you did not know specifically what

2    accommodations would have been made in the long-term?

3    A.   I think that's probably true.

4    Q.   Thank you, sir.

05:56    5                Now, the lis pendens.  This document -- Let me

6    turn to it in mine.

7                If we could scroll down to the bottom of the

8    page so we could see the date, please.

9                This document was filed by your counsel on

05:56    10   December 11th, 2007.  Correct?

11   A.   Yes.

12   Q.   And the purpose of a lis pendens is to give notice of a

13   claim regarding property.  Correct?

14   A.   Correct.

05:56    15   Q.   All right.  Let's scroll up and see what is claimed.  We

16   need to be able to read the whole thing, please.  There it

17   is.  "A notice is hereby given that Cause No. 2007-74967

18   styled Anthony G. Petrello vs. Matthew Prucka and Sheryl

19   Prucka was commenced in the 55th Judicial District Court of

05:57    20   Harris County, Texas, on December 11, 2007 --

21                THE COURT:  You're going to have to slow down.

22                MR. RALEY:  I apologize, sir --

23   Q.   -- "was commenced in the 55th Judicial District Court of

24   Harris County, Texas, on December 11th, 2007, and is now

05:57    25   pending in such court."  Did I read that accurately?

*A. Petrello - Cross by Mr. Raley*

1    A.   Correct.

2    Q.   All right.  So, this is a lawsuit that you filed against

3    the Pruckas on the same day the lis pendens was filed?

4    A.   Correct.

05:57    5    Q.   If you could look to the second paragraph, Mr. Prucka --

6    or Mr. Petrello.  You say:  "This lawsuit is an action

7    involving title to real property and/or the establishment of

8    an interest in real property.  Plaintiff seeks specific

9    performance of the sale of the property on claims for breach

05:58    10   of contract and unjust enrichment and a request for

11   attorney's fees regarding the real property more

12   specifically described as:  8 Remington Lane..." and then

13   there's the ZIP code.  Correct?

14   A.   Correct.

05:58    15   Q.   Do you agree with me, Mr. Petrello, that there is

16   nothing in the words of this document or in the lawsuit you

17   filed on that day that give any notice whatsoever of a

18   discrimination claim?

19   A.   Correct.

05:58    20        MR. RALEY:  Pass the witness, Your Honor.

21        MR. BERG:  Your Honor, I am going to have an

22   additional document that I'd like to introduce into the

23   evidence.  It is here in the stack.  Give me two seconds,

24   Your Honor.  Let me hand it to counsel, if I might.  I have

05:59    25   only got one extra copy.

*A. Petrello - Cross by Mr. Raley*

1          Is there objection?

2          MR. DeAYALA:  Well, I am going to object to the

3    document.  It's hearsay.  This is plain hearsay.

4          MR. BERG:  I'm not offering it for the truth of the

5    matter, Your Honor.

6          MR. RALEY:  Well, why it is being offered, then?

7          MR. DeAYALA:  May I --

8          THE COURT:  Let me take a look at it.

9               All right.  Come on up here.

10                   (At the bench)

11          THE COURT:  Okay.  What are we -- This is

12    concerning 18 Sunset.

13          MR. BERG:  Yes, sir.  They asked him questions

14    about whether or not there was -- he had to have -- whether

15    or not there was a contract in writing.  There was.  But

16    they have also asked him -- the whole point of their cross

17    of him has been he didn't make a written offer on the

18    contract for -- on the property at 8 Remington.  There was

19    no necessity and this is what his state of mind reflected.

20    It was a cash offer.  It's a bill of sale and a deed.

21          MR. DeAYALA:  The e-mail in 2006 --

22          THE COURT:  Say again.

23          MR. DeAYALA:  An e-mail in 2006 can't be a state of

24    mind over a year later.

25          MR. RALEY:  Also, Mr. Petrello said that --

*A. Petrello - Cross by Mr. Raley*

1        THE COURT:  He is not going to be able to pick that

2    up.  Here's the microphone.

3        MR. RALEY:  Mr. Petrello -- if Mr. Berg says his

4    state of mind is to not do a contract and Mr. Petrello

06:02   5    clearly says that you should prepare drafts of contracts and

6    closing papers, his state of mind appears to be --

7        THE COURT:  What's your objection?

8        MR. RALEY:  Well, I join in the hearsay objection.

9        THE COURT:  What else?  Anybody else?

06:02   10       MR. RALEY:  I don't think the state of mind works

11   because it's all covered by this e-mail.  There is no

12   clearer state of mind.

13       THE COURT:  What else?  Anybody else?

14       MR. DeAYALA:  Just so the record is clear, the

06:02   15   objection is hearsay.

16       THE COURT:  I can't hear you.

17       MR. DeAYALA:  The objection is hearsay.

18       THE COURT:  Yeah.  But you've got other objections,

19   too.  I am going to ask.  What's the relevance of this?

06:02   20       MR. DeAYALA:  There is no relevance of it.

21       THE COURT:  Well, I didn't hear that from anybody.

22   In other words, I'm not playing games.  None of us are.  I

23   didn't mean to be lighthearted, but I am saying -- I don't

24   see the relevancy of this.  I'm sorry.  I could have ruled

06:03   25   on the other ground that it might have been upheld, but I

1   want to keep it clean all the way.  So, I'm not here siding

2   with one side or the other to tell you what the objections

3   are, but I don't see the relevance of this, and I don't want

4   the case mucked up.

06:03   5            MR. GIBSON:  Your Honor, they crossed him on the

6   fact that he did have a purchase and sale agreement with

7   Rice University on the purchase of 18 Sunset.  This shows

8   that, actually, they had negotiated a price for that and did

9   the purchase and sale agreement later.  One of their main

06:03   10  points is that he never put anything in writing and, so,

11  therefore, he wasn't sincere.

12           THE COURT:  Sustain the objection.  If you need to

13  file that just for the record make sure Ellen gets a copy of

14  it.

06:04   15           MR. BERG:  I don't think this will be -- I am not

16  going to do that.  We're going to waive that one.

17                     (Before the jury)

18           THE COURT:  Go right ahead, sir.

19           MR. BERG:  May I --

06:04   20           THE COURT:  Go right ahead.

21                   REDIRECT EXAMINATION

22  By Mr. Berg:

23  Q.  I am going to go back, Mr. Petrello, to the brokerage

24  agreement that Mr. Fogler showed you and show you the

06:04   25  provision that he was talking about, and I need one of

A. Petrello - Redirect by Mr. Berg

1    those -- do you have a laser pointer?

2    A.  I have it.

3    Q.  Let's blow up -- would you try to blow up the part that

4    was referred to before.  Now, this is not as readable as was

06:05    5    Mr. Fogler's, so I am going to read it again.

6              Mr. Fogler showed you this provision of the

7    contract.  "...broker, individually or in cooperation with

8    another broker" -- This is when the brokerage fee is

9    earned -- I'm sorry.  To make it clear and to put it in

06:05    10   context, the jury will recall this is when the brokerage fee

11   is earned under this provision of the contract.  "When a

12   broker, individually and in cooperation with another broker

13   procures a buyer ready, willing and able to buy the property

14   at the listing price or at any other price acceptable to the

06:05    15   seller."

16             Now, Mr. Petrello, you have looked at this

17   document; have you not?

18   A.  I did subsequent to Mr. Fogler's pointing out the clause

19   because he asked me to look at it.

06:06    20   Q.  For reasons best known to Mr. Fogler, he did not show

21   you this provision.

22             Let's go to the exception, please.  Please

23   include the language at the top, "Special Provisions".  Now,

24   and are you able to do this so that we can show that all the

06:06    25   parties initialed it over here?

*A. Petrello - Redirect by Mr. Berg*

1          Now, let me read this into the record.

2     "15.  Special Provisions.  Named exclusions to this

3     agreement are Anthony Petrello and Devinder Bhatia..."  We

4     talked about this earlier.  Do you remember?

06:06   5     A.  Correct.

6     Q.  "...and family members or related parties."  And you see

7     up here it looks like somebody has initialed it.  This

8     indicates, does it not, Mr. Petrello, someone has initialed

9     it, someone has read it?

06:07   10    A.  Yes, sir.

11    Q.  And these parties may purchase the property until 1-9-09

12    and no broker's fee will be earned or paid by sellers?

13    A.  Correct.

14    Q.  Is that what is called an exception to the contract?

06:07   15    A.  Yes.

16    Q.  And why is that an exception, sir?

17    A.  Because what this provision then does is, if the deal is

18    done with me, it says there's no fee payable --

19         MR. FOGLER:  Excuse me, Judge.

06:07   20         MR. DeAYALA:  This calls for a legal conclusion on

21    the part of this witness.

22         THE COURT:  I think we have discussed that.  It's

23    their interpretation.  I think it's already in the record,

24    isn't it?  In other words, that that's what they -- that

06:07   25    that's their theory.

A. Petrello - Redirect by Mr. Berg

1          MR. DeAYALA:  Your Honor, the reading of it is in

2     the record, but every time we have asked on our side for his

3     comment on the legal weight of something there's been an

4     objection, legal conclusion.

06:07    5          THE COURT:  There you got it and you will take him

6     on cross-examination again.  And the jury will recall what

7     the testimony was on prior questioning.  I just desire not

8     to jump into it.

9               By the way, in federal court the federal judge

06:08   10    can comment on the weight of the evidence and can comment on

11    the evidence.  Rarely do I, as I choose not to at this

12    point.

13              So, you recall what you heard.  You heard the

14    questions.  You heard the answers.  And you know that there

06:08   15    is some opposition to it and we'll hear from defense counsel

16    when they have another opportunity to question the witness.

17              Go right ahead.

18    By Mr. Berg:

19    Q.   Now, Mr. Petrello, going back to this exception here,

06:08   20    does that change the math any?

21    A.   Absolutely, because what this clause says is there will

22    be no broker's fee paid or earned by sellers with respect to

23    anybody.  It doesn't say only with respect to me.  It's with

24    respect to anybody.  So, Mr. Fogler's question to me -- or

06:08   25    statement to me that there was some fee that could be

A. Petrello - Redirect by Mr. Berg

1   payable on the Nath transaction because an offer was

2   taken -- This provision is a special provision.

3            And the other thing I would point outside is

4   that the other provision is part of the preprinted form.

06:09   5   That means it's part of the standard document.

6            THE COURT:  Hold it.  Yes, sir.  What?  Just say

7   it.  I am probably going to sustain it.

8            MR. DeAYALA:  Objection.  Calls for a legal

9   conclusion.

06:09   10           THE COURT:  Sustained.

11           MR. DeAYALA:  I was expecting Latin to come after

12   that.

13   By Mr. Berg:

14   Q.  Mr. Petrello, let's discuss now the second sentence.

06:09   15   "If purchase by excluded party occurs during this time

16   broker will be reimbursed for hard costs by sellers."  You

17   were asked about what you have seen in this evidence you

18   have seen.  Do you think that the hard costs -- if you had

19   bought this house the hard costs exceeded 190-

06:09   20   thousand-dollar difference?

21   A.  No.

22   Q.  Printing a brochure, that sort of thing by the broker?

23   A.  No.

24           MR. FOGLER:  He is leading the witness.

06:10   25           THE COURT:  Sustained.

A. Petrello - Redirect by Mr. Berg

1    By Mr. Berg:

2    Q.   The next sentence:  "If purchase by excluded parties

3    occurs after June 9, 1908, [verbatim] broker will be paid

4    2.5 percent fee by sellers."

06:10    5              Now, Mr. Petrello, when were you ready to buy

6    that house?

7    A.   Immediately.

8    Q.   And when did you make your offer, the date?

9    A.   December 4.

06:10   10    Q.   The offer that you made -- tell us again what it was.

11   A.   The offer was 8.2 million, no commission, no

12   contingencies, immediate closing.

13   Q.   Now, they have asked you time and again about the issue

14   of did you submit a written contract.  In the first place,

06:10   15   were you asked to?

16   A.   No.

17   Q.   In the second place, who were you dealing with?

18   A.   I was dealing with a neighbor.

19   Q.   And then, in the third place, is it a requirement that

06:10   20   you put a cash offer into a contract of sale?

21   A.   Not at all when you do a sale on the basis of --

22          MR. DeAYALA:  Objection.  That calls for a legal

23   conclusion.

24          THE COURT:  Well, no.  It just calls for a "Yes" or

06:11   25   "No" answer.

1          MR. DeAYALA:  Then, leading.

2          THE COURT:  Overruled.

3    By Mr. Berg:

4    Q.  It is necessary when you make a cash offer with no

5    contingencies to put that cash offer in a contract of sale?

6    A.  No.

7    Q.  How can you close?  What do you do?

8    A.  What you do is when you're making an offer and you have

9    no contingencies at all and you're buying the property

10   without an inspection, as is where is, you only need one

11   piece of paper.  You need a deed.  And, usually, someone

12   just drafts up the deed and I bring a check and that's it.

13   There's no contract and that's all we needed to close the

14   deal.

15   Q.  But to make it clear:  Was any such demand made on you

16   to put it in writing?

17   A.  No.

18   Q.  Now, Mr. Petrello, you were asked several questions

19   about when you first concluded that there was a -- that

20   there had been discrimination in this case.  Do you remember

21   that, sir?

22   A.  Yes, sir.

23   Q.  And you mentioned that you first concluded it at the

24   close of Mr. Petrello's -- excuse me -- Mr. Prucka's

25   deposition?

A. Petrello - Redirect by Mr. Berg

1    A.  I think I said that I think the deposition pointed out

2    in the language or a colleague pointed out to me it was at

3    the close of the Prucka -- and I think my testimony -- I

4    think I said Prucka-McGee.  So, yes, it was right around --

06:12    5    I think they were back to back.  So, it was that time frame.

6            MR. BERG:  If I might, Your Honor, I am going to

7    ask -- let me pull this out and I --

8                Do you recall being asked a question --

9            THE COURT:  Angle it a little bit this way, just a

06:12   10    shade.

11            Can the jury see that also?

12            (Jurors indicate affirmatively)

13            THE COURT:  All right.

14    By Mr. Berg:

06:12   15    Q.  Mr. Petrello, I am going to show you each deposition.

16    You were first questioned about the deposition you gave on

17    May 12th, 2008, right here.  Do you see that, sir?

18    A.  Yes.

19    Q.  Let me write that down.  And questions were asked you

06:13   20    about what personal knowledge you had about Dr. Nath and

21    what he knew.  Remember that?

22    A.  Yes.

23    Q.  That's May 12th, Year 2008.  True?

24    A.  True.

06:13   25    Q.  Have you made an allegation of discrimination at this

1    point?

2    A.   No.

3    Q.   And whose depo is that?

4    A.   That's my depo.

06:13    5    Q.   What is the date of Matt Prucka's deposition?

6    A.   May 14, 2008.

7    Q.   Let's start with Matt Prucka because you were asked

8    about this, too.  What knowledge did you gain from that

9    deposition that indicated discrimination had been involved

06:14    10    in the sale of the house?

11         MR. DeAYALA:  This is improper use of a deposition.

12    This is not used for impeachment.

13         THE COURT:  Is that his own deposition?

14         MR. BERG:  No, sir.  That's Mr. Prucka's.  And his

06:14    15    question, if Your Honor recalls, was where did you learn

16    about this -- or when did you first learn about

17    discrimination.

18         MR. DeAYALA:  My question was when.

19         MR. RALEY:  The question that I asked was when did

06:14    20    you first conclude --

21         THE COURT:  Well, I'm not going to split hairs, but

22    I understand your point.

23              What's your objection, basically?

24         MR. DeAYALA:  It's improper use of a deposition.

06:14    25         MR. FOGLER:  It's hearsay.

1          THE COURT:  Sustained.

2              You can state it to show a state of mind when

3     he first learned, but we're not going to get into this

4     unless there is what they call impeachment of his own

06:14  5     deposition.  But for his state of mind, as to when he first

6     learned or concluded, then for that limited purpose I

7     allowed a reference to the deposition.

8          MR. BERG:  Your Honor, may I ask the Court to

9     instruct the jury on the purpose of a deposition to make it

06:15  10    clear what this is or --

11          THE COURT:  What it is, before trial the attorneys

12    have an opportunity to call anyone, including their own

13    witness if they think they need to preserve testimony, but

14    to take testimony as if someone was on the witness stand.

06:15  15    Generally, it's a lot more involved because the requirements

16    are that it's relevant or may lead to relevant evidence.

17    So, a lot of what's stated in the deposition is not

18    admitted, but it's a lot broader.  It's somewhat broader

19    than you can at the time of trial.  And in federal court it

06:15  20    can be used for impeachment, meaning 'You're saying this

21    now, but you said something that's different.'  But if a

22    witness is unavailable beyond the subpoena range in federal

23    court, basically out of state, then you can read the whole

24    thing or, if it's a video, play the whole video.  But it's

06:16  25    testimony before trial under oath, usually in a lawyer's

*A. Petrello - Redirect by Mr. Berg*

1    office, with a court reporter present so they can get an

2    understanding as to what's coming from the particular

3    witness at time of trial.

4    By Mr. Berg:

06:16   5    Q.   Now, two days after your deposition Matthew Prucka was

6    deposed.  Correct?

7    A.   Correct.

8    Q.   After, not before?

9    A.   After.

06:16   10   Q.   What was the next date there of the next deposition?

11   A.   It was Peggy McGee, May 15, 2008.

12   Q.   And Miss McGee is who?

13   A.   She's the broker with Heritage Title.

14   Q.   Now, following the deposition on May 14th, 2008, what

06:16   15   conclusion did you reach about discrimination?

16   A.   I concluded that both Mr. Prucka and McGee and Heritage

17   discriminated against us and discriminated in violation of

18   our civil rights.

19        MR. DeAYALA:  Let me object to the question.  That,

06:17   20   again, calls for hearsay and improper use of a deposition.

21        THE COURT:  Overruled.

22   By Mr. Berg:

23   Q.   Mr. Petrello, let's make this clear.  I think you --

24   Were you speaking of your conclusions after May 15th?

06:17   25   A.   Correct.

*A. Petrello - Redirect by Mr. Berg*

1    Q.  I'm sorry.  I had said 14th.  Okay.  So, after these two

2    depositions you reached conclusions about discrimination in

3    this case?

4    A.  Correct.

06:17    5    Q.  Now, what is the date of the next deposition?

6    A.  June 18, 2008.

7    Q.  And whose deposition was that day?

8    A.  Dr. Nath.

9    Q.  Now, prior to this time had you reached any conclusions

06:18    10    or do you recall about Dr. Nath's involvement in this case?

11    A.  I was still wanting to see what the record would show.

12    Q.  So, as of not May 12th, before his deposition, but after

13    his deposition what did you decide?

14    A.  We filed an amendment asserting claims for

06:18    15    discrimination and violation of civil rights after the three

16    depositions.

17    Q.  That same day; did you not?

18    A.  Yes, sir.

19    Q.  Same day.

06:19    20         MR. BERG:  Pass the witness.

21         THE COURT:  Thank you.

22              Sir.

23         MR. FOGLER:  Yes, Your Honor.

24

06:19    25

1                          RECROSS-EXAMINATION

2     By Mr. Fogler:

3     Q.   Let's have just a short review, Mr. Petrello.   Sometime

4     between 2:15 and 3:00 o'clock when I was asking you

06:19   5   questions about the listing agreement you told the jury that

6     you had not even read it.   Isn't that right?

7     A.   Correct.

8     Q.   And then we took a break and you and your counsel talked

9     about the listing agreement?

06:19  10   A.   Correct.

11    Q.   And now you're an expert on the listing agreement?

12    A.   I didn't say that.

13    Q.   Well, the point here of this case is what Mr. Prucka and

14    Miss McGee intended, isn't it, sir?

06:20  15           MR. BERG:   Objection, Your Honor.   Again, that

16    calls for speculation and --

17           THE COURT:   Sustained as to the form of the

18    question.   Just rephrase it.

19    By Mr. Fogler:

06:20  20   Q.   You're accusing them of having a discriminatory intent,

21    aren't you, sir?

22    A.   Yes.

23    Q.   Now, you told us in response to one of Mr. DeAyala's

24    questions that you're not a party to this listing agreement.

06:20  25   Isn't that right?

1    A.   Correct.

2    Q.   The people who are best to determine what that agreement

3    intends are the people who made the agreement, aren't they?

4    A.   In this case, I don't think so.

06:20   5    Q.   So, you, after having read it with your counsel during

6    the break, know more about the agreement that Mr. Prucka and

7    Miss McGee made than they do?

8    A.   I didn't say that.

9    Q.   One last question, sir.  When you use the term

06:21   10   "architectural integrity" is it a code word, sir --

11            MR. BERG:  Objection, Your Honor.  That's way

12   outside the scope.

13            THE COURT:  Sustained as to the form of the

14   question.

06:21   15            MR. FOGLER:  I'll pass the witness.

16                         RECROSS-EXAMINATION

17   By Mr. DeAyala:

18   Q.   Mr. Petrello, let me touch on two things real quick that

19   you testified about early.  One is the 18 Sunset property

06:21   20   where you build that big eight-foot brick wall.  Right?

21   A.   Yes, sir.

22   Q.   And that wall is between your property and Mr. Berg's

23   property?

24   A.   Yes.

06:21   25   Q.   Now, the front -- there's a big metal gate that's also

A. Petrello - Recross by Mr. DeAyala

1    eight feet tall or higher?

2    A.   Eight feet.

3    Q.   And it's not just a wrought iron gate.  It's a sold

4    metal gate --

06:21  5    A.   Correct.

6    Q.   -- that one cannot see through and into that property

7    from the outside --

8    A.   Correct.

9    Q.   -- from Sunset and around?  Not even Mr. Berg can see

06:22 10    through from his house.  Right?

11    A.   Correct.

12    Q.   And just so I am clear on these dates of these

13    depositions:  Yours is May 12th; Mr. Prucka, May the 14th;

14    Miss McGee, May the 15th; and then Dr. Nath, June the 18th.

06:22 15             On that same day you had already authorized --

16    before Dr. Nath's deposition, you already authorized the

17    filing of that discrimination claim, hadn't you?

18    A.   No.  The authorization only occurred after the

19    conclusion of the deposition.

06:22 20    Q.   But the pleading was prepared before then?

21    A.   There were papers prepared.

22    Q.   So, y'all were ready to file it; you just didn't want

23    the witness to know about it.  Right?

24    A.   No.  We wanted to hear what Dr. Nath had to say.

06:22 25    Q.   And, again, when Miss McGee is testifying on May the

1    15th nobody ever told her that this was a discrimination

2    claim, did they?

3    A.  Didn't know.

4    Q.  Again, you hadn't instructed your attorneys to file the

06:23    5    discrimination claim prior to her deposition, only

6    afterwards.  Is that my understanding?

7    A.  Correct.

8           MR. DeAYALA:  Pass the witness.

9                          RECROSS-EXAMINATION

06:23    10   By Mr. Raley:

11   Q.  Isn't it true, sir, that you wanted to wait until after

12   Dr. Nath's deposition to file this discrimination claim?

13   A.  Yes.

14   Q.  And isn't it true that there is no mention of Dr. Nath's

06:23    15   deposition in the amended pleading you filed that day

16   alleging discrimination?

17   A.  Correct.

18          MR. RALEY:   That's all, Your Honor.  Pass the

19   witness.

06:23    20          THE COURT:  Anything else?

21          MR. BERG:  Yeah.  Just one last question.

22                      REDIRECT EXAMINATION

23   By Mr. Berg:

24   Q.  Remember Mr. Fogler's questions about reading a contract

06:23    25   within the four corners?

1   A.   Yes.

2   Q.   That exclusion is pretty clear, isn't it?

3            MR. RALEY:   Leading, Your Honor.

4            THE COURT:   Overruled.

06:23   5            Is it?

6            THE WITNESS:   Yes.

7            THE COURT:   Anything further?

8            MR. BERG:   No, Your Honor.

9            THE COURT:   Thank you, sir.   You may step down.

06:23   10   Call your next witness.

11            MR. BERG:   Your Honor, I call Matthew Prucka to the

12   stand.

13            THE COURT:   Sir, want to come forward, please.

14            MR. PRUCKA:   Can we take a quick bathroom break?

06:24   15            THE COURT:   All right.   It's now 4:48.   We'll get

16   back in at 5:00 o'clock.   We take one break anyhow.   Even

17   though it's not an hour and a half yet, we might as well do

18   it now.   We'll take a break now and then we'll go right on

19   to between 6:00 and 6:05.   So, we'll see you back right at

06:24   20   5:00.   We'll see you then.

21                  (Jury not present)

22            THE COURT:   We've got a lot of skilled attorneys.

23   Everybody is up to speed.   It's up to you with what I am

24   about to say.   Anyone, parties, or attorneys, are free to go

06:25   25   in and out whenever you want except, of course, for the

1    attorney that's doing the interrogation just at that time.

2    You have got free rein of the courtroom.  You don't have to

3    wait for a break time.  You can have an associate lawyer, if

4    you want, fill in for you for a few minutes.  It doesn't

06:25    5    matter.  I mean, that's strictly up to you.  But you're free

6    to come and go at any time.  The only other ones who can't

7    are the judge and the court reporter and the jury and the

8    lawyer who is up.

9                 So, we'll see you back in ten minutes.

06:26    10                        (Brief recess)

11                THE COURT:  Thank you.  Be seated.

12                Let's proceed.  Sir, raise your right hand to

13    be sworn.

14        **MATTHEW WILLIAM PRUCKA, CALLED BY THE PLAINTIFF, SWORN**

06:44    15                THE COURT:  Just have a seat.

16                MR. BERG:  Your Honor, I think Mr. Fogler and I

17    would like to approach the bench and it will affect all

18    counsel.

19                THE COURT:  Sure.  Okay.

06:45    20                        (At the bench)

21                THE COURT:  You had ordered that the Defendants

22    turn over worth amounts to me.  They are now saying that

23    they are not going to do that or not only Defendants, ours.

24                MR. FOGLER:  Your Honor, punitive damages are not

06:45    25    in issue anymore and it would be --

```
 1              THE COURT:  Why not?
 2              MR. FOGLER:  Because the law in the Fifth Circuit
 3    is if there are no actual damages and no constitutional
 4    violation we don't get punitives.
 5              THE COURT:  Well, what about the constitutional
 6    violation?
 7              MR. FOGLER:  There has to be state action in order
 8    for there to be a constitutional violation here.  This is a
 9    private transaction.  It does not invoke any of the
10    constitutional protections.  There is no constitutional
11    violation.
12              MS. LIBERATO:  There is a constitutional violation.
13    We argue denial of equal process.  They are a protected
14    class.  We have a case out of the Fifth Circuit -- excuse
15    me -- Third Circuit which gives the Court showing that the
16    handicapped are a protected class.  And, so, we have alleged
17    a constitutional violation and, therefore, punitive damages
18    are appropriate.
19              MR. RALEY:  Your Honor, the Fifth Circuit case on
20    point was a racial discrimination case under the FHA and the
21    ruling was that was not a constitutional --
22              MR. BERG:  Yeah, but --
23              MR. RALEY:  That's the LeBlanc case.
24              THE COURT:  Well, we have got all the briefs in
25    there.  They all came in so late.  Why don't you do this.
```

06:45   (line 5)
06:45   (line 10)
06:46   (line 15)
06:46   (line 20)
06:46   (line 25)

1    How long are you going to have him on?  At least the next

2    hour.  Right?

3              MR. BERG:  Yes.

4              THE COURT:  All right.  Just don't ask that

06:46    5    question.  And, if need be, we can stay later tonight and we

6    can argue it out.  Or tomorrow morning I may have a little

7    bit of time, now that that sentencing is done, because

8    they're getting in here at 10:00 o'clock.  I ought to be

9    through by not later than 9:45 and we can argue it tomorrow.

06:47   10    Just don't go into it today.

11              MR. RALEY:  Thank you, Your Honor.

12              MR. MATTHEWS:  One more thing.

13              THE COURT:  Yes, sir.

14              MR. MATTHEWS:  I am going to be taking a couple of

06:47   15    these witnesses and we all heard you say about when we can

16    leave at any time except for the guy who is --

17              THE COURT:  All right.

18              MR. MATTHEWS:  I have a kidney and a half.  I

19    sometimes --

06:47   20              THE COURT:  If you need to take a break just ask

21    for it and I'll be glad to do it.

22              MR. MATTHEWS:  Okay.

23                        DIRECT EXAMINATION

24    By Mr. Berg:

06:47   25    Q.  Mr. Prucka, give us your full name, if you will, sir.

1    A.   I am Matthew William Prucka.

2    Q.   And, Mr. Prucka, how are you currently employed?

3    A.   I am self-employed.

4    Q.   Managing your own investments.  Is that correct?

06:47   5    A.   Correct.

6    Q.   You sold your business when, sir?

7    A.   In 1999.

8    Q.   And it was an engineering business; was it not?

9    A.   Yes, it was.

06:48   10   Q.   And you have not been in that business since or any

11   other business except managing your own investments since?

12   A.   That is true.

13   Q.   Mr. Prucka, when did you move into the house at

14   8 Remington that we have been talking about?  Just an

06:48   15   approximate date will be fine.

16   A.   Around 2000, 2001.

17   Q.   And is it true that Mr. Petrello, as he said, was your

18   next-door neighbor?

19   A.   Yes.

06:48   20   Q.   You had a congenial relationship with him?

21   A.   Yes.

22   Q.   You had never considered him anything but a gentleman?

23   A.   That's true.

24   Q.   When he told you why he wanted this house you thought he

06:48   25   was sincere about wanting it for his daughter, didn't you,

1    sir?

2    A.   Yes.

3    Q.   Pardon me?

4    A.   Yes.

06:48    5    Q.   So, any implication by counsel to the contrary would be

6    wrong?

7    A.   I don't what "counsel" is implying, but --

8    Q.   The lawyer.

9    A.   Yes.

06:48    10    Q.   Mr. Petrello at some point heard, did he not, that you

11    might be selling your house?

12    A.   Yes, he did.

13    Q.   And why was it that you decided to move up to Park City,

14    Utah?

06:49    15    A.   Well, we decided to move because when we sold our

16    business in 1999 we had a son who was just born then and we

17    also had a daughter that was just several years old.  And,

18    so, we decided that -- you know, we were very fortunate to

19    be in a position that we could take the next several years

06:49    20    while they're young and be parents.  And we have always

21    enjoyed the mountains and bought a vacation home up in Park

22    City.  And for a number of years we would first spend three

23    or four weeks there and then half the winter there and then

24    the whole winter.  And, of course, living in Houston as much

06:50    25    in the summer as you can get up into the mountains.

1          And the children -- In fact, for the first

2     couple of years our daughter, when she was in school, she

3     would spend the first part of the school year here and then

4     the second part there and then finishing up here.  And, so,

06:50   5     we knew as she got older that that would have to change,

6     that we'd have to decide where was the best place for us to

7     live and raise a family, and we decided to do that in

8     Park City.

9     Q.   Is it a fair statement that you were splitting your time

06:50  10     between Park City and Houston?

11     A.   We did that for a number of years.

12     Q.   And then you decided you couldn't do that any more for a

13     variety of reasons and put your house on the market?

14     A.   Right.

06:50  15     Q.   When you put your house on the market who was the first

16     person to inquire about whether or not -- or who was the

17     first person to inquire about the house and possibly buying

18     it?

19     A.   Devinder Bhatia, Dr. Bhatia.

06:51  20     Q.   Dr. Bhatia lives just on the other side, does he not, of

21     the Shadyside subdivision?

22     A.   Yes.  Our house is in an interesting location.  Half of

23     it is in Shadyside and then part of it is in what's called

24     Shadowlawn Circle, which is the neighborhood in back of our

06:51  25     house.  And Dr. Bhatia actually owns one of the houses in

1    that area.

2    Q.  And he had heard, also, you were thinking about selling

3    your house?

4    A.  He did.

06:51   5    Q.  Your house is entirely within the gates of Shadyside; is

6    it not?

7    A.  Yes.

8    Q.  You mentioned that part of it was out in Shadowlawn; so,

9    I wanted to make that clear.

06:51   10            So, you decided to put your house on the

11   market and you also got a call from Tony Petrello or an

12   e-mail from Tony Petrello; did you not?

13   A.  I received an e-mail from Tony, yes.

14   Q.  And Mr. Petrello was inquiring whether it was true or

06:51   15   not?

16   A.  He was.

17   Q.  And he was -- Judging from those e-mails, it's a fair

18   statement he was hoping it wasn't true, that you wouldn't be

19   leaving the neighborhood?

06:52   20   A.  I am sure that's true.  Right.

21   Q.  He had said something about "If you leave it's going to

22   reduce the graciousness and IQ of the neighborhood.  Do you

23   recall that?

24   A.  I do recall that, yes.

06:52   25   Q.  And he was behaving as he always does toward you with

1    respect; was he not, sir?

2    A.   Oh, yes, he was.

3    Q.   And, in fact, you and Tony had worked together on some

4    engineering issues in the neighborhood; had you not?

06:52   5    A.   I don't recall ever working with Tony on those issues.

6    Q.   Well, do you recall getting the great appointment of

7    searching for an engineer to check out the pipes in the

8    neighborhood?

9    A.   Yes, I do.

06:52   10   Q.   And you had discussed that with Tony, not that he worked

11   with you, but you discussed that --

12   A.   There was a meeting with many of the neighbors and Tony

13   was one of those, and certainly we had conversations

14   regarding that, yes.

06:52   15   Q.   Yes.  So, you had the first exchange of e-mails with

16   him.  And did you make efforts after that exchange of

17   e-mails to create the exclusion in the agreement that we

18   have been looking at, the brokerage agreement?

19   A.   Yes, I did.

06:53   20   Q.   Let's put that on the screen, please, sir, Exhibit 2,

21   Plaintiff's Exhibit 2, and go to the exclusion.  Can you

22   show the initials on the side.  Thank you.

23               Is that it?  Is that the best we can do?

24               VIDEO TECHNICIAN:  Yes.

06:53   25   Q.   It's okay.  Go over to the side.  And the jury has seen

*M. Prucka - Direct by Mr. Berg*

1    this exclusion before.  Are these your initials somewhere

2    among those initials, Mr. Prucka?

3    A.  It would be the middle one.

4    Q.  And did you understand by your -- did you take that up

06:53  5    with Heritage Texas Properties yourself?

6    A.  Did I take up what?

7    Q.  The issue of excluding Mr. Petrello and Devinder Bhatia

8    from the requirement that you pay a brokerage fee if they

9    bought the house?

06:54  10   A.  Yes, I did.

11   Q.  And you had told Tony you were going to do that?

12   A.  Correct.

13   Q.  You lived up to your word; you did what you said you

14   were going to do?

06:54  15   A.  Yes.

16   Q.  All right.  And your understanding was, was it not, that

17   if Tony Petrello were the buyer you would not owe a

18   brokerage fee?

19   A.  Yes.  My understanding was that if Tony Petrello or

06:54  20   Dr. Bhatia bought the house prior to January 9th '08 that we

21   wouldn't owe any brokerage fee to Heritage for selling the

22   house to either of those two parties.

23   Q.  Let's make this quick, then.  Will you agree with me now

24   that, as between the Nath offer at 8.2995 million dollars

06:54  25   and Mr. Petrello's offer, Tony Petrello's offer, of

1   8.2 million, his was the better offer?

2   A.  Can you say that again?

3   Q.  Yes.  On the one hand, we have -- Let's go back and use

4   that chart from opening statement.  On the one hand, we have

06:55  5   Mr. Petrello's offer of $8.2 million and we have got

6   Dr. Nath's offer of 8.2995.  Do you see that, sir?

7   A.  I do.

8   Q.  You paid -- I am going to block the screen here.  You

9   paid a 3.5 percent commission which you negotiated down from

06:55  10  5 percent on Dr. Nath's offer.  True?

11  A.  True.

12  Q.  And, therefore, you paid a brokerage fee -- will you

13  take my word -- of $290,482.50?

14  A.  Yes.

06:55  15  Q.  Now, will you please -- Let's just make this short.

16  Will you please concede that Mr. Petrello's offer was better

17  than Dr. Nath's?

18  A.  Under that circumstance, yes.

19  Q.  Well, what do you mean "under that circumstance"?

06:55  20  Either it's better or it isn't.

21  A.  Well, you know, at one time I thought that was the

22  situation, but, from the brokerage agreement, we are

23  required to pay Heritage their commission if they bring a

24  list price offer to us.

06:56  25  Q.  Now, if I understand correctly, you signed that

*M. Prucka - Direct by Mr. Berg*

1    brokerage agreement back in November, on November 12th,

2    2007.  True?

3    A.  That sounds right.

4    Q.  Let's show his signature on that brokerage agreement,

06:56    5    please.  Go to the end.

6                    Now, you see at the bottom where the

7    signatures are.

8                    Can you get to the Matthew Prucka signature,

9    please.  Thanks.

06:56    10                    Now, Mr. Prucka, you're not in the habit of

11    signing things you don't read, are you?

12    A.  I am not.

13    Q.  And could we make that broader, please, Albert.  There

14    we go.

06:57    15                    This is the brokerage agreement, and let's

16    show the date that you signed it.  It was November 12th,

17    2007.  True?

18    A.  Yes.

19    Q.  Now, do you recall -- Let me just ask you this question.

06:57    20    Will you agree with me that Mr. Petrello's offer was the

21    better offer financially as between his and Dr. Nath's?

22    A.  I don't think that is true.

23    Q.  Have you given testimony in this case before, sir?

24    A.  I have.

06:57    25    Q.  And do you remember taking an oath during the taking of

1    that deposition testimony that you would tell the truth as

2    if you were in a courtroom?

3    A.  Correct.

4    Q.  You took an oath; did you not?

06:57   5    A.  Correct.

6    Q.  Let's go to that clip, please.

7              Do you recall being asked that question of

8    whether or not you felt that Mr. Petrello's offer was the

9    better offer financially?

06:57   10   A.  Yes.

11   Q.  Now, I am going to give you one chance.  Will you please

12   tell us that you said under oath that that was the better

13   offer financially, please, sir?

14   A.  I did say that, yes.

06:57   15   Q.  All right.  But now you indicate you don't believe that.

16   True?

17   A.  True.

18   Q.  Mr. Prucka, you now have a different understanding of

19   your brokerage fee agreement than you had at the time of

06:58   20   your deposition?

21   A.  At the time of the deposition I hadn't given --

22              THE COURT:  Excuse me.  That's a "Yes" or "No"

23   answer, please.

24   A.  I'm sorry.  State the question again.

06:58   25              THE COURT:  Hold it.  Read it back.

*M. Prucka - Direct by Mr. Berg*

1            (Question read back)

2    A.   That is true.

3    Q.   Well, let's figure out what happened between now and

4    then.   Okay?

06:58    5    A.   Okay.

6    Q.   Will you admit, as of the time of your deposition, you

7    thought that Mr. Petrello's offer was $190,000 better than

8    Mr. -- Dr. Nath's?

9    A.   That is true.

06:59   10    Q.   So, the math is correct that I showed.   True?

11    A.   Excluding the hard-cost fees, et cetera, that would be

12    accounted for that.

13    Q.   Well, let me just make it clear what you're talking

14    about.

06:59   15            Under this brokerage agreement, if you had

16    sold to Tony Petrello, you still had to pay -- you didn't

17    pay a commission, but you paid the hard costs to Heritage

18    Texas Properties?

19    A.   If it would have sold to Tony or to Dr. Bhatia.

06:59   20    Q.   Or to Dr. Bhatia.   Now, would you agree with me that the

21    printing of a brochure does not exceed $190,000?

22    A.   I would hope not.

23    Q.   And that their expenses had to be de minimis, very

24    small?

06:59   25    A.   I don't know what they expenses were.

M. Prucka - Direct by Mr. Berg

1   Q.  Well, did they ever tell you that they had big time

2   expectations they you had to cover?

3   A.  No, they did not.

4   Q.  Now, did you ever ask about it?

06:59   5   A.  No, I didn't.

6   Q.  But now you come to court and you're concerned about it?

7   A.  I don't recall saying I was concerned about it.

8   Q.  Okay.  Well, you pointed it out, at least?

9   A.  I did point it out, yes.

07:00   10   Q.  Now, let's assume for a minute that we're back at the

11   time of your deposition.  You have read your agreement with

12   Heritage Texas Properties.  True?  Your deposition --

13   A.  We made the agreement with Heritage, yes.

14   Q.  Well, let me show you over here.  Your deposition was --

07:00   15   It's just to your left, sir.  Look.  Your deposition was on

16   May 14th, 2008, Prucka deposition.  You signed the agreement

17   with Heritage Texas Properties on the 12th of November,

18   2007.  True?

19   A.  That is true.

07:00   20   Q.  You had an opportunity, you told me in the deposition,

21   to review documents before you sat down and gave your sworn

22   testimony.

23   A.  I did.

24   Q.  And one of the documents that you looked at was the

07:00   25   agreement with Heritage Texas Properties.  True?

M. Prucka - Direct by Mr. Berg

1   A.  I don't know how much of it I reviewed for you, but I

2   reviewed documents and I don't recall if I reviewed that

3   document or not.

4   Q.  Well, wait a minute.  You're going into a deposition

07:01  5   regarding the sale of your house, an 8.3-million-dollar sale

6   to round it off, and you're telling us in this courtroom you

7   didn't bother to review the agreement you had with Heritage

8   Texas Properties?

9   A.  The question that -- the issue that I understood that

07:01  10   was a concern --

11          MR. BERG:  Objection.  Nonresponsive, Your Honor.

12          THE COURT:  Sustained.

13              By the way, if you can't answer a question

14   "Yes" or "No" let me know or tell counsel.  Say you can't

07:01  15   answer it "Yes" or "No".

16   A.  Can you ask the question again?

17   By Mr. Berg:

18   Q.  Okay.  You knew that you were in a lawsuit filed by Tony

19   Petrello regarding the sale of his [verbatim] house when you

07:01  20   gave your deposition.  True?

21   A.  That is true.

22   Q.  You knew that one of the issues was whether or not

23   Mr. Petrello had made a better offer than Dr. Nath.  True?

24   A.  I don't think I knew that was the issue.

07:02  25   Q.  You didn't know that Mr. Petrello alleged that he had

1   made a better offer than Mr. -- Dr. Nath.  Is that your

2   testimony?

3   A.  That's correct.

4   Q.  Is it your testimony that you did or did not review that

07:02  5   Heritage Texas brokerage agreement of November 12th before

6   you gave your testimony?

7   A.  I don't recall reviewing that agreement.

8   Q.  All right.  Did you attend Tony Petrello's deposition

9   two days before yours?

07:02  10   A.  I did, yes.

11   Q.  Do you recall his testimony at that deposition -- Do you

12   recall writing in your own notes that Mr. Petrello's

13   contention was, in words like that, that he had made the

14   better offer?

07:03  15   A.  I do recall that.  Yes.

16   Q.  So, now on May 12th -- Let's get this clear.  On May

17   12th you sit in Tony Petrello's deposition while Mr. Fogler

18   cross-examines him.  True?

19   A.  Yes.

07:03  20   Q.  And Mr. DeAyala examines him.  True?

21   A.  True.

22   Q.  And a third lawyer for Dr. Nath.  Do you recall that?

23   A.  Yes, I do.

24   Q.  And Tony Petrello testifies he can't believe it because

07:03  25   he made the better offer.  Do you recall that?

*M. Prucka - Direct by Mr. Berg*

1    A.  I do recall that.  Yes.

2    Q.  Now, let's go back to your deposition of May 14th.  Will

3    you concede, sir, that you had to know that that was one of

4    Mr. Petrello's contentions in this case?

07:03    5    A.  I didn't know that it was an issue in the lawsuit, if

6    that's your question.

7    Q.  So, why do you think we're here?  I am asking you:  Did

8    you believe that one of Tony Petrello's contentions that

9    brought him into the courtroom was that Mr. Petrello thought

07:03    10    he had made the better offer?

11    A.  No.  I didn't think that was his contention.

12    Q.  Although you heard him say it two days before.  True or

13    false?

14    A.  That is true.

07:04    15        MR. FOGLER:  Your Honor, the door is swinging open

16    here and I -- If counsel wants to talk about what was

17    alleged by Mr. Petrello at the time of the depositions, I

18    just want the record to be clear.

19        THE COURT:  All right.  By the way, I am talking to

07:04    20    the attorneys about a number of matters after 6:00 o'clock,

21    after you leave.  So, we can bring that up at that time if

22    we have to.  I got it; if he's opened the door.  We'll talk

23    about it then.

24        Mark that area, please, if you would, Bruce.

07:04    25    By Mr. Berg:

1    Q.   All right.   Mr. Prucka, let me walk you through the

2    relationship or the conversations you had with Mr. Petrello

3    about the sale of this house.

4                   On October 30th and 31st there was the

07:05    5    exchange of e-mails that we have heard about.   True?

6    A.   October 31st?

7    Q.   30th and 31st, yes, sir --

8    A.   Yes.

9    Q.   -- 2007.   The next time you head from Mr. Petrello was

07:05    10    on November 6th; was it not?

11    A.   That sounds right.

12    Q.   And is it fair to say that you would have assured him in

13    that call you were already working on the exclusion in the

14    Heritage Texas brokerage agreement?

07:05    15    A.   On the November 6 call?

16    Q.   Yes.

17    A.   That's possible.   I don't remember specifically, but

18    probably on that call, yes.

19    Q.   And during that call with Mr. Petrello -- You have heard

07:05    20    his testimony here.   True?

21    A.   I did.   Yes.

22    Q.   And you heard it on May 12th, 2008?

23    A.   Yes.

24    Q.   And you have heard Mr. Petrello say that he told you why

07:05    25    he wanted the house; did he not.

1   A.   Yes.

2   Q.   And you already knew that Carena was severely disabled?

3   A.   I did.

4   Q.   And you have seen Carena.

07:06   5   A.   A few times.

6   Q.   If you have been at a party at Tony and Cindy's house,

7   you have seen her there; have you not?

8   A.   Yes.

9   Q.   And have you seen her in the neighborhood like when

07:06   10   Cindy runs with her in her carriage?  Have you seen her

11   around the neighborhood?

12   A.   Probably no more than once or twice.

13   Q.   But you have seen her?

14   A.   I have seen her, yes.

07:06   15   Q.   So, there is no question in your mind that she was

16   disabled?

17   A.   Oh, correct.

18   Q.   Tell the jury what Tony said he wanted to do to

19   8 Remington.

07:06   20   A.   Well, as I recall, he said that he wanted to create a

21   facility for her care.

22   Q.   Now, you have testified about this before in your

23   deposition; have you not?

24   A.   Yes.

07:06   25   Q.   He never said the word -- You have never said before

219

1   that he used the word "facility", have you?

2   A.  I don't recall.

3   Q.  In your discussions with Tony did he tell you that he

4   wanted to widen the hallways?

07:07   5   A.  I don't recall him ever saying widening the hallways.

6   Q.  What do you recall him saying?

7   A.  I recall him saying that he would need an elevator.  I

8   recall him saying that he needed a big space to bathe

9   Carena.  And I think we even talked about, you know, would

07:07   10   you -- turning the master bedroom into a walk-in shower type

11   of thing.  Those are the two I remember.

12   Q.  You understood he wanted to make it handicapped-

13   accessible for his daughter?

14   A.  Yes.  I understood he wanted to make it functional for

07:07   15   his daughter, yes.

16   Q.  You answered "Yes".  May we just agree that you

17   understood he wanted to make it handicapped-accessible for

18   his daughter?

19   A.  Yes.

07:07   20   Q.  All right.  When you heard that, you decided that Tony

21   Petrello had a strike against him as a buyer; did you not?

22   Well, I was concerned what he might -- Yes, I was concerned

23   that --

24           MR. BERG:  Objection.  Nonresponsive.

07:08   25           THE COURT:  If you can't answer it "Yes" or "No"

1    let me know.  Okay?

2              THE WITNESS:  Okay.

3              THE COURT:  Ask the question again.  It will move a

4    lot quicker.  I understand people want to talk, but it will

07:08    5    move a lot quicker if we can go "Yes" or "No".  If you can't

6    answer it "Yes" or "No" just let me know.

7    Q.  Mr. Prucka, will you admit that after that conversation

8    with Tony Petrello that you said to yourself he's got a

9    strike against him as a buyer?

07:08   10   A.  Well, I didn't say it to myself that he had a strike

11   against -- I didn't say to myself that he has a strike

12   against him.

13   Q.  Would you agree that he had a strike against him and

14   that you have admitted under oath that he had a strike

07:08   15   against him as a buyer?

16   A.  Yes.

17   Q.  And the reason he had a strike against him as a buyer is

18   because he wanted to make those changes to your home.  True

19   or false?

07:08   20   A.  Well, I don't think that's complete.  So --

21              THE COURT:  Can you answer it "Yes" or "No"?  If

22   you can't let me know.  Do you want counsel to rephrase it?

23   A.  Yeah.  Rephrase it, please.

24   Q.  Mr. Petrello tells you what he wants to do to the house?

07:09   25   A.  Yes.

M. Prucka - Direct by Mr. Berg

1   Q.   He wants to make it handicapped-accessible?

2   A.   Right.

3   Q.   You decide he has a strike against him .   "Yes" or "No"?

4   A.   No.

07:09   5   Q.   Did you decide -- Then, let us go -- Do you remember

6   giving testimony in this case on that issue?

7   A.   Yes.

8        MR. BERG:  Your Honor, this will take one moment.

9   Going --

07:09   10       MR. FOGLER:  Page, please.

11       THE COURT:  They asked for page and line, please.

12       MR. BERG:  We're locating it.  Let me go on while

13   we locate that for you.

14   By Mr. Berg:

07:10   15   Q.   Do you recall testifying in this May 12th deposition

16   or -- excuse me -- May 14th deposition that Mr. Petrello had

17   a strike against him as a buyer?

18   A.   I do.

19   Q.   And the reason that he had a strike against him as a

07:10   20   buyer was because he intended to make these changes to the

21   house.  Do you recall that?

22   A.   No.

23   Q.   All right.  So, Mr. Petrello -- let's put this in

24   context -- offered you $8.2 million.  True?

07:10   25   A.   True.

*M. Prucka - Direct by Mr. Berg*

1   Q.  And this is the man who you knew was going to change the

2   architectural integrity of your house.  True?

3   A.  I didn't know he was going to do that.  I was concerned

4   he might.

07:11   5   Q.  So, when you solicited an offer from him you knew --

6          MR. DeAYALA:  Page and line.

7          MR. BERG:  I'm sorry.  That's 71:03 through 71:14.

8   I will wait for counsel.  Tell me when you're up to speed.

9   Have you got it?

07:12   10         MR. DeAYALA:  Uh-huh.

11   By Mr. Berg:

12   Q.  A moment ago I asked you to go back, because of the

13   interruption, talking about Mr. Petrello, this is the man

14   who you knew was going to change the architectural integrity

07:12   15   of the house.  True?  And your answer was you didn't know.

16   Is that correct?  Is that what you said a moment ago?

17   A.  I said I didn't know.  I was concerned he might.

18   Q.  You didn't tell me that day that it was absolutely

19   correct that was what you knew he was going to do?

07:12   20   A.  On what day?

21   Q.  The day I asked this question in deposition.

22   A.  I don't remember.

23          THE COURT:  All right.  He says he doesn't

24   remember.  What do you got?

07:12   25         MR. BERG:  One more question and then we're going

1   to do the impeachment.

2   By Mr. Berg:

3   Q.  So, when you solicited an offer from him you knew he had

4   a strike against him in becoming a purchaser of your house,

07:12   5   didn't you?

6   A.  Repeat the question.

7            THE COURT:  Wait a second.  We have been over this

8   and over this.  All right?  If you have something let's get

9   to it and move on.

07:13   10           MR. BERG:  All right.  Let's go ahead and show the

11   clip.

12   *By video:*

13   Q.  *So, Mr. Petrello offered you $8.2 million.  True?*

14   A.  *Correct.*

07:13   15   Q.  *And this is a fellow who you knew was going to change*

16   *the architectural integrity of the house.  True?*

17   A.  *Correct.*

18   Q.  *So, when you solicited an offer from him you knew that*

19   *he had a strike against him in becoming a purchaser of your*

07:13   20   *house, didn't you?*

21   A.  *Correct.*

22   Q.  *But you never told him that, did you?*

23   By Mr. Berg:

24   Q.  But you never told him that?

07:13   25            A moment ago, when we talked about the change

1    in architectural integrity, you were talking about his

2    making it handicapped-accessible.  True?

3    A.  True.

4    Q.  And you felt that -- and your belief was -- your view

07:13  5    was that, because of that, he had a strike against him as a

6    buyer.  True?

7    A.  Say the question again.

8    Q.  Yes.  Because he was going to make the house handicap-

9    accessible you thought he had a strike against him as a

07:14  10   buyer?

11   A.  Well, my concern was that he might dramatically change

12   the architectural integrity of the house.

13   Q.  And how was he going to change it?  He was going to make

14   it handicapped-accessible.  True?

07:14  15   A.  He had said that he wanted to make certain things to

16   make it handicapped-accessible, yes.

17   Q.  And that's the change you didn't want him to make?

18   A.  Well, I was concerned that he would potentially tear the

19   house down, for example.

07:14  20        MR. BERG:  Objection.  Nonresponsive, Your Honor.

21        THE COURT:  Sustained.

22   By Mr. Berg:

23   Q.  Mr. Prucka --

24   A.  Yes.

07:14  25   Q.  -- let's just run through this very quickly.

1    A.   Okay.

2    Q.   Let's see if we can get your agreement.

3              You knew Mr. Petrello was going to make the

4    house handicapped-accessible.   True?

07:14    5    A.   True.

6    Q.   You knew that he was going to widen the hallways and put

7    elevators in in your house; did you not?

8    A.   I didn't know about the widening of the hallways.   I

9    knew about putting the elevator in.

07:14    10    Q.   Or creating a very large bathroom for his daughter.

11    True?

12    A.   Yes.   I knew that.

13    Q.   And that's what upset you.   That's what you didn't want

14    him doing?

07:15    15    A.   No, I didn't have a concern about those.

16    Q.   Well, wait a minute.   You didn't have a concern about

17    those?   Is that your testimony?

18              THE COURT:   That's what he said.   What do you got?

19    By Mr. Berg:

07:15    20    Q.   Mr. Prucka, is it a fair statement to say that you never

21    told him you did not want him to make that house handicap-

22    accessible?

23    A.   I never told him that.

24    Q.   And the reason you never told him that was because he

07:15    25    had a strike against him and he wouldn't bid on the house?

1    A.   I didn't care if he bidded on the house or not.

2    Q.   Pardon me?

3    A.   State your question again.

4         THE COURT:   I had trouble following that also.

07:15    5         MR. BERG:   Yes.

6    By Mr. Berg:

7    Q.   Let's go back chronologically for just a moment.  As of

8    November 6th Mr. Petrello tells you, generally, what he

9    wants to do with the house?

07:15   10   A.   That's true.

11   Q.   You then exclude him in the next few days from the

12   Heritage Texas Property brokerage agreement.  True?

13   A.   I do.

14   Q.   Now, the next thing you hear from Mr. Petrello is that

07:16   15   Mr. Petrello makes an offer on the house on November 16th.

16   Is that correct?

17   A.   On November 16th?

18   Q.   Yes.

19   A.   Yes.

07:16   20   Q.   And how much was that offer?

21   A.   $6.5 million.

22   Q.   And did he tell you just to leave it out there and let

23   other people bid against him?

24   A.   I don't recall him saying that at all.

07:16   25   Q.   You never told him he had to put that in writing, did

1    you?

2    A.   No.

3    Q.   And you never told him that -- Mr. Petrello -- that he

4    had a strike against him as a buyer, did you?

07:16    5    A.   No.

6    Q.   And you never told him that you objected -- you were

7    concerned, to use your word, about his changing the

8    architectural integrity of the house?

9    A.   No.   I never told him that.

07:16    10    Q.   And you also didn't want him making the house handicap-

11    accessible, number one, and, number two, you wanted a family

12    to live there.   That was your preference; was it not?

13    A.   Were there two questions there or just one?

14            THE COURT:   There were two.

07:17    15    By Mr. Berg:

16    Q.   Okay.   One of the reasons you didn't want to sell to

17    Tony Petrello and to Cindy was because you wanted a family

18    to live there?

19    A.   Yes.   We would have liked to have had a family live

07:17    20    there.

21    Q.   So that your preference was that you sell to a family

22    with children and not to Tony, who would have his daughter's

23    physical therapy there and his daughter living there some

24    day?

07:17    25    A.   No, I didn't -- Is this a "Yes" or "No" question?

```
 1              THE COURT:  Is it a "Yes" or "No" question?
 2   Q.  Yes.  Absolutely.
 3   A.  State it again, please.
 4   Q.  Yeah.  It is a fair statement, is it not -- just "Yes"
 5   or "No" -- that you preferred to have a family with children
 6   living there as opposed to having Tony and Cindy's daughter,
 7   having her therapy there and some day living in that house?
 8   It's not a hard question.
 9   A.  Repeat it again, please.
10              THE COURT:  Hold it.  We'll read it back.  Let's
11   read it back.
12                      (Question read back)
13   A.  No.
14   Q.  Haven't you stated under oath that one of your
15   concerns -- or one of your preferences was that you sell the
16   house to someone who would have a family living there in
17   that house?
18   A.  I recall stating that my preference was to have a family
19   in the house.
20   Q.  Well, is the answer to my question, yes, that you
21   preferred to have a family living in the house?
22   A.  Yes.
23   Q.  Is that a fair statement?
24   A.  Yes.
25   Q.  Is it a fair statement that you preferred to have a
```

1    family living there who would not change the interior of

2    that house, wouldn't change the architectural integrity of

3    that house?

4    A.   The architectural integrity.

07:19    5           THE COURT:   Is that "Yes" or "No"?

6    A.   Yes, the architectural integrity, not the interior.

7    Q.   Now, what you knew about Mr. Petrello were the changes

8    that he was going to make; did you not?

9    A.   I just knew of the two changes that he said he might

07:19   10    make.

11    Q.   And is it a fair statement, Mr. Prucka, that when

12    Mr. Petrello made his offer as between the Naths and the

13    Petrellos that you chose the Naths because you preferred to

14    have a family living there.   True?

07:19   15    A.   Which offer?

16    Q.   The offer that you ultimately accepted of 8.299 five

17    hundred thousand dollars.   True?

18    A.   True.

19    Q.   You also preferred to have the Naths living there

07:20   20    because they wouldn't change the interior of the house.

21    True?

22    A.   They wouldn't change the architectural integrity of the

23    house.

24    Q.   Well, I understand.   And you felt that because of the

07:20   25    changes that Mr. Petrello had outlined to you he would

1   change the architectural integrity of the house?

2   A.   I was concerned that Mr. Petrello would change the

3   architectural integrity of the house.   True.

4   Q.   Well, forgive me, sir.   The question was:   The specific

07:20   5   changes that Mr. Petrello outlined to you -- did you feel

6   that by making the house handicapped-accessible he would

7   change the architectural integrity of the house?

8   A.   Those specific changes, no.   I didn't think that would

9   change the architectural integrity of the house.

07:20   10   Q.   Did you ever tell me, sir, that you didn't want him to

11   make the house handicapped-accessible?

12   A.   I never told you that.

13   Q.   All right.   In the weeks that followed after that

14   November 16th call, the discussion with Mr. Petrello, I

07:21   15   think the next contact you had with him was December the

16   3rd.   Do you recall that, the call late at night?

17   A.   Yes.

18   Q.   Now, earlier that day you had received a contract on --

19   an offer on your house, a contract offer on your house; had

07:21   20   you not?

21   A.   We did.

22   Q.   And you received that offer, did you not, from Dr. Nath

23   and his wife?

24   A.   We did.

07:21   25   Q.   And your broker was Peggy McGee.   True?

231

1    A.  That is true.

2    Q.  And Peggy McGee is not just your broker but a very close

3    personal friend.

4    A.  She is a close friend, yes.

07:21   5    Q.  Of you and Sherry Prucka?

6    A.  Yes.

7    Q.  And you had told her about Carena Petrello's disability;

8    had you not?

9    A.  I don't know if I had or not.

07:21   10   Q.  You had not discussed with her prior to the closing of

11   this transaction or -- excuse me -- prior to the contract

12   that was offered to you on December 3rd that Carena Petrello

13   was disabled?

14   A.  I don't recall if I had or not.

07:22   15   Q.  Okay.  Do you know if Miss McGee feels you told her such

16   a thing?

17   A.  I don't know.

18   Q.  Now, earlier that day had Peggy McGee told you that you

19   were going to get an offer sometime that day?  Had you

07:22   20   talked on the phone?

21   A.  I don't remember.

22   Q.  Had you talked to her over the period of time between

23   November 16th when you talked to Mr. Petrello and that night

24   of December 3rd when you talked to him again about the

07:22   25   house?

1  A.  Oh, I am sure I did.

2  Q.  You told her that he had made a 6.5-million-dollar

3  offer; did you not?

4  A.  I don't know what specific information I told her, but I

07:22  5  am sure I told her that he made an offer.

6  Q.  Well, now, she's your broker.  True?

7  A.  True.

8  Q.  And she's going to go out and get bids on this house.

9  Correct?

07:22  10  A.  Correct.

11  Q.  And you have a 6.5-million-dollar offer and you had said

12  to Mr. Petrello you wanted more money; had you not?

13  A.  I did.  Yes.

14  Q.  And is it your testimony that you didn't tell her the

07:23  15  amount of the offer on your house already?

16  A.  It's my testimony I don't remember if I did tell her.

17  Q.  Isn't it logical you would have?

18  A.  I possibly would have.

19  Q.  Well, possibly.  Isn't it a fair statement that to get a

07:23  20  bigger offer Miss McGee had to communicate to potential

21  buyers they had to beat six and a half million dollars?

22  A.  That's possible.

23  Q.  Well, all right.  Is it your testimony you don't

24  remember if you told Peggy McGee --

07:23  25  A.  It's my testimony I don't remember if I told Peggy

1    McGee.

2    Q.  Let me finish.

3    A.  I'm sorry.

4    Q.  It's your testimony that you don't remember telling

07:23    5    Peggy McGee that you had a 6.5-million-dollar offer on the

6    house?

7    A.  I don't remember if I told her that.

8    Q.  And you felt that was a sincere offer with Mr. Petrello;

9    did you not?

07:23    10    A.  Sincere in the sense that he was making an offer he was

11    going to hold up to?  Is that the question.

12    Q.  Yes.

13    A.  Yes.

14    Q.  And you knew he could write a check for that house?

07:24    15    A.  Pretty much.

16    Q.  At 6.5 or 8.3 or more?

17    A.  Sure.

18    Q.  All right.  Now, during the period of time that you

19    were -- Now, where were you on December 3rd?

07:24    20    A.  In Park City, Utah.

21    Q.  Had you all already moved to Park City?

22    A.  No.

23    Q.  Were you living in the house at 8 Remington?

24    A.  We were still living in both.

07:24    25    Q.  In both houses?

1    A.   Yeah.  We hadn't moved anything out of the Remington

2    house.  So, we were still living in -- part of the year in

3    Park City, part of the year in Houston.

4    Q.   Now, as December 3rd, though, you and your family were

07:24    5    out in Park City at your other house there.

6    A.   We were, yes.

7    Q.   And when is the first time you heard about this offer

8    that came in from Dr. Nath?

9    A.   Which offer?

07:24    10    Q.   The first offer on December 3rd, the first offer he

11    made.

12    A.   What time did I hear it?

13    Q.   Let's put that up on the screen.  Let me just refresh

14    your memory with the document itself.

07:25    15              You did get an offer from Dr. Nath that day;

16    did you not?

17    A.   That sounds about right.

18    Q.   Let's put it on the screen.  If we could, let's blow

19    this up, this part in here, and show, first of all -- Well,

07:25    20    first, if you will back up, Albert.  Let's get this part in

21    right here.

22              Now, do you recognize this document?

23    A.   I do.

24    Q.   And what exhibit number is that, please?

07:25    25              TECHNICIAN:  Plaintiff's Exhibit 9.

M. Prucka - Direct by Mr. Berg

1    Q.  That's Plaintiff's Exhibit 9.  And at the top it says

2    the parties are Matthew Prucka and Sheryl Prucka, sellers,

3    agrees to sell and convey to Rahul Nath and Usha Nath -- And

4    I want to make sure I have that pronunciation correct.  Is

07:26   5    it "Nath"?

6          MR. RALEY:  It's "Nath".

7    Q.  -- Rahul Nath and Usha Nath, buyer, and buyer agrees to

8    buy from the seller the property described below.  And I see

9    here your house is described as being both in Shadowlawn and

07:26  10    Shadyside.  True?

11    A.  True.

12    Q.  Now, let's move down to the amount of this offer.  Now,

13    this is an offer that comes in from Dr. Nath on December

14    3rd.  Will you take my word on that?

07:26  15    A.  I will.

16    Q.  And he makes an offer of $7.6 million; does he not?

17    A.  He did, yes.

18    Q.  And do you recognize those initials on the right there

19    "RN" and "UN", it appears to be?

07:26  20    A.  I see them there.

21    Q.  All right.  It appears that he and his wife initialed

22    beside the amounts?

23    A.  I assume so.

24    Q.  Now, part of this -- and I want to talk to you about

07:27  25    what's known as a "financing contingency".

1      Part of this offer from Dr. Nath, the sum of

2  all financing described below, excluding any loan funding

3  fee or mortgage insurance premium, would be $2.6 million.

4  Do you see that?

07:27   5  A.  I do.

6  Q.  Do you recall that was one of the contingencies that he

7  listed in the agreement?

8  A.  As it's stated there?

9  Q.  Yes.

07:27  10  A.  Yes.

11  Q.  Do you recall that he had a contingency?

12  A.  Yes.

13  Q.  And do you agree with me that at this time you have a

14  6.5-million-dollar offer from Mr. Petrello with no

07:27  15  contingency?

16  A.  Yes.

17  Q.  All right.  And were there any other contingencies in

18  this agreement?

19  A.  I'd have to review the agreement.

07:27  20  Q.  Do you have -- Was there a requirement of an inspection?

21  Do you recall?

22  A.  I assume there was.

23  Q.  And this is the agreement, was it not -- I mean --

24  excuse me -- this was the offer that you turned down flat?

07:28  25  A.  We did not accept this offer, yes.

*M. Prucka - Direct by Mr. Berg*

1    Q.   But you turned it down?

2    A.   We turned it down.

3    Q.   You wanted more money yet?

4    A.   Yeah.

07:28    5    Q.   And Miss McGee, when she sent that to you, you told her

6    you were turning it down; did she not?

7    A.   Did she not what?

8    Q.   You told her -- Excuse me.  You told her you were

9    turning down that offer?

07:28    10    A.   Yes.  I told Miss McGee that we were turning down that

11    offer.

12    Q.   And you told her that virtually immediately upon

13    receiving it, did you not, or the next morning?

14    A.   Yeah.  Yes.

07:28    15    Q.   Then, after you received this, after you -- You decided

16    you weren't taking 7.6.  True?

17    A.   True.

18    Q.   And the contingencies bothered you, too; did they not?

19    A.   There were concerns, yes.

07:28    20    Q.   Yeah.  Because Tony had offered you cash money.  True?

21    A.   Yes.

22    Q.   No contingency, not even an inspection.  True?

23    A.   We didn't talk about his inspection, but I assume there

24    wasn't going to be any contingencies, but I think he said

07:29    25    something like that.

1   Q.  Will you speak a little closer to the mic.

2   A.  Oh.  Certainly.

3   Q.  Mr. Petrello did not require -- Mr. Petrello told you in

4   that November 16th call $6.5 million cash, no contingencies.

07:29   5   True?

6   A.  True.

7   Q.  All right.  Now, it was December 3rd.  It was late at

8   night.  Do you recall calling Tony Petrello?

9   A.  I do.

07:29   10   Q.  And do you recall telling Mr. Petrello -- Did you call

11   to solicit an offer from him?

12   A.  No.

13   Q.  Did you call as a courtesy to him as a neighbor?

14   A.  It was a courtesy call.

07:29   15   Q.  And you didn't call to solicit an offer?

16   A.  I called to tell him -- to see if he was interested in

17   making another offer, yes.

18   Q.  Well, then, you did call to solicit an offer?

19   A.  Well, I guess I don't -- I'm not sure of the definition

07:29   20   of "solicited" in that case, but I called to see if Tony

21   wanted to make another offer on the house.

22   Q.  Did you care if he made another offer?

23   A.  I mean, it's always good to have more offers on the

24   house.

07:30   25   Q.  Well, did you care if he made another offer?  Just "Yes"

1   or "No".

2   A.   No.

3   Q.   You didn't care.  Is that why you told him he had to

4   come in at or above the asking price?

07:30  5   A.   No, that's not why I told him that.

6   Q.   Why did you tell him that?

7   A.   When I told him that we had an offer that we may accept,

8   he asked me what that offer was.  And I told him I wasn't

9   going to give him any details of the offer.  What I would

07:30  10  tell him is that I would suggest that he comes in at or

11  above the listing price, if he wanted his best chance on

12  getting the house.

13  Q.   Let me see if I understand this.  You call Mr. Petrello

14  and you tell him, "I have got an offer we may accept.  You

07:30  15  need to come in at or above the listing price, if you're

16  going to make an offer"?

17  A.   "If you're interested."

18  Q.   That's the offer you had turned down flat, the one you

19  told him you might accept.  True?

07:30  20  A.   Which one?

21  Q.   You told Mr. Petrello, "We got an offer that we might

22  accept."  The 7.6 million-dollar offer is the one I am

23  referring to.

24  A.   Yes.

07:31  25  Q.   But you had turned it down flat.  True?

1    A.   Yes.

2    Q.   And you told Tony, "We have an offer we might accept."

3    True?

4    A.   True.

07:31    5    Q.   So, you didn't tell him the truth, did you?

6    A.   Well, I expected to get another offer from the Naths.

7    Q.   "Yes" or "No" answer.  Did you tell him the truth when

8    you said, "We have another offer we might accept," the one

9    you had turned down flat?

07:31   10    A.   Correct.  We had turned that offer down.

11    Q.   Was it true what you told Tony?  Just "Yes" or "No".

12    A.   Yes, it was true.

13    Q.   Let's see if I've got this straight.  You've got a

14    7.6-million-dollar offer that you turn down flat.  True?

07:31   15    A.   Yes.

16    Q.   You call Tony Petrello and you say, "I have got an

17    offer" -- "We have got an offer we might accept."  True?

18    A.   True.

19    Q.   Same offer, the one you just turned down flat.  True?

07:32   20         THE COURT:  Which one?  You're talking about the

21    seven-million-dollar one?

22         MR. BERG:  Yes, sir.

23    By Mr. Berg:

24    Q.   The 7.6-million-dollar offer was not the one you wanted.

07:32   25    You turned it down flat.  True?

*M. Prucka - Direct by Mr. Berg*

1    A.   True.

2    Q.   And that was the offer you might accept, you told him.

3    True?

4    A.   True.

07:32  5    Q.   But that was false; was it not?

6    A.   No.

7    Q.   You weren't playing straight with him.  You tell him you

8    got an offer, to jack up his price, an offer you might

9    accept when you weren't going to accept it.  True or false?

07:32 10    A.   State the question again.

11         MR. BERG:  Your Honor, this might be a good place

12    to take a break.  I am having a -- He can finish the answer.

13         THE COURT:  All right.  We'll clear it up in the

14    morning.

07:32 15              Ladies and gentlemen, we'll stand adjourned at

16    this time.  See you tomorrow morning ready to go at 10:00

17    a.m.  Thank you and good afternoon.

18                   (Jury not present)

19         THE COURT:  All right.  I'll see everybody back in

07:46 20    five minutes.  We've got some more business I want to

21    discuss.  Okay?  We'll take a five-minute break.

22                   (Brief recess)

23         THE COURT:  Give me a couple of minutes.  I just

24    want to show you the time.  I want to put that down first.

07:46 25    Here's the time, Petrello's time, McGee, Heritage, Prucka.

1    I am going to give you the sheet.  I just want to show you

2    here.  And I have a separate sheet for the Nath time.

3              So, give me a minute.  I want to fill out my

4    time sheet for you first.  Okay?

07:46    5              Now, you're also going to get in parenthesis a

6    penciled figure.  The penciled figure are the minutes.

7              All right.  Tomorrow morning, if you would,

8    get here at -- let's make it 9:40, as soon as I get down

9    from upstairs from that ceremony, which we do once a year,

07:47    10   and they want all the judges sitting.  So, all of the folks

11   that are getting their anniversary awards for the years of

12   federal service will be down here.

13             These are some of the questions that I want

14   answered tomorrow morning, but you will get a ruling

07:48    15   tomorrow.  You may agree with it or not.  And, by the way,

16   if you disagree with it and I will express to you later the

17   reason for it if it doesn't seem to comport with what you

18   think the law is -- but don't assume I am leaning one way or

19   the other.  It haven't heard your responses.  We have gone

07:48    20   through what you have filed.  I have read it.  I have looked

21   at the cases, the highlighting.  We haven't had time to go

22   through it in detail because -- I think one came in today.

23   So, we're going to do that tonight.  I will take it home.

24   We have got copies and I'll be ready with my own questions,

07:48    25   additionally.  But these are some of the questions I have.

1          I have looked at the proposed jury charge, the

2    amended proposed jury charge, and the Plaintiff cites

3    42, United States Code, Section 1985(3).  That's in your

4    suggested amended proposed jury charge.  Is state action

07:49    5    required under that section?

6          The sixth amended -- we pulled that just now.

7    The sixth amended original complaint now states violations

8    of 42, United States Code, 1981 through 1988.  Is state

9    action required under these sections?

07:49    10         Does Plaintiff have a case that a violation --

11   a case right on point -- is there a case that a violation of

12   the federal Fair Housing Act is a constitutional violation?

13         Now, some of it may be in your briefs.  We're

14   going to read them in detail tonight.

07:49    15         Does the Plaintiff contend that nominal

16   damages of one dollar is considered actual damages for

17   purposes of punitives, keeping in mind the testimony that we

18   heard from the Plaintiff on the stand that, you know,

19   monetary damages were not incurred.  But I understand the

07:50    20   theory of nominal damages.

21         Distinguish the *LeBlanc* case in the Fifth

22   Circuit.  I want to talk about that.

23         And the bottom line is:  If punitives are

24   going to be given, I suggest this.  And, if not, I am going

07:50    25   to try to construct something.  When people are sued and

1    pulled into court -- We don't have a jury verdict on it yet.

2    I haven't hard any motions for judgment as a matter of law

3    at the end of the Plaintiff's case or into the whole case.

4              Punitive damages, if they will be submitted to

07:50    5    the jury, can you agree on a general instruction concerning

6    the net worth of the parties where they don't have to, in

7    effect, spill everything out but that will suffice enough to

8    go to the jury relative, perhaps, to ballpark figures.  They

9    all understand that, certainly, on the individuals involved,

07:51    10    they have a lot of funds and, to some extent, the

11    corporation and, to some extent, the individual.

12              But let's assume that if punitives are

13    given -- we all know that there can be some testimony

14    regarding net worth.  Now, if you can agree on something

07:51    15    general, fine.  If not, I am going to craft something.  I'd

16    much prefer you work on it.  And especially the Plaintiffs.

17    If you're entitled or you're going to get -- and notice I

18    said that two different ways.  If you're entitled or you're

19    going to get a punitive damage instruction, I'm not sure I

07:51    20    am going to require each of the parties to disclose

21    completely what their net worth is because they got hauled

22    into federal court.  The jury hasn't decided who wins the

23    case.  And I will work with the defense, who has brought

24    some concerns forward about disclosing all of that.  Yet, if

07:52    25    punitives are given, they're entitled to some information.

1    What I am saying is we can go general ballpark without even

2    asking each one "Well, how much are you worth."  So be it.

3    If we can't, we can't.

4              Another thing that we can do, if we have to --

07:52   5    and I don't like doing this -- I will clear the courtroom

6    except for the parties involved here and except for the

7    individuals that are on trial, and it would be the Plaintiff

8    and one defendant here in court and the jury.  So, everybody

9    doesn't have to seal it up.  But it's a public trial.  It

07:52   10   doesn't seem to be workable to me.  But I want to balance,

11   you know, one against the other if we have to.  And if you

12   can come up with some generalization that's fine, because I

13   know that there are some folks, some defendants, who are not

14   in the financial situation that other ones may be.

07:53   15             I don't know what I am going to do on that

16   fact.  I am just throwing that out as a possibility.  But

17   the thing the defense has to realize is that, if it's given,

18   we all know what the general rule is, that they're entitled

19   to know.  When it comes to a big corporation, usually -- and

07:53   20   I have had many, many of these -- they have one question on

21   the net worth of the company based upon what, you know, the

22   shareholders have been -- the annual report and then we move

23   on.  So, I don't know how to do it yet as far as the

24   individuals go, but we'll get somewhere on it.

07:53   25             All right.  That's it for today.  We'll see

1    you tomorrow.

2           MR. DeAYALA:  May I ask one question?

3           THE COURT:  Yes, sir.

4           MR. DeAYALA:  With respect to punitive damages is

07:53   5    it possible that we get that issue resolved?  If the Court

6    finds there is no punitives, then we don't have this issue.

7           THE COURT:  That's true.

8           MR. DeAYALA:  Is that something that we're going to

9    try to do it in that order -- that is, find out a "Yes" or

07:54  10    "No" --

11           THE COURT:  Exactly.  I'm saying I want you to talk

12    about it, the defense, as a backup.  As a backup.  If it

13    comes, what sort of question, then, does Mr. Berg ask your

14    gentleman on the stand or can we read it in as an agreement,

07:54  15    as an agreed stipulation as to the various folks?  I don't

16    know.  I have never done it that way.  I don't think it's

17    reversible if it's in the ballpark somewhere.  But who

18    knows.  If it is, that's up to the Plaintiff.  If the

19    Plaintiff absolutely requires it, then I will see if I can

07:54  20    craft something or I am just going to allow him to ask the

21    question.  So, it behooves the defense, at least, to be

22    ready as a fallback, because that's a fallback.

23           Tomorrow morning we're going to talk

24    punitives, and then I will probably take a break for

07:54  25    whatever case you want in the back and come out and rule.  I

1   will rule and then we'll move on.

2            See you tomorrow morning.

3

4            COURT REPORTER'S CERTIFICATE

5        I, BRUCE SLAVIN, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter, to the best of my ability.

8

9                    *s/Bruce Slavin*
                     BRUCE SLAVIN, RPR, CM
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1,000** [1] - 118:11
**$100,000** [1] - 10:23
**$140** [1] - 43:21
**$190,000** [4] - 13:12, 87:3, 212:7, 212:21
**$190,982.50** [1] - 13:7
**$200,000** [3] - 13:7, 88:7, 92:18
**$290,000** [1] - 87:1
**$290,482.50** [1] - 209:13
**$3.15** [1] - 118:4
**$300,000** [2] - 88:2, 88:3
**$75,000** [1] - 134:5
**$8,009,017.50** [1] - 87:2
**$8,299,500** [6] - 128:8, 128:13, 130:9, 130:14, 131:7, 134:10
**$8.2** [1] - 85:15

## '

**'08** [1] - 208:20
**'50s** [1] - 63:15
**'60s** [1] - 63:15
**'79** [1] - 146:12
**'96** [2] - 61:13, 62:3
**'Maybe** [1] - 172:22
**'Well** [1] - 165:23
**'You're** [1] - 192:20

## 1

**1** [8] - 1:14, 1:15, 36:4, 67:10, 67:11, 67:12, 67:14, 144:6
**1,000** [3] - 154:22, 161:4, 161:8
**1-9-09** [1] - 185:11
**1.1** [1] - 118:2
**1.2** [2] - 118:11, 133:6
**1.25** [1] - 153:6
**1.2954** [1] - 118:1
**1/2** [5] - 12:23, 76:1, 86:21, 86:25, 87:4
**10** [18] - 9:3, 9:14, 29:12, 77:23, 107:18, 117:8, 122:20, 143:9, 151:25, 152:11, 152:25, 153:2, 153:5, 153:11, 154:1, 154:12, 155:5
**100,000** [1] - 78:15
**106** [2] - 135:23, 164:15
**10:00** [5] - 81:15, 81:20, 102:20, 202:8, 241:16
**11** [6] - 23:10, 99:25, 136:16, 136:18, 136:21, 179:20
**11-A** [2] - 5:6, 5:14
**110** [1] - 161:23
**113** [1] - 3:11

**11:45** [2] - 60:17, 60:24
**11:53** [1] - 83:3
**11th** [3] - 110:18, 179:10, 179:24
**12** [5] - 7:23, 45:5, 106:7, 151:16, 162:20
**1221** [2] - 1:19, 2:2
**128** [2] - 173:9, 173:13
**12:00** [1] - 60:25
**12th** [17] - 24:5, 76:24, 140:19, 175:13, 175:14, 190:17, 190:23, 194:12, 197:13, 210:1, 210:16, 213:17, 215:5, 215:16, 215:17, 217:22, 221:15
**138** [1] - 3:12
**14** [5] - 42:15, 109:3, 175:7, 175:17, 191:6
**14th** [6] - 193:14, 194:1, 197:13, 213:16, 216:2, 221:16
**15** [8] - 5:9, 101:23, 117:17, 149:14, 163:17, 185:2, 193:11
**15,000-square-foot** [1] - 17:18
**150** [2] - 108:7, 122:2
**151** [1] - 3:12
**15th** [3] - 193:24, 197:14, 198:1
**16** [10] - 41:13, 41:15, 41:16, 77:23, 91:3, 100:12, 123:18, 127:24, 128:2, 162:24
**16th** [6] - 95:19, 226:15, 226:17, 230:14, 231:23, 238:4
**17** [1] - 3:6
**17,000** [3] - 53:21, 120:15, 154:13
**173** [1] - 166:10
**174** [5] - 162:12, 162:23, 163:17, 163:21, 166:8
**18** [27] - 45:24, 55:8, 55:11, 55:14, 63:7, 65:13, 65:14, 66:17, 73:4, 117:8, 120:24, 152:1, 152:15, 153:5, 153:9, 154:8, 155:13, 155:15, 156:1, 156:13, 157:10, 162:7, 173:13, 181:12, 183:7, 194:6, 196:19
**1800** [1] - 2:10
**183** [1] - 3:13
**18th** [1] - 197:14
**19** [3] - 30:20, 30:24, 154:24
**19,000** [1] - 154:19
**190** [1] - 187:19
**1908** [1] - 188:3
**1920** [1] - 46:16
**1920s** [3] - 17:25, 18:4, 119:14
**1921** [1] - 153:16

**195** [1] - 3:13
**196** [1] - 3:14
**1979** [1] - 32:7
**198** [2] - 3:14, 3:15
**1981** [1] - 243:8
**1984** [2] - 32:13, 32:15
**1985(3)** [1] - 243:3
**1988** [1] - 243:8
**1991** [2] - 32:8, 33:1
**1996** [1] - 51:6
**1997** [3] - 7:23, 33:20, 62:2
**1998** [5] - 7:22, 35:22, 37:11, 38:3, 40:11
**1999** [2] - 203:7, 204:16
**1:00** [5] - 60:20, 60:21, 101:17, 101:18, 102:6
**1:05** [1] - 60:22

## 2

**2** [7] - 75:3, 75:5, 76:1, 130:3, 175:9, 207:20, 207:21
**2,000** [1] - 154:18
**2.5** [1] - 188:4
**2.6** [1] - 236:3
**20** [6] - 6:12, 6:13, 60:2, 79:1, 132:24, 154:24
**20,000** [1] - 154:23
**20-some-odd** [1] - 26:3
**200-million-dollar** [1] - 43:19
**2000** [2] - 2:8, 203:16
**2001** [2] - 56:22, 203:16
**2004** [2] - 61:14, 62:13
**2006** [9] - 8:13, 8:15, 57:10, 59:25, 63:9, 117:17, 155:14, 181:21, 181:23
**2007** [22] - 11:21, 19:14, 27:3, 76:7, 76:18, 76:20, 83:3, 115:9, 115:24, 133:2, 133:24, 169:16, 171:12, 171:16, 172:7, 179:10, 179:20, 179:24, 210:2, 210:17, 213:18, 217:9
**2007-74967** [1] - 179:17
**2008** [19] - 24:6, 75:21, 76:1, 100:17, 127:19, 127:24, 138:2, 162:21, 175:14, 178:11, 178:24, 190:17, 190:23, 191:6, 193:11, 193:14, 194:6, 213:16, 217:22
**2009** [1] - 175:15
**2010** [1] - 1:6
**202** [1] - 3:17
**2100** [1] - 1:19
**22** [1] - 134:8
**23** [3] - 1:6, 3:7, 162:24
**23rd** [1] - 34:5
**24** [2] - 7:19, 35:14
**24-hour** [1] - 47:16
**24-hour-a-day** [1] - 8:2
**24-week** [1] - 95:9

**246** [4] - 175:4, 175:7, 175:17, 176:7
**247** [1] - 1:15
**25** [2] - 78:18, 173:13
**25th** [1] - 32:15
**26** [1] - 3:8
**27** [1] - 175:15
**27th** [1] - 32:15
**2800** [1] - 1:24
**29** [1] - 3:11
**290,000-dollar** [1] - 14:17
**2:15** [2] - 102:7, 195:4
**2nd** [1] - 62:2

## 3

**3** [11] - 12:23, 19:14, 41:12, 81:14, 83:2, 86:21, 86:25, 87:4, 123:19, 168:18, 168:21
**3.15** [1] - 60:15
**3.5** [1] - 209:9
**3.7** [1] - 153:5
**30** [8] - 5:10, 26:2, 39:9, 67:24, 68:10, 123:14, 144:4, 144:6
**30,000** [1] - 78:24
**300** [1] - 2:10
**300,000** [1] - 43:22
**30th** [6] - 24:6, 138:17, 139:3, 178:24, 217:4, 217:7
**31** [3] - 123:14, 123:15
**31st** [4] - 144:8, 217:4, 217:6, 217:7
**32** [1] - 117:16
**34** [2] - 103:12, 160:6
**35** [2] - 5:10, 88:4
**3704** [1] - 1:21
**38** [1] - 178:16
**3:00** [1] - 195:4
**3:25** [1] - 149:13
**3rd** [11] - 11:20, 19:15, 76:7, 230:16, 231:12, 231:24, 233:19, 234:4, 234:10, 235:14, 238:7

## 4

**4** [18] - 19:14, 20:1, 21:20, 36:4, 83:3, 98:6, 123:19, 133:2, 133:23, 133:25, 134:12, 134:17, 138:20, 165:11, 169:19, 170:3, 188:9
**40** [5] - 53:16, 53:17, 78:16, 120:18, 155:1
**40-year-old** [1] - 58:23
**42** [2] - 243:3, 243:8
**4500** [1] - 2:2
**4:00** [1] - 89:15
**4:48** [1] - 199:15
**4th** [4] - 15:11, 27:3, 169:25, 171:12

2

## 5

**5** [18] - 19:14, 21:20, 86:23, 87:14, 87:19, 98:6, 123:19, 129:6, 129:14, 133:23, 134:1, 134:20, 138:20, 139:10, 153:6, 169:20, 170:4, 209:10
**5.8** [1] - 78:11
**50** [1] - 39:9
**500,000** [1] - 109:4
**50s** [1] - 48:12
**5100** [1] - 2:5
**55** [2] - 48:14, 151:17
**55th** [2] - 179:19, 179:23
**580** [1] - 160:15
**5:00** [3] - 89:15, 199:16, 199:20
**5th** [9] - 15:11, 27:3, 93:6, 138:18, 139:7, 139:15, 169:16, 170:1, 171:12

## 6

**6** [3] - 3:5, 123:18, 217:15
**6.5** [6] - 18:25, 84:25, 226:21, 233:16, 238:4
**6.5-million-dollar** [6] - 80:6, 91:4, 232:2, 232:11, 233:5, 236:14
**60** [4] - 48:21, 49:4, 120:13, 120:15
**61st** [1] - 1:24
**6500** [1] - 120:22
**6:00** [4] - 60:19, 60:22, 199:19, 216:20
**6:05** [1] - 199:19
**6th** [8] - 72:16, 76:20, 77:12, 84:24, 85:4, 136:20, 217:10, 226:8

## 7

**7** [2] - 139:12, 174:11
**7,000** [1] - 155:4
**7.6** [4] - 19:8, 235:16, 237:16, 239:22
**7.6-million-dollar** [3] - 19:16, 240:14, 240:24
**70,000** [1] - 78:16
**700** [3] - 2:5, 2:8, 161:6
**71:03** [1] - 222:7
**71:14** [1] - 222:7
**77002** [2] - 1:22, 2:6
**77010** [2] - 1:19, 2:3
**77056** [1] - 1:24
**77057** [2] - 2:8, 2:11
**7th** [11] - 15:12, 93:20, 95:17, 97:15, 97:16, 99:17, 136:20, 171:16, 172:7, 174:3

## 8

**8** [27] - 9:15, 28:16, 29:17, 97:17, 133:8, 134:24, 153:18, 157:7, 157:8, 157:15, 157:22, 158:25, 159:3, 159:22, 162:5, 162:10, 166:22, 168:2, 169:18, 177:21, 178:18, 178:22, 180:12, 181:18, 203:14, 218:19, 233:23
**8,299,500** [1] - 86:21
**8,497,409.83** [1] - 88:6
**8,631,578.95** [1] - 87:23
**8.2** [22] - 11:25, 12:18, 12:19, 19:22, 20:19, 86:17, 86:19, 87:13, 87:18, 87:20, 87:22, 91:6, 133:4, 168:6, 168:9, 168:19, 168:22, 188:11, 209:1, 209:5, 221:24, 223:13
**8.2-million-dollar** [6] - 88:24, 162:10, 163:19, 163:24, 164:4, 168:14
**8.299** [1] - 229:16
**8.299,500** [1] - 168:10
**8.2995** [2] - 208:24, 209:6
**8.3** [10] - 11:7, 12:10, 16:4, 18:25, 69:5, 69:13, 80:7, 116:13, 116:15, 233:16
**8.3-million-dollar** [1] - 214:5
**8.6** [3] - 90:2, 92:8, 92:21
**8:00** [1] - 105:25

## 9

**9** [9] - 75:21, 76:1, 127:18, 175:7, 175:17, 176:7, 188:3, 234:25, 235:1
**900** [1] - 161:8
**95** [2] - 87:19, 87:20
**96.5** [1] - 88:5
**9:00** [4] - 5:3, 5:4, 5:13, 102:17
**9:30** [1] - 103:8
**9:40** [2] - 5:21, 242:8
**9:45** [2] - 5:21, 202:9
**9th** [1] - 208:20

## A

**a.m** [3] - 83:3, 102:20, 241:17
**abilities** [1] - 139:23
**ability** [5] - 38:13, 68:6, 247:7
**able** [12] - 9:24, 41:13, 75:11, 106:14, 109:14, 130:5, 130:13, 131:7, 179:16, 182:1, 184:13, 184:24

**above-entitled** [1] - 247:7
**absence** [1] - 37:21
**absolutely** [10] - 35:19, 81:11, 120:1, 155:25, 162:6, 166:17, 186:21, 222:18, 228:2, 246:19
**academic** [1] - 31:6
**accept** [6] - 16:18, 21:6, 82:2, 115:20, 165:7, 236:25, 239:7, 239:14, 239:19, 239:22, 240:2, 240:8, 240:17, 241:2, 241:9
**acceptable** [4] - 99:13, 128:22, 130:6, 184:14
**accepted** [4] - 30:10, 130:19, 142:2, 229:16
**accessible** [26] - 7:1, 10:3, 14:12, 14:22, 49:3, 49:9, 53:13, 53:16, 53:18, 73:14, 81:5, 95:14, 120:16, 155:5, 219:13, 219:17, 221:1, 224:2, 224:9, 224:14, 224:16, 225:4, 225:22, 227:11, 230:6, 230:11
**accommodate** [3] - 51:22, 155:22, 155:23
**accommodated** [1] - 13:24
**accommodations** [2] - 178:20, 179:2
**accomplishment** [1] - 26:4
**according** [2] - 6:9, 13:15
**account** [2] - 79:8, 79:12
**accounted** [2] - 38:8, 212:12
**accurate** [1] - 173:21
**accurately** [1] - 179:25
**accused** [1] - 23:20
**accusing** [1] - 195:20
**achievement** [1] - 26:5
**acquaintances** [1] - 18:9
**acquire** [1] - 145:5
**acquiring** [1] - 142:11
**acres** [6] - 53:22, 54:11, 118:1, 153:4, 153:5, 153:6
**Act** [5] - 4:12, 4:14, 15:5, 15:6, 243:12
**action** [9] - 23:24, 111:18, 137:5, 175:2, 176:19, 180:6, 201:7, 243:4, 243:9
**activities** [1] - 57:5
**activity** [1] - 93:23
**actual** [8] - 114:17, 114:18, 114:19, 114:20, 117:20, 172:12, 201:3, 243:16
**ad** [1] - 26:17
**adapt** [1] - 54:25
**added** [1] - 120:10
**addendum** [2] - 134:7, 134:17, 135:8
**addicted** [1] - 69:7
**addition** [2] - 126:6, 127:14
**additional** [2] - 122:10, 180:22
**additionally** [1] - 242:25

**address** [2] - 41:10, 133:9
**adequate** [1] - 106:16
**adjacent** [2] - 55:9, 154:1
**adjoin** [1] - 58:5
**adjoining** [2] - 57:25, 58:4
**adjourn** [1] - 60:21
**adjourned** [1] - 241:15
**administrative** [1] - 146:20
**admit** [2] - 212:6, 220:7
**admitted** [6] - 14:9, 14:21, 16:9, 34:20, 192:18, 220:14
**adopted** [1] - 165:23
**adult** [4] - 28:1, 52:21, 60:8, 73:20
**adulthood** [2] - 74:6, 142:21
**adults** [1] - 42:24
**advance** [2] - 115:24, 118:15
**advantage** [5] - 18:10, 108:5, 109:22, 145:7, 146:1
**advertisement** [3] - 127:13, 141:14, 141:20
**advise** [1] - 137:1
**advocate** [1] - 7:4
**advocates** [1] - 109:20
**affect** [1] - 200:17
**affected** [1] - 65:8
**affirmatively** [2] - 140:15, 190:12
**affluent** [3] - 8:23, 9:6, 55:25
**afford** [1] - 8:8
**afternoon** [2] - 65:15, 65:16, 241:17
**afterwards** [1] - 198:6
**age** [7] - 30:20, 30:24, 41:12, 41:13, 41:23, 41:25, 122:21
**agents** [1] - 26:1
**ago** [5] - 22:3, 114:16, 222:12, 222:16, 223:25
**agree** [26] - 4:19, 68:5, 71:17, 130:16, 147:16, 161:24, 162:5, 162:8, 167:4, 167:8, 167:15, 168:5, 168:9, 170:9, 170:10, 171:10, 180:15, 208:23, 210:20, 212:20, 219:16, 220:13, 236:13, 242:15, 244:5, 244:14
**agreed** [10] - 18:15, 43:5, 59:11, 59:13, 81:7, 85:1, 117:17, 134:23, 246:15
**agreement** [74] - 18:12, 18:16, 20:21, 28:9, 74:15, 75:14, 75:18, 76:24, 76:25, 77:1, 86:18, 86:22, 125:8, 125:13, 125:15, 125:18, 125:25, 126:11, 127:15, 128:5, 128:9, 128:11, 128:25, 129:3, 129:8, 129:9, 129:10, 133:12, 135:9, 135:15, 139:8, 140:6, 140:7,

3

140:10, 143:10, 143:16, 143:23, 144:13, 144:14, 144:25, 183:6, 183:9, 183:24, 185:3, 195:5, 195:9, 195:11, 195:24, 196:2, 196:3, 196:6, 207:17, 207:18, 209:22, 210:1, 210:4, 210:15, 211:19, 212:15, 213:11, 213:13, 213:16, 213:25, 214:7, 215:5, 215:7, 217:14, 225:2, 226:12, 236:7, 236:18, 236:19, 236:23, 246:14

**agrees** [5] - 13:15, 99:1, 128:20, 235:3, 235:7
**ahead** [20] - 6:15, 16:11, 17:11, 29:23, 41:17, 45:24, 61:7, 70:20, 92:23, 103:10, 108:24, 110:2, 113:11, 138:5, 149:17, 165:4, 183:18, 183:20, 186:17, 223:10
**ahold** [1] - 91:17
**aided** [1] - 2:25
**Al** [2] - 9:1, 82:18
**Alan** [1] - 31:4
**Albert** [3] - 82:19, 210:13, 234:20
**Albertus** [1] - 32:19
**Alex** [1] - 2:1
**alive** [2] - 37:4, 122:23
**allegation** [1] - 190:25
**alleged** [7] - 27:19, 27:24, 28:6, 176:15, 201:16, 214:25, 216:17
**alleging** [3] - 100:13, 137:24, 198:16
**allow** [4] - 8:19, 143:20, 177:2, 246:20
**allowed** [1] - 192:7
**almost** [10] - 11:24, 13:7, 16:3, 38:3, 60:16, 62:4, 78:16, 88:7, 92:18, 102:6
**alone** [1] - 123:2
**alternative** [2] - 54:18, 99:4
**Alzheimer's** [1] - 42:24
**amended** [6] - 178:4, 198:15, 243:2, 243:4, 243:6, 243:7
**amendment** [1] - 194:14
**America** [1] - 102:1
**American** [2] - 17:25, 119:16
**Americans** [1] - 109:4
**amount** [7] - 13:5, 43:13, 78:10, 86:19, 127:7, 232:15, 235:12
**amounts** [2] - 200:22, 235:22
**ancillary** [1] - 53:21
**AND** [1] - 1:13
**Androphy** [1] - 1:21
**angle** [1] - 190:9
**angles** [1] - 160:24

**anniversary** [2] - 32:16, 242:11
**annual** [2] - 5:7, 245:22
**answer** [32] - 23:8, 110:23, 136:2, 143:20, 150:14, 151:4, 164:9, 164:10, 164:16, 164:23, 164:25, 165:9, 165:20, 165:21, 166:1, 166:3, 176:12, 176:13, 176:18, 176:20, 188:25, 211:23, 214:13, 214:15, 219:25, 220:6, 220:21, 222:15, 228:20, 240:7, 241:12
**answered** [4] - 81:25, 131:17, 143:21, 157:17, 176:23, 219:16, 242:14
**answers** [2] - 42:14, 186:14
**ANTHONY** [2] - 1:3, 3:10
**Anthony** [7] - 29:10, 75:19, 77:1, 126:12, 137:8, 179:18, 185:3
**ANTONY** [1] - 29:5
**anyhow** [1] - 199:16
**anyway** [1] - 141:3
**apologize** [4] - 105:14, 149:6, 163:20, 179:22
**apologized** [1] - 72:20
**apparent** [1] - 150:7
**appear** [2] - 70:18, 135:6
**applicable** [3] - 170:13, 171:8, 171:11
**application** [1] - 141:13
**applies** [1] - 130:22
**apply** [1] - 171:7
**appointment** [1] - 207:6
**appraisal** [11] - 59:4, 59:5, 59:13, 63:22, 71:22, 72:6, 72:7, 72:9, 77:13, 79:9
**appreciate** [1] - 173:6
**appreciates** [1] - 25:21
**approach** [7] - 110:3, 143:17, 163:1, 163:2, 175:5, 175:21, 200:17
**appropriate** [3] - 73:16, 172:3, 201:18
**approved** [1] - 84:14
**approximate** [1] - 203:15
**arbitration** [3] - 146:16, 146:20, 146:23
**arbitrators** [1] - 147:1
**architect** [3] - 17:25, 119:16, 119:19
**architects** [2] - 18:22, 124:1
**architectural** [20] - 13:17, 14:6, 18:3, 25:22, 81:2, 196:10, 222:2, 222:14, 223:16, 224:1, 224:12, 227:8, 229:2, 229:4, 229:6, 229:22, 230:1, 230:3, 230:7, 230:9
**architecture** [3] - 20:7, 119:11, 148:13

**area** [6] - 55:16, 66:2, 104:8, 152:11, 206:1, 216:24
**argue** [4] - 4:21, 201:13, 202:6, 202:9
**arguing** [1] - 6:4
**argument** [1] - 176:24
**arguments** [1] - 29:14
**arithmetic** [2] - 21:1, 87:21
**arm** [1] - 38:13
**arms** [2] - 96:10, 96:13
**arrange** [1] - 71:14
**arrangements** [1] - 70:21
**arranging** [1] - 72:23
**arrive** [1] - 70:6
**Art** [1] - 55:19
**art** [1] - 87:7
**as..** [1] - 137:15
**asbestos** [1] - 63:16
**aside** [2] - 15:19, 96:20, 98:17, 172:12, 172:16
**aspect** [1] - 148:14
**aspirations** [1] - 39:21
**aspired** [1] - 39:23
**assembled** [1] - 78:4
**asserting** [1] - 194:14
**assess** [1] - 174:22
**assistant** [1] - 144:4
**associate** [2] - 32:3, 200:3
**assume** [14] - 87:18, 92:15, 92:16, 92:17, 97:23, 127:7, 169:3, 213:10, 235:23, 236:22, 237:23, 242:18, 244:12
**assumed** [2] - 97:24, 129:6
**assuming** [2] - 48:11, 125:5
**assured** [1] - 217:12
**attached** [1] - 37:20
**attempt** [1] - 217:14
**attend** [3] - 29:25, 151:12, 215:8
**attended** [2] - 57:10, 57:11
**attention** [3] - 6:8, 19:13, 61:20
**attitude** [1] - 94:13
**attorney** [4] - 146:9, 147:9, 164:22, 200:1
**attorney's** [1] - 180:11
**attorneys** [9] - 6:8, 28:21, 105:4, 152:6, 192:11, 198:4, 199:22, 199:24, 216:20
**attorneys'** [4] - 4:5, 4:12, 4:14, 137:14
**attracted** [1] - 51:13
**attractive** [1] - 55:7
**audio** [1] - 45:16
**augment** [1] - 38:15
**Augusta** [1] - 2:10
**authorization** [1] - 197:18
**authorized** [2] - 197:15, 197:16
**autistic** [1] - 54:24
**autistic-type** [1] - 54:24
**automatically** [1] - 122:7

**available** [6] - 55:12, 58:15, 60:2, 109:15, 109:17, 116:8
**averages** [1] - 39:2
**awakened** [1] - 81:24
**awards** [2] - 5:8, 242:11
**aware** [13] - 40:10, 40:22, 40:23, 65:22, 66:8, 69:20, 87:4, 95:1, 100:3, 112:23, 163:19, 163:24

## B

**B(2)** [1] - 129:25
**B(3** [1] - 129:24
**babies** [1] - 45:3
**baby** [15] - 34:6, 34:21, 34:23, 35:2, 35:6, 35:7, 35:13, 35:14, 35:15, 35:20, 36:16, 36:17, 36:20, 36:21
**baby's** [1] - 35:7
**background** [2] - 29:19, 146:9
**backup** [1] - 246:12
**backyard** [3] - 46:20, 64:21, 65:4
**bad** [5] - 62:10, 70:12, 81:23, 87:21, 148:4
**badly** [1] - 21:17
**Baker** [5] - 31:24, 32:8, 32:10, 33:5, 146:13
**balance** [2] - 39:10, 245:10
**ball** [2] - 109:9, 160:19
**ballpark** [3] - 244:8, 245:1, 246:17
**bank** [1] - 84:14
**Bank** [1] - 102:1
**bar** [1] - 160:18
**based** [6] - 79:19, 84:18, 99:22, 101:21, 124:14, 245:21
**basement** [4] - 154:15, 154:17, 154:18, 154:19
**basic** [1] - 115:2
**basis** [6] - 79:4, 96:21, 98:16, 101:12, 106:20, 177:11, 177:18, 188:21
**bathe** [1] - 219:8
**bathroom** [3] - 13:24, 199:14, 225:10
**bay** [1] - 36:2
**Baylor** [1] - 43:4
**beat** [7] - 65:16, 87:11, 88:5, 90:12, 90:13, 232:21
**beautiful** [5] - 73:12, 78:20, 79:2, 107:22, 119:1
**beauty** [1] - 51:14
**Beck** [1] - 2:2
**becomes** [1] - 122:9
**bed** [2] - 55:2, 55:3
**bedroom** [6] - 52:3, 52:4, 52:11, 73:18, 73:19, 219:10
**beef** [1] - 125:4
**BEFORE** [1] - 1:13

**began** [2] - 38:14, 139:3
**begin** [3] - 29:13, 61:12, 103:7
**beginning** [1] - 21:5
**begun** [1] - 100:10
**behalf** [2] - 23:14, 23:19
**behaving** [1] - 206:25
**behind** [10] - 8:16, 17:21, 22:12, 66:5, 77:5, 109:9, 113:3, 117:8, 118:17, 120:10
**behooves** [1] - 246:21
**belief** [3] - 14:8, 98:9, 224:4
**believers** [1] - 14:3
**below** [3] - 69:16, 235:8, 236:2
**bench** [7] - 105:8, 110:4, 110:6, 143:18, 181:10, 200:17, 200:20
**beneficiary** [1] - 143:25
**benefit** [2] - 70:1, 70:2
**BERG** [87] - 4:21, 6:16, 6:19, 22:2, 22:5, 22:11, 22:15, 29:2, 50:5, 61:8, 65:11, 67:10, 67:12, 75:2, 75:7, 75:13, 101:15, 103:11, 105:15, 105:20, 110:1, 110:8, 112:6, 112:8, 112:12, 131:14, 135:11, 135:17, 135:22, 143:11, 143:17, 149:2, 156:23, 157:17, 157:24, 162:13, 162:16, 162:18, 162:22, 162:25, 164:15, 164:19, 165:3, 165:6, 165:13, 166:9, 167:11, 167:20, 170:22, 171:4, 175:8, 175:10, 175:13, 175:16, 175:18, 176:1, 176:7, 176:13, 176:24, 180:21, 181:4, 181:13, 183:15, 183:19, 190:6, 191:14, 192:8, 194:20, 195:15, 196:11, 198:21, 199:8, 199:11, 200:16, 201:22, 202:3, 214:11, 219:24, 221:8, 221:12, 222:7, 222:25, 223:10, 224:20, 226:5, 240:22, 241:11
**Berg** [63] - 1:20, 1:21, 3:5, 3:11, 3:13, 3:15, 3:17, 4:19, 7:3, 19:15, 20:22, 21:21, 27:19, 29:8, 50:22, 52:1, 61:9, 65:12, 67:13, 75:4, 79:21, 82:25, 88:17, 95:23, 98:13, 99:10, 100:18, 103:13, 105:21, 127:1, 127:23, 131:23, 156:20, 164:21, 165:1, 175:6, 175:7, 175:9, 175:12, 182:3, 183:22, 186:18, 187:13, 188:1, 189:3, 190:14, 193:4, 193:22, 197:9, 198:23, 202:24, 214:17, 216:25, 221:14, 222:11, 223:2,

223:3, 224:22, 225:19, 226:6, 227:15, 240:23, 246:13
**Berg's** [2] - 169:15, 196:22
**Bering** [1] - 2:8
**beside** [1] - 235:22
**best** [20] - 38:20, 40:16, 46:3, 54:15, 62:7, 63:1, 98:9, 106:12, 106:13, 109:15, 109:16, 109:18, 138:16, 161:24, 184:20, 196:2, 205:6, 207:23, 239:11, 247:7
**Beta** [1] - 31:4
**better** [18] - 11:16, 49:22, 87:15, 101:22, 114:9, 126:1, 209:1, 209:16, 209:20, 210:21, 211:9, 211:12, 212:7, 214:23, 215:1, 215:14, 215:25, 216:10
**between** [28] - 18:16, 21:21, 36:11, 36:22, 67:17, 75:14, 76:24, 100:19, 107:9, 123:13, 135:9, 135:15, 148:17, 154:4, 158:9, 158:14, 169:22, 171:13, 172:4, 195:4, 196:22, 199:19, 205:10, 208:24, 210:21, 212:3, 229:12, 231:22
**beyond** [5] - 63:12, 112:17, 153:2, 153:12, 192:22
**Bhatia** [12] - 75:19, 77:2, 77:3, 126:12, 205:19, 205:20, 205:25, 208:7, 208:20, 212:19, 212:20
**Bhatia..** [1] - 185:3
**bid** [16] - 18:25, 19:20, 19:22, 83:15, 86:5, 87:10, 88:2, 90:1, 92:7, 92:20, 115:22, 130:18, 130:19, 131:6, 225:25, 226:23
**bidded** [1] - 226:1
**bidder** [2] - 87:15, 115:17
**bids** [3] - 115:20, 116:25, 232:8
**big** [15] - 23:21, 36:2, 36:7, 67:4, 73:22, 102:17, 122:16, 124:15, 149:7, 152:11, 196:20, 196:25, 213:1, 219:8, 245:19
**bigger** [2] - 66:9, 232:20
**biggest** [1] - 106:25
**bill** [4] - 132:16, 132:20, 132:24, 181:20
**Bill** [1] - 78:14
**binding** [4] - 27:2, 27:12, 135:10, 135:16
**birthday** [1] - 57:12
**bit** [12] - 17:16, 37:1, 45:22, 51:18, 62:4, 64:18, 85:11, 103:6, 142:8, 173:17, 190:9, 202:7
**biting** [1] - 55:4
**blame** [1] - 17:22

**blank** [1] - 128:23
**bleeding** [1] - 34:25
**block** [1] - 209:8
**blocks** [2] - 58:16, 58:18
**blood** [5] - 36:12, 36:18, 36:19, 36:22, 55:3
**blow** [5] - 9:1, 39:14, 184:3, 234:18
**blowup** [1] - 152:3
**blue** [1] - 105:11
**Blvd** [1] - 1:24
**board** [3] - 43:8, 43:10, 43:11
**bodily** [1] - 39:16
**book** [1] - 6:10
**books** [1] - 6:10
**Boone** [1] - 1:18
**border** [1] - 66:9
**borders** [2] - 58:7, 65:23
**born** [9] - 7:23, 29:21, 29:22, 35:20, 36:2, 38:4, 44:23, 61:24, 204:16
**borrow** [1] - 84:13
**bother** [3] - 18:25, 19:1, 214:7
**bothered** [1] - 237:18
**bottom** [10] - 12:16, 13:3, 86:12, 86:15, 118:10, 166:10, 173:10, 179:7, 210:6, 243:23
**bought** [33] - 9:10, 10:21, 12:8, 12:10, 16:4, 17:20, 20:16, 22:24, 27:24, 28:15, 45:23, 46:19, 51:6, 59:1, 60:4, 61:13, 61:25, 62:3, 63:8, 63:23, 73:3, 115:6, 117:7, 117:13, 118:17, 121:8, 121:9, 128:2, 155:13, 187:19, 204:21, 208:9, 208:20
**bound** [2] - 21:23, 21:24
**boundaries** [1] - 158:14
**boundary** [2] - 154:1, 156:12
**Bowick** [1] - 2:10
**braces** [2] - 7:17, 39:8
**brachioplexus** [1] - 96:7
**bragging** [1] - 60:11
**brain** [6] - 38:8, 40:11, 40:12, 42:23, 43:7, 44:13
**breach** [4] - 110:12, 111:8, 137:13, 180:9
**break** [17] - 17:5, 60:18, 60:24, 101:16, 101:18, 149:5, 149:11, 195:8, 196:6, 199:14, 199:16, 199:18, 200:3, 202:20, 241:12, 241:21, 246:24
**breech** [2] - 35:3, 35:6
**brick** [11] - 46:10, 55:22, 56:5, 66:5, 102:2, 154:4, 154:7, 156:4, 156:5, 156:6, 196:20
**bricks** [2] - 6:23, 16:20

**Brief** [2] - 200:10, 241:22
**brief** [3] - 4:10, 138:11, 149:15
**briefly** [3] - 61:10, 105:23, 105:24
**briefs** [2] - 201:24, 243:13
**bring** [7] - 6:8, 32:5, 109:14, 114:13, 189:12, 209:23, 216:21
**brings** [2] - 40:21, 130:12
**broader** [3] - 192:18, 210:13
**brochure** [2] - 187:22, 212:21
**brochures** [2] - 127:11, 127:12
**broken** [1] - 122:16
**broker** [46] - 12:6, 14:14, 18:12, 69:4, 69:15, 69:24, 70:3, 70:5, 70:17, 70:21, 70:22, 70:24, 71:1, 71:2, 75:24, 76:1, 85:18, 89:1, 125:8, 125:10, 126:20, 126:23, 127:5, 128:3, 128:12, 129:2, 129:6, 130:3, 130:4, 130:12, 130:19, 140:13, 144:9, 168:1, 184:7, 184:8, 184:12, 187:16, 187:22, 188:3, 193:13, 230:25, 231:2, 232:6
**broker's** [15] - 68:6, 70:4, 70:6, 71:15, 71:18, 72:10, 72:24, 75:21, 129:16, 130:1, 140:8, 140:11, 141:21, 185:12, 186:22
**brokerage** [27] - 10:16, 10:21, 10:24, 11:3, 12:15, 12:23, 12:25, 74:15, 183:23, 184:8, 184:10, 207:18, 208:8, 208:18, 208:21, 209:12, 209:22, 210:1, 210:4, 210:15, 211:19, 212:15, 215:5, 217:14, 226:12
**brokers** [1] - 78:3
**brought** [6] - 42:19, 100:13, 100:20, 101:12, 216:9, 244:23
**BRUCE** [1] - 247:5, 247:9
**Bruce** [2] - 2:12, 216:24
**BS** [2] - 30:1, 30:14
**Buck** [1] - 2:4
**build** [16] - 8:17, 43:7, 60:7, 60:8, 64:23, 65:5, 73:19, 107:15, 121:4, 121:5, 121:10, 121:14, 155:15, 155:23, 162:6, 196:20
**building** [8] - 43:19, 43:22, 44:3, 102:2, 158:22, 158:23, 158:25, 159:3
**buildings** [1] - 158:17
**built** [10] - 17:25, 18:4, 37:3, 46:16, 48:21, 48:22, 48:24, 119:14, 154:10, 156:1

**bunch** [3] - 5:10, 15:12, 96:8
**bungee** [1] - 161:15
**burden** [1] - 16:18
**business** [9] - 33:15, 44:4, 116:8, 203:6, 203:8, 203:10, 203:11, 204:16, 241:20
**busy** [1] - 104:16
**button** [1] - 160:5
**buy** [24] - 15:19, 20:13, 21:11, 23:8, 25:21, 27:2, 27:5, 27:6, 27:13, 27:14, 51:5, 58:25, 80:15, 99:4, 117:17, 117:23, 130:5, 131:8, 134:23, 158:14, 161:25, 184:13, 188:5, 235:8
**buyer** [25] - 26:25, 27:15, 28:4, 74:17, 90:8, 91:22, 92:1, 93:24, 94:6, 124:25, 130:4, 130:13, 184:13, 208:17, 219:21, 220:9, 220:15, 220:17, 221:17, 221:20, 224:6, 224:10, 227:4, 235:7
**buyers** [9] - 26:16, 26:20, 26:21, 27:15, 28:11, 124:24, 167:4, 167:10, 232:21
**buying** [5] - 63:20, 84:11, 172:8, 189:9, 205:17
**buys** [1] - 98:25
**BY** [1] - 200:14

## C

**C"** [1] - 129:11
**cafeteria** [1] - 101:25
**cage** [1] - 122:3
**calculation** [3] - 92:12, 92:15, 92:16
**calculations** [2] - 41:22, 124:15
**CALLED** [1] - 200:14
**cameras** [1] - 45:12
**campus** [1] - 66:4
**cancer** [1] - 42:23
**cannot** [4] - 7:18, 15:2, 16:8, 197:6
**capabilities** [1] - 108:2
**capable** [1] - 46:3
**capacity** [1] - 38:18
**capitalized** [2] - 128:16, 130:8
**care** [17] - 8:2, 14:3, 37:7, 37:24, 39:18, 47:17, 62:8, 139:24, 139:25, 161:24, 166:16, 218:21, 226:1, 238:22, 238:25, 239:3
**cared** [1] - 7:19
**careful** [1] - 173:6
**caregivers** [1] - 95:15
**Carena** [83] - 7:2, 7:6, 7:8, 7:21, 7:22, 8:18, 8:20, 9:17, 10:2, 13:21, 15:1, 20:11,

27:11, 36:3, 37:6, 37:24, 39:19, 40:1, 40:7, 40:14, 40:20, 41:9, 42:6, 44:10, 44:21, 45:6, 46:2, 46:7, 47:12, 47:16, 48:10, 51:11, 54:16, 54:22, 54:24, 55:1, 55:3, 60:8, 61:24, 62:6, 63:13, 64:24, 69:18, 73:4, 73:15, 74:3, 74:5, 74:18, 81:10, 85:12, 86:1, 90:16, 90:20, 96:9, 104:10, 104:23, 118:21, 121:6, 121:10, 121:15, 121:18, 122:1, 122:18, 124:11, 139:23, 142:12, 146:4, 146:5, 151:15, 151:16, 155:2, 155:5, 155:16, 157:12, 157:23, 161:12, 161:24, 218:2, 218:4, 219:9, 231:7, 231:12
**Carena's** [17] - 16:1, 36:24, 38:1, 41:10, 44:16, 45:22, 47:19, 52:3, 52:4, 52:11, 57:11, 69:19, 74:12, 121:16, 122:9, 139:20, 160:10
**caring** [1] - 144:21
**carriage** [5] - 121:22, 122:4, 143:6, 158:17, 218:10
**CASE** [1] - 102:23
**case** [47] - 6:21, 6:23, 6:24, 7:10, 8:7, 8:8, 9:4, 16:20, 16:23, 23:1, 23:23, 26:15, 36:24, 44:16, 47:19, 94:2, 102:22, 102:24, 124:19, 130:22, 147:21, 147:24, 153:18, 169:1, 171:10, 183:4, 189:20, 194:3, 194:10, 195:13, 196:4, 201:14, 201:19, 201:20, 201:23, 210:23, 216:4, 221:6, 238:20, 243:10, 243:11, 243:21, 244:3, 244:23, 246:25
**cases** [3] - 169:12, 169:13, 242:21
**cash** [6] - 181:20, 188:20, 189:4, 189:5, 237:20, 238:4
**catholic** [1] - 32:19
**caused** [1] - 34:10
**causes** [1] - 43:25
**celebrated** [1] - 32:15
**celebrating** [1] - 34:16
**cell** [4] - 69:15, 82:13, 83:4, 91:15
**Center** [5] - 42:7, 43:14, 43:23, 55:20, 62:20
**centers** [1] - 54:1
**cerebral** [4] - 7:8, 95:10, 95:12, 109:4
**ceremony** [2] - 5:11, 242:9
**certain** [13] - 18:18, 24:21, 34:22, 38:25, 53:5, 98:21, 149:8, 169:12, 170:11, 171:2, 224:15

**certainly** [7] - 9:18, 69:8, 136:20, 141:11, 207:13, 238:2, 244:9
**CERTIFICATE** [1] - 247:4
**certify** [1] - 247:5
**cetera** [2] - 69:11, 212:11
**chain** [3] - 64:15, 154:5, 154:6
**chain-link** [1] - 64:15
**chair** [1] - 53:1
**chairman** [1] - 43:11
**chairs** [1] - 44:20
**challenges** [1] - 53:1
**chambers** [1] - 36:11
**chance** [9] - 40:15, 46:3, 54:22, 77:25, 90:12, 90:21, 92:9, 211:11, 239:11
**change** [21] - 45:6, 54:25, 84:19, 159:17, 186:20, 205:5, 222:1, 222:14, 223:15, 223:25, 224:11, 224:13, 224:17, 229:1, 229:2, 229:20, 229:22, 230:1, 230:2, 230:7, 230:9
**changed** [3] - 38:1, 38:2, 96:25
**changes** [8] - 14:11, 220:18, 221:20, 229:7, 229:9, 229:25, 230:5, 230:8
**changing** [2] - 103:3, 227:7
**channel** [1] - 22:19
**characteristics** [1] - 54:24
**charge** [5] - 37:24, 169:11, 243:1, 243:2, 243:4
**charges** [1] - 100:13
**charging** [1] - 132:21
**charity** [1] - 57:14
**chart** [8] - 20:22, 21:2, 86:7, 110:8, 110:18, 127:1, 209:4
**check** [9] - 19:2, 19:10, 19:23, 60:11, 76:11, 81:18, 189:12, 207:7, 233:14
**checked** [1] - 78:1
**checking** [1] - 97:24
**chief** [2] - 33:3, 59:7
**child** [9] - 6:22, 7:15, 7:24, 14:2, 16:22, 41:22, 109:7, 123:1, 157:12
**children** [18] - 15:9, 16:7, 27:25, 28:1, 28:14, 33:16, 42:6, 42:12, 43:2, 43:6, 54:23, 67:3, 96:7, 122:25, 151:11, 205:1, 227:22, 228:5
**Children's** [5] - 38:6, 42:22, 43:4, 43:8, 43:14
**choice** [2] - 35:17, 53:13
**choices** [3] - 35:5, 35:12, 53:15
**choose** [1] - 186:11
**chose** [2] - 19:19, 229:13
**Christmas** [2] - 57:9, 57:11
**chronologically** [1] - 226:7
**Cindy** [20] - 7:5, 8:13, 9:17, 9:25, 12:24, 13:9, 14:2,

15:15, 32:14, 32:17, 32:18, 33:16, 33:19, 34:11, 34:23, 35:23, 44:8, 48:15, 218:10, 227:17
**Cindy's** [3] - 34:24, 218:6, 228:6
**circle** [3] - 104:5, 104:7, 152:25
**Circle** [1] - 205:24
**circled** [1] - 166:8
**circling** [1] - 46:8
**Circuit** [5] - 201:2, 201:14, 201:15, 201:19, 243:22
**circular** [1] - 104:4
**circumstance** [2] - 209:18, 209:19
**circumstances** [2] - 7:20, 18:18
**cites** [1] - 243:2
**City** [11] - 56:16, 69:7, 70:13, 204:13, 204:22, 205:8, 205:10, 233:20, 233:21, 234:3, 234:5
**city** [2] - 9:7, 56:9
**civil** [3] - 100:20, 193:18, 194:15
**Civil** [1] - 15:5
**claim** [20] - 100:2, 108:12, 110:12, 110:13, 112:3, 112:10, 112:13, 146:1, 147:25, 148:8, 150:3, 178:5, 178:14, 179:13, 180:18, 197:17, 198:2, 198:5, 198:12
**claimed** [5] - 21:25, 112:3, 143:15, 143:22, 179:15
**claiming** [2] - 22:22, 114:18
**claims** [5] - 110:21, 111:10, 137:13, 180:9, 194:14
**clarify** [3] - 142:7, 143:3, 165:21
**class** [3] - 109:22, 201:14, 201:16
**classically** [1] - 176:2
**clause** [2] - 184:18, 186:21
**clean** [2] - 165:24, 183:1
**cleaned** [1] - 65:2
**clear** [24] - 8:5, 9:21, 18:19, 47:3, 75:12, 85:4, 106:23, 111:21, 125:14, 142:10, 173:5, 182:14, 184:9, 189:15, 192:10, 193:23, 197:12, 199:2, 206:9, 212:13, 215:16, 216:18, 241:13, 245:5
**clearer** [1] - 182:12
**clearly** [5] - 48:10, 75:6, 76:22, 79:4, 182:5
**clerked** [1] - 31:23
**client** [5] - 23:19, 33:2, 33:5, 111:8, 131:24
**clip** [2] - 211:6, 223:11
**clock** [1] - 60:17
**clocks** [1] - 28:24
**close** [15] - 14:13, 36:12,

52:24, 76:8, 84:13, 85:2, 95:19, 103:21, 172:23, 189:7, 189:13, 189:24, 190:3, 231:2, 231:4
**closed** [3] - 56:13, 100:11, 162:11
**closer** [3] - 30:6, 61:15, 238:1
**closes** [1] - 36:22
**closing** [6] - 85:16, 100:19, 127:23, 182:6, 188:12, 231:10
**closure** [1] - 36:25
**CM** [2] - 2:12, 247:9
**Coast** [2] - 34:16, 46:22
**Code** [2] - 243:3, 243:8
**code** [3] - 14:7, 180:13, 196:10
**cognitively** [1] - 38:18
**cold** [1] - 81:23
**colleague** [1] - 190:2
**College** [1] - 43:5
**college** [1] - 32:19
**colors** [2] - 41:14, 41:18
**combined** [1] - 154:23
**coming** [8] - 5:18, 49:19, 59:25, 64:2, 66:18, 66:21, 97:7, 193:2
**commenced** [2] - 179:19, 179:23
**comment** [6] - 20:10, 20:14, 68:1, 186:3, 186:10
**commented** [1] - 116:22
**comments** [1] - 69:22
**commission** [31] - 10:16, 12:1, 14:17, 18:13, 70:23, 71:15, 71:18, 72:10, 72:24, 76:5, 85:1, 85:2, 86:18, 86:22, 86:23, 86:25, 87:1, 87:14, 87:19, 125:11, 125:21, 129:1, 140:9, 140:11, 168:13, 168:16, 168:18, 188:11, 209:9, 209:23, 212:17
**committed** [2] - 46:1, 95:5
**committee** [1] - 43:12
**common** [1] - 153:25
**commonly** [1] - 31:12
**communicate** [1] - 232:20
**communicated** [2] - 140:2, 164:5
**company** [5] - 14:15, 21:10, 32:25, 118:12, 245:21
**compare** [2] - 78:12, 104:13
**compel** [3] - 27:4, 167:16, 167:18
**complaint** [3] - 137:24, 138:1, 243:7
**complete** [3] - 164:9, 164:16, 220:20
**completely** [1] - 244:21
**completeness** [3] - 131:20, 135:24, 165:19

**complexity** [1] - 54:6
**Complies** [3] - 30:7, 66:14, 88:21
**comport** [1] - 242:17
**compulsion** [1] - 115:15
**computation** [1] - 155:1
**computer** [1] - 2:25
**computer-aided** [1] - 2:25
**concede** [2] - 209:16, 216:3
**concentrate** [1] - 8:20
**concern** [8] - 8:10, 45:21, 70:15, 107:1, 214:10, 224:11, 225:15, 225:16
**concerned** [11] - 54:7, 107:21, 213:6, 213:7, 219:22, 222:3, 222:17, 224:18, 227:7, 230:2
**concerning** [4] - 101:19, 138:16, 181:12, 244:5
**concerns** [3] - 228:15, 237:19, 244:24
**conclude** [3] - 175:23, 177:6, 191:20
**concluded** [12] - 90:22, 91:21, 174:25, 176:17, 176:22, 177:10, 177:17, 178:1, 189:19, 189:23, 192:6, 193:16
**conclusion** [10] - 143:12, 150:6, 150:10, 167:11, 185:20, 186:4, 187:9, 188:23, 193:15, 197:19
**conclusions** [3] - 193:24, 194:2, 194:9
**concrete** [3] - 48:23, 59:20, 63:13
**condition** [5] - 51:11, 59:19, 69:19, 74:12, 78:20
**conditions** [2] - 171:7, 171:9
**conducive** [1] - 63:17
**conduct** [2] - 20:4, 24:15
**conference** [1] - 133:7
**confirmed** [1] - 10:12
**confront** [1] - 66:6
**confused** [1] - 121:4
**confusion** [1] - 163:17
**congenial** [1] - 203:20
**connected** [1] - 116:7
**Connecticut** [1] - 46:23
**consider** [3] - 77:10, 79:15, 171:10
**consideration** [2] - 118:12, 142:15
**considered** [5] - 109:1, 158:15, 203:22, 243:16
**considering** [2] - 78:22, 85:7
**consistent** [3] - 47:24, 61:22, 176:3
**conspiracy** [1] - 15:5
**constantly** [2] - 40:6, 47:13
**constitutional** [9] - 201:3, 201:5, 201:8, 201:10,

201:12, 201:17, 201:21, 243:12
**construct** [1] - 243:25
**construction** [3] - 61:21, 65:14, 65:18
**contact** [4] - 66:23, 70:25, 71:16, 230:15
**contacting** [1] - 82:11
**contacts** [1] - 124:5
**contemplate** [1] - 52:21
**contend** [1] - 243:15
**contention** [2] - 215:13, 216:11
**contentions** [2] - 216:4, 216:8
**contents** [1] - 22:12
**contest** [1] - 166:5
**context** [3] - 145:22, 184:10, 221:24
**contiguous** [2] - 64:22, 158:14
**contingencies** [21] - 84:2, 84:3, 84:5, 84:8, 84:22, 84:23, 85:2, 85:5, 85:6, 85:8, 85:15, 90:7, 90:9, 188:12, 189:5, 189:9, 236:6, 236:17, 237:18, 237:24, 238:4
**contingency** [6] - 84:10, 84:11, 84:16, 236:11, 236:15, 237:22
**contingency"** [1] - 235:25
**continue** [2] - 32:2, 166:12
**continued** [2] - 34:4, 90:19
**continues** [1] - 131:22
**contract** [71] - 15:10, 18:16, 19:2, 19:9, 19:10, 19:23, 20:3, 21:14, 21:20, 21:22, 27:2, 27:3, 27:6, 27:12, 59:12, 69:15, 74:24, 86:20, 89:5, 98:20, 110:13, 111:9, 117:4, 117:14, 117:23, 128:17, 130:21, 132:7, 133:16, 133:17, 133:20, 134:2, 134:8, 134:22, 135:1, 135:2, 135:10, 135:16, 137:13, 138:18, 138:21, 138:23, 139:15, 169:5, 169:12, 169:17, 169:22, 170:10, 171:1, 171:7, 171:12, 171:25, 180:10, 181:15, 181:18, 182:4, 184:7, 184:11, 185:14, 188:14, 188:20, 189:5, 189:13, 198:24, 230:18, 230:19, 231:11
**contraction** [1] - 44:17
**contractor** [1] - 65:19
**contracts** [8] - 59:7, 128:15, 130:25, 131:3, 170:11, 170:15, 171:2, 182:5
**contractual** [1] - 22:1
**contrary** [1] - 204:5
**control** [3] - 26:23, 26:24, 39:15

**convenience** [1] - 68:8
**conveniently** [1] - 104:1
**conversation** [19] - 15:18, 41:19, 76:14, 76:21, 77:24, 80:5, 84:25, 91:18, 94:24, 96:3, 97:9, 97:12, 97:13, 136:6, 136:7, 139:9, 139:12, 146:7, 220:7
**conversations** [4] - 123:17, 138:22, 207:13, 217:2
**conversed** [1] - 93:8
**converted** [1] - 45:11
**convey** [4] - 79:22, 85:17, 99:11, 235:3
**conveyed** [1] - 106:20
**cook** [2] - 94:1
**Cooley** [1] - 36:14
**cooperates** [1] - 106:9
**cooperation** [3] - 130:4, 184:7, 184:12
**copies** [1] - 242:24
**copy** [7] - 126:1, 126:6, 162:23, 163:6, 166:7, 180:25, 183:13
**cord** [1] - 35:7
**cordial** [3] - 57:4, 57:15, 174:2
**cords** [1] - 161:16
**corners** [2] - 170:20, 198:25
**corporation** [2] - 244:11, 245:19
**correct"** [1] - 150:14
**corrections** [1] - 163:13
**correctly** [3] - 7:7, 142:18, 209:25
**corroborate** [1] - 25:1
**Cortez** [1] - 15:14
**cost** [2] - 9:19, 212:11
**costs** [8] - 4:13, 75:24, 126:24, 127:3, 187:16, 187:18, 187:19, 212:17
**counsel** [23] - 17:12, 136:13, 138:6, 142:8, 149:20, 152:5, 162:12, 162:24, 166:15, 173:10, 175:4, 179:9, 180:24, 186:15, 195:8, 196:5, 200:18, 204:5, 204:7, 214:14, 216:16, 220:22, 222:8
**counsel's** [1] - 168:8
**count** [2] - 67:6, 109:5
**counter** [3] - 80:8, 80:9
**counting** [1] - 154:15
**country** [4] - 42:4, 42:15, 43:1, 62:18
**County** [4] - 22:21, 136:23, 179:20, 179:24
**couple** [10] - 34:2, 37:9, 94:9, 104:18, 115:6, 127:2, 161:7, 202:14, 205:2, 241:23
**course** [22] - 20:16, 30:23, 31:9, 33:22, 45:7, 45:17,

68:6, 79:6, 87:4, 101:5, 114:6, 115:11, 121:23, 126:5, 127:5, 127:23, 128:7, 133:9, 139:7, 139:10, 199:25, 204:24

**COURT** [205] - 1:1, 4:3, 4:6, 4:9, 4:15, 4:18, 4:20, 4:22, 4:25, 6:18, 17:5, 17:11, 17:16, 22:4, 22:6, 22:14, 22:16, 22:19, 23:10, 26:11, 28:21, 28:24, 29:3, 29:6, 50:2, 50:6, 50:8, 50:11, 50:13, 51:18, 51:21, 60:16, 61:6, 64:5, 64:8, 64:10, 65:10, 75:9, 79:15, 82:21, 88:16, 94:17, 95:22, 98:2, 98:8, 98:12, 98:23, 100:16, 101:17, 102:12, 102:24, 105:2, 105:9, 105:17, 110:2, 110:5, 110:7, 110:9, 110:23, 111:4, 111:12, 111:16, 111:25, 112:5, 112:7, 112:15, 112:19, 112:24, 113:1, 113:5, 113:8, 113:11, 113:18, 113:23, 113:25, 126:16, 129:19, 129:21, 131:16, 131:19, 131:22, 135:13, 135:19, 136:1, 136:9, 136:11, 137:9, 137:11, 138:5, 142:8, 143:13, 143:19, 149:1, 149:10, 149:17, 149:20, 149:22, 149:25, 150:17, 150:21, 151:6, 152:6, 152:19, 153:4, 153:17, 154:4, 154:6, 157:19, 158:2, 163:2, 164:14, 164:17, 164:20, 165:1, 165:4, 165:12, 165:16, 166:5, 166:11, 166:16, 167:12, 167:22, 170:24, 171:6, 176:5, 176:8, 176:11, 177:1, 177:12, 177:15, 177:24, 179:21, 181:8, 181:11, 181:22, 182:1, 182:7, 182:9, 182:13, 182:16, 182:18, 182:21, 183:12, 183:18, 183:20, 185:22, 186:5, 187:6, 187:10, 187:25, 188:24, 189:2, 190:9, 190:13, 191:13, 191:21, 192:1, 192:11, 193:21, 194:21, 195:17, 196:13, 198:20, 199:4, 199:7, 199:9, 199:13, 199:15, 199:22, 200:11, 200:15, 200:19, 200:21, 201:1, 201:5, 201:24, 202:4, 202:13, 202:17, 202:20, 211:22, 211:25, 214:12, 216:19, 219:25, 220:3, 220:21, 221:11, 222:23, 223:7, 224:21, 225:18, 226:4, 227:14, 228:1, 228:10, 229:5, 240:20, 241:13,

241:19, 241:23, 246:3, 246:7, 246:11, 247:4
**courtesy** [2] - 238:13, 238:14
**Courtroom** [2] - 5:6, 5:14
**courtroom** [11] - 5:14, 7:12, 12:13, 102:18, 104:20, 156:21, 200:2, 211:2, 214:6, 216:9, 245:5
**courtyard** [1] - 46:13
**cover** [1] - 213:2
**covered** [1] - 182:11
**covet** [2] - 74:7, 114:3
**coveted** [2] - 17:13, 29:16, 114:4
**CP** [3] - 44:12, 44:20
**craft** [2] - 244:15, 246:20
**create** [12] - 43:3, 47:11, 47:24, 53:25, 54:15, 88:10, 106:12, 109:14, 109:17, 109:18, 207:17, 218:20
**creating** [4] - 43:6, 74:23, 225:10
**criminal** [1] - 103:7
**critical** [2] - 9:22, 10:25
**Cross** [3] - 3:11, 3:12, 3:12
**cross** [7] - 111:18, 131:21, 147:5, 149:3, 181:16, 186:6, 215:18
**CROSS** [3] - 113:15, 138:9, 151:7
**Cross-Examination** [3] - 3:11, 3:12, 3:12
**cross-examination** [2] - 111:18, 186:6
**CROSS-EXAMINATION** [3] - 113:15, 138:9, 151:7
**cross-examine** [1] - 149:3
**cross-examines** [1] - 215:18
**cross-examining** [2] - 131:21, 147:5
**crossed** [1] - 183:5
**cul** [5] - 56:3
**cul-de-sac** [1] - 56:3
**cum** [1] - 31:4
**current** [3] - 48:19, 48:20, 147:10
**curve** [1] - 41:17
**cusp** [1] - 7:24
**custom** [1] - 47:24
**cut** [3] - 36:13, 74:14, 148:4
**Cynthia** [1] - 69:18

## D

**daily** [1] - 37:7
**damage** [2] - 108:14, 244:19
**damages** [20] - 4:14, 108:18, 108:19, 109:24, 109:25, 114:17, 114:18, 114:19, 114:20, 114:22,

200:24, 201:3, 201:17, 243:16, 243:19, 243:20, 244:4, 246:4
**dancer** [2] - 39:23, 39:24
**dangerous** [2] - 35:1, 35:2
**date** [24] - 27:12, 32:13, 72:14, 82:17, 83:1, 100:14, 100:15, 128:1, 134:1, 134:20, 140:22, 162:18, 162:20, 163:7, 175:10, 179:8, 188:8, 191:5, 193:10, 194:5, 203:15, 210:16
**dates** [4] - 133:25, 138:20, 169:20, 197:12
**Daugherty** [1] - 78:2
**daughter** [38] - 7:2, 7:5, 8:6, 8:10, 8:15, 15:19, 17:18, 20:5, 23:17, 24:22, 25:10, 27:11, 28:1, 38:17, 39:22, 41:7, 44:2, 52:25, 54:2, 54:9, 56:11, 93:12, 99:3, 104:23, 107:24, 155:8, 159:12, 174:20, 203:25, 204:17, 205:2, 219:13, 219:15, 219:18, 225:10, 227:23, 228:6
**daughter's** [2] - 53:23, 227:22
**DAVID** [1] - 1:13
**David** [3] - 1:20, 7:3, 39:8
**days** [18] - 15:12, 22:3, 26:2, 26:3, 34:22, 35:14, 36:8, 48:23, 62:21, 77:23, 93:20, 99:17, 136:13, 136:19, 193:5, 215:9, 216:12, 226:11
**daytime** [1] - 37:17
**de** [6] - 56:3, 143:10, 143:15, 143:22, 143:25, 212:23
**deal** [15] - 10:18, 23:21, 38:14, 71:1, 72:10, 80:23, 91:20, 91:21, 92:19, 95:5, 96:3, 97:25, 150:22, 185:17, 189:14
**dealing** [6] - 11:3, 18:10, 24:2, 24:7, 188:17, 188:18
**dealings** [7] - 25:2, 25:3, 26:8, 123:6, 138:15, 138:25, 140:14
**deals** [1] - 13:2
**dealt** [3] - 25:16, 140:12, 140:16
**dear** [1] - 36:4
**deAYALA** [1] - 189:1
**DeAyala** [47] - 2:4, 2:5, 3:7, 3:12, 3:14, 23:11, 23:12, 112:2, 112:9, 112:13, 112:18, 138:7, 138:10, 142:9, 143:14, 149:7, 149:18, 149:24, 150:1, 150:20, 150:24, 151:5, 181:2, 181:7, 181:21, 181:23, 182:14, 182:17,

182:20, 185:20, 186:1, 187:8, 187:11, 188:22, 191:11, 191:18, 191:24, 193:19, 196:17, 198:8, 215:20, 222:6, 222:10, 246:2, 246:4, 246:8
**DeAyala's** [1] - 195:23
**debilitating** [1] - 44:1
**decades** [1] - 66:25
**December** [67] - 11:20, 15:11, 15:12, 19:14, 19:15, 20:1, 21:20, 27:3, 62:2, 76:7, 81:14, 83:2, 83:3, 93:6, 93:20, 95:17, 97:15, 97:16, 98:6, 99:17, 99:25, 110:18, 123:19, 133:2, 133:23, 133:25, 134:1, 134:12, 134:17, 134:20, 136:16, 136:18, 136:21, 138:18, 139:7, 139:10, 139:11, 139:12, 139:15, 151:16, 165:11, 169:16, 169:19, 169:20, 170:3, 170:4, 171:12, 171:16, 174:3, 174:11, 179:10, 179:20, 179:24, 188:9, 230:15, 231:12, 231:24, 233:19, 234:4, 234:10, 235:13, 238:7
**decide** [4] - 194:13, 205:6, 221:3, 221:5
**decided** [15] - 18:6, 27:5, 33:10, 42:21, 68:17, 91:25, 204:13, 204:15, 204:18, 205:7, 205:12, 206:10, 219:20, 237:15, 244:22
**deciding** [1] - 115:21
**decline** [1] - 41:24
**declined** [1] - 94:20
**declining** [1] - 62:15
**dedicated** [1] - 43:1
**deduct** [1] - 10:23
**deducted** [1] - 12:25
**deed** [4] - 117:18, 181:20, 189:11, 189:12
**deep** [1] - 5:16
**defendant** [1] - 245:8
**Defendant** [1] - 12:6
**Defendants** [11] - 1:8, 1:10, 2:1, 2:4, 2:7, 6:13, 9:4, 23:16, 101:2, 200:21, 200:23
**defendants** [1] - 245:13
**defense** [6] - 17:5, 186:15, 244:23, 245:17, 246:12, 246:21
**deficits** [1] - 38:9
**defined** [1] - 128:17
**definitely** [1] - 68:3
**definition** [2] - 150:13, 238:19
**degree** [3] - 21:8, 66:4, 146:11
**degrees** [2] - 21:8, 30:13
**delayed** [1] - 64:18
**deleted** [1] - 135:2

**deliver** [1] - 118:11
**delivered** [1] - 19:10
**demand** [2] - 71:1, 189:15
**demolished** [1] - 155:21
**demonstrative** [1] - 88:19
**denial** [1] - 201:13
**deny** [1] - 16:8
**department** [1] - 147:12
**depo** [2] - 191:3, 191:4
**deposed** [1] - 193:6
**deposit** [4] - 117:2, 118:6, 118:14, 134:5
**deposition** [67] - 101:2, 101:3, 101:8, 101:9, 147:17, 150:5, 162:12, 162:13, 162:14, 162:16, 162:18, 162:20, 163:6, 163:7, 163:12, 165:20, 172:19, 175:8, 175:23, 177:19, 178:7, 189:25, 190:1, 190:15, 190:16, 191:5, 191:9, 191:11, 191:13, 191:24, 192:5, 192:7, 192:9, 192:17, 193:5, 193:10, 193:14, 193:20, 194:5, 194:7, 194:12, 194:13, 197:16, 197:19, 198:5, 198:12, 198:15, 211:1, 211:20, 211:21, 212:6, 213:11, 213:12, 213:14, 213:15, 213:16, 213:20, 214:4, 214:20, 215:8, 215:11, 215:17, 216:2, 218:23, 221:15, 221:16, 222:21
**depositions** [12] - 147:24, 148:3, 148:6, 148:24, 150:4, 150:7, 150:10, 150:14, 194:2, 194:16, 197:13, 216:17
**depth** [1] - 62:12
**describe** [3] - 33:25, 45:25, 97:11
**described** [10] - 47:16, 137:15, 159:22, 174:5, 174:7, 174:9, 180:12, 235:8, 235:9, 236:2
**description** [2] - 7:9, 137:16
**designed** [4] - 46:6, 52:19, 119:19, 120:6
**designers** [2] - 18:23, 124:1
**desire** [5] - 6:25, 26:8, 68:7, 164:21, 186:7
**detail** [7] - 7:10, 9:11, 16:13, 61:20, 94:24, 242:22, 243:14
**details** [7] - 11:22, 13:25, 15:25, 33:23, 147:13, 172:2, 239:9
**deteriorated** [1] - 68:3
**determine** [3] - 23:2, 131:6, 196:2

**determined** [2] - 100:11, 132:2
**determines** [1] - 129:1
**develop** [1] - 29:19
**development** [2] - 38:4, 139:23
**developmental** [1] - 53:1
**Devin** [2] - 28:2, 151:9
**Devinder** [7] - 75:19, 77:2, 77:3, 126:12, 185:3, 205:19, 208:7
**diagram** [1] - 120:2
**dialogue** [1] - 165:15
**diaper** [2] - 39:15, 45:6
**die** [8] - 47:14, 53:20, 54:5, 54:8, 106:15, 107:2, 107:4, 123:1
**died** [1] - 60:9
**difference** [4] - 13:1, 13:5, 21:3, 187:20
**different** [16] - 36:15, 36:16, 62:21, 103:18, 111:12, 122:19, 141:18, 160:24, 165:14, 168:9, 168:10, 169:20, 170:3, 192:21, 211:18, 244:18
**difficult** [3] - 38:19, 69:10, 150:19
**diligence** [1] - 25:18
**dining** [2] - 50:24, 50:25
**dinner** [3] - 34:12, 34:13, 44:24
**diplegia** [1] - 96:12
**DIRECT** [2] - 29:7, 202:23
**direct** [2] - 156:15, 169:16
**Direct** [2] - 3:11, 3:17
**directly** [2] - 10:18, 24:7
**director** [1] - 43:24
**disabilities** [4] - 7:11, 39:4, 43:2, 139:24
**disability** [3] - 177:11, 177:18, 231:7
**disabled** [5] - 25:11, 109:5, 218:2, 218:16, 231:13
**disagree** [2] - 114:19, 242:16
**disagrees** [1] - 7:12
**disappear** [1] - 158:15
**disappointed** [1] - 92:3
**disclose** [1] - 244:20
**disclosing** [1] - 244:24
**discourage** [1] - 25:6
**discover** [2] - 100:21, 100:22
**discovered** [5] - 9:9, 38:5, 40:11, 42:5, 43:25
**discovery** [8] - 13:13, 87:5, 147:23, 148:2, 148:5, 148:6, 148:7, 148:23
**discriminate** [5] - 20:4, 23:3, 26:22, 27:16, 124:11
**discriminated** [8] - 23:16, 23:24, 175:24, 177:6, 177:10, 177:17, 193:17

**discrimination** [33] - 16:22, 17:2, 23:21, 24:14, 24:19, 24:24, 100:14, 100:20, 101:13, 137:20, 138:2, 147:25, 148:8, 150:3, 174:25, 176:15, 176:18, 178:5, 178:14, 180:18, 189:20, 190:25, 191:9, 191:17, 193:15, 194:2, 194:15, 197:17, 198:1, 198:5, 198:12, 198:16, 201:20
**discriminatory** [2] - 166:25, 195:20
**discuss** [3] - 17:20, 187:14, 241:21
**discussed** [6] - 48:6, 173:22, 185:22, 207:10, 207:11, 231:10
**discussion** [2] - 28:23, 230:14
**discussions** [1] - 219:3
**dismissive** [1] - 92:14
**disorder** [1] - 44:1
**disorders** [2] - 42:13, 42:16
**dispute** [4] - 11:1, 172:1, 172:2, 172:4
**disputed** [1] - 12:22
**disputes** [1] - 147:7
**distinguish** [1] - 243:21
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 179:19, 179:23
**district** [1] - 5:5
**disturb** [1] - 81:2
**divide** [1] - 87:20
**DIVISION** [1] - 1:2
**doctor** [7] - 15:8, 35:3, 36:21, 62:25, 77:4, 94:15, 94:16
**doctors** [6] - 7:24, 35:12, 35:13, 36:4, 48:7, 109:14
**doctrine** [1] - 135:23
**document** [21] - 59:2, 59:4, 117:20, 130:17, 148:11, 148:22, 149:8, 169:21, 170:16, 170:20, 171:3, 179:5, 179:9, 180:16, 180:22, 181:3, 184:17, 187:5, 214:3, 234:14, 234:22
**documentary** [1] - 101:1
**documented** [1] - 127:8
**documents** [14] - 98:4, 101:1, 101:11, 148:9, 148:15, 148:19, 148:24, 149:3, 149:4, 150:14, 169:25, 213:21, 213:24, 214:2
**dog** [1] - 82:4
**dollar** [5] - 168:20, 187:20, 239:22, 240:21, 243:16
**dollars** [7] - 11:10, 12:11, 12:21, 79:20, 208:24, 229:17, 232:21
**done** [26] - 5:18, 5:20, 5:21,

19:7, 21:13, 47:2, 57:22, 61:21, 61:22, 63:1, 71:21, 92:19, 95:4, 107:16, 109:1, 110:17, 132:21, 145:9, 145:24, 152:5, 164:22, 174:22, 185:18, 202:7, 246:16
**door** [21] - 9:5, 9:16, 15:13, 27:10, 52:4, 55:10, 56:4, 56:21, 73:6, 93:23, 99:12, 106:14, 108:5, 110:15, 111:1, 115:10, 122:2, 161:22, 203:18, 216:15, 216:22
**doors** [1] - 73:22
**doorway** [1] - 50:14
**dork** [1] - 31:13
**doubt** [1] - 119:1
**down** [63] - 13:22, 17:21, 19:3, 19:24, 22:19, 47:15, 48:25, 49:19, 49:24, 50:5, 51:24, 52:24, 53:14, 56:2, 56:12, 59:17, 60:5, 63:21, 64:13, 70:18, 76:13, 86:4, 87:8, 98:21, 99:1, 102:3, 104:12, 104:19, 105:14, 108:6, 118:10, 121:1, 134:5, 152:17, 152:19, 153:3, 161:19, 177:16, 179:7, 179:21, 190:19, 199:9, 209:9, 213:21, 224:19, 235:12, 236:24, 237:1, 237:2, 237:6, 237:9, 237:10, 239:18, 239:25, 240:9, 240:10, 240:14, 240:19, 240:25, 241:24, 242:8, 242:12
**downs** [5] - 48:22, 48:24, 49:7, 49:12, 49:14
**downstairs** [1] - 5:19
**downtown** [2] - 101:24, 102:4
**Dr** [61] - 12:7, 12:9, 12:20, 13:1, 15:3, 15:7, 15:10, 15:16, 15:18, 15:25, 19:5, 19:8, 26:14, 36:14, 85:23, 92:18, 93:17, 94:7, 97:17, 97:21, 98:10, 101:10, 139:12, 162:9, 171:14, 171:17, 171:24, 172:7, 173:22, 174:2, 174:19, 178:7, 190:20, 194:8, 194:10, 197:14, 197:16, 197:24, 198:12, 198:14, 205:19, 205:20, 205:25, 208:20, 209:6, 209:10, 209:17, 210:21, 212:8, 212:19, 212:20, 214:23, 215:1, 215:22, 230:22, 234:8, 234:15, 235:13, 236:1
**draft** [2] - 20:3, 132:6
**drafts** [2] - 182:5, 189:12
**dramatically** [1] - 224:11
**dress** [2] - 39:10, 106:1

**drilling** [2] - 21:10, 32:25
**drive** [2] - 56:2, 104:4
**Drive** [1] - 2:8
**driveway** [1] - 103:20
**driveways** [1] - 104:7
**drop** [2] - 90:8, 90:11
**drove** [1] - 34:18
**drug** [2] - 102:22, 102:24
**duct** [1] - 36:21
**due** [1] - 25:18
**during** [30] - 31:23, 35:23, 37:5, 37:16, 38:10, 44:9, 45:9, 45:17, 51:9, 57:21, 65:7, 65:14, 65:16, 65:18, 75:23, 77:8, 77:12, 101:5, 101:20, 107:9, 130:2, 132:21, 146:22, 149:11, 150:7, 187:15, 196:5, 210:25, 217:19, 233:18
**dwelled** [1] - 157:14
**dwelling** [6] - 157:23, 158:3, 158:19, 158:20, 159:4, 161:22

### E

**e-mail** [23] - 24:9, 67:17, 67:24, 69:21, 70:11, 70:14, 70:16, 71:20, 71:21, 72:15, 72:21, 82:14, 139:5, 144:4, 144:6, 146:3, 148:11, 148:17, 181:21, 181:23, 182:11, 206:12, 206:13
**e-mailed** [1] - 10:7
**e-mails** [12] - 76:18, 116:24, 123:10, 123:13, 123:14, 124:6, 124:8, 140:17, 206:17, 207:15, 207:17, 217:5
**early** [9] - 8:13, 8:15, 45:9, 62:10, 63:15, 66:1, 102:17, 123:9, 196:19
**earn** [3] - 14:15, 14:16
**earned** [11] - 75:21, 129:18, 130:1, 130:14, 130:19, 131:9, 184:9, 184:11, 185:12, 186:22
**earnest** [8] - 19:2, 9:10, 19:23, 117:2, 118:6, 118:11, 133:16, 134:2
**easement** [1] - 153:13
**easier** [1] - 150:19
**easily** [1] - 176:25
**East** [2] - 34:16, 46:22
**eat** [1] - 83:22
**eating** [3] - 40:1, 40:9, 102:5
**economic** [2] - 145:4, 145:7, 145:25
**economics** [1] - 108:3
**education** [1] - 29:23
**effect** [4] - 12:12, 13:11, 92:3, 244:7

**effort** [2] - 25:15, 106:8
**efforts** [2] - 123:7, 207:16
**eight** [12] - 12:10, 12:20, 26:3, 40:5, 40:7, 109:9, 156:7, 196:20, 197:1, 197:2
**eight-foot** [1] - 196:20
**either** [19] - 6:7, 31:12, 34:10, 45:6, 60:20, 84:19, 95:12, 97:24, 98:5, 98:19, 99:1, 107:14, 123:24, 124:9, 127:16, 164:20, 169:19, 208:22, 209:20
**elaborate** [2] - 53:24, 54:11
**elapsed** [1] - 101:10
**elderly** [1] - 47:2
**elevator** [20] - 13:21, 52:13, 52:14, 52:17, 52:19, 52:20, 52:22, 52:24, 53:2, 53:4, 53:5, 53:7, 53:8, 53:9, 53:10, 73:15, 141:6, 219:7, 225:9
**elevators** [4] - 52:23, 225:7
**Ellen** [1] - 183:13
**elsewhere** [1] - 147:18
**emergency** [1] - 34:19
**Emilio** [1] - 2:4
**emotionally** [1] - 92:4
**employed** [2] - 203:2, 203:3
**employees** [2] - 94:1, 171:19
**employer** [1] - 12:7
**empty** [1] - 155:22
**enable** [1] - 40:16
**encountered** [1] - 41:10
**encouraged** [4] - 25:5, 150:12, 151:2, 165:7
**end** [23] - 23:1, 48:2, 56:2, 60:19, 62:22, 63:25, 64:25, 68:13, 90:6, 97:9, 97:11, 107:17, 210:5, 244:3
**ended** [2] - 12:21, 88:5
**ends** [5] - 57:7, 70:7, 106:3, 139:7, 139:9
**endurance** [1] - 39:19
**enforceable** [1] - 27:2
**engineer** [2] - 72:2, 207:7
**engineering** [2] - 203:8, 207:4
**engineers** [2] - 18:23, 124:1
**English** [1] - 130:12
**enjoyed** [1] - 204:21
**enrichment** [3] - 110:13, 137:14, 180:10
**enter** [2] - 58:19, 139:8
**entered** [4] - 27:1, 134:9, 169:17, 171:13
**entire** [3] - 37:5, 42:25, 64:16
**entirely** [2] - 18:19, 206:5
**entitled** [6] - 106:20, 110:20, 111:17, 244:17, 244:18, 244:25, 245:18, 247:7
**entrance** [2] - 56:1, 58:20

**entry** [2] - 100:9, 133:2
**environment** [11] - 40:16, 46:2, 47:12, 47:24, 54:1, 54:8, 54:21, 106:12, 106:13, 107:1, 109:14
**equal** [4] - 71:17, 125:1, 156:11, 201:13
**equally** [1] - 156:11
**equipment** [2] - 65:20, 65:21
**Erb's** [1] - 44:1
**erected** [2] - 64:14, 64:16
**escalator** [1] - 102:3
**especially** [1] - 244:16
**essence** [2] - 69:2, 69:3
**essentially** [1] - 126:6
**establish** [3] - 107:3, 115:2, 157:14
**established** [1] - 107:1
**establishment** [2] - 137:6, 180:7
**estate** [7] - 63:2, 88:14, 88:15, 168:1, 169:5, 169:13, 169:21
**et** [2] - 69:10, 212:11
**evaluate** [1] - 62:22
**evaluation** [1] - 62:23
**evening** [3] - 19:15, 93:21, 171:16
**evenings** [1] - 157:15
**event** [5] - 57:15, 68:8, 81:12, 108:25, 177:20
**events** [3] - 17:20, 19:14, 38:10
**eventually** [3] - 45:1, 60:8, 121:3
**evidence** [39] - 6:1, 8:5, 9:21, 11:23, 13:25, 14:4, 14:8, 14:20, 14:24, 16:3, 16:9, 16:14, 16:16, 22:10, 22:14, 23:3, 23:6, 23:15, 23:23, 23:25, 25:4, 25:8, 25:24, 26:6, 26:15, 26:21, 27:18, 28:9, 110:12, 110:14, 110:24, 111:16, 111:17, 112:20, 180:23, 186:10, 186:11, 187:17, 192:16
**Evidence** [1] - 6:10
**evidenced** [1] - 166:24
**evidences** [2] - 12:22, 117:20
**evident** [1] - 168:11
**exact** [1] - 172:14
**exactly** [6] - 22:9, 50:2, 71:25, 126:20, 165:17, 246:11
**Examination** [10] - 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 3:17
**examination** [5] - 111:18, 131:24, 156:15, 169:16, 186:6
**EXAMINATION** [10] - 29:7, 113:15, 138:9, 151:7,

**183:21, 195:1, 196:16, 198:9, 198:22, 202:23
**examine** [1] - 149:3
**examines** [2] - 215:18, 215:20
**examining** [4] - 131:21, 147:4, 147:5, 164:22
**example** [5] - 49:16, 54:24, 59:20, 84:10, 224:19
**exams** [1] - 30:23
**exceed** [1] - 212:21
**exceeded** [1] - 187:19
**except** [7] - 7:16, 27:21, 195:25, 202:16, 203:11, 245:6
**exception** [6] - 126:8, 135:24, 184:22, 185:14, 185:16, 186:19
**exceptional** [1] - 40:19
**exceptionally** [2] - 78:19, 104:1
**exchange** [11] - 38:20, 59:7, 67:7, 67:17, 71:20, 76:18, 83:8, 123:9, 207:15, 207:16, 217:5
**exchanges** [1] - 123:12
**excited** [6] - 96:23, 174:5, 174:7, 174:10, 174:12, 174:13
**exclude** [10] - 71:9, 72:9, 74:15, 140:10, 144:9, 144:13, 144:24, 145:13, 226:11
**excluded** [13] - 10:16, 24:1, 71:9, 72:23, 75:23, 75:25, 76:4, 76:5, 140:13, 140:15, 187:15, 188:2
**excludes** [1] - 150:13
**excluding** [4] - 151:4, 208:7, 212:11, 236:2
**exclusion** [8] - 70:22, 74:24, 144:21, 199:2, 207:17, 207:21, 208:1, 217:13
**exclusions** [4] - 75:18, 77:1, 126:11, 185:2
**exclusive** [1] - 55:25
**excuse** [15] - 11:2, 14:5, 30:5, 105:2, 131:14, 140:11, 157:24, 169:23, 185:19, 189:24, 201:14, 211:22, 221:16, 231:11, 236:24
**Excuse** [1] - 237:8
**excuses** [1] - 17:2
**executive** [1] - 43:24
**exemplary** [1] - 108:18
**exempt** [2] - 125:8, 125:10
**exempted** [1] - 18:12
**exemption** [4] - 18:18, 125:23, 126:3, 127:14
**exercise** [1] - 87:9
**exercises** [2] - 104:11, 161:20
**Exhibit** [15] - 67:9, 67:10,

67:14, 75:5, 103:12, 117:16, 132:24, 134:8, 144:6, 160:6, 178:16, 207:20, 207:21, 234:25, 235:1

**exhibit** [5] - 67:12, 74:22, 75:2, 75:3, 234:24

**existed** [1] - 41:9

**existence** [1] - 105:25

**existing** [1] - 122:15

**expanded** [1] - 108:8

**expect** [3] - 47:6, 48:9, 89:9

**expectations** [2] - 62:6, 213:2

**expected** [1] - 240:6

**expecting** [2] - 70:23, 187:11

**expects** [1] - 70:4

**expense** [1] - 127:6

**expenses** [2] - 212:23, 212:25

**experiences** [1] - 41:11

**expert** [5] - 88:14, 135:18, 167:21, 170:23, 195:11

**expires** [1] - 127:18

**explain** [3] - 87:9, 131:10, 131:15

**explained** [2] - 96:12, 165:1

**explaining** [1] - 52:10

**explore** [2] - 95:4, 110:20

**exploring** [1] - 99:8

**express** [2] - 174:10, 242:16

**expressed** [1] - 174:19

**expresses** [1] - 55:4

**expressing** [3] - 145:10, 145:13, 145:15

**extend** [1] - 19:1

**extended** [2] - 37:15, 51:23

**extension** [6] - 64:20, 65:4, 74:1, 74:4, 122:15, 158:6

**extent** [4] - 22:16, 70:4, 244:10, 244:11

**extra** [6] - 64:24, 65:2, 79:3, 80:19, 107:10, 180:25

**extraordinary** [1] - 61:20

**extreme** [1] - 34:6

**extremely** [3] - 7:23, 34:6, 92:2

**eyes** [2] - 16:11, 139:18

# F

**face** [2] - 123:20

**face-to-face** [1] - 123:20

**faces** [1] - 105:12

**facilities** [4] - 64:24, 65:2, 102:5

**facility** [6] - 24:23, 121:5, 121:15, 121:16, 218:21, 219:1

**fact** [21] - 8:1, 16:9, 24:10, 39:20, 39:25, 53:6, 57:18, 63:19, 89:8, 107:25, 109:19,

112:2, 115:17, 117:16, 119:13, 123:12, 134:19, 183:6, 205:1, 207:3, 245:16

**facto** [4] - 143:10, 143:15, 143:22, 143:25

**factors** [1] - 103:23

**fail** [1] - 32:8

**fair** [12] - 29:16, 31:14, 109:10, 205:9, 206:17, 217:12, 225:20, 228:4, 228:23, 228:25, 229:11, 232:19

**Fair** [4] - 4:12, 4:14, 15:6, 243:12

**fairly** [1] - 50:14

**fall** [2] - 38:3, 44:4

**fallback** [2] - 246:22

**falls** [1] - 7:18

**false** [4] - 216:13, 220:19, 241:5, 241:9

**familiar** [4] - 60:6, 101:24, 112:15, 147:8

**families** [2] - 8:23, 46:22

**family** [33] - 6:21, 14:23, 14:25, 15:1, 15:25, 34:15, 46:22, 46:23, 47:8, 47:15, 51:17, 51:23, 54:1, 54:2, 54:3, 75:19, 77:8, 81:9, 107:23, 126:12, 185:6, 205:7, 227:11, 227:17, 227:19, 227:21, 228:5, 228:16, 228:18, 228:21, 229:1, 229:14, 234:4

**famous** [1] - 17:25

**fantastic** [1] - 107:19

**far** [6] - 16:20, 104:12, 107:21, 111:17, 161:21, 245:23

**fashioned** [1] - 82:21

**fast** [1] - 144:8

**father** [1] - 6:25

**favor** [2] - 88:18, 145:17

**FEBRUARY** [1] - 1:6

**fed** [4] - 36:17, 37:12, 40:2, 40:3

**federal** [8] - 15:6, 186:9, 192:19, 192:22, 242:12, 243:12, 244:22

**fee** [35] - 10:17, 10:21, 10:24, 11:4, 12:15, 12:23, 12:25, 68:6, 70:4, 70:6, 71:2, 75:21, 76:1, 128:3, 129:6, 129:16, 129:18, 130:1, 130:14, 130:20, 131:8, 184:8, 184:10, 185:12, 185:18, 186:22, 186:25, 188:4, 208:8, 208:18, 208:21, 209:12, 211:19, 236:3

**feed** [3] - 7:18, 39:12, 51:19

**fees** [6] - 4:5, 4:12, 4:14, 137:14, 180:11, 212:11

**feet** [2] - 43:22, 53:21, 78:15, 78:25, 108:7, 120:15,

120:21, 122:2, 154:13, 154:18, 154:19, 154:23, 155:4, 156:7, 160:14, 161:4, 161:8, 161:23, 197:1, 197:2

**fellow** [2] - 15:14, 223:15

**felt** [8] - 20:12, 20:15, 95:3, 99:22, 211:8, 224:4, 229:24, 233:8

**fence** [5] - 64:15, 154:5, 154:6, 156:1, 156:2

**fertilization** [1] - 33:21

**fetal** [2] - 42:1, 62:16

**few** [7] - 7:17, 15:12, 36:8, 41:13, 52:20, 93:20, 94:21, 94:22, 115:2, 200:4, 218:5, 226:11

**FHA** [1] - 201:20

**Fifth** [4] - 201:2, 201:14, 201:19, 243:21

**fighter** [1] - 39:20

**figure** [4] - 77:17, 212:3, 242:6

**figured** [1] - 86:4

**figures** [1] - 244:8

**file** [7] - 22:21, 136:17, 137:24, 183:13, 197:22, 198:4, 198:12

**filed** [25] - 22:9, 24:11, 65:17, 99:17, 99:25, 100:1, 110:17, 110:18, 125:14, 136:21, 136:23, 137:2, 138:2, 176:19, 178:4, 178:8, 178:13, 179:9, 180:2, 180:3, 180:17, 194:14, 198:15, 214:18, 242:20

**filing** [2] - 175:3, 197:17

**fill** [3] - 37:7, 200:4, 242:3

**finalizing** [1] - 69:14

**finally** [5] - 33:19, 62:5, 62:12, 91:17, 100:11

**finance** [1] - 43:12

**financial** [2] - 15:23, 245:14

**financially** [3] - 210:21, 211:9, 211:13

**financing** [2] - 85:3, 235:25, 236:2

**Fine** [1] - 55:19

**fine** [7] - 50:6, 80:14, 94:22, 118:23, 203:15, 244:15, 245:12

**finish** [2] - 233:2, 241:12

**finished** [3] - 30:19, 30:22, 154:16

**finishing** [2] - 4:10, 205:4

**Firm** [1] - 2:7

**firm** [6] - 31:22, 31:24, 32:3, 113:3, 132:11, 132:13

**firms** [1] - 23:22

**first** [72] - 8:14, 11:8, 18:20, 26:16, 27:15, 28:4, 29:1, 31:23, 32:1, 35:6, 40:1, 43:6, 49:8, 51:3, 55:8, 62:5, 64:12, 68:15, 69:17, 86:7, 89:7, 100:6, 100:13, 101:25,

104:20, 104:22, 115:9, 116:4, 121:8, 121:9, 122:9, 125:7, 148:11, 150:2, 150:9, 162:14, 162:16, 174:25, 175:10, 175:12, 175:23, 176:14, 176:17, 176:18, 176:22, 177:6, 177:10, 177:17, 177:23, 178:1, 178:5, 188:14, 189:19, 189:23, 190:16, 191:16, 191:20, 192:3, 192:5, 204:22, 205:1, 205:3, 205:15, 205:17, 207:15, 234:7, 234:10, 234:19, 234:20, 241:24, 242:4

**fit** [1] - 73:21

**five** [20] - 5:9, 12:11, 12:20, 26:4, 26:11, 32:12, 35:22, 37:20, 40:3, 41:25, 53:22, 54:11, 60:20, 60:22, 101:17, 146:19, 177:20, 229:16, 241:20, 241:21

**five-minute** [2] - 60:20, 241:21

**flat** [7] - 236:24, 239:18, 239:25, 240:9, 240:14, 240:19, 240:25

**flexible** [1] - 68:7

**flip** [3] - 50:21, 98:23, 98:24

**flips** [1] - 98:21

**floor** [11] - 49:6, 49:7, 52:3, 62:16, 63:13, 101:25, 122:10, 122:17, 154:15, 161:19, 161:20

**Floor** [1] - 1:24

**floors** [2] - 59:20, 63:14

**flu** [1] - 81:23

**focus** [2] - 43:1, 129:17

**focused** [2] - 43:6, 54:9

**FOGLER** [27] - 4:1, 4:4, 4:7, 17:9, 17:12, 17:17, 22:8, 22:18, 22:20, 110:3, 110:10, 113:10, 113:14, 126:18, 131:17, 131:21, 138:4, 185:19, 187:24, 191:25, 194:23, 196:15, 200:24, 201:2, 201:7, 216:15, 221:10

**Fogler** [23] - 2:1, 3:6, 3:11, 3:13, 29:23, 57:18, 69:22, 113:16, 113:17, 113:20, 126:19, 129:22, 131:25, 135:14, 136:12, 175:22, 183:24, 184:6, 184:20, 195:2, 195:19, 200:16, 215:17

**Fogler's** [4] - 184:5, 184:18, 186:24, 198:24

**folks** [5] - 102:18, 144:19, 242:10, 245:13, 246:15

**follow** [3] - 83:12, 91:19, 139:10

**follow-up** [1] - 139:10

**followed** [3] - 72:11, 145:24, 230:13

**following** [4] - 128:13, 130:2, 193:14, 226:4
**food** [3] - 39:11, 39:13, 40:4
**foot** [2] - 36:6, 196:20
**footage** [2] - 78:19, 120:14
**FOR** [1] - 1:1
**forbid** [1] - 22:13
**force** [2] - 167:5, 167:9
**foregoing** [1] - 247:5
**foremost** [1] - 104:22
**forgive** [1] - 230:4
**fork** [3] - 39:11, 39:12, 39:13
**form** [6] - 133:16, 146:25, 167:12, 187:4, 195:17, 196:13
**forma** [1] - 118:9
**forth** [2] - 99:24, 105:13
**fortunate** [5] - 30:10, 37:19, 54:13, 109:11, 204:18
**forward** [6] - 32:5, 53:11, 72:23, 76:7, 199:13, 244:24
**four** [12] - 5:16, 48:24, 51:8, 61:14, 61:17, 99:17, 119:7, 123:16, 168:25, 170:20, 198:25, 204:23
**foyer** [1] - 50:18
**frame** [7] - 76:5, 79:7, 138:15, 139:13, 165:11, 165:14, 190:5
**frankly** [5] - 40:20, 62:9, 62:16, 71:24, 109:15
**frauds** [2] - 169:9, 169:10
**free** [9] - 20:17, 110:23, 111:2, 112:21, 115:12, 152:7, 199:24, 200:2, 200:5
**French** [2] - 40:8, 41:1
**Friday** [3] - 93:21, 135:4, 171:16
**friend** [3] - 14:13, 231:3, 231:4
**friendly** [2] - 94:14, 120:21
**friends** [8] - 46:24, 54:3, 69:9, 69:25, 77:6, 77:7, 93:15, 145:18
**front** [12] - 46:13, 50:1, 50:17, 52:7, 101:6, 103:16, 103:19, 104:4, 104:6, 120:3, 196:25
**fry** [2] - 40:8, 41:1
**full** [8] - 26:3, 26:19, 27:22, 29:9, 37:22, 68:17, 122:11, 202:25
**full-price** [1] - 26:3
**full-time** [2] - 37:22, 68:17
**fully** [2] - 37:2, 155:5
**function** [1] - 62:15
**functional** [1] - 219:14
**functionally** [1] - 107:2
**functions** [4] - 7:14, 38:17, 39:16, 146:20
**fund** [1] - 63:3
**funded** [1] - 42:19
**funding** [2] - 43:18, 236:2

**funds** [1] - 244:10
**furnished** [1] - 59:12
**future** [6] - 16:1, 45:22, 142:16, 149:5, 158:4, 159:4
**fuzzy** [1] - 126:2

## G

**Gage** [1] - 2:4
**gain** [1] - 191:8
**games** [1] - 182:22
**gang** [1] - 65:16
**garden** [1] - 49:16
**gardens** [2] - 53:24, 54:12
**gate** [8] - 53:2, 53:3, 103:19, 156:8, 156:10, 196:25, 197:3, 197:4
**gated** [1] - 56:6
**gates** [6] - 52:23, 58:1, 58:5, 66:6, 73:6, 206:5
**gatherings** [1] - 25:25
**gene** [1] - 43:25
**general** [5] - 45:25, 244:5, 244:15, 245:1, 245:18
**generalization** [1] - 245:12
**generally** [4] - 6:6, 170:19, 192:15, 226:8
**gentleman** [2] - 203:22, 246:14
**gentlemen** [13] - 5:1, 6:19, 7:3, 12:22, 14:25, 16:8, 16:12, 17:1, 23:11, 28:8, 60:18, 131:22, 241:15
**George** [1] - 1:23
**GIBSON** [4] - 4:10, 67:11, 75:3, 183:5
**Gibson** [1] - 1:23
**given** [13] - 21:14, 46:2, 93:1, 158:21, 163:12, 163:15, 179:17, 210:23, 211:21, 243:24, 244:13, 244:25, 245:17
**glad** [2] - 176:2, 202:21
**gladly** [1] - 16:18
**goal** [5] - 38:17, 40:14, 51:9, 51:10, 51:13
**gothic** [1] - 102:2
**government** [1] - 5:8
**grabbed** [1] - 40:8
**graciousness** [2] - 68:2, 206:22
**graduated** [3] - 30:22, 31:4, 32:7
**graduation** [1] - 32:3
**grandmother** [1] - 47:8
**granted** [1] - 22:3
**grapevine** [2] - 67:25, 68:16
**gray** [1] - 177:2
**great** [8] - 7:10, 8:5, 39:25, 73:1, 73:24, 78:20, 94:1, 207:6
**greater** [2] - 16:13, 66:4

**greenhouse** [11] - 121:22, 122:1, 154:21, 154:25, 155:7, 158:18, 159:11, 160:23, 161:2, 161:4, 161:9
**ground** [2] - 115:3, 182:25
**grounds** [1] - 53:23
**groundskeeper** [1] - 65:15
**group** [2] - 25:19, 65:20
**grow** [1] - 62:9
**growing** [1] - 47:6
**guess** [4] - 39:21, 83:2, 108:18, 238:19
**guilty** [2] - 103:2, 103:3, 103:5
**guy** [2] - 15:8, 105:10, 202:16
**Guy** [3] - 2:7, 26:13, 112:25
**guys** [2] - 11:6, 65:16, 120:10
**gym** [1] - 155:8

## H

**H-08-CV-1933** [1] - 1:6
**habit** [1] - 210:10
**hairs** [1] - 191:21
**half** [14] - 11:9, 37:3, 51:8, 61:14, 61:17, 61:24, 79:20, 119:8, 199:17, 202:18, 204:23, 205:22, 232:21
**Halloween** [7] - 57:5, 57:7, 68:10, 68:11, 77:8
**halls** [1] - 141:6
**hallway** [2] - 50:9, 51:1
**hallways** [6] - 13:20, 73:16, 219:4, 219:5, 225:6, 225:8
**hand** [10] - 29:3, 53:2, 103:16, 163:6, 166:5, 166:6, 180:24, 200:12, 209:3, 209:4
**handicap** [5] - 177:11, 177:18, 224:8, 225:21, 227:10
**handicapped** [26] - 7:1, 10:3, 14:12, 14:22, 24:22, 47:20, 49:9, 53:13, 53:16, 53:18, 73:14, 81:5, 95:14, 120:16, 120:21, 155:5, 201:16, 219:12, 219:17, 221:1, 224:2, 224:14, 224:16, 225:4, 230:6, 230:11
**handicapped-accessible** [20] - 7:1, 10:3, 14:12, 14:22, 49:9, 53:13, 53:16, 53:18, 73:14, 81:5, 95:14, 120:16, 219:17, 221:1, 224:2, 224:14, 224:16, 225:4, 230:6, 230:11
**handicapped-friendly** [1] - 120:21
**handled** [1] - 104:25
**hands** [1] - 4:18
**handwriting** [2] - 126:5, 170:4, 170:5

**handwritten** [2] - 126:17, 126:18
**hang** [1] - 110:7
**happy** [3] - 66:24, 80:22, 96:16
**hard** [14] - 25:13, 31:15, 54:16, 75:24, 126:24, 127:3, 170:2, 187:16, 187:18, 187:19, 212:11, 212:17, 228:8, 244:2
**hard-cost** [1] - 212:11
**harming** [1] - 13:17
**Harris** [4] - 22:21, 136:23, 179:20, 179:24
**Harry** [1] - 119:16, 119:18
**Harvard** [5] - 21:9, 31:19, 31:21, 168:25
**hauled** [1] - 244:21
**Haven** [2] - 32:20, 32:21
**having..** [1] - 174:14
**Haynes** [1] - 1:18
**head** [6] - 36:6, 41:23, 62:25, 105:12, 143:5, 217:9
**health** [4] - 14:3, 151:19, 151:21, 160:9
**hear** [23] - 8:4, 14:24, 17:1, 17:2, 18:1, 18:6, 20:6, 24:25, 66:15, 81:13, 89:12, 91:10, 91:19, 116:4, 131:23, 135:11, 152:21, 182:16, 182:21, 186:15, 197:24, 226:14, 234:12
**heard** [37] - 9:15, 10:4, 17:19, 18:11, 19:14, 29:13, 57:18, 61:16, 66:17, 67:25, 68:20, 69:21, 72:15, 72:19, 86:11, 89:7, 116:2, 116:3, 132:8, 132:9, 168:8, 168:24, 186:13, 186:14, 202:15, 204:10, 206:2, 216:12, 217:5, 217:19, 217:22, 217:24, 219:20, 234:7, 242:19, 243:18
**hearing** [1] - 178:7
**hearings** [1] - 22:17
**hears** [1] - 150:18
**hearsay** [8] - 79:14, 181:3, 182:8, 182:15, 182:17, 191:25, 193:20
**heart** [8] - 15:22, 23:18, 36:9, 36:10, 36:22, 37:11, 43:23, 82:19
**heavy** [2] - 65:20, 102:24
**height** [1] - 156:11
**hello** [1] - 69:17
**help** [5] - 23:22, 42:4, 42:24, 144:5, 174:23
**helping** [1] - 106:1
**helps** [1] - 96:16
**hereby** [1] - 179:17
**Heritage** [36] - 2:5, 12:5, 12:7, 14:15, 18:17, 23:12, 23:14, 24:2, 26:7, 75:14, 125:16, 138:8, 140:3,

140:13, 140:19, 140:25, 141:4, 141:9, 141:11, 141:22, 166:21, 193:13, 193:16, 208:5, 208:21, 209:23, 212:17, 213:12, 213:13, 213:17, 213:25, 214:7, 215:5, 217:14, 226:12, 241:25

**HERITAGE** [1] - 1:7
**herself** [8] - 7:19, 39:10, 39:12, 45:8, 55:4, 63:13
**hide** [1] - 8:24
**high** [4] - 35:16, 87:17, 156:6, 156:10
**higher** [3] - 39:1, 90:17, 197:1
**highest** [5] - 15:23, 25:15, 115:17, 115:22, 124:25
**highest-valued** [1] - 25:15
**highlight** [1] - 75:5
**highlighting** [1] - 242:21
**himself** [4] - 17:19, 24:1, 24:2, 174:7
**hire** [1] - 33:10
**hired** [4] - 12:4, 21:25, 23:21, 136:13
**historic** [1] - 17:24
**historical** [3] - 25:22, 51:14, 148:13
**history** [2] - 18:5, 19:6
**hit** [1] - 6:10
**HITTNER** [1] - 1:13
**hold** [10] - 6:6, 53:8, 134:7, 148:4, 149:1, 169:11, 177:12, 187:6, 228:10, 233:11
**Hold** [1] - 211:25
**home** [63] - 7:21, 7:22, 8:2, 8:18, 10:7, 10:21, 14:3, 14:6, 16:1, 17:14, 17:18, 17:23, 24:20, 25:23, 26:1, 28:15, 37:6, 37:10, 46:4, 46:6, 54:10, 54:19, 55:2, 58:7, 61:11, 61:12, 62:6, 66:21, 78:18, 78:19, 93:22, 106:15, 107:19, 107:22, 107:23, 114:4, 121:10, 121:16, 121:19, 122:12, 135:21, 136:5, 138:16, 140:21, 141:6, 141:24, 142:3, 142:12, 150:12, 151:2, 155:8, 158:24, 159:25, 160:4, 171:17, 174:6, 174:11, 174:17, 175:1, 204:21, 220:18, 242:23
**home-schooling** [1] - 122:12
**homeownership** [1] - 28:19
**homes** [1] - 56:25
**HONORABLE** [1] - 1:13
**honorary** [1] - 77:10
**honors** [1] - 31:1
**hope** [8] - 68:8, 69:18, 106:19, 109:21, 109:23,

162:1, 162:3, 212:22
**hoped** [1] - 46:23
**hopes** [1] - 62:7
**hoping** [1] - 206:18
**Hopkins** [1] - 62:20
**Hospital** [4] - 37:21, 38:6, 42:22, 43:4
**hospital** [12] - 7:22, 34:7, 34:8, 34:11, 34:18, 35:9, 35:21, 35:24, 36:9, 37:7, 37:10, 37:19
**hour** [4] - 101:20, 101:22, 199:17, 202:2
**hours** [4] - 7:19, 22:17, 45:2, 133:6
**House** [2] - 31:7, 31:8
**house** [372] - 6:24, 7:1, 8:17, 8:21, 9:15, 9:18, 9:20, 10:2, 10:3, 10:9, 10:13, 10:15, 10:19, 10:23, 11:6, 12:5, 12:8, 12:10, 13:17, 13:19, 14:12, 14:22, 15:9, 15:13, 15:18, 15:20, 16:1, 16:4, 16:5, 16:6, 16:11, 16:19, 17:13, 17:21, 17:23, 17:24, 18:3, 18:4, 18:5, 18:7, 18:14, 18:21, 18:22, 18:23, 19:5, 19:6, 19:7, 19:11, 19:21, 20:3, 20:7, 20:8, 20:13, 20:15, 20:16, 20:24, 20:25, 21:12, 21:17, 21:23, 21:24, 23:7, 23:8, 24:16, 26:18, 26:23, 27:2, 27:5, 27:6, 27:13, 27:14, 27:25, 28:3, 28:10, 28:11, 28:13, 29:17, 42:11, 44:7, 45:12, 45:13, 45:14, 45:16, 45:23, 46:8, 46:14, 46:16, 46:19, 46:21, 46:25, 47:5, 47:7, 47:8, 47:10, 48:3, 48:19, 48:20, 48:21, 48:22, 49:2, 49:4, 49:10, 49:24, 49:25, 50:19, 51:1, 51:5, 51:14, 52:6, 52:7, 52:8, 52:13, 52:22, 52:23, 53:12, 53:16, 53:17, 53:20, 54:1, 54:4, 54:5, 56:2, 56:4, 56:18, 57:6, 57:7, 57:12, 57:14, 57:16, 57:17, 57:19, 57:20, 57:21, 57:23, 58:2, 58:7, 58:16, 58:19, 58:22, 58:24, 59:15, 59:22, 59:23, 60:7, 60:9, 60:12, 61:25, 62:13, 63:4, 63:12, 63:15, 63:17, 63:20, 63:21, 63:23, 63:24, 64:13, 64:23, 65:5, 66:13, 66:15, 66:18, 68:1, 68:12, 68:13, 68:22, 69:12, 71:8, 73:2, 73:4, 73:5, 73:10, 73:12, 74:1, 74:4, 74:5, 74:8, 76:6, 76:22, 78:9, 78:10, 78:12, 78:13, 78:14, 78:24, 78:25, 79:1, 79:2, 79:5, 80:16, 81:2, 81:5, 82:1, 89:10, 90:2, 90:16, 92:18, 93:22, 94:20,

95:6, 95:7, 95:8, 95:13, 95:19, 95:25, 96:19, 96:22, 96:24, 97:7, 97:17, 98:21, 98:24, 98:25, 99:5, 99:14, 100:11, 103:16, 103:19, 103:21, 104:6, 104:7, 106:2, 106:15, 106:16, 106:19, 107:8, 108:5, 108:9, 114:7, 114:25, 115:12, 115:25, 116:13, 117:8, 117:13, 118:18, 118:24, 119:1, 119:8, 119:13, 119:19, 119:22, 119:24, 120:3, 120:5, 120:15, 120:21, 120:25, 121:4, 121:14, 121:19, 121:22, 121:23, 121:25, 122:4, 122:7, 122:8, 122:10, 122:14, 122:15, 122:16, 122:19, 123:8, 123:22, 124:16, 125:3, 132:2, 132:7, 141:19, 141:20, 141:22, 143:7, 148:14, 151:12, 155:21, 156:12, 158:7, 158:16, 158:17, 158:18, 159:11, 173:22, 174:16, 187:19, 188:6, 191:10, 197:10, 203:13, 203:24, 204:11, 205:13, 205:15, 205:17, 205:22, 205:25, 206:3, 206:5, 206:10, 208:9, 208:20, 208:22, 214:5, 214:19, 217:3, 217:25, 218:6, 220:24, 221:21, 222:2, 222:15, 223:4, 223:16, 223:20, 224:8, 224:12, 224:19, 225:4, 225:7, 225:21, 225:25, 226:1, 226:9, 226:15, 227:8, 227:10, 228:7, 228:16, 228:17, 228:19, 228:21, 229:2, 229:3, 229:20, 229:23, 230:1, 230:3, 230:6, 230:7, 230:9, 230:11, 230:19, 231:25, 232:8, 232:15, 233:6, 233:14, 233:23, 234:2, 234:5, 235:9, 238:21, 238:24, 239:12
**household** [2] - 44:6, 155:9
**houses** [12] - 48:23, 57:25, 58:1, 78:9, 97:4, 103:22, 103:24, 103:25, 108:6, 158:7, 205:25, 233:25
**Housing** [4] - 4:12, 4:14, 15:6, 243:12
**HOUSTON** [1] - 1:2
**Houston** [22] - 1:19, 1:22, 1:24, 2:3, 2:6, 2:8, 2:11, 23:22, 32:6, 33:1, 33:4, 34:15, 46:24, 47:15, 55:24, 56:8, 56:14, 69:10, 107:22, 204:24, 205:10, 234:3
**HTP** [1] - 76:24
**Huda** [1] - 43:24
**huge** [1] - 5:14

**humor** [1] - 157:4
**hundred** [3] - 12:11, 161:8, 229:17
**hurt** [1] - 90:16
**hypothesis** [1] - 38:9
**hypothetical** [1] - 145:9
**hypothetically** [1] - 128:4

**I**

**I'll...** [1] - 149:24
**icon** [1] - 52:14
**idea** [16] - 23:25, 39:14, 41:9, 43:5, 59:24, 63:11, 64:20, 97:21, 116:6, 119:10, 121:3, 140:5, 140:7, 140:8, 142:15, 142:17
**identical** [1] - 157:25
**identify** [2] - 152:4, 160:6
**III** [1] - 2:9
**immediate** [2] - 85:15, 188:12
**immediately** [8] - 19:24, 34:20, 35:8, 76:8, 85:2, 122:16, 188:7, 237:12
**impeaching** [1] - 176:21
**impeachment** [7] - 173:4, 176:2, 177:1, 191:12, 192:4, 192:20, 223:1
**implication** [1] - 204:5
**implied** [1] - 170:18
**implies** [1] - 110:19
**implying** [1] - 204:7
**importance** [2] - 148:13, 169:4
**important** [11] - 7:10, 9:21, 28:7, 51:3, 59:2, 60:12, 124:17, 124:18, 146:4, 157:13, 171:9
**importantly** [1] - 25:8
**impregnating** [1] - 33:23
**impression** [2] - 110:22, 117:12
**improper** [3] - 191:11, 191:24, 193:20
**improve** [1] - 108:8
**improved** [1] - 46:19
**IN** [1] - 1:1
**incidents** [1] - 66:5
**include** [4] - 25:2, 154:21, 154:25, 184:23
**included** [1] - 140:15
**including** [3] - 96:6, 154:17, 192:12
**incorporate** [1] - 170:17
**increase** [2] - 85:23, 92:9
**incredible** [2] - 34:12, 70:13
**incredibly** [2] - 38:19, 105:24
**increment** [1] - 60:20
**incur** [1] - 127:5
**incurred** [1] - 243:19

**indeed** [3] - 10:12, 27:3, 155:21
**indicate** [5] - 74:10, 92:25, 97:4, 190:12, 211:15
**indicated** [2] - 108:20, 191:9
**indicates** [1] - 185:8
**indicating)** [22] - 36:7, 46:16, 46:20, 49:1, 49:4, 49:20, 50:7, 52:5, 52:9, 52:12, 55:21, 56:1, 56:5, 56:18, 56:20, 58:3, 58:8, 58:14, 58:17, 58:21, 66:2, 103:22
**indication** [1] - 38:21
**indirectly** [1] - 171:18
**individual** [1] - 244:11
**individually** [3] - 130:3, 184:7, 184:12
**individuals** [3] - 244:9, 245:7, 245:24
**Industries** [2] - 32:24, 32:25
**inform** [1] - 77:17
**information** [7] - 100:21, 100:22, 141:9, 141:22, 170:7, 232:4, 244:25
**informed** [1] - 177:18
**infrared** [1] - 45:12
**initial** [6] - 43:18, 67:7, 88:18, 88:20, 112:20, 135:6
**initialed** [4] - 184:25, 185:7, 185:8, 235:21
**initials** [4] - 207:22, 208:1, 208:2, 235:18
**initiated** [3] - 13:13, 67:21, 71:16
**injuring** [1] - 63:13
**inquire** [2] - 205:16, 205:17
**inquiring** [1] - 206:14
**inside** [6] - 34:21, 58:1, 58:5, 59:15, 73:6, 160:3
**insincere** [1] - 74:10
**inspected** [1] - 57:19
**inspection** [9] - 84:18, 85:3, 135:3, 135:4, 189:10, 236:20, 237:22, 237:23
**instances** [1] - 4:17
**instead** [1] - 15:20
**Institute** [1] - 57:14
**institute** [4] - 42:10, 43:1, 43:6, 43:17
**institutes** [3] - 42:22, 42:23, 42:24
**institution** [1] - 8:4
**institutionalization** [2] - 47:22, 54:18
**instruct** [1] - 192:9
**instructed** [5] - 22:20, 112:22, 113:4, 132:6, 198:4
**instruction** [6] - 111:13, 111:14, 111:21, 111:23, 244:5, 244:19
**instructs** [1] - 128:12

**insurance** [1] - 236:3
**integrity** [18] - 13:17, 14:6, 81:2, 196:10, 222:2, 222:14, 223:16, 224:1, 224:12, 227:8, 229:2, 229:4, 229:6, 229:22, 230:1, 230:3, 230:7, 230:9
**intend** [2] - 121:18, 151:23
**intended** [6] - 20:4, 20:11, 23:2, 124:10, 195:14, 221:20
**intends** [1] - 196:3
**intent** [3] - 122:18, 166:25, 195:20
**intention** [1] - 80:24
**intentions** [1] - 166:21
**interest** [13] - 22:22, 41:6, 68:8, 96:20, 103:7, 112:4, 117:21, 137:6, 138:16, 149:9, 149:11, 174:20, 180:8
**interested** [3] - 25:20, 42:18, 68:4, 69:5, 69:14, 71:8, 77:15, 95:8, 96:21, 96:25, 172:11, 238:16, 239:17
**interesting** [1] - 205:22
**interests** [1] - 140:24
**interim** [1] - 9:24
**interior** [4] - 13:17, 229:1, 229:6, 229:20
**internally** [1] - 34:25
**international** [2] - 146:16, 146:23
**Internet** [3] - 26:17, 116:6, 141:13
**interpose** [2] - 131:15, 135:22
**interpret** [2] - 170:9, 171:3
**interpretation** [4] - 130:21, 143:24, 158:21, 185:23
**interrogation** [1] - 200:1
**interrupt** [2] - 37:8, 105:9
**interrupted** [1] - 48:17
**interruption** [2] - 105:17, 222:13
**Intervenors** [2] - 1:11, 2:7
**interview** [1] - 101:6
**intimidated** [1] - 94:10
**introduce** [2] - 113:12, 180:22
**investment** [1] - 59:7
**investments** [2] - 203:4, 203:11
**invited** [3] - 19:18, 94:20, 171:18
**invoke** [1] - 201:9
**involved** [9] - 5:20, 6:24, 14:17, 42:7, 147:9, 191:9, 192:15, 244:9, 245:6
**involvement** [2] - 42:9, 194:10
**involving** [2] - 137:5, 180:7
**IQ** [2] - 68:2, 206:22
**iron** [1] - 197:3
**issue** [26] - 4:1, 4:4, 42:11,

49:8, 53:19, 53:20, 61:10, 66:7, 66:11, 77:16, 89:3, 104:14, 108:21, 129:24, 130:21, 137:22, 153:18, 188:13, 200:25, 208:7, 214:9, 214:24, 216:5, 221:6, 246:5, 246:6
**issues** [13] - 9:12, 38:2, 38:12, 46:7, 48:19, 59:22, 64:17, 65:1, 65:25, 66:10, 207:4, 207:5, 214:22
**it'** [1] - 172:22
**it'll** [1] - 6:25
**Italian** [1] - 36:3
**itself** [5] - 33:25, 40:12, 75:12, 78:8, 234:14

## J

**J.J** [3] - 15:14, 93:25, 94:10
**jack** [1] - 241:8
**Jackson** [2] - 132:11, 132:13
**Jacobs** [1] - 1:23
**January** [10] - 62:3, 75:21, 76:1, 95:19, 100:12, 127:18, 127:24, 128:2, 175:15, 208:20
**Jersey** [2] - 29:22, 46:23
**job** [2] - 30:12, 131:3
**John** [5] - 2:9, 26:13, 31:4, 62:20, 78:2
**join** [4] - 32:23, 121:21, 122:7, 182:8
**joined** [5] - 32:3, 33:1, 33:2, 37:22, 153:15
**jointly** [1] - 30:22
**joke** [1] - 45:4
**joy** [1] - 40:21
**jubilant** [2] - 174:12, 174:13
**judges** [3] - 5:5, 5:10, 242:10
**Judging** [1] - 206:17
**judgment** [2] - 106:13, 244:2
**Judicial** [2] - 179:19, 179:23
**jump** [1] - 186:8
**June** [5] - 138:2, 178:9, 188:3, 194:6, 197:14
**jurors** [1] - 190:12
**JURY** [1] - 1:13
**jury** [64] - 4:5, 4:8, 6:20, 23:11, 30:17, 33:14, 33:19, 33:25, 34:13, 46:8, 48:4, 55:13, 70:15, 75:7, 82:16, 86:11, 87:10, 98:24, 103:14, 105:16, 108:10, 108:17, 109:23, 113:9, 113:19, 114:3, 114:15, 114:24, 116:20, 117:11, 118:23, 119:3, 120:2, 120:20, 126:7, 127:2, 132:6, 135:20, 136:4,

136:22, 138:6, 139:13, 152:25, 160:7, 171:10, 183:17, 184:10, 186:6, 190:11, 192:9, 195:5, 199:21, 200:7, 207:25, 218:18, 241:18, 243:1, 243:2, 243:4, 244:1, 244:5, 244:8, 244:22, 245:8
**Jury** [4] - 4:24, 61:5, 102:10, 149:16
**justify** [1] - 17:3

## K

**Kappa** [1] - 31:4
**Keenan** [1] - 2:4
**keep** [8] - 6:10, 34:21, 37:4, 132:18, 137:9, 160:22, 177:25, 183:1
**keeping** [2] - 51:16, 243:17
**Kennedy** [1] - 62:20
**kept** [1] - 90:4
**kick** [1] - 113:6
**kidney** [1] - 202:18
**kids** [9] - 42:15, 44:20, 57:8, 66:24, 68:12, 96:5, 96:16, 109:3, 109:8
**kind** [16] - 9:19, 12:15, 37:24, 40:17, 41:6, 47:12, 48:11, 84:3, 84:4, 106:8, 108:14, 123:4, 124:4, 152:4, 152:25, 155:22
**kinds** [3] - 7:16, 54:12, 159:10
**knock** [1] - 63:21
**knocked** [1] - 60:5
**knocking** [1] - 64:13
**knowing** [2] - 16:10, 85:12
**knowledge** [6] - 98:9, 150:11, 151:1, 190:20, 191:8
**known** [4] - 73:4, 78:3, 184:20, 235:25
**knows** [16] - 13:9, 14:18, 15:22, 15:25, 21:11, 21:12, 42:17, 65:24, 93:12, 93:14, 94:4, 116:8, 136:22, 246:18
**Krieger** [1] - 62:20
**Kuhn** [3] - 132:25, 133:6

## L

**ladies** [13] - 5:1, 6:19, 7:3, 12:22, 14:25, 16:8, 16:12, 17:1, 23:11, 28:8, 60:18, 131:22, 241:15
**laid** [2] - 139:18, 170:15
**land** [6] - 58:12, 63:23, 78:15, 78:17, 78:25, 118:1
**landscaping** [2] - 64:19, 65:19
**Lane** [4] - 29:12, 133:8, 134:24, 143:9
**Lane..** [1] - 180:12

**language** [6] - 41:25, 126:9, 128:10, 130:15, 184:23, 190:2
**lapel** [3] - 149:22, 149:23, 150:17
**large** [3] - 50:15, 107:12, 225:10
**larger** [1] - 78:18
**largest** [4] - 21:9, 56:3, 78:9, 78:10
**laser** [2] - 86:12, 184:1
**last** [13] - 32:16, 55:2, 68:13, 69:11, 70:11, 97:14, 122:25, 139:9, 146:19, 150:20, 168:5, 196:9, 198:21
**late** [10] - 11:20, 55:2, 63:15, 91:13, 91:16, 93:21, 115:9, 201:25, 230:16, 238:7
**latest** [1] - 76:6
**Latin** [1] - 187:11
**laude** [1] - 31:4
**law** [22] - 4:9, 4:11, 16:25, 21:8, 23:22, 31:17, 31:22, 31:23, 31:24, 32:7, 33:3, 125:5, 132:11, 132:13, 146:11, 170:13, 170:18, 171:8, 171:11, 201:2, 242:18, 244:2
**Law** [3] - 21:9, 31:19, 168:25
**lawsuit** [21] - 22:12, 24:11, 99:25, 100:6, 100:10, 100:23, 101:5, 101:12, 114:13, 114:17, 125:15, 137:3, 137:5, 175:3, 178:13, 180:2, 180:6, 180:16, 214:18, 216:5
**lawyer** [14] - 20:2, 63:3, 130:23, 132:6, 132:25, 146:14, 156:19, 169:2, 169:4, 200:3, 200:8, 204:8, 215:22
**lawyer's** [1] - 192:25
**lawyers** [11] - 6:3, 21:25, 22:20, 105:3, 105:6, 132:14, 132:16, 136:16, 147:1, 152:21, 170:19
**layperson's** [1] - 36:10
**lead** [2] - 45:23, 192:16
**leading** [4] - 95:21, 187:24, 189:1, 199:3
**leads** [1] - 50:14
**leaning** [1] - 242:18
**learn** [4] - 27:17, 150:3, 191:15, 191:16
**learned** [6] - 21:19, 42:12, 115:9, 147:24, 192:3, 192:6
**least** [12] - 31:12, 79:1, 97:6, 106:11, 115:6, 121:19, 123:16, 142:25, 178:24, 202:1, 213:8, 246:21
**leave** [13] - 10:10, 11:12, 11:15, 80:14, 80:20, 97:11, 110:25, 117:11, 150:21,

202:16, 206:21, 216:21, 226:22
**leaves** [1] - 37:21
**leaving** [2] - 69:10, 206:19
**LeBlanc** [2] - 201:23, 243:21
**led** [3] - 100:22, 124:10, 148:8
**left** [10] - 26:11, 32:9, 32:11, 49:18, 50:11, 80:12, 91:15, 103:16, 110:21, 213:15
**left-hand** [1] - 103:16
**leg** [3] - 44:14, 44:16, 71:12
**legal** [3] - 137:16, 143:12, 147:12, 167:11, 185:20, 186:3, 186:4, 187:8, 188:22
**legs** [4] - 44:13, 96:11, 96:13, 106:4
**less** [3] - 78:25, 79:1, 92:18
**letter** [1] - 165:19
**level** [4] - 7:14, 38:18, 38:21, 38:22
**levels** [1] - 120:8
**Lewis** [2] - 31:5
**Liberato** [1] - 1:18
**LIBERATO** [1] - 201:12
**library** [1] - 50:25
**licensed** [1] - 146:9
**lie** [1] - 143:5
**life** [8] - 7:25, 35:2, 40:2, 40:14, 47:25, 48:6, 48:9, 104:24
**lifestyle** [2] - 69:8, 70:13
**lifetime** [1] - 9:13
**lightening** [1] - 47:19
**lighthearted** [1] - 182:23
**lights** [1] - 45:15
**likely** [1] - 35:15
**likewise** [2] - 141:4, 141:9
**limine** [2] - 22:3, 110:11
**limitations** [2] - 96:14, 125:23
**limited** [4] - 23:17, 25:19, 138:12, 192:6
**Lindberg** [3] - 119:16, 119:18, 120:5
**Lindeberg** [1] - 119:17
**Lindley** [1] - 2:5
**Line** [3] - 162:24, 163:17, 176:7
**line** [12] - 12:16, 13:3, 68:15, 153:2, 153:13, 153:15, 156:12, 162:15, 162:22, 221:11, 222:6, 243:23
**lines** [3] - 31:13, 31:14, 162:24
**Lines** [3] - 173:13, 175:7, 175:17
**link** [4] - 64:12, 64:15, 154:5, 154:6
**links** [1] - 102:3
**lis** [14] - 22:9, 22:14, 100:1,

110:11, 111:1, 111:7, 112:9, 112:14, 136:17, 136:22, 178:16, 179:5, 179:12, 180:3
**list** [10] - 19:20, 21:4, 21:13, 86:20, 92:22, 92:25, 93:1, 128:8, 142:2, 209:24
**listed** [11] - 10:15, 12:5, 20:21, 68:5, 69:16, 116:3, 116:12, 141:19, 141:24, 142:1, 236:7
**listen** [2] - 23:6, 156:25
**listing** [52] - 18:16, 20:21, 24:1, 24:4, 25:14, 26:2, 69:4, 69:13, 70:17, 76:25, 86:22, 116:5, 116:6, 125:8, 125:12, 125:15, 125:18, 125:25, 127:15, 128:5, 128:9, 128:10, 128:11, 128:13, 128:21, 128:22, 129:8, 129:9, 129:10, 130:2, 130:5, 130:8, 130:18, 133:12, 140:5, 140:10, 141:13, 143:10, 143:16, 143:23, 144:13, 144:14, 144:25, 145:14, 184:14, 195:5, 195:9, 195:11, 195:24, 239:11, 239:15
**listings** [1] - 78:3
**literally** [1] - 108:7
**litigation** [1] - 147:9
**live** [29] - 8:19, 9:3, 9:4, 9:14, 9:23, 10:2, 28:2, 46:22, 47:7, 48:10, 55:16, 56:19, 56:20, 60:10, 77:4, 95:15, 99:5, 106:14, 106:22, 106:24, 121:19, 151:11, 151:23, 161:22, 205:7, 227:12, 227:18, 227:19
**lived** [5] - 7:21, 28:15, 33:12, 47:8, 208:13
**lives** [3] - 77:5, 94:5, 205:20
**living** [21] - 14:23, 14:25, 22:25, 49:18, 50:15, 50:16, 81:9, 99:12, 204:24, 227:23, 228:6, 228:7, 228:16, 228:21, 229:1, 229:14, 229:19, 233:23, 233:24, 234:2
**LLP** [4] - 1:18, 2:2, 2:5, 2:10
**loan** [1] - 236:2
**loans** [1] - 30:11
**locate** [1] - 221:13
**located** [1] - 104:1
**locating** [1] - 221:12
**location** [2] - 9:12, 205:22
**logical** [1] - 232:17
**long-term** [12] - 66:11, 99:2, 107:25, 121:10, 121:14, 121:17, 155:14, 157:8, 157:10, 158:4, 178:20, 179:2
**look** [24] - 18:21, 18:22,

18:23, 19:4, 54:17, 66:19, 70:11, 77:25, 80:17, 123:22, 124:2, 125:25, 128:10, 129:4, 129:23, 129:25, 132:10, 152:4, 152:17, 170:19, 180:5, 181:8, 184:19, 213:15
**looked** [10] - 57:19, 78:4, 95:7, 126:3, 126:7, 130:7, 133:13, 137:2, 141:12, 184:16, 213:24, 242:20, 243:1
**looking** [14] - 42:4, 50:8, 52:2, 52:4, 54:14, 54:15, 71:11, 71:12, 98:4, 103:14, 109:8, 145:21, 176:6, 207:18
**looks** [7] - 67:17, 102:18, 164:10, 170:2, 170:3, 185:7
**loop** [1] - 25:12
**loosen** [2] - 44:19, 106:4
**lost** [10] - 34:2, 41:25, 62:15, 89:22, 89:23, 89:24, 90:3, 91:6, 135:20, 136:4
**Louisiana** [1] - 2:5
**love** [8] - 8:6, 16:6, 18:4, 18:5, 54:4, 63:2
**loved** [4] - 19:5, 19:6, 26:18, 27:14
**loves** [1] - 64:25
**lovingly** [1] - 20:8
**low** [1] - 19:12
**lower** [6] - 38:25, 63:25, 168:14, 168:20, 168:22
**LP** [1] - 1:7
**lunch** [1] - 101:20
**Lunch** [1] - 102:9
**lungs** [3] - 36:19, 36:23, 37:1
**lusted** [1] - 29:16
**Lynn** [1] - 1:18

# M

**machines** [1] - 45:11
**magically** [1] - 92:23
**magnitude** [1] - 107:18
**Magnus** [1] - 32:19
**mail** [24] - 24:9, 67:17, 67:24, 69:21, 70:11, 70:14, 70:16, 71:20, 71:21, 72:15, 72:21, 82:14, 127:13, 139:5, 144:4, 144:6, 146:3, 148:11, 148:17, 181:21, 181:23, 182:11, 206:12, 206:13
**mailed** [1] - 10:7
**mails** [12] - 76:18, 116:24, 123:10, 123:13, 123:14, 124:6, 124:8, 140:17, 206:17, 207:15, 207:17, 217:5
**Main** [1] - 55:19
**main** [3] - 56:1, 146:22, 183:9

**maintain** [2] - 53:23, 144:2
**major** [2] - 124:13, 169:1
**majority** [1] - 109:12
**man** [5] - 21:7, 21:16, 112:22, 222:1, 222:13
**MANAGER** [1] - 102:23
**managing** [3] - 32:11, 203:4, 203:11
**manner** [1] - 168:1
**Mano** [2] - 23:12, 138:7
**mansion** [1] - 17:15
**map** [3] - 5:25, 55:15, 64:21
**marble** [1] - 49:19
**mark** [2] - 41:4, 216:24
**marked** [2] - 67:8, 126:8
**marked-up** [1] - 126:8
**market** [18] - 18:7, 26:1, 66:18, 69:13, 73:5, 77:18, 80:13, 80:16, 80:21, 88:11, 88:14, 88:15, 97:7, 128:12, 157:7, 205:13, 205:15, 206:11
**marketing** [3] - 24:16, 25:25, 127:6
**married** [2] - 32:14, 32:15
**Martha** [1] - 78:2
**massage** [7] - 44:11, 44:18, 106:4, 122:11, 161:14, 161:15
**master** [3] - 13:23, 73:18, 219:10
**master's** [5] - 30:15, 30:16, 30:18, 30:19, 87:12
**match** [2] - 87:25, 88:1
**material** [3] - 78:1, 78:4, 78:6
**materials** [1] - 24:16
**math** [4] - 87:12, 120:20, 186:20, 212:10
**mathematics** [7] - 30:1, 30:2, 30:14, 30:15, 30:16, 30:18, 124:13
**mats** [1] - 161:19
**Matt** [40] - 10:6, 10:12, 10:14, 11:5, 11:7, 11:13, 11:14, 11:21, 18:1, 57:2, 57:9, 57:22, 66:23, 67:17, 67:24, 69:20, 72:1, 72:15, 76:21, 77:25, 78:24, 79:3, 80:24, 81:25, 83:7, 88:25, 89:12, 89:18, 90:15, 91:19, 140:16, 150:8, 170:4, 191:5, 191:7
**matt** [1] - 10:8
**Matt's** [2] - 92:11, 134:13
**matter** [8] - 23:18, 136:13, 136:19, 157:25, 181:5, 200:5, 244:2, 247:7
**matters** [3] - 13:4, 169:5, 216:20
**Matthew** [10] - 2:1, 11:18, 12:19, 14:9, 179:18, 193:5, 199:11, 203:1, 210:8, 235:2

**MATTHEW** [3] - 1:6, 3:16, 200:14
**MATTHEWS** [4] - 202:12, 202:14, 202:18, 202:22
**Matthews** [6] - 2:7, 2:7, 26:13, 112:25, 152:9, 153:23
**Matthews'** [1] - 113:2
**McGee** [48] - 1:7, 2:4, 12:4, 12:6, 14:13, 23:12, 23:20, 23:24, 24:3, 24:10, 25:2, 25:4, 25:9, 26:8, 85:18, 93:8, 130:12, 138:8, 138:13, 139:16, 140:14, 141:10, 141:11, 148:12, 150:8, 150:11, 151:2, 165:7, 190:4, 193:11, 193:12, 193:16, 195:14, 196:7, 197:14, 197:25, 230:25, 231:2, 231:15, 231:18, 232:20, 232:24, 233:1, 233:5, 237:5, 237:10, 241:25
**McGee's** [1] - 101:9
**McKenzie** [5] - 31:24, 32:8, 32:10, 33:6, 146:13
**McKinney** [2] - 1:19, 2:2
**mean** [35] - 5:9, 8:8, 11:2, 35:6, 39:20, 41:8, 57:20, 64:5, 71:16, 73:11, 73:12, 78:23, 80:9, 90:1, 98:18, 98:23, 98:24, 106:8, 108:23, 112:19, 116:24, 119:7, 124:23, 126:16, 127:11, 141:13, 163:3, 173:20, 174:12, 182:23, 200:5, 209:19, 236:23, 238:23
**meaning** [6] - 40:12, 41:21, 85:1, 140:17, 170:20, 192:20
**means** [12] - 6:4, 36:3, 70:7, 87:19, 88:4, 98:25, 116:7, 128:16, 130:8, 130:11, 165:19, 187:5
**meant** [2] - 38:7, 87:22
**meantime** [4] - 64:20, 73:25, 74:5, 78:1
**mechanical** [1] - 2:24
**mechanism** [2] - 172:11, 172:12
**Medical** [4] - 42:7, 43:14, 43:23, 55:20
**medical** [1] - 24:23
**Medicine** [1] - 43:5
**medicine** [1] - 37:11
**meet** [6] - 38:4, 93:17, 94:7, 96:17, 101:18, 174:22
**meeting** [2] - 98:10, 207:12
**meetings** [1] - 123:20
**meets** [1] - 54:19
**Melinda** [1] - 141:15
**member** [1] - 43:11
**members** [2] - 75:19, 126:12, 185:6
**memory** [2] - 173:17, 234:14
**mental** [3] - 7:11, 38:18,

43:1
**mentally** [1] - 47:20
**mention** [2] - 5:2, 198:14
**mentioned** [17] - 29:24, 39:8, 40:2, 62:14, 68:11, 70:16, 96:6, 97:6, 103:24, 104:8, 106:25, 107:11, 116:20, 129:5, 156:15, 189:23, 206:8
**mentions** [1] - 111:2
**message** [1] - 91:15
**messing** [1] - 13:16
**met** [7] - 27:7, 27:8, 32:17, 32:18, 94:9, 139:16, 171:14
**metal** [4] - 156:8, 156:10, 196:25, 197:4
**Meyers'** [1] - 58:2
**MIA** [1] - 77:12
**mic** [6] - 51:18, 113:23, 113:25, 149:22, 149:23, 238:1
**Michael** [2] - 106:8, 132:25
**microphone** [2] - 150:18, 182:2
**middle** [2] - 49:25, 208:3
**might** [36] - 25:3, 41:20, 49:21, 66:18, 68:1, 68:7, 71:6, 71:8, 76:12, 95:11, 97:6, 100:9, 101:15, 101:16, 131:14, 165:23, 172:18, 180:24, 182:25, 190:6, 199:17, 204:11, 219:22, 222:4, 222:17, 224:11, 229:9, 239:19, 239:21, 240:2, 240:8, 240:17, 241:2, 241:8, 241:11
**migrate** [1] - 108:4
**Mike** [1] - 132:25
**milestones** [1] - 38:5
**million** [45] - 11:7, 11:10, 11:25, 12:10, 12:18, 12:19, 16:4, 18:25, 19:8, 19:22, 20:19, 42:15, 43:21, 60:15, 69:5, 69:13, 78:11, 79:20, 85:15, 86:17, 86:19, 87:20, 90:2, 92:21, 109:3, 116:13, 116:15, 118:4, 133:4, 168:6, 168:9, 168:20, 188:11, 208:24, 209:1, 209:5, 221:24, 223:13, 226:21, 232:21, 235:16, 236:3, 238:4, 239:22, 240:21
**million-dollar** [2] - 168:20, 239:22
**mind** [24] - 9:20, 15:21, 25:9, 25:10, 47:13, 66:22, 86:4, 87:22, 96:25, 106:9, 108:21, 121:12, 144:19, 148:22, 181:19, 181:24, 182:4, 182:6, 182:10, 182:12, 192:2, 192:5, 218:15, 243:17
**mine** [2] - 33:2, 179:6
**minimis** [1] - 212:23

**minus** [1] - 60:22
**minute** [10] - 6:17, 17:7, 60:20, 114:16, 125:13, 213:10, 214:4, 225:16, 241:21, 242:3
**minutes** [17] - 6:12, 6:13, 23:10, 26:11, 60:23, 94:9, 94:21, 94:23, 101:17, 101:23, 149:14, 200:4, 200:9, 241:20, 241:23, 242:6
**misleading** [1] - 53:17
**Miss** [15] - 12:6, 14:13, 85:18, 101:9, 141:10, 193:12, 195:14, 196:7, 197:14, 197:25, 231:15, 232:20, 237:5, 237:10
**mission** [1] - 109:18
**misstate** [1] - 98:15
**mobility** [1] - 96:10
**modernistic** [1] - 58:23
**modest** [1] - 7:16
**modification** [1] - 178:25
**modifications** [1] - 178:18
**modify** [2] - 28:10, 28:11
**mom** [2] - 35:9, 69:9
**moment** [16] - 12:3, 29:19, 33:15, 76:7, 87:7, 88:19, 105:25, 110:4, 153:24, 159:4, 159:14, 221:8, 222:12, 222:16, 223:25, 226:7
**moms** [1] - 51:24
**Monday** [2] - 81:17, 83:3
**monetary** [3] - 114:20, 114:22, 243:19
**money** [27] - 9:19, 11:14, 13:5, 18:2, 19:2, 19:10, 19:23, 20:23, 43:16, 70:4, 70:7, 84:14, 86:16, 117:2, 118:6, 118:12, 119:23, 124:16, 124:20, 124:25, 125:3, 133:16, 134:2, 161:25, 232:12, 237:3, 237:20
**monitors** [1] - 37:11
**months** [10] - 27:24, 34:2, 35:22, 41:15, 41:16, 137:22, 137:25, 175:1, 175:2, 177:20
**morning** [23] - 5:1, 5:3, 6:19, 20:1, 82:10, 82:11, 91:13, 91:16, 102:14, 102:16, 102:25, 105:12, 106:1, 139:22, 202:6, 237:13, 241:14, 241:16, 242:7, 242:14, 246:23, 247:2
**mortar** [2] - 6:23, 16:20
**mortgage** [2] - 84:15, 236:3
**most** [11] - 7:16, 9:6, 9:21, 9:22, 52:23, 69:9, 107:21, 124:16, 124:20, 146:19, 147:7
**mother** [1] - 30:11
**mother's** [4] - 6:25, 36:18, 41:2

**mothers** [1] - 45:3
**motion** [3] - 22:3, 96:14, 110:11
**motions** [1] - 244:2
**motivated** [1] - 40:13
**motive** [4] - 27:19, 27:22, 27:24, 28:6
**motor** [1] - 38:9
**mountains** [2] - 204:21, 204:25
**mouth** [2] - 39:12, 43:16
**move** [19] - 16:10, 18:7, 29:23, 51:18, 61:13, 69:21, 111:22, 121:18, 152:7, 164:12, 203:13, 204:13, 204:15, 220:3, 220:5, 223:9, 235:12, 245:22, 247:1
**moved** [10] - 27:25, 32:5, 32:23, 45:11, 51:7, 56:22, 62:13, 63:4, 233:21, 234:1
**movements** [1] - 38:13
**moving** [2] - 72:22, 144:8
**MR** [211] - 4:1, 4:4, 4:7, 4:10, 4:16, 4:19, 4:21, 6:16, 6:19, 17:9, 17:12, 17:17, 22:2, 22:5, 22:8, 22:11, 22:15, 22:18, 22:20, 23:11, 26:12, 29:2, 50:5, 61:8, 65:11, 67:10, 67:11, 67:12, 75:2, 75:3, 75:7, 75:13, 79:13, 88:12, 95:21, 101:15, 103:11, 105:15, 105:20, 110:1, 110:3, 110:8, 110:10, 111:3, 111:5, 111:15, 111:23, 112:1, 112:2, 112:6, 112:8, 112:9, 112:12, 112:13, 112:18, 112:22, 112:25, 113:2, 113:7, 113:10, 113:14, 126:18, 131:14, 131:17, 131:21, 135:11, 135:17, 135:22, 138:4, 138:7, 143:11, 143:17, 149:2, 149:7, 149:24, 150:20, 151:5, 152:8, 152:20, 156:23, 156:25, 157:17, 157:24, 162:12, 162:13, 162:14, 162:16, 162:17, 162:18, 162:20, 162:22, 162:23, 162:25, 163:1, 163:4, 164:15, 164:19, 164:23, 165:3, 165:6, 165:13, 166:3, 166:7, 166:9, 166:13, 166:18, 167:11, 167:20, 169:23, 170:22, 171:4, 173:1, 175:4, 175:8, 175:9, 175:10, 175:12, 175:13, 175:14, 175:16, 175:17, 175:18, 175:19, 176:1, 176:7, 176:9, 176:13, 176:16, 176:24, 178:2, 179:22, 180:20, 180:21, 181:2, 181:4, 181:6, 181:7, 181:13, 181:21, 181:23, 181:25, 182:3, 182:8,

182:10, 182:14, 182:17, 182:20, 183:5, 183:15, 183:19, 185:19, 185:20, 186:1, 187:8, 187:11, 187:24, 188:22, 189:1, 190:6, 191:11, 191:14, 191:18, 191:19, 191:24, 192:15, 192:8, 193:19, 194:20, 194:23, 195:15, 196:11, 196:15, 198:8, 198:18, 198:21, 199:3, 199:8, 199:11, 199:14, 200:16, 200:24, 201:2, 201:7, 201:19, 201:22, 201:23, 202:3, 202:11, 202:12, 202:14, 202:18, 202:22, 214:11, 216:15, 219:24, 221:8, 221:10, 221:12, 222:6, 222:7, 222:10, 222:25, 223:10, 224:20, 226:5, 235:6, 240:22, 241:11, 246:2, 246:4, 246:8
**MRI** [1] - 38:5
**MS** [3] - 30:1, 30:14, 201:12
**mucked** [1] - 183:4
**Mueck** [1] - 23:13
**multiple** [3] - 121:25, 158:16
**Murray** [3] - 2:1, 113:17, 113:20
**muscles** [1] - 44:19
**Museum** [1] - 55:19
**music** [1] - 122:13
**must** [2] - 127:7, 129:5
**mustache** [1] - 105:11
**mutual** [2] - 70:1, 70:2

## N

**Nabors** [3] - 32:23, 32:25, 147:10
**name** [9] - 7:3, 23:12, 27:9, 29:9, 31:24, 36:3, 41:18, 138:5, 202:25
**named** [8] - 15:14, 75:18, 77:1, 77:2, 119:16, 126:11, 132:25, 185:2
**Nath** [61] - 2:7, 2:8, 12:7, 12:9, 12:20, 13:1, 15:3, 15:7, 15:10, 15:16, 15:18, 15:25, 19:5, 19:8, 26:14, 85:23, 92:18, 92:23, 93:17, 94:7, 97:16, 97:17, 97:21, 98:10, 103:12, 138:18, 138:20, 139:12, 139:15, 151:9, 151:11, 162:9, 171:14, 171:17, 171:24, 172:7, 173:22, 174:2, 174:19, 187:1, 190:20, 194:8, 197:14, 197:24, 208:24, 214:23, 215:1, 215:22, 230:22, 234:8, 234:15, 235:3, 235:5, 235:7, 235:13,

236:1, 242:2
**NATH** [2] - 1:10
**Nath"** [1] - 235:6
**Nath's** [11] - 101:10, 178:7, 194:10, 197:16, 198:12, 198:14, 209:6, 209:10, 209:17, 210:21, 212:8
**Nathan** [1] - 1:23
**Naths** [52] - 19:5, 19:17, 20:19, 20:25, 21:3, 21:19, 21:21, 21:23, 21:24, 22:24, 25:6, 26:16, 26:22, 27:1, 27:4, 27:5, 27:7, 27:8, 27:9, 27:18, 27:22, 27:23, 28:9, 28:14, 28:19, 86:20, 100:4, 127:24, 130:18, 131:6, 133:20, 134:2, 134:9, 134:23, 135:9, 135:15, 139:8, 163:19, 163:23, 164:5, 167:4, 167:8, 167:15, 167:18, 169:17, 169:22, 170:6, 171:13, 229:12, 229:13, 229:19, 240:6
**Naths'** [1] - 124:20
**navigate** [1] - 38:13
**near** [4] - 82:1, 83:13, 83:16, 149:5
**necessarily** [3] - 44:10, 142:21, 168:15
**necessary** [4] - 17:9, 42:20, 162:6, 189:4
**necessity** [1] - 181:19
**neck** [1] - 35:7
**need** [37] - 4:1, 9:18, 14:2, 15:18, 28:22, 54:10, 55:6, 57:22, 59:21, 59:23, 61:15, 65:2, 84:13, 107:15, 111:13, 139:24, 143:17, 149:11, 149:20, 149:22, 150:17, 152:6, 153:24, 156:25, 159:9, 175:21, 179:16, 183:12, 183:25, 189:10, 189:11, 192:13, 202:5, 202:20, 219:7, 239:15
**needed** [6] - 14:1, 17:14, 63:18, 95:6, 189:13, 219:8
**needn't** [2] - 163:2, 163:3
**needs** [22] - 6:22, 8:9, 14:2, 16:2, 16:21, 38:1, 41:10, 42:11, 47:16, 47:18, 54:11, 54:19, 54:23, 62:12, 65:1, 96:6, 107:10, 109:7, 109:21, 155:24, 177:16
**negative** [2] - 20:10, 20:11
**neglected** [1] - 163:14
**negligible** [1] - 127:7
**negotiate** [1] - 80:9
**negotiated** [5] - 71:25, 78:5, 159:1, 183:8, 209:9
**negotiating** [4] - 72:4, 72:5, 157:22, 168:1
**negotiation** [2] - 71:23, 159:5
**negotiations** [1] - 140:23

**neighbor** [16] - 10:5, 10:10, 10:11, 11:18, 18:8, 67:2, 72:5, 115:10, 144:20, 144:22, 156:19, 188:18, 203:18, 238:13
**neighbor's** [1] - 17:13
**neighborhood** [25] - 10:10, 55:23, 56:7, 57:4, 57:8, 66:24, 68:2, 68:12, 71:7, 71:12, 79:11, 97:8, 99:6, 99:12, 103:25, 104:12, 108:6, 145:19, 205:24, 206:19, 206:22, 207:4, 207:8, 218:9, 218:11
**neighborhoods** [1] - 55:23
**neighbors** [15] - 27:10, 56:23, 64:17, 71:10, 71:13, 90:21, 144:10, 144:14, 144:16, 145:1, 145:4, 145:14, 145:16, 156:16, 207:12
**nerd** [1] - 31:12
**net** [16] - 12:12, 12:16, 12:18, 13:11, 70:7, 84:25, 85:15, 86:18, 87:1, 87:3, 87:19, 168:7, 244:6, 244:14, 244:21, 245:21
**nets** [2] - 13:3
**neurological** [3] - 42:13, 42:16, 109:3
**Neurological** [1] - 57:14
**never** [46] - 15:2, 17:2, 18:20, 18:21, 18:22, 24:17, 24:20, 24:21, 24:22, 25:5, 41:18, 57:18, 57:19, 66:6, 85:25, 93:8, 116:22, 116:25, 117:2, 117:4, 127:8, 132:2, 132:8, 139:18, 139:20, 140:15, 141:4, 141:9, 147:6, 166:20, 166:24, 183:10, 203:22, 218:25, 223:22, 223:24, 225:20, 225:23, 225:24, 226:25, 227:3, 227:6, 227:9, 230:12, 246:16
**new** [13] - 27:9, 46:17, 52:10, 53:18, 60:9, 83:24, 85:9, 93:24, 109:18, 157:8, 174:6, 174:10, 174:17
**New** [6] - 29:22, 32:1, 32:12, 32:20, 32:21, 46:22
**Newark** [2] - 29:22, 47:6
**newborn** [1] - 45:3
**news** [2] - 62:10, 89:19
**next** [62] - 9:4, 9:16, 11:24, 15:13, 20:1, 27:10, 49:21, 50:15, 50:17, 50:23, 55:10, 56:4, 56:21, 64:4, 69:1, 69:21, 71:19, 73:5, 77:11, 81:12, 81:13, 82:10, 82:11, 89:12, 90:6, 91:10, 91:13, 93:23, 96:3, 99:12, 100:9, 102:21, 103:9, 104:1, 106:14, 108:5, 115:10, 123:2, 128:20, 134:15,

156:13, 164:3, 165:5, 165:20, 166:16, 177:25, 188:2, 193:10, 194:5, 199:10, 202:1, 203:18, 204:19, 217:9, 226:11, 226:14, 230:15, 237:13

**next-door** [3] - 27:10, 115:10, 203:18

**nice** [3] - 17:15, 71:12, 96:18

**nickel** [1] - 80:19

**night** [20] - 11:20, 44:7, 44:9, 45:5, 45:18, 45:20, 55:2, 81:15, 81:17, 81:19, 98:5, 106:4, 107:8, 123:18, 142:12, 143:5, 230:16, 231:23, 238:8

**nighttime** [1] - 37:17

**nine** [6] - 12:11, 12:20, 26:4, 105:1, 106:3

**ninety** [2] - 12:11, 12:20

**ninety-nine** [2] - 12:11, 12:20

**NO** [1] - 1:6

**No"** [4] - 214:15, 220:5, 239:1, 240:11

**nobody** [1] - 198:1

**Noel** [1] - 141:15

**nominal** [2] - 243:15, 243:20

**none** [3] - 23:15, 140:2, 182:22

**nonresponsive** [3] - 214:11, 219:24, 224:20

**noon** [1] - 60:25

**normalized** [2] - 78:20, 78:23

**nose** [2] - 37:13, 39:14

**note** [1] - 102:13

**noted** [1] - 127:14

**notes** [1] - 215:12

**nothing** [16] - 22:11, 27:10, 27:11, 28:12, 63:1, 70:24, 107:23, 115:21, 119:25, 123:2, 124:9, 126:21, 137:19, 147:11, 176:24, 180:16

**notice** [14] - 17:7, 22:21, 100:2, 108:12, 111:8, 115:25, 136:23, 137:1, 137:19, 138:1, 179:12, 179:17, 180:17, 244:17

**noticed** [1] - 116:2

**notices** [1] - 15:12

**November** [33] - 24:5, 59:25, 63:8, 72:16, 76:15, 76:20, 76:24, 77:12, 77:23, 84:24, 85:4, 91:3, 117:17, 123:18, 140:19, 155:14, 172:7, 210:1, 210:16, 213:17, 215:5, 217:10, 217:15, 226:8, 226:15, 226:17, 230:14, 231:23, 238:4

**nowhere** [1] - 24:9

**number** [41] - 33:18, 69:16, 74:2, 77:19, 79:19, 79:20, 80:22, 83:18, 83:21, 83:24, 84:19, 86:15, 87:14, 87:16, 88:1, 88:3, 88:6, 88:7, 88:10, 90:12, 90:17, 90:18, 92:8, 99:6, 128:23, 147:17, 147:18, 168:9, 168:10, 168:14, 168:20, 168:21, 204:22, 205:11, 216:20, 227:11, 234:24

**numbers** [4] - 168:10, 168:11, 168:13, 168:19

**nurse** [1] - 38:15

**nurses** [4] - 37:18, 37:19, 37:20, 45:9

## O

**o'clock** [11] - 5:4, 5:14, 81:20, 89:15, 102:6, 105:25, 195:4, 199:16, 202:8, 216:20

**Oak** [1] - 1:24

**Oaks** [1] - 79:12

**oath** [10] - 101:6, 163:8, 175:24, 177:7, 192:25, 210:25, 211:4, 211:12, 220:14, 228:14

**object** [9] - 71:9, 87:9, 88:13, 88:14, 157:17, 176:1, 176:11, 181:2, 193:19

**objected** [1] - 227:6

**objecting** [1] - 6:7

**objection** [36] - 6:2, 6:5, 22:2, 95:21, 131:15, 135:17, 135:22, 135:23, 143:11, 143:17, 149:2, 156:23, 158:1, 164:19, 166:11, 167:11, 167:20, 167:21, 170:22, 171:4, 171:5, 181:1, 182:7, 182:8, 182:15, 182:17, 183:12, 186:4, 187:8, 188:22, 191:23, 195:15, 196:11, 214:11, 219:24, 224:20

**objections** [3] - 166:15, 182:18, 183:2

**objective** [1] - 99:9

**obligated** [1] - 117:23

**obligation** [2] - 22:1, 142:3

**obtain** [1] - 25:13

**obtained** [2] - 8:15, 59:5

**obtains** [1] - 26:3

**obvious** [1] - 27:21

**obviously** [17] - 36:17, 41:8, 46:1, 47:11, 62:7, 70:3, 70:24, 78:20, 94:14, 96:21, 99:2, 111:7, 127:11, 129:24, 130:16, 130:23, 138:20

**Obviously** [1] - 116:3

**occupational** [1] - 40:5

**occurred** [4] - 38:10, 71:25, 100:19, 197:18

**occurs** [6] - 75:23, 75:25, 76:18, 130:2, 187:15, 188:3

**October** [15] - 24:6, 33:1, 66:16, 67:24, 68:10, 76:18, 115:9, 115:24, 123:14, 138:17, 139:3, 144:4, 144:6, 217:4, 217:6

**odd** [1] - 116:21

**odds** [4] - 59:25, 60:1, 64:1, 66:21

**OF** [1] - 1:1

**Off-the-record** [1] - 28:23

**offer** [154] - 11:8, 11:9, 11:12, 11:16, 11:17, 11:24, 15:23, 19:3, 19:16, 19:17, 19:18, 19:19, 19:24, 20:19, 23:7, 24:18, 26:3, 59:8, 70:9, 76:6, 80:6, 80:14, 80:21, 82:1, 83:13, 84:1, 84:7, 84:12, 84:17, 84:19, 84:20, 84:25, 85:5, 85:7, 85:9, 85:13, 85:14, 85:18, 85:20, 85:22, 85:23, 86:17, 87:3, 87:13, 87:23, 88:6, 88:19, 88:24, 90:5, 90:10, 90:11, 91:4, 92:9, 93:3, 162:10, 163:19, 163:24, 164:4, 165:7, 168:6, 181:17, 181:20, 187:1, 188:8, 188:10, 188:11, 188:20, 189:4, 189:5, 189:8, 208:24, 208:25, 209:1, 209:5, 209:6, 209:10, 209:16, 209:24, 210:20, 210:21, 211:8, 211:9, 211:13, 212:7, 214:23, 215:1, 215:14, 215:25, 216:10, 222:5, 223:3, 223:18, 226:15, 226:20, 229:12, 229:15, 229:16, 230:19, 230:22, 231:19, 232:3, 232:5, 232:11, 232:15, 232:20, 233:5, 233:8, 233:10, 234:7, 234:9, 234:10, 234:15, 235:12, 235:13, 235:16, 236:1, 236:14, 236:24, 236:25, 237:9, 237:11, 238:11, 238:15, 238:17, 238:18, 238:21, 238:22, 238:25, 239:7, 239:8, 239:9, 239:14, 239:16, 239:18, 239:21, 239:22, 240:2, 240:6, 240:8, 240:10, 240:14, 240:17, 240:19, 240:24, 241:2, 241:8

**offered** [17] - 12:18, 12:20, 19:8, 20:19, 21:4, 21:13, 27:22, 59:14, 98:14, 116:15, 133:3, 174:22, 181:6, 221:24, 223:13, 231:12, 237:20

**offering** [1] - 181:4

**offers** [5] - 15:24, 114:11, 124:20, 140:24, 238:23

**office** [3] - 32:1, 32:12,

193:1

**officer** [3] - 33:4, 59:7, 101:19

**offices** [2] - 31:25, 33:1

**often** [1] - 101:21

**old** [13] - 7:15, 30:17, 39:3, 46:15, 48:13, 48:15, 48:23, 64:15, 67:9, 82:21, 106:10, 151:15, 204:17

**old-fashioned** [1] - 82:21

**older** [1] - 205:5

**oldest** [1] - 55:23

**on-shore** [1] - 21:9

**once** [7] - 9:13, 113:12, 130:18, 131:6, 158:13, 218:12, 242:9

**once-in-a-lifetime** [1] - 9:13

**one** [142] - 4:16, 6:3, 7:11, 8:19, 9:4, 9:6, 15:2, 17:2, 25:18, 25:20, 25:21, 26:24, 34:3, 34:6, 36:4, 36:5, 39:20, 39:22, 40:7, 41:8, 42:12, 42:17, 42:19, 43:3, 44:2, 45:18, 46:14, 48:4, 49:8, 50:23, 53:13, 55:7, 55:23, 65:15, 70:11, 76:16, 87:17, 88:10, 93:25, 94:4, 97:7, 97:15, 102:1, 103:18, 103:23, 103:25, 104:1, 104:10, 104:11, 105:10, 109:7, 111:3, 111:21, 122:16, 122:17, 123:18, 123:19, 127:9, 127:10, 129:17, 130:2, 131:5, 134:12, 136:10, 142:5, 142:6, 142:7, 142:10, 143:20, 144:1, 145:3, 146:22, 147:6, 158:15, 158:19, 158:20, 158:23, 166:14, 168:21, 169:1, 169:10, 169:13, 169:25, 171:19, 172:18, 172:20, 172:22, 173:22, 173:25, 175:12, 175:14, 180:25, 183:2, 183:9, 183:16, 183:25, 189:10, 195:23, 196:9, 196:19, 197:6, 198:21, 199:16, 202:12, 205:25, 207:13, 208:3, 209:3, 209:4, 209:21, 211:11, 213:24, 214:22, 216:3, 216:8, 221:8, 222:25, 227:11, 227:13, 227:16, 228:14, 228:15, 236:6, 239:18, 239:20, 239:22, 240:8, 240:19, 240:20, 240:21, 240:24, 242:18, 242:22, 243:16, 245:2, 245:8, 245:11, 245:20, 246:2

**ones** [2] - 200:6, 245:14

**open** [9] - 5:6, 5:13, 16:11, 36:13, 44:4, 58:13, 99:7, 110:25, 216:15

**opened** [4] - 72:19, 110:15,

**111**:1, 216:22
**Opening** [4] - 3:5, 3:6, 3:7, 3:8
**opening** [10] - 5:23, 5:24, 29:13, 45:21, 69:22, 86:8, 114:3, 116:20, 168:8, 209:4
**openly** [1] - 164:1
**operate** [1] - 35:4
**operates** [2] - 15:8, 96:5
**operating** [2] - 33:4, 107:2
**operation** [3] - 36:9, 36:14, 37:4
**opinion** [1] - 88:15
**opinions** [1] - 62:19
**opportunity** [10] - 9:14, 21:14, 67:5, 135:21, 136:5, 163:12, 163:15, 186:16, 192:12, 213:20
**opposed** [1] - 228:6
**opposition** [1] - 186:15
**option** [3] - 21:22, 135:2, 135:5
**optional** [3] - 131:19, 135:23, 165:18
**or...** [1] - 98:22
**oral** [2] - 24:18, 30:23
**order** [4] - 67:22, 107:18, 201:7, 246:9
**ordered** [1] - 200:21
**orient** [2] - 55:16, 76:17
**original** [7] - 51:1, 119:11, 119:24, 120:5, 121:9, 178:13, 243:7
**originally** [5] - 18:3, 46:6, 46:21, 46:25, 61:23
**originate** [1] - 71:3
**ought** [1] - 202:8
**ounces** [1] - 36:4
**outbid** [3] - 21:18, 86:5, 87:17
**outlined** [2] - 229:25, 230:5
**outside** [3] - 187:3, 196:12, 197:7
**outstanding** [2] - 80:15, 80:21
**overlap** [1] - 157:13
**overrule** [1] - 166:11
**overruled** [11] - 22:16, 88:16, 136:1, 143:19, 158:2, 167:22, 171:6, 177:3, 189:2, 193:21, 199:4
**overview** [1] - 104:5
**owe** [2] - 208:17, 208:21
**owed** [2] - 128:3, 129:1
**own** [20] - 6:22, 8:16, 15:2, 17:15, 41:7, 56:9, 56:15, 56:16, 56:17, 104:14, 118:24, 151:25, 165:22, 191:13, 192:4, 192:12, 203:4, 203:11, 215:12, 242:24
**owned** [4] - 55:12, 58:12, 78:14, 123:8
**owner** [3] - 10:20, 115:4

**ownership** [4] - 112:3, 112:4, 112:13, 117:21
**owns** [1] - 205:25
**oxygen** [1] - 36:18

# P

**p.m** [1] - 81:15
**pad** [1] - 124:15
**page** [17] - 67:18, 126:3, 134:14, 134:15, 162:15, 162:22, 163:20, 173:9, 173:10, 175:16, 175:17, 176:7, 179:8, 221:10, 221:11, 222:6
**Page** [10] - 3:3, 162:12, 162:23, 163:17, 163:21, 166:8, 173:2, 173:13, 175:4, 175:8
**Pages** [1] - 175:7
**PAGES** [1] - 1:15
**paid** [18] - 13:1, 16:3, 26:18, 28:16, 63:24, 75:22, 76:1, 78:10, 168:13, 168:19, 185:12, 186:22, 188:3, 209:8, 209:9, 209:12, 212:17
**pain** [2] - 34:12, 34:17
**palsy** [4] - 7:8, 95:10, 95:12, 109:4
**paper** [2] - 87:7, 189:11
**papers** [2] - 182:6, 197:21
**Paragraph** [3] - 118:2, 118:11, 129:25
**paragraph** [1] - 180:5
**paralegal** [2] - 112:25, 113:2
**pardon** [2] - 204:3, 226:2
**parent** [1] - 109:7
**parenthesis** [1] - 242:5
**parents** [4] - 47:1, 54:3, 151:12, 204:20
**Park** [10] - 69:7, 70:13, 204:13, 204:21, 205:8, 205:10, 233:20, 233:21, 234:3, 234:5
**part** [33] - 5:5, 14:16, 15:1, 15:4, 20:14, 22:9, 38:2, 46:14, 46:15, 48:20, 49:3, 50:1, 69:10, 99:2, 112:20, 120:3, 152:13, 161:6, 166:8, 184:3, 185:21, 187:4, 187:5, 205:3, 205:4, 205:23, 206:8, 234:2, 234:3, 234:19, 234:20, 235:24, 236:1
**partially** [1] - 98:6
**particular** [4] - 96:9, 125:12, 134:17, 193:2
**particularly** [2] - 73:7, 151:20
**parties** [23] - 7:13, 57:21, 75:20, 75:23, 75:25, 126:13, 126:16, 135:6, 152:22, 169:1, 170:3, 170:12,

184:25, 185:6, 185:11, 188:2, 199:24, 208:22, 235:2, 244:6, 244:20, 245:6
**partner** [1] - 32:11
**parts** [1] - 146:22
**party** [17] - 57:8, 57:9, 57:11, 57:12, 68:14, 143:10, 143:15, 143:22, 143:25, 169:10, 169:11, 169:25, 170:1, 187:15, 195:24, 218:6
**pass** [5] - 89:1, 110:1, 138:4, 176:2, 180:20, 194:20, 196:15, 198:8, 198:18
**passed** [1] - 102:14
**past** [1] - 48:12
**pause** [1] - 86:10
**paused** [1] - 85:10
**pay** [16] - 10:20, 11:2, 11:3, 12:1, 12:14, 12:15, 18:13, 19:13, 80:16, 90:17, 124:16, 130:13, 208:8, 209:23, 212:16, 212:17
**payable** [2] - 129:16, 140:9, 140:11, 168:21, 185:18, 187:1
**paying** [2] - 12:21, 72:24
**payment** [1] - 98:20
**PC** [1] - 1:23
**PDA** [1] - 36:11
**pedestrian** [1] - 103:19
**PEGGY** [1] - 1:7
**Peggy** [28] - 2:4, 23:12, 23:20, 23:23, 24:2, 24:10, 25:2, 25:4, 25:9, 26:8, 93:8, 130:12, 138:7, 138:13, 139:16, 140:14, 148:18, 150:8, 150:11, 151:2, 165:7, 193:11, 230:25, 231:2, 231:18, 232:24, 232:25, 233:5
**penciled** [2] - 242:6
**pendens** [14] - 22:9, 22:14, 100:1, 110:11, 111:1, 111:7, 112:9, 112:14, 136:17, 136:22, 178:16, 179:5, 179:12, 180:3
**pending** [1] - 179:25
**people** [47] - 5:8, 5:11, 8:20, 11:17, 15:12, 19:4, 25:19, 40:10, 40:18, 42:18, 42:20, 44:2, 44:12, 46:24, 47:1, 52:20, 53:22, 54:7, 54:17, 54:23, 55:18, 58:10, 62:21, 65:20, 69:25, 70:5, 77:6, 77:9, 93:22, 97:20, 97:22, 104:25, 109:5, 109:12, 109:19, 109:22, 122:23, 145:18, 145:22, 145:25, 177:12, 196:2, 196:3, 220:4, 226:23, 243:25
**percent** [28] - 12:23, 48:21, 49:4, 53:16, 53:17, 76:1, 78:16, 78:18, 79:1, 86:21,

86:23, 86:25, 87:4, 87:14, 87:19, 88:5, 120:13, 120:15, 120:18, 129:6, 129:14, 155:1, 168:18, 168:21, 188:4, 209:9, 209:10
**perfect** [1] - 107:23
**perfected** [1] - 36:14
**perform** [3] - 7:15, 36:9, 37:4
**performance** [2] - 137:12, 180:9
**performing** [2] - 36:23, 107:6
**perhaps** [2] - 93:23, 244:8
**perimeter** [1] - 64:16
**period** [18] - 11:11, 15:11, 35:23, 37:16, 51:9, 62:21, 65:7, 65:14, 80:4, 99:14, 100:19, 101:9, 107:7, 107:9, 135:4, 142:13, 231:22, 233:18
**periods** [2] - 47:1, 51:23
**permanent** [3] - 65:5, 69:8, 106:15
**permanently** [1] - 68:21
**permission** [1] - 163:3
**permit** [1] - 108:25
**person** [10] - 20:4, 63:20, 72:5, 73:20, 77:10, 84:11, 94:2, 95:2, 205:16, 205:17
**personal** [6] - 150:11, 150:13, 151:1, 190:20, 231:3
**personally** [1] - 139:16
**persons** [1] - 94:5
**petition** [2] - 176:19, 178:4
**PETRELLO** [1] - 1:3, 3:10, 29:5
**Petrello** [180] - 7:2, 7:4, 7:5, 7:8, 7:21, 9:8, 9:9, 9:17, 9:25, 11:1, 11:3, 11:17, 12:13, 12:18, 12:24, 13:2, 13:11, 13:16, 13:19, 17:13, 17:22, 17:23, 18:8, 18:10, 18:11, 18:14, 18:20, 18:21, 18:24, 19:17, 19:19, 19:20, 19:22, 20:3, 20:11, 20:18, 20:24, 21:7, 21:16, 21:24, 22:20, 23:3, 23:16, 23:20, 23:25, 24:9, 25:1, 26:7, 28:16, 29:2, 29:10, 29:11, 31:11, 33:14, 44:5, 44:7, 46:8, 53:11, 55:13, 58:22, 61:10, 66:13, 67:9, 67:14, 67:15, 70:15, 75:17, 75:19, 77:1, 83:1, 86:3, 86:16, 88:18, 99:16, 103:14, 104:18, 105:22, 106:22, 108:10, 113:17, 114:2, 115:2, 126:12, 130:7, 132:1, 133:17, 135:25, 137:8, 138:11, 146:8, 149:19, 149:21, 150:15, 151:9, 152:11, 152:25, 162:14, 163:7, 164:12, 164:16,

166:20, 167:25, 168:5, 173:4, 175:21, 176:3, 176:13, 177:5, 178:17, 179:18, 180:6, 180:15, 181:25, 182:3, 182:4, 183:23, 184:16, 185:3, 185:8, 186:19, 187:14, 188:5, 189:18, 190:15, 193:23, 195:3, 196:18, 203:17, 204:10, 206:11, 206:12, 206:14, 208:7, 208:17, 208:19, 212:16, 214:19, 214:23, 214:25, 215:24, 216:9, 216:17, 217:2, 217:9, 217:19, 217:24, 219:21, 220:8, 220:24, 221:16, 221:23, 222:13, 223:13, 225:3, 226:8, 226:14, 226:15, 227:3, 227:17, 229:7, 229:12, 229:25, 230:2, 230:5, 230:14, 231:12, 231:23, 232:12, 233:8, 236:14, 238:3, 238:8, 238:10, 239:13, 239:21, 240:16

**Petrello's** [16] - 20:5, 189:24, 208:25, 209:5, 209:16, 210:20, 211:8, 212:7, 215:8, 215:12, 215:17, 216:4, 216:8, 231:7, 241:25

**Petrellos** [13] - 7:17, 8:3, 9:2, 9:14, 13:7, 14:10, 14:19, 25:7, 25:10, 27:9, 27:10, 229:13

**Ph.D** [1] - 31:10

**Phelps** [1] - 106:8

**Phi** [1] - 31:4

**phone** [9] - 59:11, 81:23, 82:13, 83:9, 91:15, 99:19, 124:6, 124:8, 231:20

**photocopied** [1] - 126:2

**photographs** [1] - 25:25

**phrase** [4] - 5:25, 114:19, 172:10, 172:16

**physical** [2] - 39:4, 227:23

**physically** [3] - 7:15, 39:7, 47:20

**pick** [1] - 182:1

**picks** [1] - 114:1

**picture** [4] - 8:25, 9:2, 36:5, 160:10

**pictures** [6] - 8:17, 105:5, 119:3, 160:3, 160:13, 160:23

**piece** [4] - 8:16, 64:1, 117:24, 189:11

**pieces** [1] - 115:6

**pipes** [1] - 207:7

**place** [15] - 9:23, 68:13, 79:6, 107:14, 107:15, 118:20, 121:5, 159:21, 160:16, 161:12, 188:14, 188:17, 188:19, 205:6,

241:11

**places** [2] - 31:25, 56:8

**plain** [2] - 130:11, 181:3

**Plaintiff** [13] - 1:4, 1:18, 6:12, 29:1, 137:8, 180:8, 243:2, 243:10, 243:15, 243:18, 245:7, 246:18, 246:19

**PLAINTIFF** [2] - 29:5, 200:14

**plaintiff** [2] - 137:7, 137:12

**Plaintiff's** [4] - 75:5, 207:21, 235:1, 244:3

**plaintiff's** [1] - 234:25

**Plaintiffs** [1] - 244:16

**plan** [10] - 48:1, 55:6, 64:11, 99:3, 121:9, 121:12, 155:14, 157:8, 157:10, 158:4

**planned** [2] - 120:24, 121:21

**plans** [4] - 70:21, 97:25, 178:18, 178:25

**plasticity** [1] - 40:11

**plate** [1] - 41:2

**play** [4] - 74:4, 155:10, 159:22, 192:24

**playing** [2] - 182:22, 241:7

**playroom** [10] - 108:8, 122:9, 159:9, 159:15, 160:1, 160:4, 160:10, 160:14, 160:25

**plays** [1] - 45:16

**plea** [1] - 103:3

**pleading** [3] - 103:4, 197:20, 198:15

**pleasant** [1] - 97:13

**pleased** [2] - 26:14, 119:22

**pled** [1] - 103:2

**plenty** [1] - 17:17

**plug** [1] - 35:17

**plural** [1] - 76:25

**plus** [1] - 60:22

**pocket** [5] - 4:18, 20:24, 92:17, 124:21, 125:3

**Point** [1] - 130:3

**point** [55] - 4:2, 8:18, 12:10, 12:20, 22:17, 26:4, 27:15, 27:17, 28:4, 28:5, 28:7, 34:6, 34:23, 35:2, 35:12, 35:14, 39:17, 42:3, 44:2, 50:3, 53:5, 54:7, 62:14, 66:12, 79:24, 87:6, 92:4, 93:7, 93:8, 93:14, 95:24, 98:21, 99:16, 105:9, 107:10, 108:7, 111:5, 112:17, 115:11, 122:22, 128:3, 147:15, 149:7, 153:12, 159:4, 181:16, 186:12, 187:3, 191:1, 191:22, 195:13, 201:20, 204:10, 213:9, 243:11

**pointed** [2] - 127:23, 190:1, 190:2, 213:8

**pointer** [3] - 103:17, 104:3, 184:1

**pointing** [1] - 184:18

**points** [1] - 183:10

**police** [1] - 65:17

**pool** [8] - 46:20, 64:22, 64:23, 64:25, 65:1, 79:2, 121:4, 159:10

**pools** [1] - 54:12

**pops** [1] - 36:20

**portion** [1] - 125:12

**portions** [1] - 173:15

**position** [9] - 32:10, 42:1, 62:16, 131:13, 131:16, 132:1, 144:2, 145:17, 204:19

**positive** [1] - 20:14

**posse** [1] - 57:6

**possibilities** [1] - 173:23

**possibility** [5] - 172:8, 172:18, 172:22, 173:25, 245:16

**possible** [6] - 104:16, 106:12, 106:19, 217:17, 232:22, 246:5

**possibly** [6] - 36:1, 88:10, 145:3, 205:17, 232:18, 232:19

**Post** [1] - 1:24

**potential** [2] - 124:24, 232:20

**potentially** [1] - 224:18

**pound** [1] - 36:4

**power** [6] - 26:22, 26:24, 167:5, 167:9, 167:15, 167:18

**practice** [3] - 33:3, 146:22, 146:23

**predicated** [2] - 84:17, 144:21

**prefer** [1] - 244:16

**preferable** [1] - 73:7

**preference** [3] - 227:12, 227:21, 228:18

**preferences** [1] - 228:15

**preferred** [5] - 228:5, 228:21, 228:25, 229:13, 229:19

**pregnancy** [4] - 33:25, 34:2, 34:4, 34:5

**pregnant** [3] - 33:19, 33:20, 34:1

**premature** [1] - 7:24

**premie** [1] - 95:9

**premium** [1] - 236:3

**preparation** [1] - 133:17

**prepare** [4] - 54:22, 122:24, 136:17, 182:5

**prepared** [4] - 76:8, 90:17, 197:20, 197:21

**preparing** [1] - 89:5

**preponderance** [1] - 16:16

**preprinted** [1] - 187:4

**present** [8] - 4:24, 46:4, 61:5, 102:10, 149:16, 193:1, 199:21, 241:18

**presentation** [1] - 5:7

**preserve** [4] - 14:5, 20:7,

119:23, 192:13

**president** [3] - 21:9, 33:3, 147:11

**press** [1] - 160:5

**pressing** [1] - 90:4

**presumably** [1] - 170:6

**presumptuous** [1] - 108:23

**pretty** [7] - 8:5, 70:13, 96:13, 96:23, 172:23, 199:2, 233:15

**previous** [2] - 49:17, 134:15

**Previous** [1] - 134:16

**previously** [1] - 134:22

**price** [56] - 10:22, 11:25, 12:1, 12:2, 13:1, 18:24, 19:12, 19:20, 20:20, 21:4, 21:6, 21:13, 26:3, 26:19, 27:22, 59:11, 59:13, 69:4, 70:6, 71:17, 77:17, 80:7, 80:10, 80:16, 82:1, 83:14, 86:21, 88:3, 88:8, 89:10, 92:22, 92:25, 93:1, 118:4, 128:8, 128:11, 128:13, 128:21, 128:22, 130:5, 130:6, 130:8, 130:18, 131:8, 142:2, 183:8, 184:14, 209:24, 239:4, 239:11, 239:15, 241:8

**price)** [1] - 128:14

**prices** [1] - 78:6

**pride** [2] - 39:25, 40:19

**printing** [2] - 187:22, 212:21

**private** [3] - 56:10, 104:8, 201:9

**privy** [1] - 129:9

**Priya** [2] - 28:1, 151:9

**Prize** [2] - 31:5

**prizes** [1] - 31:6

**pro** [1] - 118:9

**probability** [1] - 35:16

**probation** [1] - 101:19

**problem** [11] - 38:14, 95:3, 105:4, 105:5, 156:16, 156:18, 157:3, 157:5, 157:6, 173:19

**problems** [9] - 9:9, 35:17, 59:22, 62:9, 63:12, 63:16, 73:8, 109:4, 139:20

**proceed** [4] - 5:23, 69:24, 113:10, 200:12

**Proceedings** [1] - 2:24

**proceedings** [1] - 247:6

**process** [8] - 69:3, 69:12, 69:14, 70:7, 74:23, 125:5, 147:8, 201:13

**procures** [2] - 130:4, 184:13

**prodigy** [1] - 41:22

**produced** [1] - 2:24

**professional** [1] - 39:23

**progress** [3] - 40:17, 41:4, 41:7

**promote** [1] - 26:1
**pronounced** [1] - 119:17
**pronunciation** [1] - 235:4
**properly** [1] - 40:12
**Properties** [23] - 2:5, 12:5, 14:16, 18:17, 23:13, 23:14, 24:2, 75:14, 125:16, 138:8, 140:3, 140:13, 140:20, 140:25, 141:5, 141:10, 166:21, 208:5, 212:18, 213:12, 213:17, 213:25, 214:8
**PROPERTIES** [1] - 1:7
**properties** [5] - 25:19, 55:9, 57:24, 121:21, 152:4
**property** [116] - 8:16, 9:10, 21:11, 22:21, 22:22, 22:24, 24:3, 24:8, 24:17, 24:19, 24:23, 25:5, 25:7, 25:12, 25:15, 25:18, 26:9, 26:17, 26:19, 45:24, 49:9, 55:8, 55:9, 58:22, 58:25, 59:3, 59:13, 59:21, 59:23, 59:25, 60:4, 64:2, 64:5, 64:6, 64:8, 64:12, 64:17, 65:6, 65:8, 65:10, 65:23, 66:9, 66:17, 71:22, 72:7, 72:9, 75:20, 78:16, 85:12, 94:5, 95:3, 97:25, 98:10, 100:2, 104:13, 104:15, 107:13, 107:15, 108:13, 112:3, 112:4, 112:11, 114:21, 115:4, 115:6, 115:11, 115:20, 117:7, 117:21, 117:24, 118:17, 121:8, 121:9, 121:11, 122:5, 127:6, 128:2, 128:13, 128:21, 130:5, 134:24, 136:23, 137:2, 137:6, 137:7, 137:13, 137:15, 137:17, 139:1, 139:8, 140:24, 145:5, 146:4, 146:5, 153:15, 153:18, 159:11, 162:11, 172:8, 172:17, 179:13, 180:7, 180:8, 180:9, 180:11, 181:18, 184:13, 185:11, 189:9, 196:19, 196:22, 196:23, 197:6, 235:8
**Property** [1] - 226:12
**proposed** [5] - 19:9, 117:4, 243:1, 243:2, 243:4
**protected** [2] - 201:13, 201:16
**protections** [1] - 201:10
**proud** [3] - 7:17, 119:4, 119:22
**prove** [3] - 16:15, 16:25, 23:22
**provide** [6] - 6:25, 19:2, 24:16, 51:17, 149:4, 170:6
**provided** [3] - 101:1, 125:18, 134:3
**provides** [2] - 126:23, 171:2

**providing** [1] - 8:14
**provision** [13] - 127:2, 128:11, 129:1, 129:10, 130:11, 183:25, 184:6, 184:11, 184:21, 185:17, 187:2, 187:4
**Provisions** [1] - 185:2
**provisions** [1] - 75:16
**Provisions"** [1] - 184:23
**Prucka** [137] - 2:1, 2:2, 10:5, 10:6, 10:12, 10:14, 11:2, 11:7, 11:14, 11:18, 11:21, 12:1, 12:4, 12:14, 12:15, 12:19, 13:2, 13:10, 13:15, 13:16, 14:9, 14:10, 17:14, 17:23, 17:24, 18:1, 18:12, 18:13, 18:15, 18:16, 19:2, 19:11, 19:15, 19:17, 19:24, 20:2, 21:23, 21:25, 22:22, 24:7, 25:1, 56:4, 58:2, 66:12, 66:15, 66:18, 67:18, 67:24, 75:15, 76:21, 78:16, 79:5, 79:22, 81:13, 85:17, 86:19, 88:25, 94:5, 101:8, 103:20, 103:21, 113:21, 114:4, 115:10, 115:12, 115:25, 116:12, 116:23, 117:5, 117:16, 118:18, 121:13, 121:19, 122:7, 122:10, 123:6, 123:13, 124:5, 124:9, 125:2, 125:7, 128:7, 130:13, 132:24, 133:8, 133:9, 134:8, 135:21, 136:5, 138:15, 138:22, 139:5, 140:6, 140:12, 140:20, 141:6, 142:12, 144:12, 144:24, 145:10, 150:8, 158:18, 166:24, 171:25, 172:4, 179:18, 179:19, 180:5, 190:3, 190:4, 191:7, 193:5, 193:16, 195:13, 196:6, 197:13, 199:11, 202:25, 203:1, 203:2, 203:13, 208:2, 210:8, 210:10, 211:18, 213:16, 217:1, 220:7, 224:23, 225:20, 229:11, 231:5, 235:2, 241:25
**PRUCKA** [5] - 1:6, 1:6, 3:16, 199:14, 200:14
**Prucka's** [11] - 12:16, 14:5, 14:6, 20:24, 28:6, 78:12, 124:21, 177:19, 189:24, 191:5, 191:14
**Prucka-McGee** [1] - 190:4
**Pruckas** [56] - 9:3, 12:19, 13:6, 13:10, 14:14, 14:18, 14:22, 18:6, 18:9, 18:11, 18:19, 19:7, 20:6, 21:3, 21:21, 23:2, 25:5, 25:6, 26:23, 27:4, 27:7, 27:20, 28:9, 28:12, 56:19, 56:20, 76:25, 86:16, 87:3, 93:15, 95:4, 99:21, 99:25, 110:16, 123:8, 125:16, 130:19,

132:1, 133:21, 134:9, 134:23, 135:9, 135:15, 140:20, 142:3, 148:12, 148:18, 150:12, 151:2, 165:7, 167:5, 167:9, 169:22, 170:6, 171:13, 180:3
**Pruckas'** [2] - 119:13, 132:14
**Pruckas's** [1] - 170:4
**public** [12] - 5:6, 5:13, 58:13, 104:16, 116:1, 116:5, 116:7, 116:12, 141:25, 142:1, 142:2, 245:9
**published** [1] - 129:7
**pull** [7] - 30:5, 61:15, 87:7, 113:23, 160:5, 178:16, 190:7
**pulled** [2] - 243:6, 244:1
**pulling** [1] - 35:17
**pump** [3] - 37:12, 37:14, 40:3
**punish** [1] - 26:9
**punitive** [8] - 108:19, 109:24, 109:25, 200:24, 201:17, 244:4, 244:19, 246:4
**punitives** [7] - 201:4, 243:17, 243:23, 244:12, 244:25, 246:6, 246:24
**purchase** [25] - 6:24, 21:24, 27:22, 75:20, 75:23, 75:25, 95:2, 118:4, 123:7, 135:21, 136:5, 139:8, 159:1, 162:5, 168:2, 169:17, 173:22, 174:15, 174:16, 183:6, 183:7, 183:9, 185:11, 187:15, 188:2
**purchased** [1] - 66:16
**purchaser** [2] - 223:4, 223:19
**purchasers** [1] - 118:11
**purchasing** [2] - 157:7, 172:17
**pure** [1] - 39:19
**pureed** [1] - 40:4
**purpose** [11] - 24:21, 118:18, 140:13, 157:22, 158:3, 159:14, 159:23, 179:12, 192:6, 192:9
**purposes** [2] - 57:21, 243:17
**pursuing** [2] - 172:22, 173:25
**put** [57] - 8:3, 13:20, 18:7, 19:1, 19:9, 20:22, 39:11, 43:16, 52:15, 53:1, 64:13, 67:18, 68:24, 73:15, 79:24, 80:4, 82:16, 84:12, 84:25, 85:13, 87:12, 88:25, 92:23, 97:14, 104:11, 110:17, 115:20, 116:6, 116:25, 124:14, 124:20, 125:3, 125:13, 127:15, 134:5, 139:13, 141:6, 145:16, 160:21, 161:15, 161:16, 172:12, 183:10, 184:9,

188:20, 189:5, 189:16, 205:13, 205:15, 206:10, 207:20, 221:23, 225:6, 226:25, 234:13, 234:18, 241:24
**puts** [3] - 53:2, 100:1, 106:8
**putting** [5] - 39:12, 69:12, 70:25, 147:3, 225:9
**PVL** [4] - 38:6, 95:11, 95:12

## Q

**quest** [2] - 41:10, 42:3
**questioned** [1] - 190:16
**questioning** [1] - 186:7
**questions** [21] - 37:9, 42:13, 72:8, 96:8, 96:10, 104:19, 147:4, 151:5, 165:10, 169:15, 181:13, 186:14, 189:18, 190:19, 195:5, 195:24, 198:24, 227:13, 242:13, 242:24, 242:25
**quick** [3] - 196:18, 199:14, 208:23
**quicker** [2] - 220:4, 220:5
**quickly** [3] - 23:19, 76:16, 224:25
**quit** [1] - 83:6
**quite** [2] - 106:16, 159:17

## R

**racial** [1] - 201:20
**Rahul** [5] - 2:7, 26:14, 151:11, 235:3, 235:7
**RAHUL** [1] - 1:10
**raise** [4] - 29:3, 164:17, 200:12, 205:7
**raised** [2] - 27:19, 43:21
**Raley** [26] - 2:9, 2:10, 3:8, 3:12, 3:14, 26:13, 151:8, 152:10, 152:23, 153:7, 154:9, 157:2, 157:20, 163:5, 164:20, 166:2, 166:12, 166:19, 167:14, 169:24, 170:25, 173:3, 175:20, 177:4, 178:3, 198:10
**RALEY** [55] - 4:16, 4:19, 26:12, 79:13, 88:12, 95:21, 111:3, 111:5, 111:15, 111:23, 112:1, 112:22, 112:25, 113:2, 113:7, 152:8, 152:20, 156:25, 162:12, 162:14, 162:17, 162:20, 162:23, 163:1, 163:4, 164:23, 166:3, 166:7, 166:13, 166:18, 169:23, 173:1, 175:4, 175:9, 175:12, 175:14, 175:17, 175:19, 176:9, 176:16, 178:2, 179:22, 180:20, 181:6, 181:25, 182:3, 182:8,

182:10, 191:19, 198:18, 199:3, 201:19, 201:23, 202:11, 235:6
**range** [6] - 63:25, 79:10, 79:11, 96:14, 142:20, 192:22
**rare** [1] - 4:16
**rarely** [1] - 186:11
**rather** [3] - 45:24, 59:23, 62:10
**reach** [1] - 193:15
**reached** [4] - 40:8, 41:3, 194:2, 194:9
**reaching** [2] - 91:16, 142:21
**read** [53] - 67:9, 67:16, 75:6, 75:11, 75:16, 82:22, 82:23, 103:3, 110:24, 111:2, 111:17, 112:16, 112:21, 126:20, 128:5, 128:15, 130:15, 131:5, 144:10, 145:1, 150:25, 163:13, 163:14, 164:21, 165:17, 165:19, 173:10, 173:12, 173:15, 176:8, 177:8, 177:13, 177:15, 179:16, 179:25, 184:5, 185:1, 185:9, 192:23, 195:6, 196:5, 210:11, 211:25, 212:1, 213:11, 228:10, 228:11, 228:12, 242:20, 243:14, 246:14
**readable** [1] - 184:4
**reading** [3] - 173:17, 186:1, 198:24
**ready** [14] - 6:13, 28:25, 60:25, 65:5, 102:7, 130:4, 130:13, 131:7, 184:13, 188:5, 197:22, 241:16, 242:24, 246:22
**real** [17] - 9:9, 14:23, 23:5, 73:22, 88:14, 88:15, 137:6, 137:7, 137:14, 168:1, 169:5, 169:13, 169:21, 180:7, 180:8, 180:11, 196:18
**realize** [3] - 125:22, 158:6, 245:17
**realized** [1] - 99:19
**really** [23] - 11:25, 19:21, 21:2, 21:12, 24:13, 25:20, 40:18, 52:21, 53:19, 62:14, 66:6, 67:1, 67:6, 81:23, 83:13, 87:21, 96:24, 109:9, 114:16, 150:6, 156:19, 158:7, 158:22
**realty** [1] - 116:8
**rearraignment** [1] - 103:2
**reason** [7] - 10:15, 13:9, 81:22, 220:17, 221:19, 225:24, 242:17
**reasonable** [2] - 21:5, 70:1
**reasons** [6] - 14:20, 47:16, 99:15, 184:20, 205:13, 227:16
**rebuild** [1] - 49:10

**recap** [2] - 76:15, 76:17
**receive** [1] - 31:1
**received** [12] - 19:16, 30:1, 30:21, 30:22, 81:14, 82:1, 89:15, 127:13, 206:13, 230:18, 230:22, 237:15
**receives** [1] - 161:24
**receiving** [2] - 70:7, 237:13
**recess** [5] - 61:4, 102:9, 149:15, 200:10, 241:22
**reciprocate** [1] - 38:20
**recognize** [3] - 108:12, 234:22, 235:18
**recollection** [2] - 134:1, 173:2
**recommended** [1] - 19:19
**reconsider** [3] - 90:23, 91:8, 91:24
**record** [15] - 28:23, 67:16, 105:4, 132:18, 164:23, 166:3, 176:16, 182:14, 183:13, 185:1, 185:23, 186:2, 194:11, 216:18, 247:6
**records** [3] - 22:21, 136:24, 137:2
**Recross** [3] - 3:13, 3:14, 3:14
**RECROSS** [3] - 195:1, 196:16, 198:9
**Recross-Examination** [3] - 3:13, 3:14, 3:14
**RECROSS-EXAMINATION** [3] - 195:1, 196:16, 198:9
**red** [2] - 102:2, 105:11
**Redden** [1] - 2:2
**REDIRECT** [2] - 183:21, 198:22
**redirect** [1] - 131:24
**Redirect** [2] - 3:13, 3:15
**redone** [1] - 51:2
**reduce** [1] - 206:22
**reduced** [1] - 86:25
**redundant** [1] - 141:2
**reeling** [1] - 15:21
**reference** [2] - 134:19, 170:17, 192:7
**referencing** [1] - 71:24
**referred** [3] - 108:19, 109:2, 184:4
**referring** [4] - 68:18, 118:15, 141:17, 239:23
**refers** [3] - 110:12, 110:13, 128:22
**reflect** [1] - 176:17
**reflected** [1] - 181:19
**reflecting** [1] - 63:24
**refresh** [2] - 173:1, 234:13
**refreshed** [1] - 173:17
**refuse** [1] - 150:22
**regard** [2] - 122:6, 122:7
**regarding** [11] - 100:20, 133:8, 137:14, 178:17, 178:22, 179:13, 180:11,

207:14, 214:5, 214:19, 244:14
**regurgitating** [1] - 36:12
**reimbursed** [3] - 75:24, 126:24, 187:16
**rein** [1] - 200:2
**reiterate** [1] - 159:16
**rejected** [1] - 19:12
**relate** [1] - 165:10
**related** [4] - 75:20, 126:13, 126:16, 185:6
**relates** [1] - 165:13
**relationship** [3] - 57:2, 203:20, 217:2
**relative** [3] - 79:4, 105:6, 244:8
**relaxing** [1] - 106:4
**relevance** [3] - 182:19, 182:20, 183:3
**relevancy** [1] - 182:24
**relevant** [4] - 111:20, 131:23, 192:16
**relieved** [1] - 31:9
**relocate** [1] - 68:21
**reluctantly** [1] - 18:8
**rely** [1] - 157:13
**remain** [2] - 35:20, 68:17
**remainder** [3] - 52:6, 52:8, 164:21
**remaining** [1] - 47:25
**remember** [25] - 13:2, 81:22, 95:12, 100:15, 120:3, 126:13, 142:18, 148:15, 172:14, 185:4, 189:20, 190:21, 198:24, 210:25, 217:17, 219:11, 221:5, 222:22, 222:24, 231:21, 232:16, 232:24, 232:25, 233:4, 233:7
**Remington** [43] - 9:3, 9:14, 9:15, 28:16, 29:12, 29:17, 97:17, 107:18, 117:8, 122:20, 133:8, 134:24, 143:9, 151:25, 152:11, 153:1, 153:2, 153:5, 153:11, 153:18, 154:1, 154:12, 155:5, 157:7, 157:8, 157:15, 157:22, 158:25, 159:3, 159:22, 162:5, 166:22, 168:2, 169:18, 177:21, 178:18, 178:22, 180:12, 181:18, 203:14, 218:19, 233:23, 234:1
**remodeling** [1] - 119:8
**remove** [2] - 26:7, 140:6
**renovated** [2] - 46:18, 51:15
**renovating** [1] - 61:11
**renovation** [3] - 61:12, 61:14, 61:17
**repair** [1] - 40:12
**repeat** [4] - 167:7, 178:21, 223:6, 228:9
**repeating** [1] - 177:25

**rephrase** [4] - 167:13, 195:18, 220:22, 220:23
**replace** [1] - 157:10
**replaced** [2] - 156:2, 156:3
**replicate** [1] - 61:21
**report** [3] - 63:20, 65:17, 245:22
**reported** [1] - 2:24
**reporter** [8] - 28:22, 101:7, 152:22, 177:16, 193:1, 200:7
**Reporter** [1] - 2:12
**REPORTER'S** [1] - 247:4
**reports** [2] - 133:6, 147:12
**represent** [7] - 7:4, 23:12, 26:14, 75:13, 113:13, 113:20, 138:6
**representing** [1] - 140:20
**request** [7] - 111:23, 137:14, 149:3, 165:24, 166:14, 180:10
**require** [3] - 37:24, 238:3, 244:20
**required** [5] - 8:2, 169:7, 209:23, 243:5, 243:9
**requirement** [3] - 188:19, 208:8, 236:20
**requirements** [4] - 30:19, 30:23, 31:9, 192:15
**requires** [2] - 169:10, 246:19
**rerouted** [1] - 36:22
**rescheduled** [1] - 128:1
**research** [3] - 42:10, 42:17, 43:6
**Research** [1] - 57:14
**researches** [1] - 25:17
**reside** [2] - 29:11, 74:6
**resided** [1] - 157:14
**residence** [6] - 133:8, 143:1, 143:2, 143:8, 143:9, 155:15
**residents** [2] - 56:9, 56:16
**resolved** [3] - 99:21, 157:3, 246:5
**resources** [3] - 40:15, 51:24, 109:12
**respect** [15] - 24:3, 24:7, 24:18, 25:23, 28:18, 106:11, 108:1, 130:16, 138:13, 140:5, 186:22, 186:23, 186:24, 207:1, 246:4
**respective** [1] - 51:24
**respirator** [3] - 35:15, 37:5, 38:11
**responded** [1] - 90:3
**response** [13] - 22:7, 22:8, 35:18, 68:23, 68:25, 69:2, 69:3, 72:15, 89:25, 92:11, 96:2, 175:25, 195:23
**responses** [1] - 242:19
**responsibilities** [3] - 170:11, 170:14, 171:2
**responsibility** [1] - 43:10
**responsible** [1] - 169:11

rest [2] - 128:17, 152:14
restaurant [1] - 34:15
restore [2] - 19:7, 119:10
restored [1] - 20:8
restoring [1] - 18:2
restrict [1] - 41:6
result [6] - 6:22, 11:23, 26:2, 38:12, 49:2, 59:19
resume [2] - 60:25, 102:7
retract [1] - 42:1
Rett [1] - 43:25
return [2] - 28:19, 98:20
returned [1] - 94:15
reverse [1] - 67:22
reversible [1] - 246:17
review [9] - 133:12, 133:16, 148:2, 148:7, 195:3, 213:21, 214:7, 215:4, 236:19
reviewed [4] - 147:23, 214:1, 214:2
reviewing [1] - 215:7
revisit [1] - 61:10
revolves [1] - 8:9
Rice [5] - 55:12, 55:18, 58:11, 58:12, 59:1, 59:5, 60:5, 63:19, 63:21, 64:8, 66:4, 71:25, 72:1, 72:2, 78:5, 79:9, 117:24, 183:7
rights [9] - 7:5, 28:18, 100:21, 103:4, 170:11, 170:14, 171:2, 193:18, 194:15
Rights [1] - 15:5
rising [1] - 164:18
River [1] - 79:12
RN [1] - 235:19
road [3] - 5:25, 98:21, 99:1
Roberts [1] - 2:1
Robin [1] - 23:13
role [2] - 93:10, 147:10
roles [1] - 35:24
roof [1] - 122:19
room [22] - 17:17, 34:19, 45:10, 45:13, 45:14, 45:15, 45:16, 49:16, 49:18, 49:23, 50:15, 50:16, 50:17, 50:21, 50:24, 50:25, 122:12, 122:13, 160:16
rooms [1] - 122:14
rotten [1] - 13:8
roughly [1] - 120:22
round [1] - 214:6
rounded [1] - 161:8
routine [3] - 104:25, 105:22, 106:1
RPR [2] - 2:12, 247:9
rule [6] - 131:19, 165:18, 165:23, 245:18, 246:25, 247:1
Rule [2] - 135:23, 164:15
ruled [1] - 182:24
rules [3] - 115:3, 158:13, 158:21
Rules [1] - 6:9

ruling [3] - 22:12, 201:21, 242:14
run [3] - 8:25, 54:5, 224:25
running [2] - 8:21, 107:5
runs [1] - 218:10
rushed [1] - 94:21

## S

s/Bruce [1] - 247:9
sac [1] - 56:3
safe [1] - 31:11
sale [35] - 9:16, 13:11, 22:23, 64:2, 66:18, 66:21, 78:9, 79:6, 97:4, 116:8, 125:21, 126:21, 127:18, 133:8, 137:12, 140:21, 166:25, 167:16, 167:18, 175:1, 177:21, 180:9, 181:20, 183:6, 183:9, 188:20, 188:21, 189:5, 191:10, 214:5, 214:19, 217:3
Sale [1] - 10:20
sales [3] - 10:22, 78:8, 144:9
sat [1] - 213:21
Saturday [1] - 44:10
savant [1] - 41:20
saw [3] - 24:11, 26:17, 49:25, 64:21, 86:18, 119:3, 125:12, 135:1, 141:9, 153:25, 155:14
scenario [1] - 145:7
scenarios [1] - 172:20
schedule [1] - 104:25
scheduled [1] - 105:24
scheduled-out [1] - 105:24
Scholar [2] - 31:7, 31:8
scholarship [1] - 30:11
School [3] - 21:9, 31:19, 168:25
school [8] - 31:15, 31:17, 31:23, 32:7, 69:10, 106:1, 205:2, 205:3
schooling [1] - 122:12
scientific [1] - 33:22
scope [1] - 196:12
Scott [1] - 59:6
scratched [1] - 135:6
screaming [2] - 92:5, 92:6
screen [11] - 20:23, 49:13, 49:17, 67:19, 68:24, 82:16, 133:13, 207:20, 209:8, 234:13, 234:18
scroll [3] - 160:13, 179:7, 179:15
scrolling [1] - 160:22
scrubs [2] - 94:17, 94:18
seal [1] - 245:9
search [1] - 62:18
searching [2] - 99:24, 207:7
seat [3] - 4:25, 29:6, 200:15

seated [4] - 61:6, 102:12, 149:17, 200:11
Sechrest [1] - 2:2
second [19] - 27:17, 28:5, 30:12, 49:6, 49:7, 52:3, 66:21, 67:18, 110:7, 154:10, 164:14, 165:12, 175:14, 177:24, 180:5, 187:14, 188:17, 205:4, 223:7
seconds [1] - 180:23
secret [1] - 66:3
Section [1] - 243:3
section [6] - 46:15, 46:18, 49:25, 55:25, 161:7, 243:5
sections [1] - 243:9
security [5] - 9:11, 65:25, 66:10, 73:7, 101:23
sedated [1] - 35:4
see [97] - 5:12, 8:16, 10:11, 11:16, 11:19, 18:15, 24:25, 26:15, 26:21, 28:8, 28:21, 40:21, 44:20, 45:14, 49:16, 49:23, 50:8, 50:20, 50:24, 52:4, 52:14, 56:3, 56:5, 58:8, 58:12, 61:1, 68:1, 68:9, 71:23, 75:6, 75:8, 75:10, 82:17, 87:11, 87:22, 88:2, 88:7, 91:20, 94:2, 102:6, 102:7, 102:17, 103:12, 103:21, 104:11, 105:3, 105:6, 112:17, 113:3, 113:5, 115:2, 127:12, 129:12, 129:18, 131:3, 134:16, 149:8, 149:10, 149:14, 153:9, 160:18, 161:14, 161:19, 171:21, 176:5, 177:1, 179:8, 179:15, 182:24, 183:3, 185:6, 190:11, 190:17, 194:11, 197:6, 197:9, 199:19, 199:20, 200:9, 209:6, 210:6, 225:2, 235:8, 235:20, 236:4, 238:16, 238:20, 239:13, 240:13, 241:16, 241:19, 245:25, 246:19, 247:2
seeing [4] - 41:6, 59:19, 68:4
seeking [4] - 4:13, 95:2, 108:18, 114:20
seeks [2] - 137:12, 180:8
seem [6] - 75:12, 77:15, 124:14, 141:2, 242:17, 245:10
self [2] - 168:11, 203:3
self-employed [1] - 203:3
self-evident [1] - 168:11
sell [42] - 10:6, 10:9, 10:13, 10:22, 13:11, 14:9, 14:10, 14:18, 20:3, 20:6, 21:23, 25:5, 26:23, 27:13, 27:20, 27:21, 65:6, 68:21, 70:22, 93:15, 99:1, 106:15, 115:10, 115:12, 115:15, 115:25, 117:24, 124:24, 128:21,

132:2, 132:7, 134:23, 142:3, 150:12, 151:2, 167:5, 167:6, 167:9, 227:16, 227:21, 228:15, 235:3
seller [9] - 10:19, 70:7, 124:24, 128:12, 128:20, 128:22, 130:6, 184:15, 235:8
sellers [8] - 75:22, 75:25, 76:2, 185:12, 186:22, 187:16, 188:4, 235:2
selling [8] - 13:10, 24:15, 25:6, 68:1, 92:18, 204:11, 206:2, 208:21
send [3] - 59:8, 124:1, 132:20
sends [2] - 15:14, 44:13
sense [8] - 54:19, 54:20, 59:3, 85:8, 92:20, 108:3, 108:4, 233:10
sensory [1] - 160:18
sent [5] - 18:22, 67:24, 82:14, 171:19, 237:5
sentence [4] - 128:20, 131:6, 187:14, 188:2
sentenced [1] - 102:18
sentencing [6] - 5:19, 101:19, 102:13, 102:21, 103:8, 202:7
separate [7] - 117:20, 122:1, 122:5, 158:7, 158:22, 158:23, 242:2
September [3] - 61:14, 62:13, 178:24
serious [2] - 18:20, 19:11
service [3] - 5:8, 242:12
set [12] - 37:11, 46:21, 46:25, 47:10, 53:25, 63:17, 102:13, 122:22, 123:2, 123:4, 153:23
sets [3] - 38:14, 129:14, 132:20
settled [1] - 147:7
seven [2] - 10:5, 240:21
seven-million-dollar [1] - 240:21
several [14] - 18:2, 19:4, 21:14, 34:22, 37:23, 45:2, 57:10, 123:12, 137:22, 137:24, 142:25, 189:18, 204:17, 204:19
severe [1] - 7:11
severely [1] - 218:2
shade [2] - 177:2, 190:10
Shadowlawn [3] - 205:24, 206:8, 235:9
Shadyside [29] - 9:5, 55:24, 56:3, 58:8, 69:9, 71:6, 77:4, 77:5, 77:6, 77:9, 77:10, 78:8, 78:9, 78:10, 79:12, 144:10, 144:14, 144:16, 144:25, 145:3, 145:14, 145:22, 145:25, 158:13, 158:21, 205:21, 205:23, 206:5, 235:10

**shake** [1] - 109:10
**shaking** [1] - 105:12
**shareholders** [1] - 245:22
**sheet** [3] - 242:1, 242:2, 242:4
**Sherry** [10] - 10:6, 12:19, 18:1, 57:2, 57:13, 66:23, 69:20, 81:7, 113:21, 231:5
**Sherry's** [2] - 69:9, 78:24
**Sheryl** [3] - 2:2, 179:18, 235:2
**SHERYL** [1] - 1:6
**shirt** [1] - 105:11
**shoe** [1] - 8:11
**shoes** [1] - 12:16
**shops** [1] - 102:4
**shore** [1] - 21:9
**short** [6] - 38:7, 162:23, 178:19, 179:1, 195:3, 209:15
**short-term** [2] - 178:19, 179:1
**shortly** [2] - 83:10, 178:4
**show** [48] - 6:1, 8:22, 8:25, 9:2, 11:23, 12:2, 12:12, 14:1, 14:4, 14:8, 14:21, 15:4, 16:3, 16:9, 16:13, 16:14, 19:10, 21:2, 23:4, 23:15, 23:23, 23:25, 24:17, 25:4, 25:8, 25:24, 26:6, 49:12, 49:21, 55:13, 67:8, 109:21, 118:13, 183:24, 184:20, 184:24, 190:15, 192:2, 194:11, 207:22, 210:4, 210:16, 213:14, 223:10, 234:19, 241:24, 242:1
**showcase** [1] - 25:15
**showed** [7] - 86:7, 120:2, 131:7, 135:25, 183:24, 184:6, 212:10
**shower** [4] - 73:19, 73:21, 73:22, 219:10
**showing** [1] - 201:15
**shown** [2] - 127:1, 160:4
**shows** [3] - 118:4, 141:21, 183:7
**shut** [2] - 56:15, 105:14
**sick** [5] - 11:21, 34:2, 34:6, 81:23, 82:4
**side** [18] - 6:3, 6:7, 17:7, 50:18, 50:19, 65:23, 67:3, 101:5, 101:6, 103:7, 103:16, 103:25, 154:8, 183:2, 186:2, 205:20, 207:22, 207:25
**sides** [2] - 6:7, 94:25
**sidewalk** [1] - 104:17
**siding** [1] - 183:1
**sign** [2] - 10:19, 163:13
**signal** [2] - 44:13, 44:16
**signature** [5] - 134:13, 134:14, 135:5, 210:4, 210:8
**signatures** [1] - 210:7
**signed** [21] - 19:9, 21:19, 24:5, 27:6, 27:12, 98:1, 98:5, 98:8, 125:16, 126:1, 126:6,

133:20, 133:23, 134:12, 134:17, 169:21, 169:25, 209:25, 210:16, 213:16
**significance** [2] - 25:22, 51:15
**significant** [2] - 8:1, 43:13
**signing** [2] - 118:16, 210:11
**silly** [1] - 57:20
**simply** [1] - 167:9
**simultaneous** [1] - 165:15
**sincere** [4] - 183:11, 203:25, 233:8, 233:10
**sinister** [1] - 169:23
**sister** [1] - 35:9
**sit** [2] - 5:10, 215:17
**sits** [1] - 56:2
**sitting** [12] - 5:5, 25:22, 40:7, 44:15, 112:23, 113:3, 150:16, 163:18, 163:23, 164:3, 165:6, 242:10
**situation** [5] - 47:4, 85:11, 145:4, 209:22, 245:14
**six** [8] - 11:9, 27:24, 53:22, 54:6, 79:20, 175:1, 175:2, 232:21
**sixth** [2] - 243:6, 243:7
**size** [5] - 37:14, 51:24, 78:25, 168:16
**skilled** [1] - 199:22
**skip** [1] - 76:7
**SLAVIN** [2] - 247:5, 247:9
**Slavin** [2] - 2:12, 247:9
**sleep** [3] - 44:25, 45:1, 45:4, 122:19, 143:1, 143:5, 143:6, 143:7, 157:15, 159:8, 159:9, 159:16
**sleeping** [2] - 122:23, 143:4
**sleeps** [2] - 45:1, 107:8
**slide** [1] - 49:21
**slow** [2] - 70:18, 179:21
**smack** [1] - 43:23
**small** [2] - 36:25, 212:24
**smaller** [2] - 8:18, 106:16
**smart** [1] - 15:8
**smelled** [2] - 99:23, 110:16
**smells** [1] - 13:8
**so...** [3] - 47:9, 63:25, 70:1
**sold** [10] - 10:21, 13:6, 18:14, 20:24, 20:25, 25:16, 26:23, 28:13, 60:10, 78:12, 86:16, 125:2, 197:3, 203:6, 204:15, 212:16, 212:19
**solely** [1] - 43:7
**solicit** [3] - 238:11, 238:15, 238:18
**solicited** [4] - 222:5, 223:3, 223:18, 238:20
**solid** [1] - 111:21
**solution** [2] - 47:22, 108:1
**someone** [2] - 33:23, 46:18, 49:3, 49:5, 53:3, 81:18, 86:4, 90:1, 92:7, 92:10, 92:20, 103:2, 104:5, 106:19, 109:21, 125:3,

142:2, 185:8, 185:9, 189:11, 192:14, 228:16
**sometime** [3] - 142:23, 195:3, 231:19
**sometimes** [2] - 72:4, 202:19
**somewhat** [2] - 77:7, 192:18
**somewhere** [4] - 86:24, 208:1, 245:24, 246:17
**Sommers** [1] - 1:23
**son** [2] - 28:1, 204:16
**soon** [6] - 5:18, 5:20, 5:21, 45:17, 77:18, 242:8
**sorry** [18] - 30:5, 48:17, 55:16, 65:11, 79:13, 88:12, 105:9, 105:17, 131:17, 135:12, 175:16, 177:14, 182:24, 184:9, 194:1, 211:24, 222:7, 233:3
**sort** [7] - 7:1, 37:3, 58:23, 102:2, 158:9, 187:22, 246:13
**sorts** [1] - 141:7
**soul** [2] - 39:19, 40:24
**sounds** [3] - 210:3, 217:11, 234:17
**source** [1] - 100:25
**SOUTHERN** [1] - 1:1
**space** [9] - 65:3, 74:4, 107:10, 122:11, 154:16, 155:8, 155:9, 160:1, 219:8
**spaces** [1] - 53:21
**span** [2] - 48:6, 48:9
**spanks** [1] - 36:21
**spastic** [1] - 96:12
**speaker** [1] - 45:13
**speaking** [4] - 62:15, 101:3, 136:6, 193:24
**speaks** [1] - 111:8
**Special** [1] - 184:23
**special** [21] - 6:21, 6:22, 14:1, 14:2, 16:1, 16:21, 16:22, 19:13, 25:25, 32:9, 38:15, 42:11, 43:10, 47:18, 54:23, 75:16, 96:5, 109:7, 145:21, 185:2, 187:2
**specializes** [1] - 96:16
**specific** [2] - 128:25, 130:16, 137:12, 155:23, 180:8, 230:4, 230:8, 232:4
**specifically** [8] - 123:7, 126:23, 137:15, 164:1, 178:19, 179:1, 180:12, 217:17
**speculation** [1] - 195:16
**speed** [3] - 177:13, 199:23, 222:8
**spell** [1] - 41:18
**spend** [10] - 9:19, 25:14, 43:13, 47:1, 47:25, 51:25, 68:20, 142:12, 204:22, 205:3
**spent** [7] - 18:2, 107:22, 119:7, 119:23, 133:6, 139:22, 146:19

**spill** [1] - 244:7
**splendor** [1] - 119:24
**split** [1] - 191:21
**splitting** [2] - 69:11, 205:9
**spoken** [2] - 24:13, 172:15
**spot** [1] - 116:15
**spotted** [2] - 105:12, 105:13
**square** [15] - 43:22, 53:21, 78:15, 78:19, 78:24, 120:13, 120:15, 120:20, 152:11, 154:13, 154:19, 154:23, 155:4, 160:14, 161:4
**squeeze** [1] - 80:19
**St** [2] - 28:2, 151:12
**stabbing** [1] - 39:13
**Stablewood** [1] - 56:15
**stack** [1] - 180:23
**staff** [4] - 37:18, 53:22, 53:23, 123:4
**staffed** [1] - 107:6
**stairs** [2] - 13:22, 49:20
**stand** [3] - 10:1, 87:8, 147:3, 147:16, 152:24, 153:8, 161:17, 161:18, 192:14, 199:12, 241:15, 243:18, 246:14
**standard** [2] - 168:18, 187:5
**Stanley** [1] - 31:5
**start** [5] - 13:20, 36:23, 122:23, 129:25, 191:7
**started** [11] - 37:1, 40:8, 41:12, 41:24, 62:14, 64:11, 64:19, 66:10, 109:8, 121:13, 157:21
**starting** [3] - 121:17, 166:9, 176:7
**state** [20] - 136:3, 138:5, 144:8, 181:19, 181:23, 182:4, 182:6, 182:10, 182:12, 192:2, 192:5, 192:23, 201:7, 211:24, 226:3, 228:3, 241:10, 243:4, 243:8
**statement** [16] - 29:16, 31:11, 45:21, 86:8, 168:8, 174:13, 186:25, 205:9, 206:18, 209:4, 225:20, 228:4, 228:23, 228:25, 229:11, 232:19
**Statement** [4] - 3:5, 3:6, 3:7, 3:8
**statements** [2] - 5:24
**STATES** [1] - 1:1
**States** [3] - 109:6, 243:3, 243:8
**states** [1] - 243:7
**stating** [1] - 228:18
**statute** [2] - 169:9, 169:10
**stay** [5] - 22:17, 22:19, 32:4, 99:14, 202:5
**staying** [1] - 45:10
**steeples** [1] - 102:2

**stenography** [1] - 2:24
**step** [17] - 15:19, 48:22, 48:24, 48:25, 49:7, 49:12, 49:14, 50:5, 71:19, 86:3, 86:4, 98:16, 172:12, 172:16, 199:9
**step-down** [2] - 48:25
**step-downs** [5] - 48:22, 48:24, 49:7, 49:12, 49:14
**stepping** [1] - 96:20
**steps** [14] - 7:17, 39:9, 40:21, 48:24, 49:17, 49:19, 49:21, 49:23, 49:24, 50:2, 50:20, 52:5, 72:25
**Stewart** [2] - 78:14, 79:1
**sticks** [1] - 148:21
**still** [11] - 39:15, 87:2, 114:24, 140:23, 144:2, 155:18, 162:6, 194:11, 212:16, 233:24, 234:2
**stipulated** [1] - 7:12
**stipulation** [1] - 246:15
**stole** [1] - 65:21
**stomach** [2] - 37:13, 37:15
**stone** [1] - 8:11
**stone's** [1] - 55:20
**stop** [7] - 22:23, 28:12, 34:9, 49:11, 60:17, 84:6, 95:16
**stopped** [1] - 135:24
**stopping** [1] - 82:19
**store** [1] - 124:14
**stories** [3] - 5:15, 154:13
**story** [4] - 16:13, 16:21, 16:22, 104:23
**straight** [3] - 50:8, 240:13, 241:7
**strained** [1] - 34:5
**Street** [1] - 55:19
**street** [8] - 32:24, 58:13, 65:24, 102:1, 104:9, 104:16, 108:6, 154:8
**streets** [5] - 56:9, 56:12, 56:15, 56:16
**stretch** [2] - 44:18, 160:21
**stretched** [1] - 161:17
**strictly** [2] - 41:7, 200:5
**strike** [20] - 74:17, 85:25, 116:21, 149:10, 219:21, 220:9, 220:10, 220:11, 220:13, 220:14, 220:17, 221:3, 221:17, 221:19, 223:4, 223:19, 224:5, 224:9, 225:25, 227:4
**strikes** [1] - 149:8
**stroke** [3] - 38:8, 38:9
**struck** [1] - 47:19
**structure** [7] - 122:1, 122:5, 122:8, 143:7, 155:23, 159:12, 161:22
**structures** [3] - 17:24, 121:24, 121:25
**students** [1] - 28:2
**studied** [1] - 129:3

**study** [1] - 130:17
**stumbles** [1] - 7:18
**stupid** [2] - 80:17, 80:20
**style** [1] - 18:3
**styled** [1] - 179:18
**subdivision** [4] - 9:6, 56:14, 77:5, 205:21
**subdivisions** [1] - 9:6
**subject** [4] - 84:13, 157:25, 170:13, 171:7
**submit** [2] - 140:23, 188:14
**submitted** [5] - 4:13, 24:17, 116:22, 117:5, 244:4
**subparagraphs** [1] - 129:11
**subpoena** [1] - 192:22
**subsequent** [1] - 184:18
**substance** [1] - 124:4
**succeeded** [1] - 142:11
**successful** [1] - 21:7
**sue** [2] - 27:4, 100:4
**sued** [2] - 100:8, 243:25
**sues** [3] - 24:13, 24:19, 24:23
**suffered** [1] - 38:7
**suffers** [1] - 7:9
**suffice** [1] - 244:7
**sufficiency** [1] - 52:18
**sufficient** [2] - 23:8, 100:21
**sufficiently** [1] - 57:22
**suggest** [2] - 239:10, 243:24
**suggested** [2] - 36:5, 243:4
**suggesting** [3] - 124:23, 145:15, 145:23
**suggestion** [1] - 145:24
**suit** [6] - 12:7, 99:17, 100:20, 110:17, 110:18, 111:22
**suitable** [1] - 48:3
**Suite** [5] - 1:19, 2:2, 2:5, 2:8, 2:10
**sum** [2] - 124:4, 236:1
**summa** [1] - 31:4
**summation** [1] - 6:3
**summer** [4] - 31:23, 32:1, 33:20, 204:25
**summertime** [1] - 100:15
**Sunday** [1] - 11:20, 44:10, 81:17
**Sunset** [38] - 45:24, 55:8, 55:11, 55:14, 58:9, 58:10, 58:20, 63:7, 64:5, 65:13, 65:14, 65:23, 65:24, 66:17, 73:4, 104:13, 104:15, 107:15, 117:8, 120:24, 152:1, 152:15, 153:6, 153:9, 153:25, 154:8, 155:13, 155:15, 156:1, 156:13, 157:10, 162:7, 162:10, 181:12, 183:7, 196:19, 197:9
**support** [1] - 54:10
**supposed** [1] - 60:21
**surgeon** [1] - 96:4

**surprise** [2] - 67:4, 132:5
**surprised** [1] - 67:1
**surrounds** [1] - 55:22
**suspicion** [1] - 63:16
**sustain** [2] - 183:12, 187:7
**sustained** [15] - 6:4, 95:22, 135:19, 143:13, 157:19, 167:12, 170:24, 187:10, 187:25, 192:1, 195:17, 196:13, 214:12, 224:21
**swinging** [1] - 216:15
**sworn** [3] - 29:4, 200:13, 213:21
**SWORN** [2] - 29:5, 200:14
**sympathy** [3] - 16:23, 16:24, 109:8
**Syndrome** [1] - 43:25
**system** [3] - 45:12, 101:22, 102:4
**systems** [1] - 45:13

## T

**table** [3] - 40:7, 161:14, 161:15
**talks** [2] - 129:16, 129:17
**tall** [3] - 5:15, 154:13, 197:1
**tap** [1] - 39:23
**team** [3] - 38:15, 54:17, 62:21
**tear** [3] - 53:14, 59:17, 224:18
**TECHNICIAN** [2] - 207:24, 234:25
**telephone** [10] - 59:6, 72:11, 72:14, 81:14, 82:5, 89:15, 123:16, 124:10, 133:7, 136:10
**telephoned** [2] - 72:17, 77:23
**telephoning** [1] - 91:14
**ten** [3] - 40:20, 62:21, 200:9
**tended** [1] - 62:10
**tendency** [1] - 177:12
**tennis** [6] - 46:20, 58:16, 58:17, 79:2, 79:3
**tenor** [1] - 92:13
**tense** [2] - 44:14, 44:16
**term** [22] - 66:11, 96:6, 99:2, 107:25, 108:18, 121:10, 121:14, 121:17, 128:16, 128:17, 128:22, 130:8, 155:14, 157:8, 157:10, 158:4, 174:12, 178:19, 178:20, 179:1, 179:2, 196:9
**terminate** [1] - 135:2
**termination** [2] - 21:22, 135:5
**terms** [4] - 171:7, 171:9, 172:13, 175:2
**terrible** [1] - 10:9
**test** [3] - 38:19, 80:13,

80:21
**testament** [1] - 39:19
**testified** [10] - 88:13, 146:8, 147:17, 148:22, 155:18, 159:7, 163:8, 174:19, 196:19, 218:22
**testifies** [1] - 215:24
**testifying** [3] - 139:22, 197:25, 221:15
**testimony** [36] - 24:25, 101:2, 101:11, 106:25, 136:9, 138:17, 142:7, 142:10, 154:12, 159:18, 169:15, 169:19, 173:18, 177:19, 186:7, 190:3, 192:13, 192:14, 192:25, 210:23, 211:1, 213:22, 215:2, 215:4, 215:6, 215:11, 217:20, 221:6, 225:17, 232:14, 232:16, 232:23, 232:25, 233:4, 243:17, 244:13
**Texas** [34] - 2:4, 12:5, 12:7, 14:16, 18:17, 23:13, 23:14, 24:2, 38:5, 42:21, 43:4, 43:8, 43:14, 55:20, 75:14, 125:16, 138:8, 140:3, 140:13, 140:19, 140:25, 141:5, 141:10, 179:20, 179:24, 208:5, 212:18, 213:12, 213:17, 213:25, 214:8, 215:5, 217:14, 226:12
**TEXAS** [2] - 1:1, 1:7
**text** [1] - 83:4
**Thanksgiving** [1] - 34:17
**THE** [230] - 1:1, 1:1, 1:13, 4:3, 4:6, 4:9, 4:15, 4:18, 4:20, 4:22, 4:25, 6:18, 17:5, 17:11, 17:16, 22:4, 22:6, 22:14, 22:16, 22:19, 23:10, 26:11, 28:21, 28:24, 29:3, 29:5, 29:6, 50:2, 50:4, 50:6, 50:7, 50:8, 50:10, 50:11, 50:12, 50:13, 51:18, 51:20, 51:21, 60:16, 61:6, 64:5, 64:7, 64:8, 64:9, 64:10, 65:10, 75:1, 75:9, 79:15, 82:21, 82:23, 88:16, 94:17, 94:19, 95:22, 98:2, 98:4, 98:8, 98:11, 98:12, 98:23, 98:25, 100:16, 100:17, 101:17, 102:12, 102:24, 105:2, 105:9, 105:17, 110:2, 110:5, 110:7, 110:9, 110:23, 111:4, 111:12, 111:16, 111:25, 112:5, 112:7, 112:15, 112:19, 112:24, 113:1, 113:5, 113:8, 113:11, 113:18, 113:23, 113:24, 113:25, 126:16, 129:19, 129:21, 131:16, 131:19, 131:22, 135:13, 135:19, 136:1, 136:9, 136:11, 137:9, 137:11, 138:5, 142:8, 143:13, 143:19, 149:1,

149:10, 149:17, 149:20, 149:22, 149:25, 150:17, 150:21, 151:6, 152:6, 152:19, 153:4, 153:5, 153:17, 154:4, 154:5, 154:6, 154:7, 157:19, 158:2, 163:2, 164:14, 164:17, 164:20, 165:1, 165:4, 165:10, 165:12, 165:16, 166:5, 166:11, 166:16, 167:12, 167:22, 170:24, 171:6, 176:5, 176:8, 176:11, 177:1, 177:12, 177:14, 177:15, 177:24, 179:21, 181:8, 181:11, 181:22, 182:1, 182:7, 182:9, 182:13, 182:16, 182:18, 182:21, 183:12, 183:18, 183:20, 185:22, 186:5, 187:6, 187:10, 187:25, 188:24, 189:2, 190:9, 190:13, 191:13, 191:21, 192:1, 192:11, 193:21, 194:21, 195:17, 196:13, 198:20, 199:4, 199:6, 199:7, 199:9, 199:13, 199:15, 199:22, 200:11, 200:14, 200:15, 200:19, 200:21, 201:1, 201:5, 201:24, 202:4, 202:13, 202:17, 202:20, 211:22, 211:25, 214:12, 216:19, 219:25, 220:2, 220:3, 220:21, 221:11, 222:23, 223:7, 224:21, 225:18, 226:4, 227:14, 228:1, 228:10, 229:5, 240:20, 241:13, 241:19, 241:23, 246:3, 246:7, 246:11
   **themselves** [2] - 59:5, 109:20
   **theory** [5] - 60:7, 65:3, 125:2, 185:25, 243:20
   **therapies** [5] - 44:18, 62:8, 74:2, 106:2, 160:16
   **therapist** [2] - 40:6, 44:11
   **therapists** [10] - 38:16, 73:25, 74:3, 105:1, 106:3, 107:11, 109:15, 122:10, 124:2, 159:13
   **therapy** [11] - 38:14, 39:17, 44:22, 56:12, 122:3, 122:13, 155:10, 159:22, 161:13, 227:23, 228:7
   **there'd** [1] - 97:22
   **thereabouts** [1] - 102:17
   **thereafter** [1] - 94:9
   **therefore** [6] - 37:16, 99:21, 176:21, 183:11, 201:17, 209:12
   **thing's** [1] - 67:2
   **thinking** [7] - 66:10, 85:11, 87:6, 87:14, 88:22, 99:18, 206:2
   **third** [4] - 143:25, 154:15, 188:19, 215:22

   **Third** [1] - 201:15
   **third-party** [1] - 143:25
   **thirsty** [1] - 45:7
   **Thomas** [2] - 28:2, 151:12
   **thousand** [4] - 12:11, 12:20, 187:20, 229:17
   **thousand-dollar** [1] - 187:20
   **three** [25] - 5:15, 7:15, 23:21, 35:14, 38:21, 38:22, 39:3, 40:2, 41:24, 48:24, 49:19, 55:9, 57:24, 57:25, 60:1, 106:10, 123:14, 123:16, 129:10, 135:4, 150:6, 154:13, 168:25, 194:15, 204:22
   **three-day** [1] - 135:4
   **three-year** [2] - 38:21, 38:22
   **three-year-old** [3] - 7:15, 39:3, 106:10
   **thrive** [2] - 40:16, 47:12
   **throughout** [3] - 42:25, 45:13, 106:2
   **throw** [1] - 55:20
   **throwing** [1] - 245:16
   **Thursday** [1] - 102:25
   **tie** [1] - 105:11
   **timeline** [1] - 76:15
   **timing** [1] - 51:4
   **tired** [1] - 39:9
   **Title** [1] - 193:13
   **title** [6] - 112:10, 112:12, 118:12, 137:5, 180:7
   **today** [17] - 39:25, 40:10, 49:2, 53:6, 54:2, 89:7, 121:17, 136:9, 150:16, 163:10, 163:18, 163:23, 164:3, 165:6, 202:10, 242:22, 245:25
   **Together** [1] - 34:18
   **together** [7] - 32:18, 42:20, 57:5, 152:17, 153:6, 163:16, 207:3
   **tomorrow** [15] - 5:2, 82:5, 101:19, 102:14, 102:16, 103:8, 202:6, 202:9, 241:16, 242:7, 242:14, 242:15, 246:1, 246:23, 247:2
   **tonight** [3] - 202:5, 242:23, 243:14
   **Tony** [70] - 7:4, 7:5, 8:13, 9:17, 9:25, 10:4, 10:14, 11:3, 11:5, 11:8, 11:17, 11:21, 11:24, 12:23, 13:2, 13:8, 13:16, 13:18, 13:19, 13:24, 14:2, 15:7, 15:9, 15:12, 15:15, 15:21, 20:3, 21:7, 29:2, 29:9, 35:20, 37:6, 48:13, 69:7, 79:25, 83:5, 89:22, 92:11, 206:11, 206:12, 206:13, 207:3, 207:5, 207:10, 207:12, 208:11, 208:17, 208:19,

208:25, 212:16, 212:19, 214:18, 215:8, 215:17, 215:24, 216:8, 218:6, 218:18, 219:3, 219:20, 220:8, 227:17, 227:22, 228:6, 237:20, 238:8, 238:20, 240:2, 240:11, 240:16
   **Tony's** [1] - 15:25
   **took** [12] - 30:11, 30:23, 37:21, 41:2, 62:19, 79:6, 165:22, 175:2, 176:18, 195:8, 211:4
   **top** [5] - 25:25, 38:8, 82:17, 184:23, 235:1
   **topic** [1] - 150:7
   **tore** [2] - 17:21, 121:1
   **total** [2] - 17:5, 120:14
   **totally** [1] - 57:22
   **touch** [1] - 196:18
   **toured** [1] - 26:18
   **toward** [3] - 52:10, 99:8, 206:25
   **towards** [2] - 20:11, 20:12
   **town** [1] - 26:1
   **track** [1] - 58:11
   **tract** [1] - 58:12
   **traction** [2] - 161:16, 161:17
   **traffic** [2] - 56:13, 104:9
   **training** [2] - 105:22, 106:6
   **trample** [1] - 110:11
   **transaction** [9] - 15:4, 16:10, 71:25, 86:10, 125:10, 127:24, 187:1, 201:9, 231:11
   **transcript** [2] - 176:10, 247:6
   **transcription** [1] - 2:25
   **transfer** [1] - 114:21
   **transferred** [1] - 108:13
   **transition** [6] - 48:1, 54:22, 55:7, 107:7, 122:24, 123:3
   **Travis** [1] - 1:21
   **treadmill** [1] - 161:18
   **treated** [1] - 145:21
   **treating** [3] - 57:5, 68:9, 69:17
   **treatment** [2] - 48:11, 161:25
   **treatments** [1] - 34:22
   **treats** [1] - 77:9
   **TREC** [1] - 133:16
   **trial** [11] - 5:22, 146:13, 146:25, 147:1, 147:9, 192:11, 192:19, 192:25, 193:3, 245:7, 245:9
   **TRIAL** [1] - 1:13
   **trick** [4] - 57:5, 68:9, 69:17, 77:9
   **trick-or-treating** [3] - 57:5, 68:9, 69:17
   **trick-or-treats** [1] - 77:9
   **tricycle** [3] - 56:11, 104:11, 104:12

   **tried** [6] - 22:23, 33:18, 34:20, 82:11, 91:14, 91:15
   **trouble** [6] - 34:23, 34:24, 44:25, 72:21, 114:2, 226:4
   **true** [110] - 20:9, 34:11, 49:6, 67:2, 107:12, 107:13, 114:4, 115:22, 116:1, 116:9, 116:23, 126:20, 129:14, 131:12, 136:15, 147:5, 150:12, 157:21, 166:20, 166:24, 167:17, 167:25, 168:17, 168:25, 178:17, 178:24, 179:3, 190:23, 190:24, 198:11, 198:14, 203:12, 203:17, 203:23, 206:14, 206:18, 206:20, 209:10, 209:11, 210:2, 210:17, 210:22, 211:16, 211:17, 212:2, 212:9, 212:10, 213:12, 213:18, 213:19, 213:25, 214:20, 214:21, 214:23, 215:18, 215:20, 215:21, 216:12, 216:14, 217:5, 217:20, 220:18, 221:24, 221:25, 222:2, 222:15, 223:13, 223:16, 224:2, 224:3, 224:6, 224:14, 225:4, 225:5, 225:11, 226:10, 226:12, 229:14, 229:17, 229:18, 229:21, 230:3, 230:25, 231:1, 232:6, 232:7, 235:10, 235:11, 237:16, 237:17, 237:20, 237:22, 238:5, 238:6, 239:19, 239:25, 240:3, 240:4, 240:11, 240:12, 240:14, 240:17, 240:18, 240:19, 240:25, 241:1, 241:3, 241:4, 241:9, 246:7
   **trust** [2] - 63:2, 63:3
   **trusted** [1] - 59:10
   **trustees** [1] - 43:11
   **truth** [4] - 181:4, 211:1, 240:5, 240:7
   **try** [14] - 4:5, 33:16, 40:14, 43:3, 102:14, 138:11, 144:23, 148:19, 150:2, 157:13, 161:18, 184:3, 243:25, 246:9
   **trying** [11] - 70:18, 82:15, 87:15, 107:22, 109:17, 139:13, 147:15, 148:15, 148:21, 149:8, 159:16
   **tube** [2] - 37:12, 40:3
   **Tuesday** [2] - 83:2, 83:3
   **tunnel** [3] - 101:22, 102:4, 158:9
   **turn** [6] - 19:24, 113:25, 170:7, 179:6, 200:22, 240:14
   **turned** [12] - 19:3, 87:1, 96:19, 236:24, 237:1, 237:2, 239:18, 239:25, 240:9, 240:10, 240:19, 240:25

**Turner** [1] - 78:2
**turning** [4] - 219:10, 237:6, 237:9, 237:10
**turns** [1] - 94:6
**twice** [4] - 31:5, 47:19, 147:22, 218:12
**twins** [2] - 34:1, 34:3
**twisted** [1] - 44:20
**two** [58] - 5:15, 6:17, 7:14, 12:10, 12:20, 14:20, 15:11, 17:7, 21:8, 22:3, 22:25, 24:11, 24:12, 26:4, 26:16, 27:25, 28:15, 30:13, 47:8, 48:19, 56:8, 58:1, 58:4, 58:13, 62:4, 65:24, 70:5, 70:25, 72:8, 103:6, 103:22, 103:24, 104:16, 120:4, 121:21, 123:19, 124:24, 133:25, 138:20, 138:21, 150:10, 151:4, 158:7, 168:10, 169:20, 180:23, 193:5, 194:1, 196:18, 208:22, 215:9, 216:12, 219:11, 227:11, 227:13, 227:14, 229:9, 244:18
**two-day** [1] - 15:11
**two-family** [1] - 47:8
**two-minute** [2] - 6:17, 17:7
**two-way** [3] - 58:13, 65:24, 104:16
**TX** [7] - 1:19, 1:22, 1:24, 2:3, 2:6, 2:8, 2:11
**type** [4] - 54:24, 61:21, 84:21, 219:10
**types** [2] - 38:25, 73:23
**typical** [4] - 45:20, 47:4, 47:5, 84:10
**typically** [6] - 45:1, 45:19, 57:6, 68:13, 70:6, 128:19
**typing** [1] - 75:12

## U

**ultimately** [5] - 20:15, 20:18, 70:8, 118:20, 229:16
**umbrella** [1] - 7:8
**UN** [1] - 235:19
**unable** [1] - 7:15
**unavailable** [1] - 192:22
**unaware** [2] - 25:10, 25:11
**uncomfortable** [1] - 72:5
**under** [26] - 4:11, 4:14, 18:18, 101:6, 115:15, 122:19, 125:2, 135:23, 143:24, 145:4, 145:7, 163:8, 164:15, 175:24, 177:7, 184:11, 192:25, 201:20, 209:18, 209:19, 211:12, 212:15, 220:14, 228:14, 243:5, 243:9
**undergoes** [1] - 44:24
**undergraduate** [1] - 31:10
**underlined** [1] - 130:1

**understood** [7] - 68:19, 154:12, 155:7, 214:9, 219:12, 219:14, 219:17
**underway** [1] - 102:20
**Unfortunately** [1] - 47:19
**unique** [2] - 25:23, 56:7
**United** [3] - 109:6, 243:3, 243:8
**UNITED** [1] - 1:1
**universe** [1] - 124:5
**universities** [1] - 39:22
**university** [1] - 42:5
**University** [20] - 28:2, 29:25, 30:4, 55:12, 55:18, 58:11, 58:13, 59:1, 59:5, 60:5, 63:19, 64:8, 66:4, 72:1, 78:6, 79:10, 117:24, 151:13, 183:7
**University's** [1] - 63:22
**unjust** [3] - 110:13, 137:13, 180:10
**unless** [1] - 192:4
**unlimited** [1] - 127:15
**unnecessary** [1] - 57:23
**up** [127] - 4:2, 5:5, 5:9, 5:11, 6:10, 9:1, 9:14, 11:21, 12:21, 13:22, 17:5, 17:16, 20:23, 32:19, 33:3, 37:20, 39:9, 40:20, 43:5, 43:22, 44:3, 44:19, 45:6, 46:21, 46:25, 47:6, 47:10, 49:24, 52:8, 53:25, 55:19, 56:12, 57:7, 59:12, 60:4, 63:17, 64:2, 64:13, 64:25, 65:2, 65:17, 67:18, 68:13, 68:24, 70:7, 71:12, 72:19, 78:10, 79:19, 80:5, 82:16, 83:6, 83:12, 87:16, 88:5, 88:9, 91:19, 95:7, 97:14, 102:3, 105:3, 105:7, 105:25, 107:5, 108:21, 110:5, 110:25, 111:12, 112:16, 114:1, 122:17, 122:22, 123:2, 123:4, 125:13, 126:8, 129:19, 138:18, 139:10, 142:8, 142:10, 149:20, 152:6, 152:20, 153:3, 155:4, 160:5, 161:8, 161:18, 163:2, 163:3, 165:24, 166:5, 166:6, 176:3, 177:13, 178:16, 179:15, 181:9, 182:2, 183:4, 184:3, 185:7, 189:12, 199:23, 200:5, 200:8, 204:13, 204:21, 204:25, 205:4, 208:4, 208:6, 208:13, 216:21, 222:8, 233:11, 234:13, 234:19, 234:20, 241:8, 241:13, 245:9, 245:12, 246:18
**updated** [1] - 51:16
**upheld** [1] - 182:25
**uphold** [1] - 6:5
**upped** [1] - 11:24
**upper** [1] - 36:11

**upset** [9] - 13:9, 21:18, 21:25, 55:1, 55:3, 92:6, 135:20, 136:4, 225:13
**upstairs** [3] - 5:6, 5:15, 242:9
**urge** [1] - 109:1
**useable** [1] - 155:1
**uses** [2] - 130:8, 159:25
**Usha** [3] - 2:8, 26:14, 151:11, 235:3, 235:7
**USHA** [1] - 1:10
**Utah** [5] - 18:7, 68:17, 69:16, 204:14, 233:20

## V

**vacation** [2] - 68:19, 204:21
**value** [3] - 59:3, 63:23
**valued** [1] - 25:15
**values** [1] - 79:11
**valve** [1] - 36:11
**variety** [1] - 205:13
**various** [4] - 34:21, 106:2, 246:15
**vast** [1] - 109:12
**verbatim** [3] - 176:9, 188:3, 214:19
**verdict** [2] - 28:19, 244:1
**version** [1] - 134:11
**versus** [3] - 12:23, 148:5, 165:8
**viability** [1] - 7:25
**video** [3] - 192:24, 223:12
**VIDEO** [1] - 207:24
**view** [4] - 16:25, 50:20, 161:9, 224:4
**violate** [1] - 15:5
**violated** [2] - 16:25, 125:5
**violates** [1] - 22:2
**violation** [12] - 100:21, 193:17, 194:15, 201:4, 201:6, 201:8, 201:11, 201:12, 201:17, 243:10, 243:11, 243:12
**violations** [1] - 243:7
**virtually** [4] - 44:9, 45:5, 57:9, 237:12
**vis-à-vis** [2] - 141:11, 145:21
**visit** [1] - 46:24
**visited** [1] - 121:23
**visiting** [2] - 34:16, 106:3
**vitro** [2] - 33:21, 33:22
**voiding** [1] - 65:1
**VOLUME** [1] - 1:14
**volume** [1] - 175:5
**Volume** [1] - 175:9
**vs** [1] - 179:18

## W

**wait** [14] - 22:6, 162:17,

164:14, 165:12, 165:22, 175:6, 177:24, 198:11, 200:3, 214:4, 222:8, 223:7, 225:16
**waited** [1] - 178:7
**waive** [2] - 103:4, 183:16
**wakes** [2] - 11:21, 105:25
**waking** [1] - 45:6
**walk** [8] - 7:16, 38:13, 39:9, 53:8, 84:19, 161:19, 217:1, 219:10
**walk-in** [1] - 219:10
**Walker** [2] - 132:11, 132:13
**walker** [1] - 39:8
**walks** [1] - 98:20
**wall** [15] - 55:22, 56:5, 64:13, 64:16, 66:6, 154:4, 154:7, 156:3, 156:4, 156:5, 156:6, 156:12, 156:16, 196:20, 196:22
**wants** [11] - 5:3, 15:9, 15:25, 21:17, 28:16, 71:7, 169:10, 216:16, 220:24, 221:1, 226:9
**warning** [1] - 6:17
**ways** [3] - 7:16, 106:7, 244:18
**weak** [1] - 36:25
**wears** [2] - 39:8, 39:15
**website** [4] - 78:2, 141:18, 141:21, 141:23
**week** [6] - 34:5, 44:9, 72:16, 93:21, 102:15, 136:20
**weeks** [3] - 35:14, 204:23, 230:13
**weighed** [1] - 160:8
**weight** [2] - 186:3, 186:10
**welcome** [3] - 5:13, 5:16, 102:19
**well-known** [1] - 78:3
**Wesley** [1] - 2:9
**whatsoever** [2] - 27:11, 180:17
**wheelchair** [8] - 13:22, 49:3, 49:5, 52:21, 53:6, 53:7, 73:17, 73:20
**whereas** [1] - 78:15
**wherewithal** [1] - 235:21
**whichever** [1] - 98:19
**whole** [18] - 5:10, 37:11, 41:9, 42:5, 46:15, 49:9, 63:17, 102:4, 116:6, 124:4, 147:8, 147:13, 179:16, 181:16, 192:23, 192:24, 204:24, 244:3
**wide** [2] - 5:16, 16:11
**widen** [5] - 13:20, 73:16, 141:6, 219:4, 225:6
**widening** [2] - 219:5, 225:8
**wife** [29] - 13:15, 16:6, 17:18, 18:17, 21:23, 35:3, 35:25, 39:23, 42:21, 43:18, 45:4, 45:19, 46:4, 47:14, 54:5, 54:7, 55:2, 62:19,

97:18, 97:22, 106:11, 107:22, 109:11, 123:24, 151:21, 152:2, 156:24, 230:23, 235:21

**wife's** [2] - 46:23, 54:3

**WILLIAM** [1] - 200:14

**William** [1] - 203:1

**willing** [10] - 80:16, 94:3, 98:16, 130:5, 130:13, 131:7, 171:21, 172:11, 184:13

**window** [1] - 50:11

**wing** [8] - 46:14, 48:25, 49:1, 49:24, 52:10, 53:18, 120:10

**wings** [1] - 120:4

**wins** [1] - 244:22

**winter** [2] - 204:23, 204:24

**Wise** [1] - 59:6

**wish** [1] - 107:20

**wished** [1] - 20:17

**withdrawn** [1] - 111:11

**WITNESS** [21] - 50:4, 50:7, 50:10, 50:12, 51:20, 64:7, 64:9, 82:23, 94:19, 98:4, 98:11, 98:25, 100:17, 113:24, 153:5, 154:5, 154:7, 165:10, 177:14, 199:6, 220:2

**witness** [23] - 29:1, 88:13, 110:1, 110:21, 113:19, 138:4, 163:1, 165:22, 166:15, 180:20, 185:21, 186:16, 187:24, 192:13, 192:14, 192:22, 193:3, 194:20, 196:15, 197:23, 198:8, 198:19, 199:10

**witness's** [1] - 173:2

**witnesses** [2] - 147:3, 202:15

**woman's** [1] - 32:19

**womb** [1] - 36:17

**Women's** [1] - 37:21

**wonderful** [1] - 54:13

**wonderfulness** [1] - 148:12

**word** [13] - 36:10, 114:3, 114:9, 130:1, 148:16, 196:10, 208:13, 209:13, 218:25, 219:1, 227:7, 235:14

**words** [15] - 14:7, 41:13, 48:22, 92:3, 98:8, 98:15, 130:16, 141:5, 165:18, 170:15, 172:14, 180:16, 182:22, 185:24, 215:13

**workable** [1] - 245:10

**workmen** [1] - 65:8

**works** [3] - 15:15, 28:13, 182:10

**world** [5] - 21:10, 31:25, 41:9, 42:5, 100:3

**worry** [1] - 47:14

**worth** [7] - 79:4, 200:22, 244:6, 244:14, 244:21, 245:2, 245:21

**wrapped** [1] - 35:7

**write** [5] - 60:11, 76:11,

152:24, 190:19, 233:14

**writing** [18] - 19:1, 19:9, 19:23, 23:7, 24:18, 79:25, 88:25, 112:16, 116:22, 116:25, 124:9, 141:5, 169:12, 181:15, 183:10, 189:16, 215:12, 226:25

**written** [14] - 19:1, 21:20, 27:2, 59:8, 59:12, 89:5, 117:14, 148:5, 148:6, 148:7, 169:4, 169:17, 181:17, 188:14

**wrote** [1] - 173:19

**wrought** [1] - 197:3

## Y

**y'all** [1] - 197:22

**Yale** [11] - 21:8, 29:25, 30:1, 30:2, 30:9, 31:1, 31:7, 31:8, 32:17, 32:18, 124:13

**yard** [1] - 15:13

**Year** [1] - 190:23

**year** [24] - 7:15, 17:19, 32:4, 32:16, 38:3, 38:4, 38:21, 38:22, 39:3, 44:4, 57:10, 61:24, 66:16, 66:17, 69:11, 78:5, 100:16, 106:10, 181:24, 205:3, 234:2, 234:3, 242:9

**years** [37] - 5:9, 10:5, 18:2, 22:25, 28:15, 32:12, 33:18, 37:23, 38:1, 40:2, 40:3, 40:5, 40:7, 45:5, 45:9, 47:25, 51:8, 60:2, 61:14, 61:17, 62:4, 62:10, 99:6, 106:7, 107:22, 119:8, 123:3, 123:4, 142:25, 146:10, 146:19, 204:17, 204:19, 204:22, 205:2, 205:11, 242:11

**Yes"** [1] - 219:16

**yesterday** [2] - 7:7, 16:17

**York** [2] - 32:1, 32:12

**young** [4] - 27:11, 66:24, 67:3, 204:20

**yourself** [7] - 23:6, 44:8, 113:12, 115:4, 123:13, 208:5, 220:8

## Z

**ZIP** [1] - 180:13

**Zoghbi** [1] - 43:25